# Exhibit D

**MARCUS & HOFFMAN, P.C.**
**BY: ROBERT J. HOFFMAN, ESQUIRE**
Attorney Identification No. 68743
**BY: JAMES P. McEVILLY, III, ESQUIRE**
Attorney Identification No. 74072
326 West State Street
Media, PA  19063
(610) 565-4660
Attorneys for Plaintiff

---

### IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PA
### CIVIL ACTION - LAW

---

| | | |
|---|---|---|
| HAVERFORD RESERVE COMMUNITY | : | |
| ASSOCIATION | : | |
| Plaintiff | : | No.  2016-11177 |
| v. | : | |
| | : | |
| HAVERFORD RESERVE, LP | : | JURY TRIAL DEMANDED |
| HAVERFORD RESERVE GP, LLC | : | |
| THE GOLDENBERG GROUP, INC. | : | |
| GUIDI HOMES AT HAVERFORD RESERVE, LLC | : | |
| GUIDI HOMES, INC. | : | |
| Defendants | : | |

---

# NOTICE

---

You have been sued in Court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served by entering in writing with the Court your defenses or objections to the claims set forth against you herein.  You are warned that if you fail to do so, the case may proceed without you and a Judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

LAWYER'S REFERENCE SERVICE
DELAWARE COUNTY BAR ASSOCIATION
Front & Lemon Streets
Media, Pennsylvania 19063
(610) 566-6625

## AVISO

LE HAN DEMANDADO A USTED EN LA CORTE. SI USTED QUIERE DEFENDERSE DE ESTAS DEMANDAS EXPUESTAS EN LAS PAGINAS SIGUIENTES, USTED TIENE VEINTE (20) DIAS DE PLAZO AL PARTIR DE LA FECHA DE LA DEMANDA Y LA NOTIFICACION. HACE FALTA ASCENTAR UNA COMPARENCIA ESCRITA O EN PERSONA O CON UN ABOGADO Y ENTREGAR A LA CORTE EN FORMA ESCRITA SUS DEFENSAS O SUS OBJECIONES A LAS DEMANDAS EN CONTRA DE SU PERSONA. SEA AVISADO QUE SI USTED NO SE DEFIENDE, LA CORTE TOMARA, MEDIDAS Y PUEDE CONTINUAR LA DEMANDA EN CONTRA SUYA SIN PREVIO AVISO O NOTIFICACION. ADEMAS, LA CORTE PUEDE DECIDER A FAVOR DEL DEMANDANTE Y REQUIERE QUE USTED CUMPLA CON TODAS LAS PROVISIONES DE ESTA DEMANDA. USTED PUEDE PERDER DINERO O SUS PROPIEDADES U OTROS DERECHOS IMPORTANTES PARA USTED.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

LAWYER'S REFERENCE SERVICE
DELAWARE COUNTY BAR ASSOCIATION
Front & Lemon Streets
Media, Pennsylvania 19063
(610) 566-6625

**MARCUS & HOFFMAN, P.C.**
**BY: ROBERT J. HOFFMAN, ESQUIRE**
Attorney Identification No. 68743
**BY: JAMES P. McEVILLY, III, ESQUIRE**
Attorney Identification No. 74072
326 West State Street
Media, PA 19063
(610) 565-4660
Attorneys for Plaintiff

---

### IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PA
### CIVIL ACTION - LAW

---

| | | |
|---|---|---|
| HAVERFORD RESERVE COMMUNITY | : | |
| ASSOCIATION | : | |
| Plaintiff | : | No.  2016-11177 |
| v. | : | |
| | : | |
| HAVERFORD RESERVE, LP | : | JURY TRIAL DEMANDED |
| HAVERFORD RESERVE GP, LLC | : | |
| THE GOLDENBERG GROUP, INC. | : | |
| GUIDI HOMES AT HAVERFORD RESERVE, LLC | : | |
| GUIDI HOMES, INC. | : | |
| Defendants | : | |

---

### SECOND AMENDED COMPLAINT

---

Plaintiff, Haverford Reserve Community Association ("Association") by and through its undersigned counsel, hereby files this Second Amended Complaint (hereinafter referred to as "Second Amended Complaint") and in support thereof avers as follows:

### I.    BACKGROUND

1.    Haverford Reserve, the Carriage Homes ("Haverford Reserve" or "Community"), is a relatively new 100 home planned community in Haverford Township with stucco and stone-clad homes that were constructed from 2010-2019.

2.      Homes throughout the Community are currently beset with moisture intrusion issues and extensive damage behind the exterior cladding due to numerous construction defects from the tops of the chimney enclosures to the bottom of grade level stone veneer and stucco.

3.      The entire Community is currently in the midst of a multi-million dollar repair and remediation project funded by a bank construction loan and special assessments levied by the Association on homeowners in an effort to salvage the integrity, habitability and value of their homes.

4.      The remediation project commenced with the Association's general contractor on March 1, 2021, and the removal of stucco and stone veneer has revealed far more extensive moisture damage to the underlying building components in multiple homes than anticipated by the thorough invasive testing procedures performed by the Association's engineers and contractors.

5.      As a result, the expected cost of the approximately $10 million remediation project undertaken by the Association on March 1st, after a diligent bidding and negotiation process conducted by the Board of the Association and its advisers, has now quickly ballooned to the point that the cost is expected to far outstrip original estimates when the remediation project started.

6.      After engaging in a joint investigation with the Association's engineering representatives and developing repair protocols for numerous structural defects in homes throughout the Community in 2018 and 2019, Defendants abruptly reversed course in late 2019 and have since engaged in a campaign of delay, denial and obstruction in defiance of their obligations to the Community.

7.      Prior to the inception of this Action, the Association offered to enter into a tolling agreement with Defendants to avoid filing a legal action while still protecting any potential claims from being allegedly barred by the applicable statute of limitations while transition of control of

the Association from defendants' control to homeowner control took place, but the Association's overture was rebuffed.

8.    Consequently, on December 20, 2016, the Association filed and served a Praecipe for Writ of Summons in the above-referenced matter.

9.    The next day, on December 21, 2016, the Defendants forced the Association to file a Complaint by filing of a Rule requiring the filing of a Complaint within twenty days.

10.    Thus, on January 10, 2017, the Association filed its original Complaint at the direct behest and insistence of Defendants.

11.    Immediately thereafter, Defendants waged an aggressive attack on the Association, its volunteer Board members, and the Association's professional property management firm by refusing to grant customary extensions of time for discovery responses and documents to be collected by the Association, rapidly filing motions to compel discovery with little or no attempt to comply with the obligation to confer, service of subpoenas on all manner of third party representatives affiliated with the Association, and demands for the immediate depositions of all Board members and the Community property manager.

12.    In a blatant and bad faith effort to intimidate the Association and its Board to surrender any legal claims they had or may subsequently discover during the transition with due diligence, on January 19, 2017, Defendants filed an Answer with New Matter and Counterclaim against the Association.  In their Counterclaim, Defendants filed baseless claims for abuse of process, tortious interference with contract and tortious interference with prospective business relationships for a Complaint they essentially forced the Association to file at the time it did so.

13.     Defendants and their representatives have refused to withdraw the transparently abusive Counterclaim and have been placed on formal notice of the Association's Dragonetti claims against Defendants and their legal counsel.

## II.     PARTIES

14.     The Association incorporates all prior paragraphs as if fully set forth at length herein.

15.     Plaintiff, Haverford Reserve Community Association, a non-profit corporation, was created pursuant to the Pennsylvania Planned Community Act, 68 Pa. C.S.A. §§ 5101 *et seq.* (the "Act"), on June 28, 2010 ("Plaintiff," "Community," and/or "Association").

16.     Defendant, Haverford Reserve, LP, is a Pennsylvania Corporation having a business address of 350 Sentry Parkway, Building 630, Suite 300, Blue Bell, PA 19422.

17.     Defendant, Haverford Reserve GP, LLC, is a Pennsylvania Corporation having a business address of 350 Sentry Parkway, Building 630, Suite 300, Blue Bell, PA 19422.

18.     Defendant, The Goldenberg Group, Inc. is a Pennsylvania Corporation having a business address of 350 Sentry Parkway, Building 630, Suite 300, Blue Bell, PA 19422.

19.     Defendant, Guidi Homes at Haverford Reserve, LLC, is a Pennsylvania Corporation having a business address of 921 B N. Bethlehem Pike, P.O. Box 826, Spring House, PA 19477.

20.     Defendant, Guidi Homes, Inc., is a Pennsylvania Corporation having a business address of 925 Harvest Drive, Suite 220, Blue Bell, PA 19422.

21.     Defendants, Haverford Reserve, LP, Haverford Reserve GP, LLC, are hereinafter collectively referred to as the "Haverford entities."  The Haverford Entities are essentially shell companies used by the Builders in connection with the development, construction and sale of homes in the Community.

22.     Defendants, The Goldenberg Group, Inc., Guidi Homes at Haverford Reserve, LLC, and Guidi Homes, Inc., the Builders of the Community, are hereinafter collectively referred to as the "Builders."

23.     Defendants, Haverford entities and Builders, are hereinafter collectively referred to as the "Defendants."

### III.           JURISDICTION AND VENUE

24.     The Association incorporates all prior paragraphs as if fully set forth at length herein.

25.     The acts and omissions of Defendants, as described herein, occurred in Delaware County, Pennsylvania, and affected real property located in Delaware County, Pennsylvania.

26.     The Defendants routinely solicit and conduct business within the Commonwealth of Pennsylvania.

27.     The amount in controversy is greater than Fifty Thousand Dollars ($50,000.00).

28.     Pursuant to Pa.R.C.P. Sections 1006(a), 2130(a) and 2179(a), venue is proper in this Court.

## IV.          FACTUAL ALLEGATIONS

### A.          Background

29.     The Association incorporates all prior paragraphs as if fully set forth at length herein.

30.     All construction defects identified throughout this Complaint involve the Defendants' work on the Haverford Reserve which was performed, upon information and belief, solely by subcontractors hired by Defendants to do this work on their behalf, which work was performed negligently.

31.     This case involves Defendants' and/or Defendants' subcontractors failure to comply with applicable building codes, manufacturers specifications, construction plans, and established industry standards in Defendants' design and installation of structural elements of the Units constructed, marketed, and sold by them at the Haverford Reserve Community, including without limitation: exterior façade stucco, stone veneer and cement fiber siding (collectively "cladding"); weep screeds, weather resistant barriers beneath the cladding, and flashing for proper drainage of the moisture beneath Unit cladding; chimney caps, pans, and enclosures with weep screed; windows and flashing; cladding; roofs; deck ledger boards and flashing; entry stoops/porches; frieze board installation; and undersized gutters and downspouts.

32.     On or about June 29, 2010, Haverford Reserve, LP recorded a Declaration with the Recorder of Deeds, Delaware County, Pennsylvania.  (A true and correct copy of the Declaration is attached hereto as Exhibit "A" and is incorporated herein by reference.)

33.     The act of recording the Declaration created the Community commonly known as Haverford Reserve Community Association.

34.    The Association is a flexible planned community pursuant to the Act at Sections 5103, 5105, and 5206 *et seq.*

35.    Pursuant to the Public Offering Statement, in Section "I," the Community will have up to 150 single family dwellings. (A true and correct copy of the Public Offering Statement is attached hereto as Exhibit "B" and incorporated herein by reference.)

36.    The Association consists of all the unit owners within the Community.

37.    Most of the Units within the Association are currently owned by individuals who purchased their units from the Defendants primarily for personal, family, or household purposes.

38.    Haverford Reserve, LP is the Declarant of the Association as that term is defined in the Association's Governing Documents and the Act.

39.    The Builders and the Haverford Entities were all actively involved and interchangeably responsible for the creation, planning, development, construction and marketing of the Community and they are all jointly and severally responsible for the claims and damages alleged by the Association herein.

40.    Defendant, Haverford Reserve GP, LLC, is the general partner of Defendant, Haverford Reserve, LP, a limited partnership.

41.    Pursuant to 15 Pa.C.S.A. §8533, a general partner is liable for the debts and obligations of a limited partnership.  Accordingly, Defendant, Haverford Reserve GP, LLC, is jointly liable for the debts and obligations of Defendant, Haverford Reserve, LP, with respect to the Association.

42.    Upon information and belief, Defendants, Haverford Reserve, LP, Haverford Reserve GP, LLC, and The Goldenberg Group, Inc. shared common ownership, operated under unified administrative control, and have similar or supplementary business functions.

43.     Upon information and belief, at all relevant times, the Defendants intermingled their affairs with one another and otherwise failed to recognize clear distinctions among one another with respect to development and construction of the entire Community and the marketing and sale of the units therein.

44.     At all relevant times, the Defendants worked in concert and/or provided material support to one another with respect to the acts and omissions set forth in this lawsuit.

45.     Consequently, the Defendants effectively operated as one entity whose acts, omission, and shared leadership effectively makes the decision of one immediately applicable to the other.

46.     The Defendants and the Association are subject to the Act as well as the Governing Documents including the Public Offering Statement, Declaration and Bylaws.

47.     Pursuant to Section 5302 of the Act, the Association has the power to, *inter alia*, institute litigation in its own name on behalf of itself or two or more unit owners on matters affecting the Association.

### B.          Defendants' Control of the Association and Transition to Unit Owner Control

48.     The Association incorporates all prior paragraphs as fully set forth at length herein.

49.     Pursuant to Section 5303(a) of the Act, the Executive Board acts on behalf of the Association and stands in a fiduciary relation to the Association.

50.     As set forth in the Declaration in Section 3.2, the Declarant controlled the Board until the earliest to occur of (i) seven (7) years after the date of the Declaration or (ii) sixty (60) days from the date when 75% of Units have been conveyed by the Declarant. (Exhibit "A" at pg. 4).

51.     The Declaration was created by and/or at the direction of the Defendants.

52.     The Defendants controlled and dominated the Executive Board and the affairs of the Association from the recording of the Declaration on June 29, 2010 through the transition election on or about July 20, 2016.

53.     It was during this time period in which the Defendants controlled the Association through their employees on the Executive Board and stood in a fiduciary relationship to the Association and its members.

54.     As part of the process of transitioning from the Defendants' control of the Association to control by the unit owners, the Association began commissioning comprehensive reports and studies to evaluate the Defendants' design, construction, and operation of the Community.

55.     The structural defects as defined in the Act constitute deficiencies and nonconformities set forth in this Second Amended Complaint are both patent and latent in nature.

56.     The latent defects were not disclosed by the Defendants and/or required the services of skilled professional engineers to locate and identify in homes throughout the Community, including extensive hidden moisture damage behind the stucco and exterior cladding on homes in the Community.

57.     The Association provided information regarding certain structural defects to the Defendants well before the filing of this action to persuade them to conduct repairs discovered to be necessary as part of a joint investigation by the parties of construction defects and later as part of the Association's own investigation by its engineering experts.

58.     Despite numerous requests by the Association, and the discovery of structural defects and moisture damage of increasing severity, the Defendants have refused to address the structural defects, deficiencies and nonconformities identified by the Association promptly and fully.

59.     Pursuant to the Act, the Association is entitled to recover those funds it has expended and will continue to expend to investigate and remediate the defects and deficiencies described herein, and whatever else is necessary to address the acts and omissions of Defendants.

60.     Pursuant to the Act, the Association is entitled to recover any attorney's fees and court costs incurred in seeking redress against the Defendants for the acts and omissions described herein.

61.     Given the willful nature of the violations of the Act, and other conduct described in this Complaint by Defendants, the Association is entitled to punitive damages as provided for under the explicit terms of the Act.

62.     At all relevant times, the Defendants knew, or through the exercise of reasonable care, should have known about the existence of design and construction defects, deficiencies, and nonconformities contained in the homes they and/or their subcontractors built in the Community.

63.     Pursuant to Section 5411(b) of the Act, the Defendants are obligated to warrant against all defects in the Units, Controlled Facilities and Common Elements that are considered structural under the Act.

64.     Pursuant to Section 5103 of the Act, "structural defects" present in the Community refers to defects in any structure which is a component of (1) any unit or common element; or (2) any other portion of a unit or common element constructed, modified, altered or improved by or

on behalf of a declarant; any of which reduce the stability or safety of the structure below accepted standards and require repair, renovation, restoration or replacement.

65.     Additionally, pursuant to Section 5103 of the Act, Controlled Facilities fall under the ambit of areas in the Association protected by Section 5411(b) of the Act relating to Defendants' obligation to warrant against all structural defects in the Units, Controlled Facilities and Common Elements in the Community.

66.     Despite the exercise of reasonable diligence, the Association continues to discover the increasing number, nature and extent of all structural defects as defined in the Act, and other deficiencies and nonconformities in the Community.  Investigations into these structural defects as defined in the Act, and other deficiencies and nonconformities in the Community are ongoing as part of the Association's multi-million dollar Remediation Project to repair homes throughout the Community, and the Association reserves the right to supplement this pleading upon discovery of further latent and patent structural defects as defined in the Act, and other deficiencies and nonconformities in the Community, including the extent of hidden moisture damage beneath exterior stucco, stone veneer, and other cladding. These structural deficiencies caused by Defendants and/or their subcontractors have caused further extensive damage to the homes in the Community.

67.     The structural defects existing throughout all homes in the Community occurred in the Common Elements and Controlled Facilities of the Community.

### C.       Exterior Façade/Cladding Defects throughout the Community

68.      The Association incorporates all prior paragraphs as fully set forth at length herein.

69.      Many of the structural defects as defined in the Act, and other deficiencies and nonconformities discovered to date relate specifically to the exterior facade of the Units in the Community, including the stucco and stone veneer.

70.      These defects were latent in nature because they were hidden behind the exterior façade/cladding of the building and were not discovered until after the drafting and filing of the original Complaint in this matter.

71.      These structural defects are more fully described in multiple reports and correspondence prepared by dC Engineering, Inc. ("dCEI"), and the findings of these reports and letters are fully incorporated into this Second Amended Complaint as structural defects by reference.

72.      The reports and letters regarding the exterior façade/cladding issues, which have been provided to the Defendants in this matter (and incorporated into this Second Amended Complaint), include:

a.      Weep Screed Recommendations dated July 30, 2018 (attached hereto as Exhibit "C");

b.      Letter Report Regarding Moisture Probe Testing dated August 30, 2018 (attached hereto as Exhibit "D");

c.      Invasive Facade Inspection Summary dated October 10, 2018 attached hereto as Exhibit "E");

d.      Interim Facade Testing Report dated December 20, 2018 (attached hereto as Exhibit "F");

e.      Haverford Reserve Facade Investigation Testing and Repair Protocols Revision dated March 28, 2019 (attached hereto as Exhibit "G");

f.      Letter Report Regarding Windowsill Flashing dated April 16, 2019 (attached hereto as Exhibit "H");

g.      Letter Report Regarding 222 Valley Ridge Road Chimney Stucco Evaluation Report dated June 17, 2019 (attached hereto as Exhibit "I");

h.      Haverford Reserve Moisture Probe Testing (Twenty (20) Chimney Enclosures) dated December 2, 2019 (attached hereto as Exhibit "J"); and

i.      Deck Ledger Observations dated September 10, 2019 (attached hereto as Exhibit "K").

j.      Façade Related Defects Report dated September 28, 2020 (attached hereto as Exhibit "L").

### i.      Stone Veneer Foundation Weep Screed and Entry Stoops

73.     The exterior cladding of the Units at or adjacent to the entryways is comprised of a combination of stone veneer with transition points to stucco over weather protective barriers covering wood sheathing. The results of joint moisture testing by engineering firms retained separately on behalf of Plaintiff and Defendants revealed elevated moisture levels and active water intrusion behind the exterior cladding system, in violation of the warranty against structural defects in the Act. *See* Exhibit "D."

74.     The Defendants' work on the stone veneer foundation weep screed and entry stoops was performed solely by subcontractors hired by Defendants to do this work on their behalf, which work was performed negligently. Said negligent work has further damaged the underlying components of the Units in the Community.

75.     The exterior cladding system of the Units has been constructed in a manner that deviates from the applicable building codes, plans filed with Haverford Township and manufacturer's specifications, requiring full removal of stone veneer and stucco cladding, removal and replacement of stone pavers surrounding the entryways, and resulting in damage to the building components underlying the exterior cladding which require replacement.  *See* Exhibits "C" and "E."

76.     Exterior cladding systems of the type used throughout Haverford Reserve allow some rainwater and incidental moisture to pass through it.  The internal vapor barrier and  weep screed is part of the system that directs water to the exterior of the structure and prevents water from remaining trapped behind the cladding and causing the stone, building paper, wood and other components to deteriorate.  *See* Exhibit "C."

77.     Among the multiple problems with the installation of the exterior cladding systems at or adjacent to the Unit entryways, Defendants failed to properly install weep screed used to facilitate the drainage of moisture from behind the exterior cladding out the bottom of the façade or between transition points between stucco and stone veneer in the façade.  Instead, Defendants and/or their subcontractors negligently failed to install any weep screed or required flashing at the transition points between stucco and stone veneer, and buried foundation weep screed so that moisture is trapped behind the exterior cladding of the building system causing damage.  *See* Exhibit "E."

78.     Instead, Defendants and/or their subcontractors buried foundation weep screed installed at the bottom of the stone veneer below ground (at least 4"-6" below grade in many instances), despite building codes, plans filed with Haverford Township, manufacturer specifications and industry standards calling for foundation weep screed installation at no less than

4" <u>above</u> grade, effectively trapping moisture within the system and leading to deterioration of the building components. *See* Exhibit "F." Indeed, the design detail for the building plans filed by Defendants with Haverford Township show that foundation weep screed was supposed to be installed at a minimum of 2" above paving or 4" above grade. Instead, the as-built foundation weep screed in the Community is missing or buried from sight.

79. Moreover, Defendants admitted that they failed to install on the first four Units built in the Community continuous drainage mats behind the exterior cladding to facilitate the draining of moisture behind the façade cladding. Additional testing at other locations in the Community showed a lack of continuity in the drainage mats installed behind cladding on the Units. The predictable result of Defendants' and/or Defendants' subcontractors negligent and defective construction techniques is extensive water damage to the exterior façade components, stone pavers surrounding entryways, and the interior building components, materials, framing, and wood sheathing throughout the Community, as documented in detail by Plaintiff's engineers. *See* Exhibit "F."

80. As detailed above, despite filing foundation weep screed designs with Haverford Township regarding the Units, Defendants and/or their subcontractors disregarded their own filed design specifications and written reports from unit owners and buried foundation weep screen *below* grade or with less than two (2) inches minimum clearance to paving surfaces.

81. David Mercuris, an officer and Senior Vice President of The Goldenberg Group, parent company of the special purpose entities formed in connection with developing, constructing, and marketing Haverford Reserve, was the primary point of contact for handling the sale of new Units sold by Defendants in the Community. Indeed, the sales literature for Haverford Reserve used by Defendants, including videos and web materials, bore the name of "Goldenberg

Group," rather than the names of the special purpose entities formed for purposes of development, construction and marketing of the Community. The website for Haverford Reserve marketing the remaining Units for sale in the Community by Defendants identifies "The Goldenberg Group" as the builder. Accordingly, The Goldenberg Group did not observe corporate formalities in its dealings with third parties, including Unit purchasers, and commingled its affairs with the special purpose entities formed by it in connection with Haverford Reserve.

82.    Likewise, the sales literature for Haverford Reserve used by Defendants, including videos and web materials, bore the name of "Guidi Homes" rather than the names of the special purpose entities formed for purposes of development, construction and marketing of the Community. Moreover, the website for Haverford Reserve marketing the remaining Units for sale in the Community by Defendants identifies "Guidi Homes" as the builder. Accordingly, Guidi Homes did not observe corporate formalities in its dealings with third parties, including Unit purchasers, and commingled its affairs with the special purpose entities formed by it in connection with Haverford Reserve.

83.    The defectively and negligently installed entry stoops, cladding systems, and weep screed in the Units have led to failures in the structures of the Units resulting in water and moisture infiltration into the building components and causing extensive damage, the full extent of which is still being uncovered as part of the Remediation Project taking place in the Community.

  **ii. Defectively Installed Chimneys throughout Haverford Reserve**

84.    Investigation of construction defects at Haverford Reserve has also uncovered extensive problems likely common to all chimneys installed in the 100 Units throughout the Community. Moisture probe testing pursuant to an agreed protocol was conducted on twenty (20) exterior chimney enclosures within the Community by Defendants' engineering firm on October

18

31, 2019 and November 1, 19, and 20, 2019.  Nineteen (19) of the twenty (20) chimney enclosures tested yielded elevated moisture readings or were observed to have "soft" wood sheathing indicative of sustained elevated moisture levels.  *See* Exhibit "J."

85.    The Defendants' work on the defectively installed chimney caps and enclosures was performed solely by subcontractors hired by Defendants to do this work on their behalf, which work was performed negligently.

86.    This moisture probe testing of chimney enclosures followed invasive testing at two Units in the Community where inspections revealed manifold as-built construction defects in the chimney enclosures throughout the Community including the following:

     a.   the top surfaces of the chimney chase covers are not sloped to shed water;

     b.   projecting flanges are not provided at the chimney chase skirts;

     c.   the chimney chase seams and fasteners are improperly sealed;

     d.   there is insufficient overlap between chimney chase skirt and the stucco systems;

     e.   drainage mat is not provided behind the architectural trim feature at the top of the chimney enclosures;

     f.   drainage openings are not provided between the horizontal and vertical stucco surfaces;

     g.   there are excessive penetrations through the weather-resistive barrier;

     h.   there are areas of discontinuity of the weather-resistive barrier;

     i.   improper underlayment installed at chimney shoulder; and

     j.   the thermal envelope is discontinuous at the chimney enclosure.

*See* Exhibit "J."

87.     One of the root causes of the structural defects in the chimney enclosures leading to extensive damage from water intrusion is Defendants' and/or Defendants' subcontractors use of galvanized chimney covers fabricated onsite, rather than stainless steel chimney covers measured to fit and fabricated at the distributor/manufacturer facility, resulting in misalignment and leaking into and throughout the enclosure and  placing the entire chimney enclosure system in jeopardy of extensive damage.  In order to pocket a relatively marginal amount of money by using galvanized steel fabricated onsite to protect chimney enclosures on the Units (and dispensing with the time and effort necessary to measure, fabricate at the distributor/manufacturer facility and return to install), Defendants opted for a solution systemically prone to misalignment, leaking and corrosions.  Moreover, the useful life of galvanized steel for this application is a mere ten (10) to twelve (12) years, at most, whereas for stainless steel the useful life for a chimney cover application is thirty (30) years.  Doing so was directly contrary to Defendants' representations that the Units in Haverford Reserve were "low maintenance."

88.     As a result of these multiple defects in the design and construction of the chimney enclosures, one Unit had its entire stucco system removed from the enclosure revealing the building components to be saturated with extensive sheathing damage to the structure.  *See* Exhibit "I."  The damage from the construction defects allowing excessive moisture penetration at the top of the chimney enclosure was compounded by the absence or burial of required foundation weep screed which trapped moisture in the enclosure.

89.     The Remediation Project at Haverford Reserve started on March 1, 2021 reveals the extent of the damage caused by the defective chimney enclosures installed throughout the Community by Defendants.  Thus far, extensive and severe water damage to the wood sheathing and other building components beneath the cladding of the chimney enclosures confirms the likely

necessity many of the chimney enclosures will require a full "rip and strip" of the stucco enclosing the chimneys for an evaluation of water damage and replacement of all damaged building components and installation of weep screed.  *See* Exhibits "I" and "J."

90.   The defectively installed chimney caps, pans, and enclosures in the Units led to failures in the structures of the chimney enclosures, resulting in water and moisture infiltration into the building components and causing extensive damage.

91.   The full scope of remediating the defective chimney enclosures throughout the Community is estimated to cost several million dollars to fix as to this one category of defects alone.

### iii.    Deck Ledger Board Improperly Fastened to Units and Lacking Required Flashing

92.   The extensive chimney enclosure repair work recounted above required the removal of deck boards which exposed previously concealed portions of the installation of the deck ledger board and fastening of the decks to the Unit structure.  Examination of this facet of the Defendants' construction revealed to Plaintiff's engineers that the deck ledger board was attached directly to the "Hardie Board" or stucco siding of the Unit.  In some instances, this will permit gaps between the back side of the ledger board and the exterior face of the wall of the Unit, which does not allow the intended clamping action to occur and adequately secure the deck to the Unit structure.  *See* Exhibit "K."

93.   The Defendants' work on the defectively installed deck ledger boards, including without required flashing, was performed solely by subcontractors hired by Defendants to do this work on their behalf, which work was performed negligently.

94.     Defendants' and/or Defendants' subcontractors defective fastening of the deck ledger board directly to the Hardie Board system also permits water to become trapped between these two components and exposure of the Hardie Board siding to standing water and deterioration. For this reason, Hardie Board is not permitted for structural uses of this type and constitutes a safety hazard.  *See* Exhibit "K."  Furthermore, Defendants and/or Defendants' subcontractors did not correctly install required deck ledger flashing between the ledger board and the structure to direct moisture away from the Unit.  Consequently, moisture probe testing done in the cladding surrounding the removed deck ledger board on the Unit demonstrated elevated moisture levels within the structure at that location.

95.     During discussions between the parties about the deteriorating condition of the deck ledger board and surrounding cladding, Plaintiff's representatives learned that the defective construction techniques for attaching deck ledger boards to the Unit structures, and missing or incorrectly installed deck flashing, exist throughout the Community for all decks without screened porches installed by Defendants.  Defendants' admitted that the deck ledger board was attached directly to the cladding in this manner – rather than in the structurally sound and secure manner of attaching it directly to the frames of the Units – so that unit owners had more flexibility in specifying the size of the deck attached to their home during the home sale process.

96.     Due to this situation, Plaintiff is in the process of repairing as part of its Remediation Project all defective deck construction throughout the Community by implementing its engineer's recommended repair protocols including temporary shoring of the decks, removal of existing deck ledger boarding and Hardie Board siding above the finished deck surface and installation of new deck ledger board properly secured to the structure and installed with code-compliant deck ledger flashing.  Indeed, Plaintiffs are also in the process of remediating all

moisture related damage beneath the stucco or at prior points of attachments to the underlying building components.

### iv.    Façade Construction Defects

97.    The investigation by the Association's engineering firm continued to uncover multiple construction defects contributing to extensive moisture intrusion and damage to the homes in February and March 2020, as detailed in its report dated as of September 28, 2020, which defects were incorporated into the bidding specifications provided to bidding contractors on the Remediation Project.  Exhibit L.

98.    The Defendants' work on the various façade construction defects identified herein was performed solely by subcontractors hired by Defendants to do this work on their behalf, which work was performed negligently.

99.    The Defendants utilized improper construction techniques surrounding roof eaves as it relates to the placement and installation techniques for frieze boards throughout the Community.  In short, the as-built conditions of the frieze boards are significantly different from the approved design plans for construction in the Community because the as-built conditions prevent proper shedding of water over successive layers of materials due to defective installation techniques.  Exhibit L at 12.

100.    The approved design plans for the Community also provide details on construction at and around roof dormers installed by Defendants.  The as-built construction techniques deviate significantly from the approved design plans in that there is discontinuous stucco at dormer barge trim with the weather resistant barrier turned out and the entire installation creating another entry point for water into and throughout the façade elements of the homes.  Exhibit L at 12-13.

101.    Moreover, the sealant joints along the interfaces of dissimilar materials in the façade are either discontinuous or non-existent allowing water to readily infiltrate the wall system, including around gutter terminations and areas where Canamold window heads intersect with roof returns, allowing the wall system to become overwhelmed and resulting in failures and water intrusion.  Exhibit L at 13-14.

102.    The wall systems of many homes in the Community have discontinuous drainage planes where upper layers of weather resistant barrier do not overlap with lower levels of weather resistant barrier or there is insufficient overlap between consecutive weather resistant barriers or the barriers and the flashing layers.  Exhibit L at 14-17.

103.    The Association's engineers also identified numerous design and construction defects relating to the Pembrey Model home.  Essentially, the tall tower element of these roofs and channeling effects of the roof design direct large amounts of water against the tower elements. When combined with improper or missing flashing in these areas, moisture is able to penetrate from the roof area and infiltrate throughout the stone veneer and drainage plane of the wall system. Exhibit L at 18.

104.    Likewise, the faulty design and construction methods used for the Pembrey Model roofs is causing moisture penetration above the family rooms of these homes due to the funneling of water to this area, too.  Exhibit L at 19.

105.    Contrary to manufacturer specifications and installation instructions, Defendants and/or Defendants' subcontractors also improperly fastened exterior trim boards to many of the homes and improperly flashed the fiber cement siding installed beneath the trim boards, allowing for standing water and premature deterioration of these building components and reduced service life.  Exhibit L at 21-22.

106.   The cost to remediate the structural defects caused by moisture infiltration issues behind the exterior building envelope are currently estimated to be in the millions of dollars and growing as more extensive moisture damage than anticipated is uncovered during the Remediation Project as exterior cladding is removed from the homes.

107.   The defectively installed deck ledger boards on the Units led to failures in the structures of the Units, resulting in water and moisture infiltration into the building components and causing extensive damage, the full extent of which is being repaired as part of the Remediation Project.

108.   Despite this situation, Defendants did not at any time take action while they controlled and dominated the Board of Directors of the Association, nor did they take any action whatsoever to inform the Association of the defects, deficiencies, and non-conformities that they knew or should have known of once the Association was turned over to Unit Owner control as required by the Uniform Planned Community Act.

## D.  Remaining Structural Defects in the Community

109.   The Association incorporates all prior paragraphs as fully set forth at length herein.

110.   The remaining structural defects, as defined in the Act, and other deficiencies and nonconformities discovered to date, relate to non-cladding Common Elements and Controlled Facilities in the Community.

111.   The Defendants' work on the non-cladding Common Elements and Controlled Facilities in the Community was performed solely by subcontractors hired by Defendants to do this work on their behalf, which work was performed negligently.

112.   Like the cladding issues, many of these items were latent in nature as well.

113.    Multiple expert reports commissioned by Plaintiff have outlined the non-cladding/non-building envelope issues in the Community, including the following, which have been provided to Defendants:

a.   Linn Architects Roofing Analysis Carriage Homes Haverford Reserve dated June 14, 2017;

b.   dC Engineering Transition Inspection Report dated October 25, 2017; and

c.   Momenee, Inc. Drainage Evaluation Report dated December 18, 2018.

114.    Many of the structural defects as defined in the Act, and other structural deficiencies and nonconformities discovered to date and as outlined in the reports and letters above, which are incorporated herein by reference, are too voluminous to list without layering this Second Amended Complaint with excessive detail, include, without limitation, the following:

a.      poor drainage/wet yards between Units;

b.      driveway depressions, edge cracking and raveling;

c.      insulation at rim joists;

d.      improper attic ventilation systems;

e.      roof sheathing that is not fire retardant;

f.      deficient roof truss connections;

g.      missing PVC trim board fasteners to prevent connection failures;

h.      clearance of Hardie Board in the Community; and

i.      missing and/or improper window flashing;

115.    For the sake of brevity, all structural defects contained in the attached reports and letters in this section D. are not repeated in the above list, but all structural defects found to date

are referenced in the foregoing reports and letters which are incorporated herein by reference and known to Defendants.

116.    Additionally, many of the structural defects as defined in the Act, and other deficiencies and nonconformities discovered to date relate specifically to roof and gutter Controlled Facilities in the Community (as outlined and incorporated in this report in the various reports and letters to Defendants) and include, but are not limited to, the following:

a.      Water intrusion due to poor and inconsistent design and construction;

b.      Improper design of roof elements;

c.      Creation of trap points for eaves on roofs due to poor and inconsistent design and construction;

d.      Ice damming on roofs due to poor and inconsistent design and construction;

e.      Improper gutter performance due to poor and inconsistent design and construction;

f.      Undersized gutters and downspouts due to poor and inconsistent design and construction, requiring replacement of gutters and downspouts on the Units;

g.      Failure to record the precise location of all underground leaders.

h.      Deficient gutter endcaps and outlet tubes; and

i.      Incorrectly designed gutter slopes;

117.    In many instances while performing its obligations to design, construct, modify, alter, improve and/or repair the Units in the Community, which performance resulted in the structural defects, deficiencies, and non-conformities identified hereinabove, Defendants' work in the Community was performed on their behalf by various third-party contractors, subcontractors, consultants, agents, and/or professionals retained by Defendants to perform work.  These third

parties performed such work in a manner that was defective, deficient, and non-conforming with respect to, among other things, applicable building codes, plans, specifications, and standards.

118.    The construction defects, deficiencies and non-conformities in the Units throughout the Community identified in this Second Amended Complaint were caused by the work performed on Defendants' behalf by various third-party subcontractors.

119.    In other certain instances, work performed by employees and/or affiliates of Defendants was damaged by third-party contractors, subcontractors, consultants, agents, and/or professionals retained by Defendants to perform work on their behalf.   These third parties negligently performed such work in a manner that was defective, deficient, and non-conforming.

120.    Defendants' structurally defective construction as stated above herein has led to the failure of certain Units' cladding systems and building components, resulting in extensive damage to homes, compromise of structural integrity, impairment of Unit values within the Community, infiltration of water reaching behind water resistant barriers into interior building components, moisture penetration, and water entrapment in and through the Unit cladding system, leading to water damage to the Units.

121.    Defendants and their employees, agents, and affiliates consistently failed to comply with their warranty obligations under the Uniform Planned Community Act to deliver Units and Controlled Facilities free from structural defects in that Defendants' work (or work performed on their behalf by third parties) was not performed using modern methods and materials in accordance with applicable building codes, plans, specifications and standards.   As a result, the Units in the Community suffer from the extensive structural defects identified as set forth above herein.

122.    Based upon the conduct, representations, and assurances made by or on behalf of Defendants, Unit Owners and the Association reasonably relied upon Defendants' warranties and representations that the Units were constructed using modern methods and materials and in accordance with applicable building codes, plans, specifications, and standards.

123.    Due to the conduct and representations made by or on behalf of Defendants, Unit Owners and the Association reasonably believed that the Units designed and constructed by Defendants would be built in compliance with all applicable building codes, plans, specifications, and standards when Unit Owners agreed to purchase their Units from Defendants.

124.    Unit Owners who purchased Units with structural deficiencies, as identified above herein, were not cognizant of the numerous defects, deficiencies, and/or non-conformities in their Units at the time they purchased them from Defendants.

125.    Many, if not all, of the structural defects in the Units identified above herein are not readily apparent or noticeable to the Unit Owners, as the damage caused by such structural defects is often hidden and only discovered once cladding or exterior building components are removed (or subject to invasive and destructive inspection methods).

126.    Due to the nature of the structural defects in the Units as set forth above, Owners of the Units and the Association were not aware of the of the defects and damage for years after they purchased Units from Defendants.

127.    Defendants' and/or Defendants' subcontractors structurally defective construction of the Units has caused damages that require Plaintiff and Unit Owners to incur financial costs for investigations, inspections, and repairs, inability to re-sell their Units at full market value for comparable residential housing in the immediate area. At all times hereto, Defendants subcontractors are the agents of Defendants and Defendants are liable for the negligent actions

and/or inactions of said subcontractors.

### Count I –Violation of 68 Pa.C.S.A. §§ 5101 *et seq.*
### (Breach of Warranty, Failure to Complete and Restore)
### <u>The Association v. All Defendants</u>

128.   The Association incorporates all prior paragraphs as if fully set forth at length herein.

129.   The Defendants expressly and impliedly warranted to the Association and its members that the Association was, and would be, constructed in accordance with the building plans, Governing Documents and specifications, and the standards of construction in the Community as prescribed by, *inter alia*, the township codes and ordinances, and that the Community was otherwise constructed in a good and workmanlike manner.

130.   Pursuant to Section 5411(b) of the Act, the Defendants were obligated to warrant against all structural defects as defined in the Act in the Units, Controlled Facilities and Common Elements.

131.   The Defendants surrendered control of the Association to the Unit Owners, with knowledge of the existence of structural defects, deficiencies and nonconformities in the Units, Controlled Facilities and Common Elements.

132.   The structural defects, deficiencies, and nonconformities identified in detail throughout this pleading fall within the applicable warranty period and were not addressed or remedied by the Defendants during the Declarant control period despite the Association's demand that Defendants undertake repairs soon after their discovery.

133.   The nature of the structural defects, deficiencies and nonconformities in the Units, Controlled Facilities, and Common Elements, both those explicitly identified in the Complaint and present in the Community were such that they fall during the applicable warranty period and the

Declarant controlled Board did not enforce the Association's rights at that time.

134.    The Association is protected by the discovery rule and adverse domination doctrine for any and all omissions in pursuing its interests for structural defects, deficiencies, and nonconformities in the Units, Controlled Facilities and Common Elements.

135.    The Defendants knew, or through the exercise of reasonable diligence, should have known, of the existence of the structural defects, deficiencies, and nonconformities in the Units, Controlled Facilities and Common Elements at all relevant times herein.

136.    At all times relevant, the Defendants had a statutory and contractual duty to repair and remediate the structural defects, deficiencies, and nonconformities in the Community and failed to do so.

137.    Because the Executive Board of the Association was under the control of the Defendants during the period of Declarant control, the Association was not in a position to enforce its remedies until such time as the Unit Owners gained control of the Executive Board and had the time and opportunity to review and investigate these matters.

138.    Any alleged statute of limitations applicable to an action by the Association to enforce the statutory warranty created by Section 5411(b) or any other legal remedy was tolled during the period of Declarant control.

139.    Section 5113 of the Act, among other statutes and case law, imposed an obligation of good faith upon the Defendants in the performance of their contractual and statutory warranty obligations.

140.    At all times relevant, the Defendants willfully failed to perform their contractual and statutory warranty obligations in good faith.

141.    The Defendants' willful acts, omissions and violations as described herein, also constitute violations of Sections 5411 and 5414 of the Act.

142.    As a direct and proximate result of the foregoing willful acts and omissions, the Association and its members have sustained direct and consequential damages in an amount in excess of $50,000.00, which amount will be determined at trial.

143.    Pursuant to the Act, the Association is entitled to recover those funds it has expended and will expend to investigate and remediate the structural deficiencies described herein and whatever else is necessary to address the acts and omissions of the Defendants.

144.    The Defendants' acts and omissions constitute a knowing, willful and deliberate violation of the Act.

**WHEREFORE**, Plaintiff, Haverford Reserve Community Association, respectfully requests that this Honorable Court enter judgment in its favor against the Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00), plus statutory damages, punitive damages, attorneys' fees, interest and costs, together with such other relief as this Court deems appropriate.

### Count II – Violation of 68 Pa.C.S.A. §§ 5101 *et seq.* (Breach of Fiduciary Duty/Breach of Duty to Act in Good Faith)

### Plaintiff v. All Defendants

145.    Plaintiff incorporates all prior paragraphs as if fully set forth at length herein.

146.    At all times relevant, prior to July 20, 2016, the Defendants exercised control over the Community pursuant to Section 5303(c) of the Act and the Declaration.

147.    During the period of Declarant control, the Defendants exercised, through their control of the Executive Board of the Association, exclusive control over the affairs of the Association.

148.    During the period of Declarant control, the Defendants exercised the unlimited right to select, appoint, remove and replace a voting majority of the members of the Executive Board who managed the Association.

149.    By virtue of its right and ability during the Declarant Control period to appoint, remove, and replace a majority of the Association's Executive Board, the Defendants owed a fiduciary duty to appoint individuals to the Executive Board, and as officers of the Association, who were free of conflicts of interest and who would act only in the best interests of the Association.

150.    Sections 5303 and 5113 of the Act impose an obligation of good faith in the performance of every duty governed by the Act.

151.    Pursuant to Sections 5303 and 5113 of the Act, the Defendants had a statutory duty to act in good faith in the appointment of the members of the Association's Executive Board.

152.    Section 5303 of the Act specifically states that "the executive board shall stand in a fiduciary relation to the association and shall perform their duties…in good faith in a manner they reasonably believe to be in the best interests of the association; and with care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."

153.    The members of the Association's Executive Board selected and appointed by the Defendants during the period of Declarant control were also employees, principals or closely affiliated individuals with the Defendants.

154.    The Defendants appointed their own employees, principals, or closely affiliated individuals to serve on the Association's Executive Board because its employees, principals, and closely affiliated individuals would take direction from the Defendants and place the Defendants'

interests ahead of the Association's best interests.

155.    At all times relevant, during the period of Declarant control, the Declarant-appointed members of the Association's Executive Board were acting in the best interests of the Defendants.

156.    At all times relevant, during the period of Declarant control the Defendants had the ability to direct and control the actions of its employees, principals, or closely affiliated individuals serving on the Executive Board during the period of Declarant control.

157.    At all times relevant, during the period of Declarant control the Executive Board members affiliated to the Defendants were loyal to the interests of the Defendants.

158.    Because the Executive Board members appointed by the Defendants during the period of Declarant control were loyal to the interests of the Defendants and owed a fiduciary duty to the Association, the Defendants knowingly created a conflict of interest on the Executive Board.

159.    By knowingly creating a conflict of interest on the Executive Board, the Defendants negligently, willfully and/or recklessly breached their fiduciary duty and statutory duty to act in good faith pursuant to Sections 5303 and 5113 of the Act.

160.    The Defendants and the Declarant-appointed officers and members of the Association's Executive Board further breached the fiduciary duty and/or statutory duty of good faith owed to the Association by, without limitation:

        a.    Failing to detect, recognize and respond to the construction defects, deficiencies and nonconformities outlined in this Second Amended Complaint;

        b.    Failing to properly maintain, repair and replace the Common Elements as required by Section 5307 of the Act and the Declaration;

    c.      Failing to disclose the existence of the Joint Management Agreement in the Public Offering Statement or Declaration;

    d.      Failing to provide the full budget for maintenance items in the Public Offering Statement; and

    e.      Failing to disclose the budgeting and expense responsibilities of all entities with respect to the Association.

161.    As a direct and proximate result of the foregoing described conduct, the Association and its members have sustained direct and consequential damages in an amount in excess of $50,000.00, which amount will be determined at trial.

162.    The foregoing described conduct of the Defendants, its employees and appointed members of the Association's Executive Board also amounted to knowing, deliberate and willful violations of Sections 5303and 5113 of the Act.

163.    Section 5412 of the Act creates a general cause of action in favor of the Association when a Declarant violates the Act, the Declaration or By-Laws of the Community.

164.    Section 5412 of the Act provides a legal basis for a breach of fiduciary duty/breach of duty to act in good faith claim against the Defendants.

165.    Section 5412 of the Act also permits the Association to recover punitive damages as a result of the above described willful violation of Sections 5303 and 5113 of the Act by the Defendants.

**WHEREFORE**, Plaintiff, Haverford Reserve Community Association, respectfully requests that this Honorable Court enter judgment in its favor against the Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00), plus statutory damages, punitive damages, attorneys' fees, interest and costs, together with such other relief as this Court deems appropriate.

**Count III- Breach of Covenant**

**The Association v. All Defendants**

166.    Plaintiff incorporates all prior paragraphs as if fully set forth at length herein.

167.    By virtue of the Governing Documents including the Declaration, Plan, By-Laws, advertising materials used to market the Community and the Public Offering Statement, the Defendants agreed and covenanted with the Unit Owners as well as the Association that it would install and complete the Units, Controlled Facilities, and Common Elements in accordance with the Governing Documents, including the Declaration and Plan, free from defects and deficiencies.

168.    The Governing Documents, including the Declaration, Plan, By-Laws, advertising materials used to market the Community and the Public Offering Statement, created a covenant between the parties for the Declarant to install and complete the Units, Controlled Facilities and Common Elements in accordance with the Governing Documents, including the Declaration and Plan, free from defects and deficiencies.

169.    The Defendants breached their explicit promises within the Governing Documents including the Declaration, Plan, By-Laws, advertising materials used to market the Community and the Public Offering Statement by not fulfilling their promises.

170.    The Plaintiff suffered financial damage as a result of the breach of covenant.

171.    The Defendants knowingly, deliberately and willfully failed to construct, install and complete the Units and Common Elements in accordance with the Declaration and Plan, free from defects and deficiencies.

172.    Section 5113 of the Act imposed an obligation of good faith upon the Defendants to construct, install and complete the Units and Common Elements all in accordance with the Declaration and Plan and free from defects and deficiencies.

173.    As a direct and proximate result of the foregoing acts and omissions, the Association has sustained direct and consequential damages in an amount in excess of $50,000.00, which amount will be determined at trial.

174.    The Defendants' conduct constituted a deliberate and willful violation of the Act and covenants contained in the Declaration.

**WHEREFORE**, Plaintiff, Haverford Reserve Community Association, respectfully requests that this Honorable Court enter judgment in its favor against the Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00), plus statutory damages, punitive damages, attorneys' fees, interest and costs, together with such other relief as this Court deems appropriate.

### Count IV – Negligent Construction

### The Association v. All Defendants

175.    Plaintiff incorporates all prior paragraphs as if fully set forth at length herein.

176.    At all times relevant hereto, the Defendants owed a duty to the Association and its members, independent of and supplemental to any contractual or statutory duties, to exercise such reasonable care, technical skill and ability and diligence as are ordinarily required of builders and contractors. The Defendants were careless and negligent in the performance of their duties in connection with the building and construction of the Community by failing to exercise such reasonable care, technical skill, ability and diligence as are ordinarily required of builders, contractors and developers in the course of building and constructing the Community.

177.    Examples of the Defendants' failure to meet the requisite standards of care are set forth in this Second Amended Complaint and the Association is diligently investigating additional latent and patent instances of the same.

178.   As a direct and proximate result of the foregoing acts and omissions, the Association and its members have sustained direct and consequential damages in an amount in excess of $50,000.00, which amount will be determined at trial.

**WHEREFORE**, Plaintiff, Haverford Reserve Community Association, respectfully request that this Honorable Court enter judgment in its favor against all Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00), plus interest and costs, together with such other relief as this Court deems appropriate.

### Count V - Negligent Supervision

### <u>Plaintiff v. All Defendants</u>

179.   Plaintiff incorporates each of the foregoing paragraphs of this Complaint as though the same were fully set forth at length herein.

180.   Pursuant to Section 5302(a)(4) of the Act, the Association is permitted to institute litigation in its own name on behalf of itself or two (2) or more Unit Owners on matters affecting the Community.

181.   At all times relevant hereto, Defendants, and their agents, as declarant(s), builder(s), developers, general contractors, designers, architects and construction managers, owed a duty to the Association and its members, independent of and supplemental to any contractual duties, to exercise such reasonable care, technical skill and ability, and diligence as are ordinarily required of builders, developers, general contractors, designers, architects, and construction managers in the course of hiring contractors, subcontractors, and suppliers and in supervising and inspecting the work and materials provided to the Community by contractors, subcontractors and suppliers.

182.   Defendants were careless and negligent in the performance of their duties in connection with the hiring of contractors, subcontractors and suppliers, and in their supervision and inspection of the work and materials provided to the Association, by failing to exercise such reasonable care, technical skill and ability, and diligence as are ordinarily required of developers, general contractors, designers, architects, and construction managers in the course of supervising and inspecting the construction of the Community for the protection of persons, including the Association, and its members, who foreseeably, and with reasonable certainty, might be injured by Defendants' failure to do so, resulting in the defects and deficiencies set forth in this Second Amended Complaint, and any other defects or deficiencies, known or unknown, at this time.

183.   Defendants' carelessness and negligence is clearly evidenced in multiple instances of the Defendants' awareness of construction defects and either changing construction techniques and not fixing prior structurally deficient work or being aware of structurally deficient work and continuing to build more Units in a structurally deficient manner notwithstanding this knowledge.

184.   Defendants were careless and negligent by hiring architects, construction managers, designers, contractors and subcontractors who lacked the requisite technical skill and ability and diligence as are ordinarily required of architects, contractors, subcontractors, designers, architects and construction managers.

185.   As a direct and proximate result of Defendants' acts and omissions, including their willful violations of the Act, significant harm has and will result to the Unit Owners and the Association, as the Association has been and will be compelled to expend Association funds to remedy the defects and deficiencies and the costs of such expenditures shall be borne by the Unit Owners in the form of increased Association assessments; the amount of such damages is expected to greatly exceed $50,000.00.

**WHEREFORE,** Plaintiff, Haverford Reserve Community Association, respectfully requests that this Honorable Court enter judgment in its favor against the Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00), plus statutory damages, attorneys' fees, interest and costs, together with such other relief as this Court deems appropriate.

**Count VI - Violation of the Pennsylvania**
**Unfair Trade Practices and Consumer Protection Law**

**<u>Plaintiff v. All Defendants</u>**

186.     Plaintiff incorporates each of the foregoing paragraphs of this Complaint as though the same were fully set forth at length herein.

187.     Pursuant to Section 5302(a)(4) of the Act, the Association is permitted to institute litigation in its own name on behalf of itself or two (2) or more Unit Owners on matters affecting the Association.

188.     Pursuant to Section 5411 of the Act, the Defendants represented and warranted to the Association that all the Common Elements and Controlled Facilities in the Community would be free from defects.

189.     The Association brings this statutory claim, both on its own behalf and on behalf of the Unit Owners who purchased the Units and is therefore a "purchaser" for the purposes of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201, et seq. ("UTPCPL").

190.     The Association, as a representative of the Unit Owners who have purchased Units for personal, family and household use, is a person under the UTPCPL and, therefore, is within the class of persons protected by the UTPCPL.

191.    Moreover, the defects and deficiencies outlined in this Second Amended Complaint exist within and affect the Common Elements and Controlled Facilities of the Association, and the Association, not the individual Unit Owners, has the responsibility to maintain those Common Element areas.

192.    The Unit Owners of the Association who purchased Units from the Defendants purchased those units primarily for personal, family or household purposes and, pursuant to Section 5302(a)(4) of the Act, the Association may institute litigation not only on its own behalf, but also in a representative capacity on behalf of its Unit Owner members in regard to matters which affect the Community.

193.    Defendants, as sellers of the Units, are subject to the UTPCPL.

194.    Defendants and their agents, by their acts and omissions as set forth have materially violated the following, *inter alia*, provisions of the UTPCPL:

a.  Section 201-2(4)(v) – Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have…;

b.  Section 201-2(4)(vii) – Representing that goods or services are of a standard, quality or grade...;

c.  Section 201-2(4)(xiv) – Advertising goods or services with the intent not to sell them as advertised;

d.  Section 201-2(4)(xvi) – Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing; and

e. Section 201-2(4)(xxi) – Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

195. At all times material hereto, and specifically prior to the Unit Owners' purchase of the Units, Defendants and their agents made express and/or implied representations to the Unit Owners that the Association was reasonably fit for its intended purpose, was free of defects and deficiencies, was built in a workmanlike manner, that the Community buildings, improvements, Common Elements and Limited Common Elements were constructed in accordance with the Plan and specifications for the Community and all applicable building codes and standards.

196. As set forth in this Second Amended Complaint, these representations were false and were made by Defendants with knowledge of their falsity or, at least, with reckless disregard as to whether they were true or false and for the purpose of misleading the Unit Owners into purchasing their Units.

197. The Unit Owners justifiably relied upon these representations when they made their decisions to purchase the Units.

198. Furthermore, upon information and belief, Defendants and their agents have made additional misrepresentations to the Unit Owners and the Association concerning the quality of construction of the Association and the Units, concerning the cause of various defects and deficiencies, along with other material misrepresentations, further evidence of which may be obtained during discovery.

199.    As a direct and proximate result of the Unit Owners' reliance on Defendants' representations and Defendants' violations of the UTPCPL , as set forth above, the Association has been and will be compelled to expend Association funds to investigate and remedy the defects and deficiencies and the costs of such expenditures shall be borne by the Unit Owners in the form of increased  assessments, resulting in significant harm to the Association and its Unit Owner members; the amount of such damages is expected to greatly exceed $50,000.00.

200.    Pursuant to Section 201-9.2(a), the Association is entitled to treble damages and attorneys' fees as a result of Defendants' violations of the UTPCPL.

**WHEREFORE**, Plaintiff, Haverford Reserve Community Association, respectfully requests that this Honorable Court enter judgment in its favor against the defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00), plus statutory damages, treble damages, attorneys' fees, interest and costs, together with such other relief as this Court deems appropriate.

## Count VII – Negligent Misrepresentation

### Plaintiff v. All Defendants

201.    Plaintiff incorporates each of the foregoing paragraphs of this Complaint as though the same were fully set forth at length herein.

202.    Defendants all participated in making misrepresentations of material facts by assuring the homeowners in the Community that their homes were built in compliance with all applicable codes, designs, plans and specifications despite knowing that homes throughout the Community were riddled with serious construction design and installation defects which were causing hidden moisture damage throughout the Community.

203.    Defendants were either aware for years, or failed to reasonably investigate, during the period of Declarant control and thereafter that their statements seeking to falsely assure residents of the quality of their homes were false, and that construction defects and shoddy construction techniques utilized by Defendants during the construction of homes in the Community rendered them structurally defective and suffering from steadily increasing moisture penetration and damage.

204.    Defendants intended for the Association and its members to rely on their false statements and assurances regarding the lack of construction defects in their homes.

205.    Members in the Association justifiably relied on Defendants' misrepresentations and false statements about the lack of hidden construction defects and moisture damage in the homes.

206.    Defendants owed a duty to the members of the Association at the time they made false statements regarding the lack of construction defects in their homes.

**WHEREFORE**, Plaintiff, Haverford Reserve Community Association, respectfully requests that this Honorable Court enter judgment in its favor against the defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00), plus statutory damages, treble damages, attorneys' fees, interest and costs, together with such other relief as this Court deems appropriate.

### Count VIII - Punitive Damages

### Plaintiff v. All Defendants

207.    Plaintiff incorporates each of the foregoing paragraphs of this Complaint as though the same were fully set forth at length herein.

208.     Pursuant to Section 5302(a)(4) of the Act, the Association is permitted to institute litigation in its own name on behalf of itself or two (2) or more Unit Owners on matters affecting the Community.

209.     Pursuant to Section 5412 of the Act if a declarant or any other person subject to the Act violates any provision of this subpart or any provisions of the declaration or bylaws, any person or class of persons adversely affected by the violation has a claim for appropriate relief.  Punitive damages may be awarded in the case of a willful violation of the Act.

210.     For the sake of clarity, pursuant to Section 5412 of the Act, Defendants' conduct is not required to be proven intentional, wanton, or reckless in order for the Association to be entitled to punitive damages for violation of any subpart of the Act.  Instead, as specified by the statutory language of the Act, Defendants need only be shown to have committed a "willful violation" of the Act in derogation of the Association's rights thereunder.

211.     The Defendant's conduct was willful with respect to the defects and deficiencies in the Community when, after being informed of the defects in the roof and gutter systems, the Defendants did not promptly investigate and remediate all affected roofs.

212.     The Defendants' conduct was willful and/or reckless when the Defendants, with full knowledge of their actions, surrendered control of the Association to the Unit Owners, with defects and deficiencies in the Units and Common Elements as outlined throughout this Second Amended Complaint.

213.     The Defendants' conduct was willful and/or reckless when the Defendants refused to fulfill their good faith obligation to construct, install, and complete the Units and Common Elements all in accordance with the Declaration and Plan and free from defects and deficiencies pursuant to Section 5411 of the Act and as outlined throughout this Second Amended Complaint.

214.     The Defendants' conduct was willful and/or reckless when the Defendants failed to perform its duties in connection with the building and construction of the Community by failing to exercise such reasonable care, technical skill, ability and diligence as are ordinarily required of builders, contractors and developers in the course of building and constructing the Community and as outlined throughout this Second Amended Complaint.

215.     The Defendants' conduct was willful and/or reckless when the Defendants participated in UTPCPL violations when breaching their covenant with the Association and failing to properly construct the Common Elements and Common Facilities as outlined throughout this Second Amended Complaint.

216.     The Defendants' conduct was willful and/or reckless when the Defendants failed to exercise such reasonable care, technical skill and ability, and diligence as are ordinarily required of developers, general contractors, designers, architects and construction managers in the course of supervising and inspecting the construction of the Community for the protection of persons, including the Association, and its members, who foreseeably, and with reasonable certainty, might be injured by Defendants' failure to do so, resulting in the defects and deficiencies set forth above and in this Second Amended Complaint, and any other defects or deficiencies, known or unknown, at this time as outlined throughout this Second Amended Complaint.

217.     The Defendants willfully and/or recklessly violated the Act and the Governing Documents based on the above described conduct.

218.     Punitive damages are therefore applicable to all counts.

**WHEREFORE,** Plaintiff, Haverford Reserve Community Association, respectfully requests that this Honorable Court enter judgment in its favor against the Defendants in an amount in excess of Fifty Thousand Dollars ($50,000.00), plus statutory damages, attorneys' fees, interest and costs, together with such other relief as this Court deems appropriate.

**RESPECTFULLY SUBMITTED,**

**MARCUS & HOFFMAN, P.C.**

Date: April 12, 2021

ROBERT J. HOFFMAN, ESQUIRE
JAMES P. McEVILLY, III, ESQUIRE
*Attorneys for the Plaintiff*

## **VERIFICATION**

I, Robert Brown, hereby state that I the President of the Board of Directors of the Haverford Reserve Community Association, and am authorized to make this verification on its behalf.  I hereby verify that the statements set forth in the foregoing Second Amended Complaint are true and correct to the best of my knowledge, information and belief.  I further understand that this statement is made subject to penalties of 18 PA. C.S. Section 4904 relating to unsworn falsification to authorities.

_____

Name: Robert Brown
Title:  President
On Behalf of:
Haverford Reserve Community Association

# EXHIBIT "A"

Prepared by:

Simi Kaplin Baer, Esquire
Kaplin Stewart Meloff Reiter & Stein, P.C.
P. O. Box 3037
910 Harvest Drive
Blue Bell, PA   19422

Return to:

Simi Kaplin Baer, Esquire
Kaplin Stewart Meloff Reiter & Stein, P.C.
P. O. Box 3037
910 Harvest Drive
Blue Bell, PA   19422

Folio No. 22-04-00503-04

---

## DECLARATION OF PLANNED COMMUNITY

## HAVERFORD RESERVE, THE CARRIAGE HOMES,
## A PLANNED COMMUNITY
Haverford Township
Delaware County
Commonwealth of Pennsylvania

1

RECORDER OF DEEDS
DELAWARE CO. PA.

10 JUN 29  AM 8: 45

06/24/2010

## DECLARATION OF HAVERFORD RESERVE, THE CARRIAGE HOMES, A PLANNED COMMUNITY

THIS DECLARATION OF HAVERFORD RESERVE, THE CARRIAGE HOMES, a planned community ("**Declaration**") made this _28th_ day of _June_, 2010, by **HAVERFORD RESERVE, L.P.**, a Pennsylvania limited partnership ("**Declarant**").

### ARTICLE I
### THE PROPERTY

1.1.     The Property.  Declarant is the owner of an approximately twenty-eight and seven one hundredths (28.07) acre parcel of the real estate located near the intersection of Darby and Parkview Roads in Haverford Township ("**Township**"), Delaware County, Pennsylvania, which is described on **Exhibit "A"** attached hereto and made a part hereof ("**Property**"), a portion of which is more fully described on **Exhibit "A-1"** attached hereto and made a part hereof ("**Convertible Real Estate**").

### ARTICLE II
### SUBMISSION OF THE PROPERTY

2.1.     Submission of the Property.  Declarant hereby submits the Property and all easements, rights and appurtenances belonging thereto to the provisions of the Pennsylvania Uniform Planned Community Act, Act No. 1996-180, 68 Pa. Cons.Stat. § 5101 et. seq., as amended ("**Act**") which Act is hereby incorporated by reference and hereby creates a planned community ("**Community**").

2.2.     The Community.  The Community which shall be established on the Property shall be known as Haverford Reserve, The Carriage Homes, a Planned Community.

2.3.     Easements and Licenses.  The Property is submitted under and subject to the matters of record listed on **Exhibit "B"** attached hereto and made a part hereof, only to the extent such matters continue to affect the Property and the easements listed in Article IX in perpetuity.

2.4.     Provisions of the Act.  The provisions of the Act shall apply to and control the operation and governance of the Community and the Association except to the extent that contrary provisions not prohibited by the Act are contained in one or more of this Declaration, the Plans or the By-Laws.

2

## ARTICLE III
## INTERPRETATION/DEFINITIONS

3.1.    Interpretation of Declaration and By-Laws.  In the event of a conflict of interpretation between the provisions set forth in the By-Laws and this Declaration, this Declaration shall govern, except to the extent this Declaration is inconsistent with applicable law. In the event that the Internal Revenue Code is hereafter amended or changed, this Declaration and By-Laws shall be interpreted as to conform to the provisions of the Internal Revenue Code with respect to non-profit entities, it being the intention to preserve the lawful status of the Association as a bona fide non-profit entity.

3.2.    Definitions.  The following terms when used in this Declaration and in the By-Laws of the Association have the meanings set forth in this Section 3.2:

(a)    "**Architectural Review Committee**" means the committee created pursuant to Article XII hereof.

(b)    "**Assessments**" means those assessments or sums payable to the Association by the Owners of the Units in the Community from time to time as provided herein or in the Act.

(c)    "**Association**" means Haverford Reserve Community Association, a Pennsylvania nonprofit corporation, organized on a nonstock basis, the Members of which are the Owners and the Declarant.

(d)    "**Board**" means the Board of Directors of the Association.

(e)    "**By-Laws**" and "**Articles**" mean the By-laws and the Articles of Incorporation of the Association, which have been or shall be adopted by the Board, as amended from time to time.

(f)    "**Common Elements**" means the Common Facilities and the Controlled Facilities.

(g)    "**Common Expenses**" means and includes expenses for which the Owners are liable, subject to the terms of this Declaration, including, but not limited to:

(i)    Expenses of administration, maintenance, repair and replacement of the Common Facilities and Controlled Facilities;

(ii)    Expenses or liabilities agreed upon as common by the members of the Association;

3

(iii)    Expenditures made or liabilities incurred by or on behalf of the Association, together with any allocations to reserves; and

(iv)    All other expenses or charges levied or to be levied pursuant to this Declaration or the By-Laws against the Owners.

(h)    **"Common Facilities"** means and includes all of those portions of the Property which are or shall be owned by or leased to Association (other than the Units) including, but not limited to the following, as may be amended from time to time:  all real estate not included within the title line of any Unit and any improvements on such real estate; the Stormwater Management System; until accepted for dedication by the Township or the Radnor Haverford Marple Municipal Authority ("**RHMMA**"), the Sanitary Sewer System, streets, curbs, rights-of-way and sidewalks as depicted on the Plan; open space and walking trails, and entrance gates and guard houses (to the extent constructed).

(i)    **"Common Receipts"** means and includes the funds collected from the Owners as Assessments and receipts designated as common by the provisions of this Declaration of Covenants and the By-Laws.

(j)    **"Controlled Facilities"** means and includes any portion of the Community that is not a Common Facility and is regulated, maintained, improved, repaired, replaced, managed, insured or controlled by the Association.  The Controlled Facilities include the Units but only to the extent: (i) maintained by the Association as provided in Section 5.10; (ii) regulated by the use restrictions in Article XI hereof; or (iii) subject to those easements as set forth in Article IX hereof.

(k)    **"Convertible Real Estate"** shall have the meaning ascribed in the Act and for purposes of the Community shall consist of the real property described on Exhibit "A-1", attached hereto and made a part hereof ("**Convertible Real Estate**").

(l)    **"Declarant Control Period"** means the period of time from the date of the first conveyance of a Unit to a person other than the Declarant until the earliest of the following to occur: (i) seven (7) years; (ii) sixty (60) days after conveyance of seventy-five percent (75%) of the Units which may be created from the Declarant to a person other than the Declarant; (iii) two (2) years after the Declarant has ceased to offer Units for sale in the ordinary course of business; and (iv) two (2) years after the Declarant last exercised any right to add new Units.

(m)    **"Director"** means a member of the Board.

(n)    **"Dwelling"** means single family attached residential building, including wood decks or patios attached to the rear of such Dwelling, constructed on a Unit.

4

(o)    **"Garage Spaces"** shall mean a single garage space located in the freestanding garage buildings shown in the Plan.  The Garage Spaces shall be limited common elements allocated and maintained in accordance with this Declaration.

(p)    **"Limited Common Expense"** shall have the meaning set forth in the Act.

(q)    **"Limited Charge"** means Association costs which are excluded from the budget (and monthly fees) and will be charged directly to the one or more Owners who receive the benefit.

(r)    **"Limit Common Facility"** means any real estate that is allocated by this Declaration for the exclusive use of one or more, but fewer than all Units.

(s)    **"Member"** means each Owner and the Declarant for so long as the Declarant owns or reserves the right to build any Unit in the Property.

(t)    **"Owner"** means a person or entity who is a record owner of a fee or undivided fee interest in a Unit subject to the Declaration, but excluding (i) those persons or entities who hold an interest merely as security for the performance of an obligation and (ii) the Declarant.  Multiple owners of a Unit shall together be deemed one Owner for the purposes of this Declaration.

(u)    **"Permitted Mortgage"** means a first mortgage from an Owner to (i) the Declarant; (ii) the seller of a Unit; (iii) a bank, trust company, savings bank, savings and loan association, mortgage service company, insurance company, credit union, pension fund, real estate investment trust or similar institutional investor or lender; and (iv) any other mortgage approved by the Board.

(v)    **"Permitted Mortgagee"** means the holder of a Permitted Mortgage.

(w)    **"Person"** means a natural individual, corporation, partnership, association, trust or other legal entity or any combination thereof.

(x)    **"Plan"** refers to the Plan for Haverford Reserve, entitled "Declaration Plat, Carriage Homes at Haverford Reserve, a Planned Community" dated May 19, 2010, prepared by Chester Valley Engineers, a copy of which is attached to this Declaration as **Exhibit "C"**.

(y)    **"Project"** means the development and improvement of the Property in accordance with the Plan, as may be amended as specified herein, and the construction and sale of Units.

(z)    **"Rules and Regulations"** means such rules and regulations as are promulgated by the Board from time to time, with respect to various details of the use of all or

5

any portion of the Property, either supplementing or elaborating upon the provisions in the Declaration or the By-Laws.

(aa) **"Special Assessment"** means an Assessment, either for Common Expense or Limited Common Expense, as applicable, which may be made by the Association for the purpose of defraying an unforeseen or unbudgeted Common Expense.

(bb) **"Sanitary Sewer Lateral"** means the laterals which connect a Dwelling to the Sanitary Sewer System.

(cc) **"Sanitary Sewer System"** means the system to be constructed by or on behalf of the Declarant on the Property for collection and conveyance of sanitary sewage, (but not including the Sanitary Sewer Laterals).

(dd) **"Special Declarant Rights"** has the meaning given to such term in the Act and includes any rights reserved for the benefit of the Declarant hereunder or under the Act which includes the rights to: complete the improvements shown on the Plan; maintain offices, signs and models; use and grant easements through the Property for the purpose of making improvements and constructing utilities within the Community; appoint or remove an officer of the Association or a Director during the period of Declarant control; modify the size, design and appearance of the Units located within a Unit (prior to conveyance of the Unit); convert a Unit into Common Facilities, or two (2) or more Units and Common Facilities, or change the boundary lines between Units and Common Facilities.

(ee) **"Storm Water Management System"** means all storm water drainage facilities to collect or control water on the Property and facilities related thereto such as detention basins, drainage easements, drainage swales and related facilities shown on the Plan from time to time located outside of legal rights-of-way of dedicated streets.

(ff) **"Surplus"** means and includes the excess of all Assessments over all Common Expenses.

(gg) **"Unit"** the separate parcel of land on which Dwellings will be constructed together with the Dwelling now or hereafter constructed thereon, as shown on the Plan.

(hh) **"Water Company"** means Aqua America, its successors and assigns.

(ii) **"Water Line"** means the system owned and maintained by the Water Company for the provision of water to the Units.

(jj) **"Water Line Lateral"** means the laterals which connect a Dwelling to the Water Line owned and maintained by the Association.

6

## ARTICLE IV
## APPLICABILITY

4.1.   Applicability.  This Declaration shall be applicable to the Property.  All present and future Owners and occupants or tenants of any Unit, their guests, licensees, servants, agents, employees, and (except as provided herein) any other person or persons who shall be permitted to use the Common Facilities or a Unit shall be subject to this Declaration, the Articles and By-Laws and Rules and Regulations of the Association promulgated from time to time to govern the conduct of its Owners and occupancy of the Property.  Ownership, rental or occupancy of any Unit in the Property shall be conclusively deemed to mean that the Owner, tenant or occupant has accepted, ratified and will comply with this Declaration, the Articles, the By-Laws and any Rules and Regulations of the Association.

4.2.   Transfer of Units.  If an Owner transfers all of his ownership in a Unit which is subject to this Declaration, the transfer shall automatically include his membership in the Association.

## ARTICLE V
## DESCRIPTION OF UNITS; COMMON FACILITIES;
## CONTROLLED FACILITIES AND PROVISIONS APPLICABLE THERETO

5.1.   Unit Boundaries.  Each Unit shall consist of the area of land designated on the Plan ("Lot"), together with the Dwelling constructed thereon.  Each Unit consists of:

(a)   The Lot and the Dwelling, provided that where an interior party wall is between two Dwellings, the horizontal boundary shall be the mid-point of such party wall.

(b)   the duct work and faces of the heating/air conditioning vents serving the Unit;

(c)   any pipes, ducts, wires, cables, flues, meters, sewer or water lines, conduits or other installations for services and utilities serving only the particular Unit (whether or not located within the Unit as described in this Section 5.1) shall be part of that Unit;

(d)   each Unit shall also include, to the extent any of the following are purchased by Unit Owner and situated within the Unit, any ovens, ranges, dishwashers, garbage disposals, washers, dryers, sinks, tubs, showers, cabinets, lavatories, water closets, exhaust fans, light fixtures, floor coverings and all heating, air conditioning and ventilation equipment; and any other appliances situated within the Unit and serving only the same;

(e)   any deck, patio, or terrace serving only that Unit.

7

5.2.   Common Facilities.   Common Facilities has the meaning set forth in Section 3.2(h).

5.3.   Construction and Transfer of Common Facilities.

(a)   Declarant shall construct or cause to be constructed, the Common Facilities on the Property within seven (7) years from the date of the conveyance of the first Unit and convey same to the Association no later than sixty (60) days after conveyance of the last Unit in the Property owned by Declarant, or such earlier time as mandated by the Act. Declarant reserves the right to convey the Common Facilities at any time prior to this event and in the event the Common Facilities are not substantially complete at the time of conveyance, Declarant covenants that it shall substantially complete the Common Facilities.   These Declarant obligations shall be a covenant running with the Property.   Until such time as the Common Facilities are conveyed to the Association, they shall be owned by the Declarant.   Declarant shall be entitled to reasonable extensions of time to complete the Common Facilities if such extension becomes necessary due to weather conditions or other conditions beyond Declarant's control.

(b)   The Declarant shall convey to the Association, and the Association shall accept, the Common Facilities by deed and/or bill of sale, as applicable, for no consideration. The Declarant shall be responsible for recording fees and transfer taxes, if any. Acceptance of the Common Facilities shall not constitute a waiver of the Declarant's obligation to complete the Common Facilities.

(c)   The Declarant shall be responsible for the real estate taxes on property designated to be Common Facilities, if any, until conveyed to the Association.

5.4.   Use of Common Facilities.   Except as their use may otherwise be limited by this Declaration or the Bylaws or otherwise by the Board pursuant to its powers, each Owner, tenant and occupant of a Unit, and the family members and guests of such Owner, tenant and occupant, may use the Common Facilities in common with all other Owners and tenants or occupants of other Units and their respective family members and guests in accordance with the purposes for which they are intended without hindering or encroaching upon the lawful rights of the other Owners.   Owners or occupants shall not obstruct the Common Facilities in any way including, but not limited to, interfering with any storm water drainage.   Owners or occupants may not store anything in or on the Common Facilities.

5.5.   Maintenance and Repair of Common Facilities and Other Items. The Association shall be responsible, at the Association's expense, for the maintenance and repair of any Common Facilities and other items as set forth on the responsibility checklist attached hereto as **Exhibit "D"** and made a part hereof ("**Responsibility Checklist**").   The cost and expense of the foregoing shall be a Common Expense and the Board shall include in the annual budget of the Association as part of the Assessments reasonable reserves for periodic maintenance, repair and replacement of Common Facilities.

8

5.6. <u>Alteration to Common Facilities By Owner</u>. Without limiting the rights of the Declarant in connection with all construction and improvements to be made in or to the Community by the Declarant, no Owner may make any improvements or alterations or do any work to any of the Common Facilities. No Owner shall impair any easement or hereditament related to the Common Facilities.

5.7. <u>Common Expense Liability</u>.

(a) The Common Expenses incurred or to be incurred for the administration and governance of the Community and the maintenance, repair, replacement, insurance, administration, management, operation and use of the Common Elements and the making of any additions or improvements thereto and the charges for common utility services, if any, shall be assessed by the Association against, and collected from, the Owners; provided, however, that until the Association charges its first assessments to the Owners, the Declarant shall pay all Common Expenses of the Community. Common Expenses benefiting fewer than all of the Units may be assessed as Limited Common Expenses exclusively against the Units benefited.

(b) Each Owner, by accepting title to a Unit, covenants and agrees to pay the Association its share of the Common Expenses. The obligation to pay Assessments is a covenant running with the Property, inseparable from each Unit, and any conveyance, lease, devise or other disposition or mortgage or other encumbrance of any Unit shall extend to and include the Assessment liability, whether or not expressly referred to in the instrument effecting such transfer.

(c) No Owner may exempt himself from liability with respect to the payment of Assessments by waiver of the enjoyment of the right to use any of the Common Elements or by abandonment of his Unit or otherwise. The obligation to pay Assessments is absolute and unconditional and shall not be subject to set-offs or counterclaims.

5.8. <u>Common Expense Percentage</u>. The allocation of Common Expenses appurtenant to each Unit shall have a permanent character, shall be inseparable from each Unit and shall not be altered or changed except by the recording of an amendment to this Declaration executed by the Declarant in accordance with Declarant's Special Declarant's Rights or duly executed by all of the Owners affected thereby and their Eligible Mortgagees. The Common Expense Percentage for a particular Unit once one hundred (100) Units have been added to the Community will be .0094% except in the case where a Unit owner has been allocated a Garage Space, in which case the Common Expense Percentage shall be .0094% plus .0050% for each Garage Space allocation for such Unit. Until the one hundredth (100th) Unit is added to the Community, the Common Expense percentage for each Unit will be a percentage (rounded off to the nearest ten thousandth)

9

created by multiplying one hundred by the quotient resulting from dividing one (1) by the total number of the Units plus a factor of .0050 for each Garage Space which has been assigned to such Unit. The Common Expense Percentages are set forth in **Exhibit "E"** attached hereto and made a part hereof.

      5.9.   <u>Controlled Facilities</u>. The Controlled Facilities are subject to regulation by the Association as provided in this Declaration.

      5.10.   <u>Maintenance and Repair of Controlled Facilities</u>.

      (a)   The Association shall have the obligation to maintain, repair and replace those portions of Controlled Facilities set forth the Responsibility Checklist, otherwise the Association will have no obligation for the maintenance, repair or replacement of Controlled Facilities. The Responsibility Checklist sets forth the manner in which the Association will bill the cost of the maintenance, repair, and replacement of the Controlled Facilities. The maintenance responsibilities of the Association shall be performed at such times and in such manner as the Board may, in its sole discretion, determine.

      (b)   The Association shall be responsible for repairing, maintaining and replacing the shingles and other roof materials on the roof of each Unit at the end of the anticipated life of such shingles or such other time as determined by the Board in its sole discretion ("**Roof Maintenance**"). In the event the contractor hired by the Association to replace the shingles advises the Association that additional repair or replacement of any part of the roof or exterior of the Unit is required to keep the roof and the exterior of such Unit watertight, the Association shall have the right to have any recommended work done ("**Roof Repair**"). All costs of Roof Maintenance and Roof Repair shall be a Limited Common Expense during the Declarant Control Period and a Common Expense charged against all of the Units thereafter. Roof Maintenance and Roof Repair shall include the decking, flashing (or other water seepage prevention system) and shingles only. All other costs associated with Roof Maintenance or Roof Repair, including, but not limited to insulation, shall be charged as a Limited Charge.

      (c)   The Association shall be responsible for repairing, maintaining and replacing the stucco, hardiplank, masonry siding, stone or other material, as applicable ("**Exterior Material**"), covering the exterior of a Dwelling at such time as determined by the Board in its sole discretion. All costs of repair, maintenance or replacement of Exterior Materials shall be a Limited Charge charged against the specific Units.

      (d)   The Water Company owns the Waterlines in the streets. Each Unit Owner owns, and shall be responsible to repair, replace, and maintain the portion of the Waterlines which run from the curb stop to the Unit.

10

                

(e)     Neither the Storm Water Management System nor Common Facilities, shall be offered for dedication to the Township and shall be maintained by the Association (or the Unit Owners as applicable) in accordance with this Declaration.

5.11.   Obligation of the Owners.

(a)     Subject to the obligations of the Association as provided herein and on the Responsibility Checklist, it shall be the duty of each Owner, at such Owner's sole cost and expense, to maintain and repair such Owner's Unit in a neat, safe, sanitary and attractive condition including, but not limited to, all exterior maintenance of the Unit.

(b)     The Radnor Haverford Marple Municipal Association ("RHMMA") owns the Sanitary Sewer System up to the lateral line which brings service from the main to the Dwelling. Each Unit Owner shall be responsible to repair, replace, and maintain the lateral, the clean-out and the line which runs from the street to the Unit.

(c)     If all or any portion of any Unit is damaged, falls into disrepair it shall be the duty of the Owner to rebuild, repair or reconstruct the Unit in a manner which will restore the Unit substantially to its appearance and condition immediately prior to the casualty. If the Owner shall fail to rebuild, repair or reconstruct, the Association may undertake such repair or reconstruction and may levy a Special Assessment against the Owner.

5.12.   Owners' Negligence.

(a)     Any costs incurred by the Association in connection with any maintenance, repair or replacement obligations as may arise in connection with the negligence of the Owner(s) or occupant(s) of any particular Unit(s) shall be charged as a Special Assessment to the Owner(s) and against the Owner's Unit.

(b)     To the extent maintenance, repair and replacement of a Unit by an Owner may involve the possible damage to the Common Facilities or to any other property other than such Unit, the work shall be performed only with the prior written consent of the Board or its duly authorized agent except in the case of an emergency. The work may be performed only by a person or entity who shall deliver to the Board prior to the commencement of any work, in form satisfactory to the Board, the following:

(i)     A release of the Board and its agents, servants and employees for all claims that such person or entity or their respective agents, servants or employees may assert in connection with work to be performed;

(ii)    An indemnification of the Association, Board and their agents, servants and employees holding each and all of them harmless from and against any claims asserted for loss or damage to person or property, including, but not limited to, the Common Facilities, other Units or any other property included in the Community;

11

   (iii) A certificate or other acceptable evidence of insurance, including liability and workmen's compensation coverage, in amounts and companies reasonably acceptable to the Board; and

   (iv) Any other information and protection which the Board may reasonably require.

  5.13. <u>Garage Spaces</u>.  The Garage Spaces shall be initially allocated by the Declarant to the Unit Owners.  Units which have allocated garage Spaces will bear the increased Common Expense percentage as set forth on Exhibit "E" attached hereto and made a party hereof.  Garage Spaces shall be used for the sole purpose of parking vehicles and storage.  The Association shall maintain a list of the Garage Space Allocations.  Owners may transfer a Garage Space only to another Owner upon the prior written approval of the Board which consent shall not be unreasonably withheld, delayed, or conditioned.  The Board shall file an amendment to <u>Exhibit "E"</u> each time a Garage Space is allocated or re-assigned.  The Board may file an amendment to the Declaration for the purpose of amending <u>Exhibit "E"</u> in accordance with this § 5.13, notwithstanding the provisions of § 16.1.  The Association shall maintain a list of Owners who have expressed an interest in a future Garage Space assignment.  The Board shall have the right to make additional rules and regulations regarding the Garage Spaces that do not conflict with the Act or this Declaration.



  5.14. <u>Water Features</u>. Upon the prior written permission of the Board, an Owner shall be permitted to install an in-ground swimming pool, spa, or hot tub ("**Water Feature**") not greater than one hundred sixty-five (165) square feet subject to the following conditions:

   (a) Plans for the Water Feature and associated landscaping or hardscaping require the approval of the ARC. Not every Unit contains enough pervious square footage behind the Dwelling to permit the installation of a Water Feature.

   (b) If a Water Feature is approved by the Board and installed by the Owner, the Owner must install a fifty-four (54) inch height, alumi-guard, flat top, Ascot-3 channel fence or other equivalent fence approved by the Architectural Committee that runs along the backyard envelope of the Unit, the back section of which shall be twenty (20) feet as measured from the back exterior wall of the Dwelling of the pair which is set back furthest from the curb line and two feet (2) from the side exterior wall of such Dwelling ("**Fencing**"). It is the intention of the Declarant that the fences be uniform in design and construction and create a single, straight-line of fencing if viewed from the side-yard of the Units.  To the extent that Units 250, 252, 254 and/or 256 are approved for a Water Feature, the location of the Fencing shall be determined by the Arc taking into consideration the depth of the Unit.

12

(c)     Owners shall be responsible for the maintenance, repair, and replacement of the Fencing and the Water Feature. If the Owner does not maintain, repair, or replace the Fencing or Water Feature in accordance with the standards of a first-class residential community and all local ordinances, upon twenty (20) days prior written notice to the Owner, the Association may maintain, repair, or/and replace, as applicable the Fencing or the Water Feature and charge the Owner a Limited Charge for such maintenance, repair, and/or replacement.

(d)     Upon installation of the Fencing, the Owner shall become responsible for all landscaping and lawn care of the area contained by the Fencing. If the Owner does not maintain the landscaping and mow the lawn of the area contained by the Fencing in accordance with the standards of a first-class residential community (and, with respect to mowing the lawn, not less than once per week between April 1 and October 31), upon twenty (20) days prior written notice to the Owner, the Association may perform such landscaping and lawn mowing charge the Owner a Limited Charge for such.

(e)     Notwithstanding the fact that the Owner is responsible for the landscaping and lawn care of the area contained by the Fence, the Owner shall, nonetheless, be required to obtain the approval of the ARC prior to the installation of any trees, flowers, bushes, shrubs, or other landscaping.

(f)     Any Owner who has installed a Water Feature on his Unit hereby specifically agrees to indemnify, hold harmless, and defend the Declarant and the Association from and against any and all claims, demands, actions, causes of action, penalties, judgments, court costs, reasonable attorneys' fees and liabilities of every kind and description for injury and death to persons and damage to and loss of property which are caused by or arise from or grow out of the rights granted to the Owner by this Section 5.14.

(g)     Any Owner who has installed a Water Feature on his Unit shall procure and keep in place umbrella liability coverage in an amount not less than $1,000,000.00 per occurrence. Such insurance shall contain a specific endorsement covering the Water Feature.

(h)     The Units located at 107 and 108 Green Lane shall be exempt from the provisions of Sections 5.14(a) and (b); provided however that any changes to the Water Feature and Fencing installed on those Units as of the date of recording of this Declaration shall required the prior written consent of the Architectural Committee.

**ARTICLE VI**
**THE PLAN**

13

6.1.   Plan.  The Plan depicts the Property.  The Plan and all amendments thereto shall be recorded in the Office for Recording of Deeds in and for Delaware County, Pennsylvania.

## ARTICLE VII
## THE ASSOCIATION; MEMBERSHIP; VOTING RIGHTS; POWERS AND DUTIES

7.1.   Organization.  The Association is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania charged with the duties and vested with the powers prescribed by law and set forth in the Declaration, the Articles and the By-Laws.

7.2.   Membership.

(a)   Membership in Association.

(i)   Unit Owners upon acceptance of a deed to a Unit shall become members of the Association and the Declarant shall become members upon this Declaration being recorded.  Membership in the Association shall be limited to the Unit Owners of the Community.

(ii)   Every Unit Owner who shall be a member of the Association shall be entitled to all of the rights and shall be bound by all of the obligations accompanying membership, provided that any Unit Owner who is holding the interest in a Unit merely as a security for the performance of an obligation shall not be a member.

(iii)   Each Unit in the Community shall have one (1) vote associated with such Unit.  When more than one Person holds an interest or interests in any Unit, all such Persons shall be members, and the vote for such Unit shall be exercised as provided in Section 7.2 hereof and in the Bylaws, but in no event shall more than one (1) vote be cast with respect to any Unit.  Garage Space Assignments do not receive a separate vote.

(iv)   Only Unit Owners in "good standing" shall be entitled to vote, considered for purposes of obtaining a quorum, determining the percentage of Unit Owners voting on a matter, entitled to serve as a Director or have the right to submit plans for Board approval.  A Unit Owner shall be deemed to be "in good standing" if, and only if, he shall have fully paid all Assessments made or levied against the Owner and against his Unit by the Board together with all interest, costs, attorneys' fees, penalties and other expenses, if any, chargeable to the Owner and against his Unit not less than ten (10) days prior to such vote and has not been notified by the Association of any violations of this Declaration or the Rules and Regulations which has not been cured to the reasonable satisfaction of the Board.

(v)   In the event an Owner shall lease or permit another to occupy his Unit in accordance with the provisions of this Declaration, the tenant or occupant shall be

14

permitted to use the Common Elements of the Association (subject to such limitations on such use as would be applicable to the Owner) but shall not vote in the affairs of the Association, except as the Owner shall permit the tenant or occupant to exercise the proxy vote of the member.

(vi)     Every lawful transfer of title to a Unit shall include membership in the Association and, upon making such transfer, the previous Unit Owner's membership shall automatically terminate.   Except as otherwise expressly provided herein or in the Act, membership in the Association may not be assigned or transferred without the transfer of legal title to a Unit and any attempt at such assignment or transfer thereof shall be void and of no effect.

(vii)     Membership in the Association shall automatically terminate when a Unit Owner sells, transfers or otherwise conveys his Unit.

(b)     Certificate of Voting.

(i)     If a Unit is owned by one Person, the Owner's right to vote shall be established by the recorded title to the Unit.  If a Unit is owned by more than one Person, the Person entitled to cast a vote for the Unit shall be designated in a Certificate signed by all of the record owners of the Unit and filed with the Secretary of the Association.  If a Unit is owned by a corporation or partnership, the officer, partner or employee thereof, entitled to cast the votes of the Unit for the corporation or partnership shall be designated in a certificate for this purpose, signed by the president or vice-president, and (as to a corporation) attested to by the secretary or assistant secretary of the corporation, and filed with the Secretary of the Association (the "**Corporate Certificate**"). The Person designated in the Corporate Certificate, who is entitled to cast votes for a Unit shall be known as the "Voting Member".  If such a Corporate Certificate is not on file with the Secretary of the Association for a Unit owned by more than one Person or by a corporation or partnership, the votes of the Unit concerned shall not be considered in determining the requirement for a quorum, or for any purpose requiring the approval of a Person entitled to cast votes for the Unit except if such Unit is owned by a husband and wife.  A Corporate Certificate shall be valid until revoked in writing by any owner of the Unit, or until superseded by a subsequent Corporate Certificate, or until a change in the ownership of the Unit concerned.

(ii)     If a Unit is owned by husband and wife, the following three provisions are applicable to voting by such Unit:

(iii)     The Unit Owners may, but they shall not be required to, designate a voting member.

(iv)     If they do not designate a voting member, and both husband and wife are present at a meeting and are unable to concur in their decision upon any subject requiring a vote, they shall lose their right to vote on that subject at that meeting.

15

(v)   If a voting member is not designated and only one Person is present at a meeting, the Person present may cast the vote for the Unit, without establishing the concurrence of the absent Person, just as though he or she owned the Unit.

7.3.   The Board.

(a)   Subject to the provisions of the Act, this Declaration and the By-Laws, the Executive Board shall have the power to act on behalf of the Association. The Executive Board shall consist of three (3) members. The members of the initial Executive Board shall be appointed, removed and replaced from time to time by the Declarant without the necessity of obtaining resignations. The Declarant-appointed members of the Executive Board shall be replaced with Owners (or if an Owner is a corporation, an officer, director or employee thereof duly authorized by the corporation to serve on the corporation's behalf), other than the Declarant, in accordance with the provisions of Section 7.3 (b).

(b)   For purposes of this Section 7.3(b), the term "First Election Meeting" shall mean the first meeting of the Association which shall occur no later than sixty (60) days after conveyance of twenty-five percent (25%) of the maximum number of Units permitted to be created by this Declaration to an Owner other than the Declarant. The term "Transitional Meeting" shall mean the meeting of the Association which shall be held no later than on the first to occur of the following: (i) sixty (60) days after conveyance of seventy-five (75%) of the maximum number of Units permitted to be created by this Declaration other than the Declarant; (ii) seven (7) years after the date of the first conveyance of a Unit to a party other than the Declarant; (iii) two (2) years after Declarant has ceased to offer Units for sale in the ordinary course of business; and (iv) two (2) years after any development right to add new Units was last exercised. Subject to the right of the Declarant to alter the following procedure so as to have all or part of the transition from an Executive Board comprised solely of members appointed by the Declarant to an Executive Board comprised of members elected by the Owners, the transition of the Executive Board to an Executive Board comprised of members elected by Owners shall occur as follows:

(i)   At the First Election Meeting, the Owners other than the Declarant shall elect one (1) Owner to serve as a member and replace one (1) member selected by the Declarant. This one (1) elected Owner shall serve until the next annual meeting of the Association which is at least one hundred eighty (180) days after the First Election Meeting, at which time successors to such Owner–voted member shall be elected by the Owners other than the Declarant to serve three (3) year terms.

(ii)   At the Transitional Meeting, the Owners (including the Declarant) shall elect two (2) Owners who shall replace the remaining two (2) Declarant-appointed members. These elected members shall serve until the annual meeting of the Association next following the annual meeting at which the member elected pursuant to Section 7.3(b)(i) above

16

was elected or reelected, at which time successors shall be elected by the Owners to serve for three (3) year terms.

(iii)     After the Transitional Meeting and until the Declarant has conveyed the last Unit in the Community in the ordinary course of business, the Board shall notify the Declarant in advance of all meetings of the Board and the Association at the same time as notices are given to the Board members or the Owners as the case may be. Notwithstanding any other provision of the Declaration or the By-Laws, until the Declarant conveys the last Unit in the Community in the ordinary course of business, the Declarant shall be entitled to send representatives to observe all meetings of the Executive Board and the Association.

(c)     Powers and Duties.

(i)     The Board shall have all of the powers for the conduct of the affairs of the Association which are established by the Act, the Declaration, the By-Laws and the Articles and which are not specifically reserved to Owners or the Declarant including, without limitation, the power to levy Assessments and Special Assessments and to establish and enforce reasonable rules and regulations for the use of the Property and to impose fines for the violation thereof.

(ii)     The Board shall exercise its power in accordance with the Articles, the By-Laws and this Declaration.

(iii)     The Association, acting through the Board, shall also have the power and duty to:

(A)     Repair, manage and maintain the Common Facilities and Controlled Facilities as set forth herein.

(B)     Grant easements or rights-of-way, where necessary, for utilities and sewer facilities in, over or under the Property.

(C)     Grant easements to the Township and others of ingress, egress and regress over the Common Facilities for the purpose of inspection, maintenance and repair thereof.

(D)     Maintain such policy or policies of comprehensive general liability insurance with respect to the Common Facilities, including personal property, if any, owned by the Association as provided herein in furthering the purposes of and protecting the interests of the Association and Members and as directed by this Declaration and the By-Laws.

(E)     Maintain directors and officers liability insurance, if available, and delegate its powers to directors, officers, committees and employees of the Association.

17

(F)     Adopt and implement rules and regulations which are not inconsistent with the terms of this Declaration.

(G)     Take and carry out all actions reasonably necessary and proper to enforce the provisions of this Declaration, including the right to impose reasonable fines upon any Owner for violation thereof.

(H)     Perform any other acts necessary or proper to carry out any of the duties and obligations of the Association.

(I)     Amend this Declaration in accordance with the terms and provisions hereof.

(J)     Suspend the voting rights of an Owner and the right of an Owner to use any of the Common Facilities for the failure to pay in full any Assessment within thirty (30) days after the due date or for the infraction of any rules and regulations of the Association after the Board determines that an infraction has occurred and notifies the Member or Unit Owner of the infraction.

(K)     Notify any mortgagee of a Unit of a default in the payment of any Assessment by any Owner.

(L)     Enter upon any Unit during reasonable hours to inspect said Unit for violations of this Declaration, the By-Laws and any Rules and Regulations and/or compliance with approved Plans for alterations and improvements provided the Owner of such Unit is given written notice of the purpose and time of the inspection at least three (3) days in advance and to perform such maintenance as is required or permitted by this Declaration.

(M)     Repair any damage to the Common Facilities or any improvements in the Common Facilities caused by an Owner or any of his family, guests, tenants, or invitees.   In such case, the Association shall repair the damage in good and workmanlike manner and conformance with the original plans and specifications of the area involved or as the area may have been modified or altered subsequently by the Association in the sole discretion of the Association. The cost of such repairs shall become a Special Assessment upon the Owner of said Unit.

(N)     Establish parking and no-parking areas within the Common Elements as well as to enforce these parking limitations by all means lawful for such enforcement on public streets including the removal of any violating vehicle by those sole empowered.

(O)     The right to acquire, provide and pay for water, sewage, garbage disposal, electrical, telephone, gas, cable, fire hydrant service and street lighting and other necessary utility services for the Units and the Property and to pass such costs through to the Owners.

18

(P)     Comply with all matters of record to which the Property is subject.

(Q)     The power to adopt operating and capital budgets of the Association and to make amendments thereto from time to time as necessary or desirable.

(R)     The power to engage and compensate legal counsel, accountants and other professional advisors in connection with any matters affecting the Association.

(S)     Establish the Architectural Review Committee.

(T)     Purchase the insurance set forth in this Declaration or permitted under the Act and charge the Unit Owners therefore.

(d)     Controlled Facilities.   The Controlled Facilities include all exterior surfaces of a Dwelling and other exterior improvements on a Unit including the roof and exterior siding of a Dwelling as well as all lawns, shrubs, trees, patios, porches, decks and personal property outside of a Dwelling but within the title lines of a Unit.  The Association, acting through the Board shall have the authority to promulgate reasonable Rules and Regulations concerning the Controlled Facilities and the maintenance, repair or alteration thereof.  Except as shown on the Responsibility Chart, each Owner is responsible for all other maintenance, repair or replacement of the Controlled Facilities located on or compromising a part of his Unit or Dwelling.  The costs incurred by the Association for repair, maintenance, replacement or other services with respect to the Controlled Facilities shall be charged to Units conveyed to Unit Owners (other than a Declarant) as generally shown on the Responsibility Chart.  However, notwithstanding the manner in which such charges are to be levied as shown on the Responsibility Chart, the Board shall have the right, in its sole discretion, to change the manner in which such costs or expenses are budgeted for and billed to Unit Owners.

(e)     ECR.  The Community is located on a portion of a two hundred and nine acre parcel of property which was owned by the Township ("**Township Property**") and subdivided into five (5) parcels; three (3) of which were retained by the Township; one (1) of which was sold to the Declarant; and one (1) of which was sold to a developer and may be developed as an age restricted condominium ("**Condominium Property**").  Prior to the sale of the Property to Declarant and the Condominium Property to the developer, the Township subjected the Township Property to a Declaration of Reciprocal Easements and Restrictions ("ECR") by recording the ECR of record in the Office of the Recorder of Deeds in and for Delaware County, a copy of which is attached hereto as **Exhibit "F"** and made a part hereof.  The Association shall be responsible to comply with the terms of the ECR and shall pay all costs and fees allocated to in accordance with the ECR.  The ECR provides, in part, that the Association and the association of the Condominium Property maintain the landscaping material located along both sides and within the island located in Parkview Road (which is the main road into the Property and is owned by the Township).  Each association will pay one-half of the

19

expense and the Condominium Property's association will perform said maintenance. The Association will make four (4) quarterly payments to the Condominium based on a budget prepared by the Condominium. It is anticipated that the Condominium will provide an annual accounting of the costs.

**ARTICLE VIII**
**INSURANCE**

8.1.    Liability Insurance. The Board shall obtain and continuously maintain or cause to be obtained and continuously maintained "broad-form" comprehensive public liability and property damage insurance covering liability for loss or damage to persons or property in those amounts, against those risks written by those insurance companies which the Board shall determine from time to time, but with limits in no event less than Two Million Dollars ($2,000,000.00) for bodily injury (including death) to persons and property damage arising out of a single occurrence. This insurance shall include protection against bodily injury and property damage that results from the operation, maintenance, repair, replacement or use of the Common Facilities, any legal liability that results from lawsuits related to employment contracts to which the Association is a party, liability for non-owned and hired automobiles, liability for property of others, host liquor liability and such other insurance covering any and all other risks customarily covered in similar policies for associations similar to the Association, including, without limitation, liabilities arising out of or in connection with the Association's maintenance, repair and replacement responsibilities. All liability insurance policies shall contain severability of interest provisions and cross liability endorsements to cover liabilities of the Association or the Owners as a group to an individual Owner.

8.2.    Property Insurance.

(a)    Generally: The Board shall acquire (if and to the extent available) and pay for insurance as required by the Act in addition to and subject to the following:

(i)    Such insurance as the Board deems advisable in the operation, and for the protection, of the Common Elements and the Units, including, without limitation, flood insurance to the extent appropriate and available.

(ii)    The amount of property insurance obtained shall be equal to the full insurable value replacement cost of the insured property (excluding land, foundations, excavations or other items that are usually excluded from coverage), without deduction for depreciation. Full insurance value replacement cost coverage is to be assured by either (i) a Guaranteed Replacement Cost Endorsement (pursuant to which the insurer agrees to replace the insurance property regardless of the cost) and an Agreed Amount Endorsement (which waives the requirement for coinsurance) if a coinsurance clause is included or (ii) a Replacement Cost Endorsement (pursuant to which the insurer agrees to pay up to 100% of the property's insurable replacement cost, but no more) and an Agreed Amount Endorsement if a coinsurance clause is

20

included. It shall insure against all risks of direct physical loss commonly insured against and covered by the standard "all risk" endorsement, if available, and such other risks as FNMA, FHLMC, the Federal Housing Administration or the Veterans Administration (or their respective successors) may require by reason of their holding of one or more Permitted Mortgages. If an "all risk" endorsement is not available, a "broad form" policy will be obtained. Such insurance policy(ies) may, at the option of the Board, contain a "deductible" provision in an amount determined by the Board but not to exceed (unless a higher amount is required by Pennsylvania law) the lesser of the maximum sum permitted by the then applicable FNMA or FHLMC regulations (or their successors), $10,000 or one percent (1%) of the policy face amount. Policies will contain standard mortgage clauses or endorsements naming either specifically or generically the Posted Mortgagees or their services followed by "its successors and assigns". Property insurance shall be written by carriers (or reinsured by companies) that at least meet the requirements for a Best's rating of B or financial performance index of 6 or an A rating from Demotech, Inc. or such other minimum requirement as may be acceptable to FNMA from time to time.

      (iii)    Each Unit Owner and the Board hereby waives and releases any and all claims which he or it may have against any other Unit Owner, the Association, the Board and members thereof, the Declarant and their respective employees and agents, for damage to the Common Elements, the Units, or to any personal property located in the Units or Common Elements, caused by fire or other casualty or any act or omission of any such party to the extent that such damage is covered by fire or other form of hazard insurance.

      (iv)    If the act or omission of a Unit Owner, or of a member of his family, a household pet, guest, occupant or visitor of such Unit Owner, shall cause damage to the Common Elements or to a Unit or Units owned by others, or maintenance, repairs or replacements shall be required which would otherwise be a Common Expense, then such Unit Owner shall pay for such damage and such maintenance, repairs and replacements, as may be determined by the Board, to the extent such payment is not waived or released under the provisions of subparagraph "iii" above.

      (v)    Any release or waiver referred to in subparagraphs "iii" and "iv" hereof shall be valid only if such release or waiver does not affect the right of the insured under the applicable insurance policy to recover thereunder. The Unit Owners and the Board, with regard to the insurance carried by each of them, shall use their best efforts to see that their insurance carriers agree that such release or waiver does not affect their rights to recover.

      (vi)    If the Board fails within sixty (60) days of an insured loss to initiate a claim for damages recoverable under the property insurance policy(ies) obtained pursuant to the Act, the holder of any Posted Mortgage may initiate such a claim on behalf of the Board. The Board, shall from time to time at such times as it shall deem appropriate, cause an appraisal of the Property to be made for the purpose of determining the current full insurable replacement value of the insured property, without considering depreciation, and the Board shall

21

change the amount of hazard insurance on the Property to the amount of the then current full insurable replacement value of the Property as established by such appraisal.

(vii)    The Association's property insurance shall cover fixtures, equipment, and other personal property and supplies of the Association and fixtures and equipment within Units as of the date of initial sale of the Unit by the Declarant, whether or not part of the Common Elements. Each Unit Owner, other than the Declarant, shall notify the Board in writing of any additions, alterations or improvements to his Unit and he shall be responsible for any deficiency in any insurance loss recovery resulting from his failure so to notify the Association. The Board shall use its reasonable efforts to obtain insurance on any such additions, alterations or improvements if such Unit Owner requests it to do so and if such Unit Owner shall make arrangements satisfactory to the Board to reimburse it for any additional premiums attributable thereto; and in the absence of insurance on such additions, alterations or improvements, the Board shall not be obligated to apply any insurance proceeds to restore the affected Unit to a condition better than the condition existing prior to the making of such additions, alterations or improvements.

(viii)    Commercial general liability and property damage insurance for the Common Facilities as required by the Act shall be in such limits as the Board shall deem desirable provided that such limit shall not be less than One Million Dollars ($1,000,000.00) per occurrence, for bodily injury and/or property damage, insuring the Association, the Board members, the managing agent, if any, and their respective agents and employees, and the Units Owners from any liability to the public or to the Unit Owners, their tenants or invitees, relating in any way to the ownership and/or use of the Property or any part thereof. The policy shall cover bodily injury and property damage that results from the operation, maintenance, or use of the Community's Common Elements, and any legal liability that results from lawsuits related to employment contracts in which the Association is a party. If the policy does not include "severability of interest" in its terms, it must include a specific endorsement to preclude the insurer's denial of a Unit Owner's claim because of negligent acts of the Association or of other Unit Owners.

(ix)    The Board may obtain such other forms of insurance as the Board shall elect to effect including Board members' and officers' liability insurance and such Worker's Compensation insurance as may be necessary to comply with applicable laws.

(x)    The Association shall obtain fidelity insurance to protect against dishonest acts on the part of the Board members, officers, agents, employees, volunteers and all others who handle, or are responsible for handling, funds of the Association. Such insurance shall name the Association as the insured and shall be in such amount as the Board deems appropriate, but not less than the greater of (i) the maximum funds that will be in the custody of the Association or its agents at any time, or (ii) the sum of three (3) months' Common Expense assessments against all Units. Notwithstanding the foregoing, in the event that the FNMA and the FHLMC reduces or increases the required amount of the fidelity insurance which the

22

Association must maintain to less or more than the amount set forth above, the Board may decrease or increase the amount of the fidelity insurance to the amount required by such entities. Such insurance shall contain a waiver of defense based upon the exclusion of persons who serve without compensation from the definition of "employee" or such endorsement or provision as shall accomplish the same result. Any managing agent shall be required to carry its own insurance with the same coverage as set forth above.

(xi)    Except as otherwise provided in this Declaration, premiums for all insurance obtained or maintained by the Board, fees and expenses of the insurance trustee (**"Insurance Common Expense"**), if any, and the cost of any appraisal which the Board deems advisable in connection with any insurance, shall be Common Expenses. The Board may bill the Insurance Common Expense either on an annual basis or as part of the monthly Assessment.

(xii)   The Board shall use commercially reasonable efforts to secure policies providing that the policies cannot be cancelled, invalidated or suspended on account of the conduct of any one or more individual Unit Owners or any officer or employee of the Board or managing agent, if any, without a prior demand in writing that the Board or managing agent, as the case may be, cure the defect and without a reasonable period of time thereafter in which to cure the same. Association policies shall provide that the policy will be primary, even if a Unit Owner has other insurance that covers the same loss. The policy must require the insurer to notify in writing the Association, any Insurance Trustee and each mortgagee named in a mortgage clause at least ten (10) days before it cancels or substantially changes coverage.

(xiii)  Insurance coverage on the furnishings and other items of personal property belonging to a Unit Owner and insurance for his personal liability to the extent not covered by insurance maintained by the Board shall be the responsibility of each such Unit Owner.

(xiv)   All physical damage insurance policies purchased by the Board shall be for the benefit of and name as insured the Association for the use and benefit of the Unit Owners and their Posted Mortgagees, as their interests may appear, and shall provide that, with respect to any single loss, if the proceeds thereof exceed $250,000, then all such proceeds shall be paid in trust to such lending institution in the metropolitan Philadelphia area with trust powers as may be designated by the Board (which trustee is herein referred to as the Insurance Trustee) and the policy loss payable provision shall provide that such proceeds are payable to the Insurance Trustee as trustee for each Unit Owner and each Unit's mortgagees. If such proceeds do not exceed $250,000, then the policy loss payable provision shall provide that all such proceeds shall be paid to the Board to be applied pursuant to the Act as trustee for each Unit Owner and each Unit's mortgages. If proceeds are payable to the Insurance Trustee, the Board shall enter into an Insurance Trust Agreement with the Insurance Trustee which may provide that the Insurance Trustee shall not be liable for payment of premiums, the renewal of the policies, the sufficiency of coverage, the form of contents of the policies, the correctness of any amounts received on account of the proceeds of any insurance policies nor for the failure to collect any

23

insurance proceeds. The sole duty of the Insurance Trustee shall be to receive such proceeds as are paid to it and to hold the same in trust for the purposes elsewhere stated in this Declaration and the Act, for the benefit of the insureds and their beneficiaries thereunder.

(xv)    The name of the insured under each policy required pursuant to this Article 8 shall be stated in form and substance similar to the following:

> Haverford Reserve Community Association, for the use and
> benefit of the individual owners, or their authorized
> representatives, of the Units in Haverford Reserve, The
> Carriage Homes, a Planned Community

(xvi)   If any part of the improvements in the Community is in a special flood hazard area, the Association shall maintain a "master" or "blanket" policy of flood insurance, the premiums to be paid as common expenses. The amount of flood insurance shall be equal to the lesser of 100% of the insurable value of the improvements or the maximum coverage available under the appropriate National Flood Insurance Administration program. The maximum deductible amount for such policy shall be the lesser of $5,000 or 1% of the policy face amount.

8.3.    Repairs and Reconstruction After Fire or Other Casualty.

(a)    When Repair and Reconstruction are Required. Except as otherwise provided in subparagraph d of this § 8.3, in the event of damage to or destruction of the Units or any part thereof as a result of fire or other casualty, the Board, under the direction of the Insurance Trustee if an Insurance Trustee is required, shall arrange for and supervise the prompt repair and restoration of the Buildings as required by the Act. Notwithstanding the foregoing, each Unit Owner shall have the right to supervise the redecorating of his own Unit.

(b)    Procedure for Reconstruction and Repair.

(i)    Cost Estimates. Immediately after a fire or other casualty causing damage to the Buildings, the Board shall obtain reliable and reasonably detailed estimates of the cost of repairing and restoring the Buildings as required by the Act to a condition as good as that existing before such casualty. Such costs may also include professional fees and premiums for such bonds as the Board or Insurance Trustee (if any) determines to be necessary.

(ii)    Assessments. If the proceeds of insurance are not sufficient to defray such estimated costs of reconstruction and repair, or if upon completion of reconstruction and repair the funds for the payment of the costs thereof are insufficient, the amount necessary to complete such reconstruction and repair may be obtained from the appropriate reserve for replacement funds and/or shall be deemed a Common Expense (and/or Direct Charge) and special monthly assessments therefor shall be levied. The funds shall be paid out of the Common Receipts funds, or both, depending on whether or not the source of the shortfall can be

24

properly determined in the opinion of the Board. If such source cannot be so determined, then the shortfall shall be allocated among the funds referred to above in proportion to the relative costs of restoration in each of the categories. Costs of restoration of a Unit to the extent required to be done by the Board shall be paid out of the Common Receipts unless the shortfall is due to failure of the Unit Owner to notify the Association of improvements made to his Unit, in which event the shortfall so caused shall be assessed against the particular Unit Owner. Unit Owners may apply the proceeds from their individual property insurance policies, if any, to the share of such Common Expense or Direct Charges, or both, as may be assessed to them. The Board shall be responsible for restoring the Property only to substantially the same condition as it was immediately prior to the damage, and each Unit Owner shall personally assume the additional expense of any improvements to his Unit which he desires, to restore it beyond such condition.

(iii)     Plans and Specifications. Any such reconstruction or repair shall be substantially in accordance with the construction of the Property as it existed immediately prior to the casualty.

(c)     Disbursements of Construction Funds.

(i)     Construction Fund and Disbursement. The proceeds of insurance collected on account of casualty, and the sums received by the Board or Insurance Trustee from collections of assessments against Unit Owners on account of such casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner:

(ii)     If the estimated cost of reconstruction and repair is less than $250,000, then the construction fund shall be disbursed in payment of such costs upon order of the Board.

(iii)     If the estimated cost of reconstruction and repair is $250,000, or more, then the construction fund shall be disbursed in payment of such costs upon approval of an architect qualified to practice in Pennsylvania and employed by the Insurance Trustee to supervise such work, payment to be made from time to time as the work progresses. The architect shall be required to furnish a certificate giving a brief description of the services and materials furnished by various contractors, subcontractors, materialmen, the architect and other persons who have rendered services or furnished materials in connection with the work and stating that: (a) the sums requested by them in payment are justly due and owing and that such sums do not exceed the value of the services and materials furnished; (b) there is no other outstanding indebtedness known to such architect for the services and materials described; and (c) the cost as estimated by such architect for the work remaining to be done subsequent to the date of such certificate does not exceed the amount of the construction fund remaining after payment of the sum so requested, taking into account retainage.

(iv)     Surplus. It shall be presumed that the first monies disbursed in payment of the cost of reconstruction and repair shall be from insurance proceeds and, if there is

25

a balance in the construction fund after the payment of all of the costs of the reconstruction and repair for which the fund is established, such balance shall be used first to reimburse Unit Owners for sums paid to cover shortfalls under subparagraph b(ii) above in proportion to the sums so paid until full reimbursement and any remaining balance shall be divided among all Unit Owners in proportion to their Percentage Interests and shall be distributed in accordance with the priority of interests at law or in equity in each Unit.

(v)     Certificate.  The Insurance Trustee shall be entitled to rely upon a certificate executed by the President or Vice President, and the Secretary, certifying: (i) whether the damaged Property is required to be reconstructed and repairs; (ii) the name of the payee and the amount to be paid with respect to disbursement from any construction fund or whether surplus funds to be distributed are less than the assessments paid by the Unit Owners; and (iii) all other matters concerning the holding and disbursing of any construction fund.  Any such certificate shall be delivered to the Insurance Trustee promptly after request.

(vi)     When Reconstruction Is Not Required.  In the event of insubstantial damage to the Common Elements and if the Board shall elect not to repair the same or in the event there is to be no repair or replacement pursuant to the Act, then in either such event any insurance proceeds received on account of such damage shall be expended and/or distributed in accordance with the Act.

## ARTICLE IX
## EASEMENTS AND SPECIAL DECLARANT'S RIGHTS

9.1.     Utility Easements.  All Property subjected to this Declaration shall be subject to an easement for the present and future installation, maintenance, inspection, repair and replacement of electric service, master and/or cable television service, telephone service, water service, storm water and sanitary sewage services, gas service, television service (including cable television) and other utility services and the facilities and appurtenances necessary or desirable to any portion of the Property, which easement shall run in favor of the Declarant, the Association and the entity or entities owning or operating these facilities and providing the aforementioned services.  All utility companies shall have an easement for access to read and repair the utility meters.  The Declarant and the Board shall have the right to grant to third parties additional utility easements which are deemed reasonable by the Declarant or Board in connection with the supply of utility services to the Units and other portions of the Property.  Such easement shall also include rights of access as may be granted to the Township for access to the Stormwater Management System, Sanitary Sewer System and Water Line.

9.2.     Declarant's Easement for Marketing.  The Declarant reserves the right with respect to its marketing of Units to use the Common Facilities for the ingress and egress of itself, its officers, employees, agents, contractors, subcontractors, prospective purchasers and residents. The Declarant shall also have the right, in connection with its marketing of Units until the conveyance of the last Unit it has the right to build or own in the Property, to erect signs on the

26

Property subject to compliance with all applicable Township codes. The Declarant shall have the right to maintain one or more sales offices, management offices, rental offices and Model Units on the Property, subject to compliance with all applicable Township codes. Any damage to the Property resulting from this easement shall be repaired by the Declarant within a reasonable time after the completion of its sale of all of the Units in the Property. The Declarant agrees to indemnify and to hold the Association harmless from liability for personal injuries and property damage resulting from the use of the Property in conjunction with the marketing of Units. The rights reserved for the Declarant by this <u>Section 9.2</u> shall remain in effect for as long as the Declarant shall remain the owner of a Unit in the Property or has the right to build a Unit. This section shall not be amended without the prior written consent of the Declarant.

9.3.   <u>Declarant's Easement to Correct Drainage</u>. For a period of five (5) years from the date of conveyance of each Unit the Declarant reserves an easement and right on, over and under the Unit to maintain and to correct drainage of surface water in order to maintain reasonable standards of health, safety and appearance. Such right expressly includes the right to cut any trees, bushes, or shrubbery, make any gradings of the soil or to take any other similar action reasonably necessary, following which the Declarant shall restore the affected property to its original condition as near as practicable. The Declarant shall give timely notice of intent to take such action to all affected Owners, unless in the opinion of the Declarant an emergency exists which precludes such notice, in which event, such reasonable notice shall be given as the circumstances shall allow.

9.4.   <u>Declarant's Easement for Construction</u>. Notwithstanding any provision of this Declaration to the contrary, so long as the Declarant, its successors and assigns, employees, agents, subcontractors, contractors, independent contractors and other persons acting by, through or under the Declarant, are engaged in developing or improving, maintaining or repairing any portion of the Property, such persons shall have an easement to go upon any and all of the Property for purposes of construction, reconstruction, maintenance, repair and renovation, replacement or construction, correction of the Common Facilities, Units or other improvements. The Declarant agrees to indemnify and hold the Association and each Owner harmless from liabilities for personal injuries and physical damage resulting from the exercise of this easement. This easement shall be appurtenant and shall pass with title to every Unit.

9.5.   <u>Easement for Governmental Personnel</u>. A right of entry to the Common Facilities is hereby granted to the Township and to law enforcement officers, fire and rescue and local animal control personnel as needed to carry out their duties.

9.6.   <u>Easement for the Association and the Board</u>. The Association and the Board, its officers, agents and employees shall have the irrevocable right and easement of access to each Unit as may be necessary for the inspection, maintenance, repair or replacement of any facilities in the Common Facilities to make repairs thereto if these repairs are deemed necessary for public safety and to prevent damage or to abate any violation of this Declaration or any rules or

27

regulations of the Association or any violation of any laws or orders of any governmental authorities having jurisdiction over the Property.

    9.7.   Storm Water Management System.

        (a)   The surface of all storm water facilities shown on the Plan shall remain unencumbered by buildings, structures or trees of any kind and the grade of any such areas shall not be changed or altered in any way except as shown on the Plan without first obtaining the written approval of the Township.

        (b)   The Declarant has created and hereby imposes upon the Property an easement and right-of-way on, over and under the Units in favor of the Declarant, the Association and the Township for the purpose of maintenance, repair and/or replacement of the Storm Water Facilities so that all such Storm Water Facilities shall be kept in good working order and repair at all times.

        (c)   The maintenance, repair and replacement responsibility with regard to the Storm Water Management System is set forth in Section 5.10 hereof.

    9.8.   Owners' Easement of Enjoyment. Every Owner shall have the right of ingress, egress and regress over and the right of enjoyment in and to the Common Facilities which right shall be appurtenant to each Unit and shall pass with title to every Unit subject, nevertheless, to:

        (a)   The right of the Association to assess each Owner for the use of any or all of the Common Facilities, and the obligation of the Owners to contribute to the expense of maintenance, repair and replacement of such Common Facilities.

        (b)   The right of the Association to suspend the voting rights and the right of an Owner to use any of the Common Facilities for failure to pay in full any assessment within thirty (30) days of the due date or after a determination by the Board of Directors that the Owner violated the Declaration or any of the rules and regulations of the Community.

        (c)   The right of the Association to convey all or any part of the Common Facilities in accordance with Section 5.3 hereof.

        (d)   The right of the Association to establish rules and regulations governing the use of the Common Facilities.

    9.9.   Easement Related to Units. Each Unit is subject to the following rights, easements, restrictions and covenants in favor of each adjoining Unit and the Association:

        (a)   An easement for the installation, maintenance, use, repair, removal and replacement of electric, telephone, plumbing, cable television, security alarm or utility equipment of any kind pertaining to and servicing or benefiting any Unit which passes across or through any

28

                                          

other Unit or any Unit Line, provided that such acts will not unreasonably interfere with the area burdened hereunder or the use thereof or impair or structurally weaken any load bearing walls, ceilings or floors and provided that no Owner shall enter any adjoining Unit for any such purpose except at reasonable hours upon reasonable notice to the Owner thereof and with the consent of such Owner and the Association, which consent shall not be unreasonably withheld. All damage caused by such installation, maintenance, use, removal, repair and replacement shall be repaired at the expense of the Owners benefiting therefrom.

(b)     An easement for lateral and surface support, in, through, under, over and alongside each Unit.

(c)     The obligation of each Owner to maintain all portions of his Unit in such condition as to insure the structural support, sanitary hygienic condition, habitability and soundness and maintain or repair the Unit whether after damage by fire or otherwise so as not to materially impair the value of any other Unit.

9.10.   Easement to Facilitate Completion. The Declarant shall have an easement through the Common Elements as may be reasonably necessary for the purpose of discharging a Declarant's obligations or exercising Declarant's rights hereunder, including any obligations to the Township. In addition, without affecting the rights of any of each Owner with respect to the use and enjoyment of the Common Elements, subject to the provisions of this Declaration, each Owner and its agents, contractors and invitees shall have a non-exclusive access easement through the Common Elements as may be reasonably necessary for the purpose of construction, repair and renovations of the Unit. The Association shall not have the power to impose any fees or charges or required financial security including, but not limited to, surety bonds, letters of credit or escrow deposits for the use of the easement rights described in this section. The Association shall be entitled to recover costs and expenses incurred by the Association for the repair or damage caused to Common Elements in the exercise of any easement rights.

9.11.   Continuing Easements. The foregoing easements and conditions in Sections 9.1 through 9.10 shall run with the land and inure to the benefit of and be binding upon the Association, each Owner and each tenant, occupant or other person having any interest in any Unit or in the Common Facilities or any part of the Property at the time of reference.

9.12.   Other Conditions of Record. In addition to the easements set forth above, the rights of each Owner shall be subject to, and each Owner shall be bound by, all documents recorded with respect to the Property, including, without limitation, the notes, restrictions and conditions set forth on the Plan and the Improvements Agreement intended to be recorded prior to the recordation of this Declaration and the list of recording data for recorded easements and licenses appurtenant to or included in the Community or to which any portion of the Community is or may be subject as set forth on **Exhibit "B"**.

9.13.   Encroachments. If any portion of the Common Elements hereafter encroaches upon any Unit, or if any Unit hereafter encroaches upon any other Unit or upon any portion of the

29

Common Elements, as a result of settling or shifting of any building or buildings in which they are located or for other reasons, other than as a result of the purposeful or negligent act or omission of the Unit Owner of the encroaching Unit, or of the Condominium Association in the case of encroachments by the Common Elements, a valid easement appurtenant to the encroaching Units or Common Elements for the encroachment and for the maintenance of the same shall exist for so long as the encroachment shall exist. In the event that any building or buildings shall be partially destroyed as a result of fire or other casualty or as a result of a taking by the power of or in the nature of eminent domain or by an action or deed in lieu of the condemnation, and then is rebuilt, encroachments of a portion or portions of the Common Elements upon any Unit or of any Unit upon such rebuilding, shall be permitted, and valid easements appurtenant to the encroaching Units or Common Elements for such encroachments and the maintenance thereof shall exist so long as that building as so rebuilt shall stand.

9.14.   Special Declarant Rights. Unless otherwise expressly provided in this Section 9, the covenants, restrictions and prohibitions set forth in this Section 9 shall be applicable only to Unit Owners other than the Declarant. Dwellings and other improvements constructed by the Declarant shall not be subject to the restrictions and architectural review provisions set forth in this Declaration. Declarant reserves the right to change, from time to time, the style, models, configuration, elevation and other features of the Dwellings which the Declarant reserves the right to build on the Property.



9.15.   Reservation of Special Declarant Rights. Declarant reserves for itself (and any successor Declarant) all special Declarant rights set forth in the Act, including, but not limited to the following rights:

(a)   The right to maintain and relocate, from time to time, one (1) or more (but not more than ten (10)) construction and/or sales offices on the Common Elements (without limitation as to size or location);

(b)   Subject to compliance with all Township ordinances and/or the Township's approval, the right to maintain signs on Units owned by the Declarant and on the Common Elements, including promotional and directional signs, as the Declarant may desire in connection with the marketing and/or sale of Units and the construction of Dwellings and other improvements on the Property;

(c)   The right to maintain, locate and relocate offices and models used in connection with the management of and sale or rental of Units owned by the Declarant on the Declarant's Units;

(d)   The right and easement to complete all improvements and Dwellings planned or contemplated for construction within the Property including, but not limited to, the Common Elements;

30

(e)     The right to relocate the boundaries between Units and Common Elements, together with the right to prepare, execute and record such amendments to this Declaration and the Plats as may be necessary to show the altered boundaries, to the fullest extent permitted by Section 5214 of the Act;

(f)     The right to use and enjoy all easements through the Common Elements for the purpose of constructing, maintaining and/or repairing any improvements required or permitted to be constructed within the Property;

(g)     The right to appoint, remove and replace officers and Directors of the Association during the Declarant Control Period, to the fullest extent permitted hereunder and by the Act;

(h)     The right to transfer any or all of the Special Declarant Rights reserved by the Declarant herein in the manner provided for in the Act; and

(i)     The right to convert the Convertible Real Estate as hereinafter set forth.

9.16.   Declarant's Rights as to Convertible Real Estate.  Declarant hereby reserves the right to create additional Units, Garages, Common Elements, Limited Common Elements (or all four) within the Convertible Real Estate.  Such right may be exercised at any time within seven (7) years after this Declaration is recorded, after which time said option shall lapse as to any part of the Convertible Real Estate with respect to which the Declarant has not, on or before that date, exercised its option hereunder.  There are no limitations on the options reserved by the Declarant hereunder, except those created by or imposed by operation of law and those expressly set forth in this Declaration.

(a)     If additional Units are created within the Convertible Real Estate, the voting power in the Association and the Common Expenses appurtenant to each Unit shall be reallocated as provided herein.

(b)     The Declarant reserves the right to convert parts of the Convertible Real Estate at different times and in any order the Declarant may determine.  No assurances are made with regard to the order in which, or boundaries of, parts of the Convertible Real Estate that may be converted at any time.

(c)     The maximum number of Units that may be created within the Property, including those that may be created within the Convertible Real Estate, is one hundred fifty (150).  All Units created within the Convertible Real Estate shall be restricted exclusively to residential use.

(d)     All restrictions in this Declaration affecting use, occupancy and alienation of the Units shall apply to Units created within the Convertible Real Estate, subject to reasonable differentiations that the Declarant may deem appropriate based on the different character, style or

31

type of Units created within the Convertible Real Estate, which differentiation the Declarant reserves the right to make in the Declarant's sole and absolute discretion.

(e)      The right to convert the Convertible Real Estate shall in no way affect, diminish, reduce, alter, modify or otherwise amend the obligations of the Declarant to build, construct and install all of the improvements (other than Units within the boundaries of the Convertible Real Estate) depicted on the Plans and as to which Declarant has obligated itself to construct pursuant to its development agreement and financial security agreements with the Township.

9.17.   Assignment of Special Declarant Rights. The Declarant may assign some or all of its rights contained in this Section to one or more builders. The assignment of the Special Declarant Rights to a Builder does not preclude the Declarant from retaining said rights and assigning any of the Special Declarant Rights to other Builders.

## ARTICLE X
## COVENANT FOR ASSESSMENTS

10.1.   Owners' Assessment Obligation.

(a)      Each Owner, by acceptance of the deed for his Unit, whether or not it shall be so expressed in the deed or other conveyance, shall be deemed to covenant and agree to pay to the Association all Assessments and any other charges or costs levied by the Association pursuant to this Declaration, including, but not limited to:

(i)      Base Assessments to fund Common Expenses for the benefit of all members of the Association and Limited Common Expenses;

(ii)      Special Assessments as described in Section 10.2(b) below;

(iii)      Any other charges or Assessments which may be determined by the Association from time to time to be due and payable by an Owner in accordance with this Declaration; and

(iv)      Any interest, late charges, collection costs, attorneys' fees, penalties or fines levied by the Board for non-payment of Assessments or for noncompliance with the terms and provisions of this Declaration, the By-Laws or any rules or regulations created by the Board. The Base and Special Assessments, together with any interest thereon, fines, late charges, attorneys' fees, penalties and costs of collection thereof, as hereinafter provided, shall be a charge on the Unit and shall be a continuing lien upon the Unit against which each Assessment is made from the time the Assessments, fines, penalties, late charges, attorneys' fees or costs of collection become due. Each Assessment, together with interest thereon, fines, late charges and costs of collection thereof, as hereinafter provided, shall also be the personal obligation of the Owner of the Unit at the time when the Assessment becomes due. The obligations of each

32

Owner hereunder with respect to Assessments, interest, late charges, fines, attorneys' fees and costs of collection shall be absolute and unconditional obligations of each Owner. No Owner may exempt himself from Assessments or other charges due under this Declaration by waiver of the use or enjoyment of the Common Facilities.

    10.2.   Base Assessments.

        (a)    Base Assessments shall be levied on all Units in accordance with a Unit's Common Expense percentage as set forth on Exhibit "E". The Board shall, at least forty-five (45) days before the beginning of each fiscal year, prepare a budget covering the estimated Common Expenses and Limited Common Expenses of the Association during the coming year. As applicable and appropriate, the budget shall include reserve funds adequate for the periodic maintenance, repair and replacement of improvements upon the Common Facilities and all other parts of the Property which do not consist of Units. The Base Assessment to be levied against each Unit shall be computed by dividing the budgeted Common Expenses by the total number of Units contained on the Property. The Board shall cause a copy of the Community Expense budget and notice of the amount of the Base Assessment to be levied against each Unit for the following year to be delivered to each Owner at least thirty (30) days prior to the beginning of the fiscal year. Such budget and Assessment shall become effective upon passage by the Board. In the event the Board fails for any reason so to determine the budget for any year, then and until such time as a budget shall have been determined as provided herein, the budget in effect for the immediately preceding year shall continue for the current year.

        (b)    Special Assessments. In addition to the Base Assessments, the Board may levy a Special Assessment or Special Assessments from time to time in amounts which the Board deems proper, whenever the Board is of the opinion it is necessary to do so in order to meet increased operating or maintenance costs, additional capital expenses, or because of emergencies. The obligation to pay Special Assessments for the benefit of all Owners shall be computed on the same basis as for Base Assessments, except with respect to Limited Charges which will be charged to the Unit Owners Limited Charges is incurred. In the event a Unit shall not be properly maintained by an Owner as required under this Declaration, the Association shall have the right, after giving the Owner at least fifteen (15) days written notice to cure any maintenance problems or deficiencies, and the Board shall have the right to assess as a Special Assessment the particular Owner for the cost of such maintenance. If the Association incurs any expenses to repair or replace any part of a Unit or the Community damaged by the act, omission or negligence of an Owner, the Board shall have the right to levy upon such Owner a Special Assessment to cover the expenses incurred by the Association to effectuate such remedial action.

    10.3.   Date of Commencement of Assessments. The Assessments provided for herein shall commence not later than the date the first Unit is conveyed by the Declarant to an Owner.

    10.4.   Reserve Funds. The Association shall establish one (1) or more Reserve Funds, in an amount or amounts which the Association deems appropriate, to pay the cost of maintenance,

33

repair and replacement of Common Facilities, Controlled Facilities, and any other parts of the Property that are anticipated to require maintenance, repair or replacement on a periodic basis ("**Reserve Funds**"). The Owner shall pay such amounts as the Association may direct as part of any Base Assessment or Special Assessment to be applied to any such Reserve Funds. The Board shall have the right to invest the Reserve Funds in banks or investment accounts, using commercially reasonable discretion.

10.5.   Surplus Funds. Any Surplus of the Association remaining after the payment of or provision for Common Expenses and any prepayment of reserves may be used by the Association as determined by the Board and, to the extent not so used, may be credited to the Owners to reduce their future Assessments.

10.6.   Time of Payment. Assessments shall be paid in such manner and on such dates as may be fixed by the Board which may include, without limitation, acceleration of the annual Base Assessment for delinquents. Unless the Board otherwise provides, the Base Assessment shall be paid in monthly installments.

10.7.   Effect of Nonpayment of Assessments: Remedies of the Association. Any assessment not paid within ten (10) days after the due date may upon resolution of the Board bear late fees and charges, and alternatively or additionally, interest from the due date, in amounts and at a rate to be set by the Board for each assessment period. The Association may bring an action at law against the Owner personally obligated to pay the same or an action to foreclose the lien against his Unit and there shall be added to the amount due the cost of preparing and filing the complaint in such action, advertising and other costs, and in the event a judgment is obtained, such judgment shall include interest on the amount due as herein provided and reasonable attorneys fees to be fixed by the court together with costs of the action. If the Board has provided for collection of assessments in installments, upon default in the payment of any one or more installments, the Board may accelerate payment and declare the entire balance of said assessment due and payable in full. The Board may notify any institutional or other lender holding a mortgage lien on such Unit of the nonpayment of assessments. In the event of a delinquency in the payment of any assessment when due, the Board shall have the right to accelerate and call due any assessments which will become due and payable within the next succeeding twelve (12) month period and suspend the voting rights of an Owner or Member and the right of an Owner or Member to use any of the Common Facilities.

10.8.   Power to Confess Judgment to Collect Delinquent Assessments.   **IF PERMITTED BY LAW, AS A MEANS OF ENFORCING THE OBLIGATION OF THE OWNERS TO PAY ALL ASSESSMENTS LEVIED PURSUANT TO THIS DECLARATION, THE BOARD SHALL HAVE THE RIGHT AND POWER TO OBTAIN A JUDGMENT OR JUDGMENTS FOR DELINQUENT ASSESSMENTS BY CONFESSION AGAINST THE OWNER AGAINST WHOM SUCH DELINQUENT ASSESSMENTS HAVE BEEN LEVIED. ACCORDINGLY, EACH OWNER, BY SUCH OWNER'S ACCEPTANCE OF THE DEED TO HIS OR HER UNIT, SHALL BE**

34

DEEMED TO HAVE APPOINTED ANY ONE OR MORE MEMBERS OF THE BOARD (DURING SUCH MEMBER'S TERM OF OFFICE) AS THE ATTORNEY-IN-FACT FOR SUCH OWNER TO CONFESS JUDGMENT AGAINST SUCH OWNER IN ANY COURT OF COMPETENT JURISDICTION IN THE COMMONWEALTH OF PENNSYLVANIA FOR ANY DELINQUENT ASSESSMENT OR ASSESSMENTS, FOR THE PURPOSE OF WHICH A COPY OF THIS SECTION AND A COPY OF THE OWNER'S DEED TO HIS OR HER UNIT (BOTH VERIFIED BY THE AFFIDAVIT OF ANY MEMBER OF THE BOARD) SHALL BE SUFFICIENT WARRANT.   THE AUTHORITY HEREIN GRANTED TO CONFESS JUDGMENT SHALL NOT BE EXHAUSTED BY ANY EXERCISE THEREOF BUT SHALL CONTINUE AND BE EFFECTIVE AT ALL TIMES WITH RESPECT TO EACH AND EVERY DELINQUENT ASSESSMENT. SUCH AUTHORITY TO CONFESS JUDGMENT AND THE AFORESAID APPOINTMENT OF ATTORNEYS-IN-FACT, BEING FOR SECURITY, SHALL BE IRREVOCABLE. THE BOARD SHALL NOT EXERCISE ITS RIGHT TO OBTAIN A JUDGMENT BY CONFESSION AGAINST ANY INSTITUTIONAL LENDER WHO HAS ACQUIRED TITLE TO A UNIT BY FORECLOSURE SALE OR DEED OR ASSIGNMENT IN LIEU OF FORECLOSURE, NOR SHALL SUCH RIGHT BE EXERCISED AGAINST ANY OWNER EXCEPT AFTER THE BOARD SHALL HAVE GIVEN THE DELINQUENT OWNER AT LEAST TEN (10) DAYS' NOTICE OF ITS INTENTION TO DO SO.

10.9.  Subordination and Release of Lien to Mortgagee. Any Unit subject to the lien of the Assessments provided for herein shall be relieved of such lien to the extent hereinafter described upon the exercise by a Permitted Mortgagee of the remedies provided in a Permitted Mortgage which results in the Permitted Mortgagee obtaining possession of such Unit by foreclosure or a Deed or assignment in lieu of foreclosure. The release of lien shall be applicable only to the extent that such lien relates to assessments or charges which have accrued prior to the mortgagee taking possession by foreclosure of the Mortgage or Deed or assignment in lieu of foreclosure. The lien of the assessments provided for herein shall be subordinate to the lien of any mortgage now or hereafter placed upon the Unit.

10.10.  Initial Contribution. Every Owner, at the time of such Owner's purchase of the Unit from the Declarant, shall pay to the Association the nonrefundable sum of One Thousand Five Hundred Dollars ($1,500.00) as an initial assessment, such sums to be applied by the Association as determined by the Board. Upon any resale of a Unit and purchase by a subsequent owner, the purchasing owner shall pay the Association a nonrefundable sum of One Thousand Five Hundred Dollars ($1,500.00), or such other amount as the Association may establish from time to time.

10.11.  No Waiver of Use. No Owner may exempt himself from the payment of assessments levied by the Association or release his Unit from the liens created for nonpayment of assessments by waiver of the use or enjoyment of the Common Facilities, or by abandonment of his Unit or by any conveyance of covenant severing the rights and benefits from the Unit or

35

otherwise. The obligation to pay assessments is absolute and unconditional and in addition to being a covenant running with the land, is a personal obligation to each Owner and shall not be subject to set-off or counter-claim.

10.12. <u>Governmental Fines, Etc.</u> All local government fines, penalties and assessments against a Unit or the Common Facilities may be imposed and liened directly against the responsible Owner or the Owner's Unit or the Association or the Common Elements without reference to any duties or functions of the Association or the Board.

10.13. <u>Mortgage Foreclosure.</u> If a mortgagee or other purchaser of a Unit acquires title to the Unit as a result of foreclosure of the first mortgage lien, or by deed in lieu of foreclosure or otherwise, the acquirer of title, his successors and assigns, shall not be liable for the share of Common Expenses or other charges by the Association pertaining to the Unit or chargeable to the Owner who previously owned the Unit which have accrued in the six (6) months prior to acquisition of title as a result of the foreclosure. The unpaid share of the charges shall be a Common Expense collectible for all Owners including the acquirer of the Unit by foreclosure, his successors and assigns.

10.14. <u>Monthly Payments of Base Assessments.</u> All Base Assessments made in order to meet the requirements of the Association's annual budget shall be deemed to be adopted and assessed on a monthly basis (rather than on an annual basis payable in monthly installments) and shall commence and be due and payable in advance on the first day of each month after settlement by the Owner on the Unit.

**ARTICLE XI**
**USE RESTRICTIONS**

11.1. <u>Use Restrictions.</u> The Property shall be held, used and enjoyed subject to the following limitations and restrictions, subject to the exemption of Declarant contained herein.

11.2. <u>Use.</u> Units shall be used for residential and accessory home office purposes only. The Declarant, its successors and assigns, may use any portion of the Property for a model home site and display, sales and/or construction office during the construction and sales period of the Community.

11.3. <u>Maintenance.</u> Except as otherwise set forth herein, each Unit shall be maintained by its Owner or occupants in a safe, clean and sanitary condition, in good order and repair, and in accordance with all applicable restrictions, conditions, ordinances, ordinances, codes and any rules or regulations which may be applicable under this Declaration or under law. Fireplaces and chimneys will be cleaned and maintained on a regular basis by the Owner, and proof of compliance may be required by the Association.

36

11.4.   Nuisances.   No noxious or offensive activity (including but not limited to the repair of motor vehicles) shall be carried on, in or upon any Unit or Common Elements nor shall anything be done therein which may be or become an unreasonable annoyance or a nuisance to any other Owner.   No loud noises or noxious odors shall be permitted on the Property, and the Board shall have the right to determine if any noise, odor or activity producing such noise, odor or interference constitutes a nuisance.   Without limiting the generality of any of the foregoing provisions, no exterior speakers, horns, whistles, bells or other sound devices (other than security devices used exclusively for security purposes), noisy or smoky vehicles, large power equipment or large power tools, unlicensed off-road motor vehicles or other items which may unreasonably interfere with television or radio reception of any Owner in the Property, shall be located, used or placed on any portion of the Property, or exposed to the view of other Owners without the prior written approval of the Architectural Review Committee.

11.5.   Parking and Vehicular Restrictions.

(a)   No Owner or occupant shall leave any non-operating vehicle, any vehicle not currently registered and licensed, any vehicle having an invalid and expired state motor vehicle inspection sticker parked anywhere on the Property except if entirely enclosed in the garage.  No Owner or guest shall park on the streets of the Community.

(b)   Driveways, streets and other exterior parking areas on the Property shall be used by Owners, occupants and guests for four wheel passenger vehicles, two wheel motorized bicycles and standard bicycles only.  No recreational vehicles, vans (other than non-commercial passenger vans), mobile homes, trailers, boats or trucks which are (i) used for commercial purposes; (ii) contain commercial lettering or commercial equipment; or (iii) other than sport utility vehicles having a capacity in excess of three-quarters of a ton (whether or not registered as a commercial vehicle with the State Department of Transportation) shall be permitted to be parked on the Property, except on a day-to-day temporary basis in connection with repairs, maintenance or construction work, if entirely enclosed in a Unit Owner's garage.  Motorcycles must be parked in the garage attached to the Dwelling or a Garage Space, if applicable.

(c)   No motor vehicles including, but not limited to, mini-bikes, snowmobiles and golf carts, may be driven on the Property and driveways by any Owner, occupant or guest.

11.6.   Animal Restriction.  No animals, livestock, reptiles or poultry of any kind shall be raised, bred or kept in any Unit, except usual and ordinary dogs, cats, fish, birds and other household pets may be kept in Units subject to Rules and Regulations adopted by the Association, provided that they are not kept, bred or maintained for commercial purposes or in unreasonable quantities. As used in this Declaration, "unreasonable quantities" shall ordinarily mean more than two (2) cats or two (2) dogs, or more than one (1) cat and one (1) dog, or any other domestic animal of similar or larger size, per household. The Association, acting through the Board, shall have the right to prohibit maintenance of any animal which constitutes, in the opinion of the Board, a nuisance to any other Owner. Animals belonging to Owners, occupants

37

or their licensees, tenants or invitees within the Property must be either kept in a Unit or on a leash being held by a person capable of controlling the animal. Should any animal belonging to a Owner be found unattended out of the Unit and not being held on a leash by a person capable of controlling the animal, such animal may be removed by the Association or a person designated by the Association to do so, to an animal shelter. Furthermore, any Owner shall be absolutely liable to each and all remaining Owners, their families, guests, tenants and invitees, for any unreasonable noise or damage to person or property caused by any animals brought or kept upon the Property by an Owner or by members of his family, his tenants or his guests; and it shall be the absolute duty and responsibility of each Owner to clean up after such animals which have used any portion of the Property. Dog and pet houses are prohibited.

11.7.   Outdoor Activities.   No garbage, refuse or rubbish shall be deposited on the Common Facilities unless placed in a suitable container located and screened from view from other Units. Trash cans and any other refuse container must be removed after pick up, the day of said pick up. No refuse or any personal effects are to be stored on the side of the house facing the street, or in the front yard. The Board shall have the right to enact rules and regulations regarding trash removal. Each Unit shall be kept free and clear of rubbish, debris and unsightly materials. No building material or equipment of any kind or character shall be placed or stored upon the Units except within the confines of an enclosed structure or except in connection with construction on the Unit, which construction shall be promptly commenced and diligently prosecuted to completion within a reasonable time. No household fabrics shall be hung, aired or dried outside the Unit. No swimming pool, spas, hot tubs or other water features shall be installed or kept on any Unit, except in accordance with Section 15.4 hereof.

11.8.   Outside Installations.   No attachments or installations (including, but not limited to exterior lighting) shall be placed on the exterior of any Unit unless approved by the ARC (hereinafter defined). The Board shall have the right to regulate the installation of antenna or satellite signal reception devices in accordance with the Federal law. No tents, storage tanks or accessory buildings or structures shall be erected or permitted to remain on a Unit or the Common Facilities. No basketball or other sports equipment shall be installed upon any portion of any Unit. No clothes lines or lawn ornaments, holiday lights (with the exception of non-blinking white lights between Thanksgiving and New Year's Day) or seasonal decorations shall be permitted in the Community if visible from the street.

11.9.   Resales.

(a)   Reference to Declaration.   The deed or instrument transferring title to any Unit shall contain a provision incorporating by reference the Covenants, Easements and Restrictions and the Declaration Plan set forth in this Declaration.

(b)   Notification.   The Seller of a Unit shall notify the Board as to his intent to sell the Unit so that an Estoppel Certificate may be prepared.

38

(c)    Estoppel Certificate.    Within ten (10) days of the receipt of such notification, the Board shall prepare an Estoppel Certificate which shall set forth any assessments and charges due upon such Unit at the time of conveyance and certify as to whether or not there are violations remaining on the Unit as of the date of preparation of such certificate. This certificate shall be mailed to the place designated by Seller. Payment of outstanding assessments, if any, and a reasonable charge to cover the cost of providing such certificate shall be transmitted directly to the Association by the closing attorney or title company.

(d)    UPCA. Owners and the Association must comply with the requirements of the UPCA.

11.10. Fences. No fences shall be permitted on the Property except those approved by the Board in accordance with Section 5.14 of this Declaration.

11.11. Signs. No signs, posters, displays, billboards or other advertising device of any kind shall be displayed to the public view on any portion of the Property, except that an Owner shall be allowed to erect a "for sale" or "for rent" sign subject to compliance with all Township Ordinances. The Declarant and the Association shall have the right to maintain a community sign and entrance features in the Common Facilities including planting beds and entrance signage as the Declarant or the Board shall determine. Nothing contained herein shall prevent the Declarant from installing such development signs as the Declarant deems necessary during the construction and sales phase of the Project.

11.12. Leasing of Units. Except as expressly provided in this Section, there shall be no restrictions on the leasing of Units. No transient tenants may be accommodated in any Unit, and no Lease shall be for less than a whole Unit, nor for an initial term of less than one (1) year. Each Lease shall be in writing and shall provide the terms of the Lease, shall be subject in all respects to the provision of the Act, this Declaration, the By-Laws and the Rules and Regulations of the Association, and that any failure by the Lessee to comply with the terms of such document shall be an event of default under the Lease. Each Owner or tenant of such Owner shall be subject to the limitations for guest set forth herein. The Association shall be a third party beneficiary of such covenants in any Lease and shall have the right to enforce them. An Owner shall not engage in the leasing of his Unit except after having his lessee execute a Lease which contains the following provision:

"Lessee hereby agrees to be bound by all terms and conditions contained in the Declaration of Covenants, Easements and Restrictions for Haverford Reserve, The Carriage Homes, By-Laws and Rules and Regulations of the Association as the same shall apply to the Unit leased hereunder, and agrees to assume all duties and responsibilities and be jointly and severally liable to the Owner for all of the liabilities and for the performance of all of the obligations applicable to the Owners under the Act, the Declaration, the Articles and the By-Laws or otherwise during the term of the Lease."

39

The Declarant shall be expressly exempt from this Section 11.12.

11.13.  Changes to Exterior of Unit.  Owner shall not make any changes to the exterior of a Unit, including, but not limited to the construction of a deck or patio not constructed during the initial construction of the Unit, except in accordance with Article XII hereof.

11.14.  Declarant Exemption.  Declarant or its successors or assigns will undertake the work of constructing and developing all of the Unit and Common Facilities included within the Property.  The completion of that work and sale, rental and other disposal of Units is essential to the establishment and welfare of the Property as a residential community.  As used in this Section and its subparagraphs, the words "its successors and assigns" specifically do not include purchasers of Units improved with Units.  In order that said work may be completed and the Community be completed and established as a fully occupied residential community as rapidly as possible, no Owner nor the Association shall do anything to interfere with, and nothing in this Declaration shall be understood or construed to:

(a)  Prevent Declarant, its successors or assigns, or the contractors or subcontractors, from doing on any Unit or Common Facilities whatever it determines to be necessary or advisable in connection with the completion of said work, including without limitation the alteration of its construction plans and designs as Declarant deems advisable in the course of development.

(b)  Prevent Declarant, its successors or assigns, or their representatives, from erecting, constructing and maintaining on any Unit, Common Facilities or portion thereof, owned or controlled by Declarant, or its successors or assigns, or its or their contractors or subcontractors, such structures and equipment as may be reasonably necessary for the conduct of its or their business of completing said work and establishing the Property as a residential community and disposing of the same in Units by sale, lease or otherwise.

(c)  Prevent Declarant, its successors or assigns, or its contractors or subcontractors, from maintaining such signs on any Unit or Common Facilities as may be necessary including, but not by way of limitation, safety and Unit identification signs in connection with the sale, lease or other marketing of Units in the Property.

(d)  Prevent Declarant, its successors or assigns, from granting additional licenses, reservations and rights-of-way to itself, to utility companies, or to others as may from time to time be reasonably necessary for the proper development and disposal of the Property.

The provisions herein restricting Owners and the Association from interfering with the construction activities of the Declarant shall survive turnover of control of the Association.

## ARTICLE XII
## ARCHITECTURAL REVIEW AND APPROVAL

40

12.1.   Architectural Review and Approval.

(a)     Each Owner, by accepting a deed or other instrument conveying any interest in any portion of the Property, acknowledges that Declarant has a substantial interest in ensuring that the improvements within the Property enhance Declarant's reputation as a community developer and do not impair Declarant's ability to market, sell, or lease its property. Therefore, each Owner agrees that no activity within the scope of this Article shall be commenced on such Owner's Unit unless and until Declarant or its designee has given its prior written approval for such activity, which approval may be granted or withheld in Declarant's or its designee's sole discretion.  In reviewing and acting upon any request for approval, Declarant or its designee shall be acting solely in Declarant's interest and shall owe no duty to any other person.  Declarant's rights reserved under this Article shall continue so long as Declarant owns any portion of the Property unless earlier terminated in a recorded instrument executed by Declarant.  Declarant may, in its sole discretion, designate one or more persons from time to time to act on its behalf in reviewing applications hereunder. Declarant may from time to time, but shall not be obligated to, delegate all or a portion of its reserved rights under this Article to (i) an Architectural Review Committee ("ARC") appointed by the Board, (ii) a design professional appointed by the Declarant to review and approve the construction of buildings on the Property (the "**Town Architect**") or (iii) a committee comprised of architects, engineers, or other persons who may or may not be Members of the Association.  Any such delegation shall be in writing, shall specify the scope of responsibilities delegated, and shall be subject to (i) Declarant's right to revoke such delegation at any time and reassume jurisdiction over the matters previously delegated and (ii) Declarant's right to veto any decision which Declarant determines, in its sole discretion, to be inappropriate or inadvisable for any reason.  So long as Declarant has any rights under this Article, the jurisdiction of the foregoing entities shall be limited to such matters as Declarant specifically delegates to it.

(b)     Upon delegation by Declarant or upon expiration or termination of Declarant's rights under this Article, the Association, acting through the ARC, shall assume jurisdiction over architectural matters.  The ARC, when appointed, shall consist of at least three (3), but not more than seven (7), persons who shall serve and may be removed and replaced in the Board's discretion.  The members of the ARC need not be Members of the Association or representatives of Members, and may, but need not, include architects, engineers, or similar professionals, who may be compensated in such manner and amount, if any, as the Board may establish. Unless and until such time as Declarant delegates all or a portion of its reserved rights to the ARC or Declarant's rights under this Article terminate, the Association shall have no jurisdiction over architectural matters.

(c)     For purposes of this Article, the entity having jurisdiction in a particular case is referred to as the "**Reviewer**".

(d)     The Reviewer may establish and charge reasonable fees for review of applications and may require such fees to be paid in full prior to review of any application.  Such

41

fees may include the reasonable costs incurred in having any application reviewed by architects, engineers, or other professionals.   Declarant and the Association may employ architects, engineers, or other persons as deemed necessary to perform the review.   The Board may include the compensation of such persons in the Association's annual operating budget.

(e)     The standards and procedure established by this Article are intended as a mechanism for maintaining and enhancing the overall aesthetics of the Property; they do not create any duty to any person.   Review and approval of any application pursuant to this Article may be based on aesthetic considerations only.   The Reviewer shall not bear any responsibility for ensuring the structural integrity or soundness of approved construction or modifications, nor for ensuring compliance with building codes and other governmental requirements, nor for ensuring that all dwellings are of comparable quality, value, or size, of similar design, or aesthetically pleasing or otherwise acceptable to neighboring Owners.

(f)     Declarant, the Association, the Board, any committee, or any member of the Board or any committee shall not be held liable for soil conditions, drainage, or other general site work; any defects in plans revised or approved hereunder; any loss or damage arising out of the action, inaction, integrity, financial condition, or quality of work of any contractor or its subcontractors, employees, or agents, whether or not Declarant has approved or featured such contractor as a builder; or any injury, damages, or loss arising out of the manner or quality or other circumstances of approved construction on or modifications to any Unit or Dwelling.  In all matters, the Board, the Reviewer, and the members of each shall be defended and indemnified by the Association as provided in Article 16.



(g)     Any Owner may request that the Reviewer issue a certificate of Architectural compliance certifying that there are no known violations of this Article.   The Association shall either grant or deny such request within thirty (30) days after receipt of a written request and may charge a reasonable administrative fee for issuing such certificates. Issuance of such a certificate shall estop the Association from taking enforcement action with respect to any condition as to which the Association had notice as of the date of such certificate.

(h)     Without obtaining approval as provided herein, no building, landscaping (including, but not limited to, berming, grading, trees, shrubs and plantings, water features) "**Landscaping**") wall or other structure or improvements shall be commenced, erected, installed or maintained upon a Unit (other than those features constructed or installed by the Declarant), nor shall any exterior addition to, change or replacement (including change of external color scheme) or alteration or addition be made to any Unit (other than alterations or changes or additions installed or constructed by the Declarant) which alters the external appearance of the Dwelling or the Unit.

(i)     An Owner seeking review and approval of the structure or improvements described herein shall submit plans and specifications showing the nature, kind, shape, height,

42

materials, finish, colors and location of the same, as well as proof of compliance with all applicable codes, laws and ordinances by certified mail to the ARC.

(j)    The ARC must approve, in writing, with or without conditions, any request received by the ARC within sixty (60) days after all plans and specifications, including additional information, plans and materials which may have been requested by the ARC have been submitted, or the request is deemed denied.

(k)    In making a determination as to the acceptability of any proposed alteration, change or addition, the ARC shall consider the effect the alteration, change or addition will have on the maintenance, repair and replacement obligations of the Association, including the costs of fulfilling these obligations.  The ARC shall have the right to impose conditions on any approval given including, without limitation, providing all maintenance, repair and replacement of any such change, addition or alteration and paying to the Association any additional cost that may be incurred by the Association in performing its obligations due to such change, addition or alteration.

(l)    The ARC shall have the right to request additional information, plans and materials concerning any proposed alterations, additions and improvements.

(m)    The ARC, with the approval of the Board, shall have the right to establish design criteria and standards for alterations, additions and improvements within the Property.

(n)    Notwithstanding the above, the ARC shall have the power to grant waivers from architectural design criteria and standards according to procedures and subject to the conditions established by the Board.

(o)    The provisions of this Section shall not apply to the Declarant.

(p)    Any decision of the ARC may be appealed to the Board within thirty (30) days of the Committee's decision.

(q)    Approval by the ARC shall not constitute an endorsement or precedent for any design.

(r)    Each Owner, subsequent to approval from the ARC, shall obtain the necessary approvals and permits from the appropriate Township and governmental entities.

## ARTICLE XIII
## COMPLIANCE AND DEFAULT

13.1.   Compliance and Default.

43

(a)     Each Owner shall be governed by and shall comply strictly with the terms, covenants, conditions and restrictions of this Declaration, the By-Laws, and any rules and regulations adopted pursuant thereto, and the same as they may be amended from time to time.

(b)     The Board shall have the power to adopt, amend and enforce compliance with any reasonable rules and regulations relative to the operation, use and occupancy of the Property consistent with the provisions of this Declaration, including, but not limited to enforcement procedures and penalties for violations of this Declaration, the By-Laws and any rules and regulations adopted pursuant thereto which the Board shall deem appropriate.  Any rules and regulations shall be adopted or amended, from time to time, by means of appropriate resolutions duly approved by the Board in accordance with the By-Laws.  A copy of the rules and regulations and copies of any amendments thereto shall be delivered or mailed to each Owner and occupant of a Dwelling promptly after the adoption thereof and shall become binding upon all Owners, their successors in title and assigns, and occupants of Units.

(c)     Failure of the Owner to comply with any provisions of this Declaration or the By-Laws or any rules and regulations adopted pursuant thereto shall entitle the Association or Owners to the remedies provided in this Declaration, and also to the following relief, none of which shall be exclusive of any other remedies:

(i)     Suits.  Failure to comply with the terms of this Declaration, the By-Laws and any rules and regulations adopted pursuant thereto shall entitle the Association or any aggrieved Owner or any Permitted Mortgagee to sue for the recovery of damages or for injunctive relief, or both.  This relief shall not be exclusive of other remedies provided by law.

(ii)     Costs and Attorneys' Fees.  In any proceeding arising because of an alleged failure of an Owner to comply with the terms of this Declaration, the By-Laws and any rules and regulations adopted pursuant thereto, the prevailing party shall be entitled to recover the costs of the proceeding and reasonable attorneys' fees; provided, however, that no costs or attorneys' fees may be recovered against the Board in any action unless the court shall first expressly find that the Board acted in bad faith.

(iii)     No Waiver of Rights.  The failure of the Declarant or the Board, or any Owner to enforce any covenant, restriction or other provision of this Declaration, the By-Laws or any rules and regulations adopted pursuant thereto, shall not constitute a waiver of the right to do so thereafter.

13.2.   Complaint and Hearing Procedure.

(a)     Unless the internal remedies provided by this Section and any rules and regulations promulgated by the Board shall be expressly waived by the Association, or the Association fails or refuses to act, no action at law or in equity shall be commenced by any Owner or occupant of a Unit until this internal remedy is pursued to exhaustion.

44

(b)     The Board shall hear complaints from Owners or occupants of Units of alleged violations of this Declaration (other than violations with respect to Assessment obligations), the By-Laws and any rules and regulations of the Association.

(c)     The Board shall hold a hearing on any complaint within thirty (30) days after the receipt by the Board of a formal notice of complaint from an Owner or occupant of a Unit. A decision shall be issued in writing by the Board of Directors within ten (10) day after the conclusion of the hearing.

(d)     The Board shall have the right to establish various rules and procedures governing the operation and administration of the complaint and hearing process and the enforcement of this Declaration, the By-Laws and any rules and regulations.

(e)     In hearings before the Board, all parties shall be entitled to be represented by counsel.

## ARTICLE XIV
## INDEMNIFICATION OF OFFICERS, MEMBERS OF THE BOARD AND COMMITTEE MEMBERS

14.1.    Indemnification. The Association shall indemnify each of its Directors, officers and employees whether or not then in service as such (and his or her executor, administrator and heirs) against all reasonable expenses actually and necessarily incurred by him or her in connection with the defense of any litigation to which the individual may have been a party because he or she is or was a Director, officer or employee of the Association. The individual shall have no right to reimbursement, however, in relation to matters as to which he or she has been adjudged liable to the Association in the performance of his or her duty as director, officer or employee by reason of willful misconduct, bad faith, gross negligence or reckless disregard of the duties of his or her office or employment. The right to indemnify for expenses shall also apply to the expenses of suits which are compromised or settled if the court having jurisdiction of the matter shall approve such settlement. The foregoing right of indemnification shall be in addition to, and not exclusive of, all other rights to that which such director, officer or employee may be entitled.

14.2.    Limited Liability of Directors.

(a)     Fiduciary Relationship. A Director of this Association shall stand in a fiduciary relation to this Association and shall perform his duties as a Director, including his duties as a member of any committee of the Board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of this Association, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his duties, a Director shall be entitled to rely in good

45

faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

(i)     One or more Directors or employees of this Association whom the Director reasonably believes to be reliable and competent in the matters presented;

(ii)    Counsel, public accountants or other persons as to matters which the Director reasonably believes to be within the professional or expert competence of such persons; and

(iii)    A committee of the Board upon which he does not serve, duly designated in accordance with law, as to matters within its designated authority, which committee the Director reasonably believes to merit confidence.  A Director shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause his reliance to be unwarranted.

(b)    <u>Reliance</u>.  In discharging the duties of their respective positions, the Board, committees of the Board and individual Directors may, in considering the best interests of this Association, consider the effects of any action upon employees, upon suppliers and customers of this Association and upon communities in which offices of other establishments of this Association are located, and all other pertinent factors.  The consideration of these factors shall not constitute a violation of <u>Section 15.2</u> hereof.

(c)    <u>Presumption</u>.  Absent breach of fiduciary duty, lack of good faith or self-dealing, actions taken as a Director or any failure to take any action shall be presumed to be in the best interests of this Association.

(d)    <u>Limited Liability</u>.  A Director of this Association shall not be personally liable for monetary damages as such for any action taken, or any failure to take any action, unless:

(i)    The Director has breached or failed to perform the duties of his office under <u>Section 14.02</u> hereof; and

(ii)    The breach or failure to perform constitutes self-dealing, willful misconduct or recklessness.

(e)    <u>Exclusion to Limited Liability</u>.  The provisions hereof shall not apply to:

(i)    The responsibility or liability of a Director pursuant to any criminal statute; or

(ii)    The liability of a Director for the payment of taxes pursuant to local, state or federal law.

46

## ARTICLE XV
## MORTGAGEE PROVISIONS

15.1.   Reports and Notices.  Upon the specific written request of a holder of a Permitted Mortgage on a Unit, the Permitted Mortgagee shall be entitled to receive some or all of the following as designated in the request to the same extent as an Owner:  copies of budgets, notice of assessment; audited or unaudited financial statements; notices of meetings; notice of decision of Owners to make any material amendment to this Declaration; notices of the commencement of any condemnation or eminent domain proceedings with respect to any part of the Property; and the right to examine the books and records of the Association.  Failure to comply with the requirements set forth above shall in no way invalidate otherwise proper actions of the Association and/or the Board.

15.2.   Subordination of Assessment Lien to Mortgages.  The lien of the assessments provided for herein shall be subject and subordinate to the lien of any Permitted Mortgage held by a Permitted Mortgagee.  Sale or transfer of any Unit shall not affect the assessment lien. However, the sale or transfer of any Unit pursuant to mortgage foreclosure or any Deed or proceeding in lieu of foreclosure (other than foreclosure by the Association of its own assessment lien) shall extinguish the lien of such assessments as to payments which become due prior to such sale or transfer, except for claims for a share of such assessments resulting from a reallocation thereof among all Owners and Units including the Unit so sold.  No sale or transfer shall release such Unit from liability for any assessment thereafter becoming due or from the lien thereof.

## ARTICLE XVI
## GENERAL PROVISIONS

16.1.   Amendments Generally.  Subject to the other provisions of this Declaration relative to amendment, this Declaration in the following manner:

(a)   Before Last Conveyance.  Prior to the transfer of all of the Units owned by the Declarant to an Owner, the Declarant may amend this Declaration in any legal fashion as the Declarant may deem appropriate.

(b)   After Last Conveyance.  After the last transfer of title to the Units by the Declarant, each of the following conditions shall apply; provided, however, that any other provisions of this Declaration setting forth other conditions of amendment shall take precedence:

(i)   Notice.  Notice of the subject matter of a proposed amendment shall be included in the notice of any annual or special meeting of the Association in which a proposed amendment is considered, and shall be served upon all Members in the manner hereinafter provided for service of notices.

47

(ii)    Resolution.  An amendment may be proposed by either the Board or by at least fifty percent (50%) of the Members.  No resolution of the Board adopting a proposed amendment shall be effective until it has the affirmative vote of at least seventy-five percent (75%) of the Owners.

(iii)    Agreement.  In the alternative, an amendment may be made by an agreement signed and acknowledged by at least seventy-five percent (75%) of the Members in the manner required for the execution of a deed, and this amendment shall be effective when recorded.

(c)    Amendment to Correct Errors.  If any amendment to this Declaration or the By-Laws is necessary in the judgment of the Board to correct any ambiguity or to change, correct or supplement anything appearing or failing to appear therein which is incorrect, defective or inconsistent with anything in this Declaration or the By-Laws or to the requirements of the municipality in which the Property is located, the Board may, at any time and from time to time effect an appropriate corrective amendment without the approval of the Owners of all or part of the Property, upon receipt by the Board of an opinion from independent legal counsel to the effect that the proposed amendment is permitted by the terms of this paragraph.  Each amendment shall be effective upon its recording.

(d)    Proviso.  For so long as Declarant continues to own any Unit or continues to have any right to build any Unit, no amendment of this Declaration shall make any changes which would in any way affect any of the rights, privileges, powers and options of the Declarant unless the Declarant shall join in the execution or amendment.

(e)    Execution and Recording.  A copy of each amendment shall be executed and acknowledged by the officers of the Association with the formalities of a deed.  The amendment shall be effective when the amendment is recorded in the Office of the Recorder of Deeds in and for Delaware County, Pennsylvania.

(f)    Township Approval.  Notwithstanding the foregoing, the following Sections may not be revised without the prior written consent of the Township:  5.10, 9.5, 9.7, 9.13 and 9.14.

16.2.    Duration.  The covenants and restrictions of the Declaration shall run with and bind the land perpetually. The Declaration shall not be terminated without the prior written approval of the Township.

16.3.    Enforcement.  The Township shall have all rights of enforcement as otherwise set forth herein, and any and all rights of enforcement which may now exist or may hereinafter be established by law.

48

16.4.   Severability.   Invalidation of any one of those covenants or restrictions by judgment or court order shall in no way affect any other provisions which shall remain in full force and effect.

16.5.   Effective Date.   This Declaration shall become effective when duly entered of record in the Office of the Recorder of Deeds of Delaware County, Pennsylvania.

16.6.   Governing Law.   This Declaration and any questions concerning its validity, construction or performance shall be governed by the laws of the Commonwealth of Pennsylvania.

16.7.   Notification.   The Township Manager shall be provided with notification of the mailing address of the Association, the Board and the names and addresses of the members of the Board and the officers of the Association, and such mailing information shall be kept current.

16.8.   Headings.   The headings herein are for reference purposes only and shall not affect the meaning or interpretation of this Declaration.

16.9.   Binding.   This Declaration shall run with the Property and all of the Units and shall further inure to the benefit of and shall be binding upon the Declarant's successors or assigns.

IN WITNESS WHEREOF, the Declarant, Haverford Reserve, L.P., a Pennsylvania limited partnership, has caused these presents to be duly executed by its _General Partner_, this _20_ day of _June_, 2010.

WITNESS:

_David Moren_

HAVERFORD RESERVE, L.P.
   By: Haverford Reserve GP, LLC,
   a Pennsylvania limited liability company, its
   sole general partner
      By: _____
      Kenneth N. Goldenberg
      Sole Member

49

## ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA    :
                                  : ss:-
COUNTY OF ~~DELAWARE~~ *Montgomery*   :

        On this the *2Fth* day of *June*_____, 2010, before me, a Notary Public in and for the Commonwealth of Pennsylvania, the undersigned officer, personally appeared Kenneth N. Goldenberg, sole member of Haverford Reserve GP, LLC, the sole general partner of Haverford Reserve, L.P., a limited partnership, and being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the general partner by himself as sole member.

        IN WITNESS WHEREOF, I have hereunto set my hand and official seal.


                                           *Patricia E. Simpson*
                                           Notary Public
                                           My Commission Expires: *6/03/14*

                        COMMONWEALTH OF PENNSYLVANIA
                             Notarial Seal
                      Patricia E. Simpson, Notary Public
                    Whitpain Twp., Montgomery County
                   My Commission Expires June 3, 2014
                Member, Pennsylvania Association of Notaries

50

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit "A" | Legal Description of the Property |
| Exhibit "A-1" | Convertible Real Estate |
| Exhibit "B" | Easements and Licenses |
| Exhibit "C" | Reduced Size Copy of the Plan |
| Exhibit "D" | Responsibility Checklist |
| Exhibit "E" | Common Expense Percentages |
| Exhibit "F" | Declaration of Easements, Covenants and Restrictions |

## EXHIBIT "A"

## LEGAL DESCRIPTION OF THE PROPERTY

The portions of the property designated as Unit, Common Facility and/or Limited Common Facility on the Plan entitled "Declaration Plat, Carriage Homes at Haverford Reserve, a Planned Community" dated May 19, 2010, prepared by Chester Valley Engineers, a copy of which is attached to this Declaration.

**EXHIBIT "A-1"**

**CONVERTIBLE REAL ESTATE**

Legal Description

ALL THAT CERTAIN tract or parcel of land SITUATE in Haverford Township, Delaware County, Pennsylvania, as shown on a Subdivision and Land Development Plan for Haverford Reserve, dated July 28, 2006, last revised November 30, 2007 by Chester Valley Engineers, Inc., Paoli, Pennsylvania, and bounded and described as follows:

BEGINNING at a point, the northeast corner of lands now or formerly of CNL Retirement MA3 Penns, LP, said corner being the following two courses from a monument to be set of the Right-of-Way line of Darby Road (S.R. 2005): (1) South 32 degrees 30 minutes 41 seconds West a distance of 541.50 feet to a point; (2) South 33 degrees 27 minutes 41 seconds West a distance of 630.55 feet to a point; thence from the point of beginning, along the aforesaid lands of CNL Retirement, the following three courses and distances: (1) South 61 degrees 47 minutes 16 seconds East a distance of 443.19 feet to a point; (2) South 33 degrees 36 minutes 44 seconds West a distance of 468.57 feet to a point; (3) South 82 degrees 56 minutes 20 seconds East a distance of 551.54 feet to a point, a corner of Parcel 3 of said Plan, thence along the lands of Parcel 3, the following nine course and distances: (1) South 6 degrees 26 minutes 55 seconds West a distance of 363.51 feet to a point; (2) South 40 degrees 12 minutes 03 seconds West a distance of 231.26 feet to a point; (3) South 60 degrees 53 minutes 36 seconds West a distance of 102.79 feet to a point; (4) South 79 degrees 40 minutes 17 seconds West a distance of 87.82 feet to a point; (5) North 80 degrees 37 minutes 09 seconds West a distance of 253.12 feet to a point; (6) South 86 degrees 36 minutes 36 seconds West a distance of 196.57 feet to a point; (7) South 76 degrees 40 minutes 39 seconds West a distance of 114.37 feet to a point; (8) South 72 degrees 04 minutes 37 seconds West a distance of 449.25 feet to a point; (9) North 89 degrees 03 minutes 48 seconds West a distance of 56.08 feet to a point, a corner of Parcel 2 of said Plan, thence along the line of lands of Parcel 2 the following thirteen course and distances: (1) North 6 degrees 30 minutes 56 seconds West a distance of 129.19 feet to a point of curvature; (2) along the arc of a non-tangent circle curving to the right having a radius of 154.00 feet, an arc length of 134.27 feet and a chord bearing North 52 degrees 15 minutes 47 seconds West a distance of 130.06 feet to a point of tangency; (2) North 27 degrees 17 seconds 09 minutes West a distance of 234.43 feet to a point of curvature; (3) along the arc of a circle curving to the right having a radius of 420.00 feet, an arc length of 79.39 feet and a chord bearing North 21 degrees 52

minutes 16 seconds West a distance of 79.27 feet to a point of curvature; (4) along the arc of a non-tangent circle curving to the left having a radius of 60.00 feet, an arc length of 80.85 feet and a chord bearing North 58 degrees 19 minutes 16 seconds East a distance of 74.87 feet to a point of reverse curvature; (5) along the arc of a circle curving to the right having a radius of 20.00 feet, an arc length of 19.47 and a chord bearing North 47 degrees 36 minutes 15 seconds East a distance of 18.71 feet to a point of tangency; (6) North 75 degrees 29 minutes 23 seconds East a distance of 72.55 feet to a point of curvature; (7) along the arc of a circle curving to the left having a radius of 695.00 feet, an arc length of 301.57 feet and a chord bearing North 63 degrees 03 minutes 32 seconds East a distance of 299.21 feet to a point of tangency; (8) North 50 degrees 37 minutes 41 seconds East a distance of 226.19 feet to a point of curvature; (9) along the arc of a circle curving to the left having a radius of 800.00 feet, an arc length of 215.97 feet and a chord bearing North 42 degrees 53 minutes 39 seconds East a distance of 215.31 feet to a point of reverse curvature; (10) along the arc of a circle curving to the right having a radius of 100.00 feet, an arc length of 86.54 feet and a chord bearing North 10 degrees 22 minutes 06 seconds East a distance of 83.87 feet to a point of reverse curvature; (11) along the arc of a circle curving to the right having a radius of 100.00 feet, an arc length of 85.66 feet and a chord bearing North 10 degrees 07 minutes 03 seconds East a distance of 83.07 feet to a point of tangency; (12) North 34 degrees 39 minutes 31 seconds East a distance of 319.99 feet to a point; (13) South 61 degrees 47 minutes 16 seconds East a distance of 40.30 feet to a point, said point being the first mentioned point and place of beginning.

Excluding such portions of the property designated as Unit Common Facility and/or Limited Common Facility on the Plan entitled "Declaration Plat, Carriage Homes at Haverford Reserve, a Planned Community" dated May 19, 2010, prepared by Chester Valley Engineers, a copy of which is attached to this Declaration.

EXHIBIT "B"

EASEMENTS AND LICENSES

Rights granted to Public Utility Companies as set forth in Deed Book 975 page 501; Deed Book 1059 page 488 and Deed Book 1085 page 96. [not plottable per below referenced Survey]

Covenants, reservations, conditions and/or restrictions as set forth in Record Book 2631 page 947 but deleting any covenant, condition or restriction indicating a preference, limitation, specification or discrimination based on race, color, religion, sex handicap, familial status, national origin, age, ancestry, disability or use of guide or support animals to the extent such covenants, conditions or restrictions violate 42 U.S.C. §3604(c) and/or 43 P.S. §951.

ALTA/ACSM Land Title Survey prepared by Langan Engineering and Environmental Services, Philadelphia, PA dated 1/14/2004, last revised 11/26/2007 discloses:

a. 40' wide access and utility easement.

Final Subdivision Plan recorded 12/12/2007 in Plan Book 31 page 134 and Land Development Plan recorded 12/___/2007 in Plan Book ___ page _____.

EXHIBIT "C"

PLAN

A full size copy of the Plan is available at the office of the Declarant.





### EXHIBIT "D"

**HAVERFORD RESERVE, COMMUNITY ASSOCIATION RESPONSIBILITY CHART**

**Ownership Key:**

| | |
|---|---|
| H | Home - owned by one or more Homeowners, a dwelling. Includes the Lot under and around the Dwelling as shown on the Plan. A "Unit" under the PA UPCA. |
| H-CTF = | Controlled Facility - Those components of the Home which receive one or more services from the Association. |
| CF = | Common Facility - owned by the Association to which all Homeowners are members. A "Common Element" under the Pennsylvania Uniform Planned Community Act. |
| LCF = | Limited Common Facility - portions of the Common Facilities which are limited in use or access to one or more Homeowners. |
| P = | Public - components owned by a Public Utility Company. |
| T = | Township owned |

**Assessment Key:**

| | |
|---|---|
| CE = | Common Expense - fees charged to cover the Association costs which are shared equally by all Homeowners. |
| LCE = | Limited Common Expense - fees charged for Association costs which are shared equally only by those Homeowners of conveyed homes for services to Controlled Facilities and Limited Common Facilities. Once all homes are conveyed, these Limited Common Expenses will become Common Expenses |
| LC = | Limited Charge – direct charges to Homeowners for Association costs which are excluded from the budget (and monthly fees), charged only to one or more Homeowners who derive the benefit when the service will be provided. |

| COMPONENT | COMMUNITY OWNERSHIP CATEGORY | ASSOCIATIONS RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Roofing<br>Flashing | H-CTF | Repair<br>Replacement | LCE<br>LCE | None |
| Skylights | H | None | | Repair<br>Replacement (I) |
| Gutters<br>Downspouts | H-CFT | Repair<br>Maintenance<br>Replacement | LCE<br>LCE<br>LCE | None |
| Stucco and Stone exterior | H-CTF | Repair<br>Eventual<br>replacement | LC<br>LC | None |
| Handiplank or similar siding material | H-CTF | Repainting<br>Replacement | LC<br>LC | None |
| Chimney Exteriors | H-CTF | Repair<br>Eventual<br>replacement | LC<br>LC | Full<br>Cleaning |
| Fireplaces, Hearths | H | None | | Repair<br>Replacement |
| Windows<br>Window glass,<br>Sliding glass doors<br>Patio doors | H | None | | Cleaning<br>Repair<br>Replacement (I) |
| Front Entrance Door<br>Patio or Balcony door | H-CFT | Repainting<br>Exterior side | LCE | Repair<br>Replacement (I) |
| Locks, hinges or other hardware on windows and doors | H | None | | Repair<br>Replacement |
| Garage Door | H-CTF | Repainting exterior side | LCE | Repair<br>Replacement (I) |

| COMPONENT | OWNERSHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Garage door lock, Hardware, mechanicals | H | None | | Maintenance Repair Replacement |
| Front Porch, entranceway landing, stoop (brick with concrete | H-CTF | Snow clearing Replacement | LCE LC | Clearing Ice Melting |
| Exterior entrance lighting, controlled inside Home | H | None | | Repair Maintenance Electricity Replacement (1) |
| Privacy fencing | H-CTF | Repair Maintenance Replacement Restraining | LC LC LC LC | None |
| Foundation Walls | H | None | | None |
| Basement, internal structural components | H | None | | None |
| Interior components or everything inside "exterior surface side" or having an "interior aspect" | H | None | | Repair Maintenance Replacement |
| Attic space, non-structural components beneath roof sheathing, including insulation | H (access only with Board approval | None | | Cleaning Repair |
| Plumbing and electrical-if services one Home, regardless | H | None | | Repair Maintenance Replacement |

| of location | | | | |
| --- | --- | --- | --- | --- |
| COMPONENT | OWNERSHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
| HVAC units (wherever located) | H | None | | Repair Maintenance Operation Replacement |
| Sidewalks to main entry of individual Homes | H-CTF | Snow clearing Repair Replacement | LCE LCE LCE | Cleaning Ice melting |
| Driveways | H-CTF | Snow clearing Repair Sealcoating Replacement | LCE LCE LCE LCE | Clearing Ice melting |
| Sprinkler Irrigation System in the Common | CF | Operation Maintenance Repair Replacement | CE CE CE CE | None |
| Sprinkler Irrigation System near homes | H | Operation Maintenance Repair Replacement | LCE LCE LCE LCE | None |
| Common sidewalk near entrance to the property | CF | Snow clearing Repair Replacement | CE CE CE | None |
| Planted beds directly adjacent to homes | H-CTF | Limited maintenance Mulching | LCE LCE | Watering Planting |
| All other landscape on the property | CF | Maintenance Replacement | CE CE | None |

| COMPONENT | OWNERSHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Common Wall Adjacent to the Quadrangle property | CF | Repair Replacement Repainting fencing | CE CE CE | None |
| Independent Garage Buildings (Garage Spaces) located along front of the community | CF(3) | Repair Operation Maintenance Replacement | CE CE CE CE | None |
| Green Lane and Valley Ridge Road as well as the parking spaces locate | CF | Repair Resurfacing Snow clearing (2) | CE CE CE CE | None |
| Entrances into the Haverford Reserve property from Parkview Boulevard | CF | Operation Repair Maintenance Replacement Resurfacing | CE CE CE CE CE | None |
| Curbing along Green Lane and Valley Ridge Road | CF | Repair Replacement | CE CE | None |
| Street Lighting along Green Lane and Valley Ridge Road | CF | Electricity Repair Maintenance Replacement | CE CE CE CE | None |
| Mailboxes | CF | Repair Replacement | CE CE | None |
| Storm Water Basin | CF | Operation Maintenance Replacement | CE CE CE | None |
| Parkview Boulevard Landscape | T(4) | Maintenance Replacement | CE(4) CE(4) | None |

(1) Items to be replaced by Owner which must first be approved by the Association

(2) Snow will be cleared where there are no vehicles are parked in area when contractor is present to do the work.

(3) The four parking spaces inside each garage are Limited Common Elements initially assigned by the Declarant with subsequent assignments made by the Board. Holders of those twelve assignments pay a monthly fee to the Association

(4) Although Parkview Boulevard is owned by Haverford Township, all the landscape material located along both sides and the islands are the permanent maintenance obligation shared by the Haverford Reserve Community Association and the Athertyn Condominium Association. Each Association will pay half of the expense with Athertyn having the duty to manage these services. The Haverford Reserve-related expense is included in its budget so no separate fee will be charged to the Owners.

## EXHIBIT "E"

## COMMON EXPENSE PERCENTAGES

| Unit | 107 | 16.66% |
|------|-----|--------|
| Unit | 108 | 16.66% |
| Unit | 253 | 16.66% |
| Unit | 255 | 16.66% |
| Unit | 257 | 16.66% |
| Unit | 259 | 16.66% |

EXHIBIT "F"

DECLARATION OF EASEMENTS, COVENANTS AND RESTRICTIONS

# EXHIBIT "B"

PUBLIC OFFERING STATEMENT

FOR

HAVERFORD RESERVE, THE CARRIAGE HOMES

A PLANNED COMMUNITY

EVERY PROSPECTIVE PURCHASER SHOULD READ THIS PUBLIC OFFERING STATEMENT CAREFULLY BEFORE SIGNING AN AGREEMENT OF SALE

## PUBLIC OFFERING STATEMENT FOR

Haverford Reserve, the Carriage Homes, a Planned Community

IMPORTANT NOTICE:   The following statements are made in compliance with the requirements of Section 5402(a)(13) of the Pennsylvania Planned Community Act (the "Planned Community Act").

WITHIN SEVEN (7) DAYS AFTER RECEIPT OF THIS PUBLIC OFFERING STATEMENT OR AN AMENDMENT TO THIS PUBLIC OFFERING STATEMENT WHICH MATERIALLY AND ADVERSELY AFFECTS THE RIGHTS OF THE PURCHASER, THE PURCHASER, BEFORE CONVEYANCE, MAY CANCEL ANY CONTRACT HE OR SHE HAS PREVIOUSLY EXECUTED FOR THE PURCHASE OF A UNIT IN HAVERFORD RESERVE, THE CARRIAGE HOMES (THE "COMMUNITY") FROM THE DECLARANT.  IF THE PURCHASER ELECTS TO CANCEL THE CONTRACT FOR THE PURCHASE OF A UNIT (THE "PURCHASE CONTRACT") PURSUANT TO THE IMMEDIATELY PRECEDING SENTENCE, HE OR SHE MAY DO SO BY HAND DELIVERING NOTICE OF CANCELLATION TO THE DECLARANT (IN WHICH CASE A RECEIPT SHOULD BE OBTAINED) OR BY MAILING THE NOTICE BY POSTAGE PREPAID UNITED STATES MAIL, RETURN RECEIPT REQUESTED.  THIS CANCELLATION OF THE PURCHASE CONTRACT IS WITHOUT PENALTY AND ALL PAYMENTS MADE BY THE PURCHASER BEFORE THIS CANCELLATION WILL BE REFUNDED PROMPTLY BY THE DECLARANT.

IF THE DECLARANT FAILS TO PROVIDE A PUBLIC OFFERING STATEMENT (AND ANY AND ALL AMENDMENTS THERETO) TO A PURCHASER BEFORE CONVEYING A UNIT, THAT PURCHASER MAY RECOVER FROM THE DECLARANT, IN ADDITION TO ANY OTHER RELIEF, DAMAGES AS PROVIDED IN SECTION 5406(C) OF THE PLANNED COMMUNITY ACT, CONSISTING OF AN AMOUNT EQUAL TO FIVE PERCENT (5%) OF THE SALE PRICE OF THE UNIT UP TO THE MAXIMUM OF TWO THOUSAND DOLLARS ($2,000), OR ACTUAL DAMAGES, WHICHEVER IS THE GREATER AMOUNT; PROVIDED, HOWEVER, THAT A MINOR OMISSION OR ERROR IN THE PUBLIC OFFERING STATEMENT (OR IN AN AMENDMENT THERETO) THAT IS NOT WILLFUL SHALL ENTITLE THE PURCHASER TO RECOVER ONLY ACTUAL DAMAGES, IF ANY.

IF A PURCHASER RECEIVES THE PUBLIC OFFERING STATEMENT MORE THAN SEVEN (7) DAYS BEFORE SIGNING THE PURCHASE CONTRACT, HE OR SHE CANNOT CANCEL THE PURCHASE CONTRACT, EXCEPT THAT, IN ACCORDANCE WITH PARAGRAPH A ABOVE, HE OR SHE SHALL HAVE THE RIGHT TO CANCEL THE PURCHASE CONTRACT, BEFORE CONVEYANCE, WITHIN SEVEN (7) DAYS AFTER RECEIPT OF ANY AMENDMENT TO THE PUBLIC OFFERING STATEMENT THAT WOULD HAVE A MATERIAL AND ADVERSE EFFECT ON THE RIGHTS OR OBLIGATIONS OF THAT PURCHASER.

### EACH PURCHASER OF A UNIT SHOULD READ THIS DOCUMENT CAREFULLY FOR HIS OR HER OWN PROTECTION.

GENERAL INFORMATION

NAME OF PLANNED COMMUNITY:   Haverford Reserve, the Carriage Homes, a planned community

LOCATION OF PLANNED COMMUNITY:   Haverford Township, Delaware County, Pennsylvania

NAME OF DECLARANT: Haverford Reserve, L.P.

ADDRESS OF DECLARANT:  350 Sentry Parkway, Building 630, Suite 300, Blue Bell, PA 19422-2316

EFFECTIVE DATE OF PUBLIC OFFERING STATEMENT: July, 2009

The Pennsylvania Uniform Planned Community Act ("Act") requires that the original developer and seller of units in a planned community disclose the characteristics of the planned community and the units being offered for sale. This Public Offering Statement is the means by which such disclosure is to be made.

i

IMAN_BB 1293195v7

PUBLIC OFFERING STATEMENT

FOR

HAVERFORD RESERVE, THE CARRIAGE HOMES

a Planned Community

## NARRATIVE DESCRIPTION

### 1. INTRODUCTION

Haverford Reserve, L.P. ("**Declarant**") is developing certain real estate located near the intersection of Darby Road and Parkview Road in Haverford Township, Delaware County, Pennsylvania ("**Property**") as a planned community known as "Haverford Reserve, the Carriage Homes" ("**Community**") having up to one hundred and fifty (150) single family, attached semi-attached, or free standing Dwellings ("**Dwellings**").  The Dwellings will be constructed by Declarant pursuant to its construction contract with Guidi Homes, Inc. ("**Builder**").  The Declarant is the owner of the Property.

This Public Offering Statement consists of a narrative description of information about the Community and exhibits identified throughout this Public Offering Statement.  The exhibits include the legal documents relating to the creation, marketing and operation of the Community, plans of the Property and a proposed first annual budget for the Community.  The narrative section of this Public Offering Statement is intended to summarize the significant features of the exhibits and to present other information of importance to prospective purchasers of the Dwellings.  If there is any inconsistency between the exhibits and the narrative section of this Public Offering Statement, the text of the exhibits will control.

Any capitalized terms used in this Public Offering Statement and not otherwise defined herein will have the meanings given to such terms in the Pennsylvania Uniform Planned

Community Act, 68 P.S. §5101, et. Seq. ("**Act**") and in the Declaration of Haverford Reserve, the Carriage Homes ("**Declaration**"), a copy of which is attached as **Exhibit "A"**.

## 2. PLANNED COMMUNITIES GENERALLY

The term **"planned community"** refers to a type of real estate development in which the Homeowners are obligated to pay periodic assessments to a Community Association or similar organization, which then uses the amounts collected from Homeowners to pay the costs of operating, maintaining, repairing, replacing, insuring and managing parts of the development that are for the common benefit of the Homeowners, which are called **"Common Facilities."** Common Facilities generally include all parts of the Property and the improvements other than the Dwellings and lots themselves and facilities owned by or dedicated to the public or to utility companies (such as sanitary sewer facilities). In addition, Homeowners in a planned community are subject to the payment of periodic assessments for the payment of the costs of operating, maintaining, repairing, replacing and managing elements in the planned community which are not "Common Facilities," such as certain portions of the Dwellings and lots themselves.

When used in this Public Offering Statement, a person who buys a Unit is called a **"Unit Owner"** or a **"Home Owner"**. The term **"Unit"** refers to the Unit Owner's part of the Community designated for separate ownership and occupancy and the house constructed on that Unit (**"Dwelling"**).

A Unit Owner in a planned community automatically becomes a member of the association created to own, manage, operate and maintain the Common Facilities. Such associations are governed by a board of directors (**"Board"**), the members of which are appointed by the Declarant (during the development stage) and later elected by the Unit Owners. Subject to the Declarant's right to control the association while the Community is being developed, Unit Owners have the right to participate in the control and management of the association through the election of members of the Board.

In the Community, Unit ownership includes the obligation to pay a share of the expenses of operating and maintaining the Common Facilities and other common elements (the **"Common**

2

Expenses"), as well as any assessments and charges authorized under the Declaration for expenses allocable to Controlled Facilities (which are portions of property owned by Unit Owners, but regulated and/or maintained by the Association), and the Units themselves, defined in the Declaration to include **"Common Expenses"** and **"Limited Common Expenses."** Common Expenses and Limited Common Expenses are allocated among, or assessed against the Unit Owners as provided in the Declaration and in the Responsibility Chart ("Responsibility Chart") appended hereto as **Exhibit "B"**.

### 3. THE DECLARANT

The Declarant is Haverford Reserve, L.P., a Pennsylvania limited partnership. While the Declarant is a newly formed entity, the partners of the partnership, Goldenberg Group and Guidi Homes, each have extensive experience in real estate development throughout Pennsylvania and New Jersey.

Since 1984, Goldenberg has been actively developing both residential and commercial real estate. Most notably, Goldenberg renovated and converted the N.W. Ayer building, a former office building located on Washington Square in Philadelphia to The Ayer, a fifty-six (56) unit luxury condominium completing approximately $75 million in renovations. Goldenberg also owns and manages nearly five million square feet of retail space, including the Metroplex in Plymouth Meeting, PA and Columbus Commons in South Philadelphia PA which includes the first urban IKEA in the United States.

Guidi Homes, in business for over 60 years, is recognized as one of the top quality custom homebuilders in southeastern Pennsylvania. In addition to constructing prominent single family custom homes, including Philadelphia Magazine's Design Home for 2008, Guidi has also developed the prestigious Enclave at Gywnedd and the Preserve at Skippack.

IMAN_BB 1293195v7

## 4. GENERAL DESCRIPTION OF THE COMMUNITY

The Community is being developed as a residential planned community consisting of up to one hundred and fifty (150) Units with certain Common Facilities consisting generally of open space, utility installations, stormwater management systems, undedicated streets, sidewalks, mailboxes, street lights and retaining walls.

Declarant plans to develop the Community in phases, with the Units to be constructed in sequence as determined by the Declarant. A model Dwelling is planned to be completed in or about September, 2009.

The Community is being constructed on approximately twenty-eight (28) acres of property. The Property was subdivided out of an approximately two hundred and nine (209) acre parcel of property ("Overall Property") owned by Haverford Township ("Township"). Declarant purchased the Property from the Township pursuant to an agreement of sale ("Agreement of Sale") between the Township, an affiliate of Declarant, and an affiliate of Pohlig Builders ("Pohlig"). The Declarant reserves the right, but not the obligation, to construct amenities not shown on the Plans on the Convertible Real Estate (as that term is defined in the Declaration) or in the Common Facilities.

Pursuant to the Agreement of Sale, Declarant and Pohlig were obligated to construct certain infrastructure improvements to the Overall Property, including the entrance road to the Community. Those infrastructure improvements have been constructed. Additionally, the Township intends to construct a variety of amenities which will not be part of the Community, but which residents of the Township will be allowed access. The Declarant shall be permitted, but is not obligated to construct gates ("Gates") at each of the three (3) vehicular entrances to the Property (not the Overall Property) which gates may be key-card and/or telephone access. The Declarant has not received land development approval from the Township to install the Gates and does not represent that it will receive such approvals, or that it will install the Gates. If the

4

IMAN_BB 1293195v7

Gates are approved and constructed, the budget set forth on Exhibit "**B**" will be amended.

Also pursuant to the Agreement of Sale, Pohlig purchased an approximately twelve (12) acre portion of the Overall Property and intends to construct as many as one hundred ninety-eight (198) "age restricted" condominium units ("**Pohlig Project**"). The Pohlig Project will not be part of the Community, however, the Community will share certain obligations with the Pohlig Project as described in Section 9 hereof.

### 5. THE UNITS

Each Unit consists of a dwelling ("**Dwelling**") and the piece of ground as shown on the Plans (hereinafter defined). The configuration and description of the Units are as shown on the Plans of the Community attached to the Declaration, and the recorded plans filed with the Delaware County Recorder of Deeds ("**Plans**"). Such plans may be supplemented from time to time during construction, and upon the completion of construction of the Community, in order to reflect any changes in lot lines necessary to address field conditions.

The Declarant intends to offer various models of Dwellings for sale at different prices. Model descriptions, specifications and current base pricing of Dwellings are available from the Declarant. The Declarant reserves the right to change the exterior elevations, plans, specifications and materials for Dwellings offered for sale from time to time. The base models presently offered by the Declarant range in size from approximately three thousand two hundred (3,200) square feet to approximately three thousand nine hundred (3,900) square feet of space, with a minimum of three (3) bedrooms and two and a half (2.5) bathrooms. The Dwellings include a variety of alternative first floor and second floor main bedroom layouts. There may be three (3) models that offer first floor master bedrooms and three (3) models that offer second floor master bedrooms.

The Declarant may, but shall not be obligated to offer larger or smaller base models, (whether attached, semi-attached, or single family), and option packages than are currently offered. Declarant does not represent that the type and size of models and options which are

5

presently offered will be available at a later time. The Declarant reserves the right to change the types and pricing of model, options and upgrades, from time to time without notice.

Prices for the Units may be increased or decreased from time to time by the Declarant. Prices paid by purchasers for substantially similar Units may vary. The Declarant may, from time to time, offer the Units under special promotional pricing programs all of which are subject to change by the Declarant from time to time without notice (provided that the Declarant cannot change the price of a Unit established in a fully executed agreement of sale for the Unit between the Declarant and a purchaser unless permitted by that agreement).

The Declarant intends to offer certain optional features and upgrades that may be included in the Dwellings at additional cost. Not all options or upgrades may be available on all Dwelling models, and the availability of certain selections may depend on particular features of the lot on which the Dwelling will be built. The Declarant reserves the right to change the types and pricing of available options and upgrades, and to determine final pricing at the time of entering into an agreement of sale, from time to time without notice.

Units will be conveyed to purchasers in fee simple at the time of settlement by customary special warranty deed, subject to the Declaration and other easements and matters of record affecting the Units and the Community (see "Easements and Title Matters" below). The Units will generally consist of the land shown on the Plan, the Dwelling and, the deck or patio attached thereto. The front, rear, and side yards which will vary in dimension based on the location of the Unit purchased.

Each Unit will be taxed separately for real estate tax purposes. No Unit owner is liable for the payment of real estate taxes on any other Unit. The assessed value of the completed Units for real estate tax purposes is not yet known. The assessed value of the Units may vary depending on their size, features, and cost.

The Declarant has contracted with the Builder to construct the Dwellings and related improvements in compliance with its agreements with Unit buyers. When a Unit is conveyed to a purchaser, the Unit will be substantially complete, connected to all necessary utilities and will

6

have been issued a certificate of occupancy.  Further, any Common Facilities reasonably necessary for the use and enjoyment of a Unit will have been substantially completed.

The estimated completion schedule for each individual Unit will be determined when the agreement of sale for the purchase of that Unit is signed between the Declarant and the Unit buyer.  Declarant presently intends to commence construction of the Units, including model Dwellings and spec Dwellings prior to receipt of agreements of sale from Unit buyers, but reserves the right to complete or construct the Unit in the Community only after an Agreement of Sale with a purchaser has been signed; therefore, it is not possible to provide a schedule of completion for the Unit in the Community.  Ultimately the schedule of completion of the Unit is subject to consumer demand and other market conditions.

The maximum number of Units that may be included in the Community is 150. The Declarant reserves the right to rent Units or to market the Units in blocks to investors.

The Declarant is not obligated to build any minimum number of Units in the Community.

The Declarant is not offering or arranging financing for the purchase of Units, but reserves the right to do so.

### 6.  COMMON ELEMENTS

The Community will include Common Elements that are described in the Declaration. Common Elements fall into two categories -- those parts of the real estate or improvements that will be owned by the Association ("**Common Facilities**") and other parts of the Community (including certain components of the Units) that are controlled, maintained, governed and/or insured, but not owned, by the Association ("**Controlled Facilities**").

The Common Facilities generally include all parts of the Property other than the Units (excluding improvements owned or to be dedicated to governmental authorities or utility providers) and include the open space areas, interior roads, sidewalks, retaining walls and fencing, stormwater management facilities, and streetlights. These Common Facilities are for the benefit of the Community as a whole.

7

The Association will be responsible for certain maintenance as described on the Responsibility Chart. Homeowners will be responsible for some maintenance activities also set forth in the Responsibility Chart.

The Community will also have certain **"Controlled Facilities."** These will include certain parts of the exteriors of the Units and the Lots that will be regulated by the Association.

The Association is generally responsible for operation, maintenance, repair, replacement and insurance of the Common Facilities. The expenses of managing, maintaining, repairing and insuring of Common Facilities will be a Common Expense assessed pro rata against all Units. All Units will be assessed the same fees for Common Expenses regardless of size, model or comparable amenities or features. The expense of performing the Association's maintenance obligations with respect to the Controlled Facilities will be **"Limited Charges"** and charged to the Unit Owners receiving the benefit of such service as and when the service is provided. Certain other costs of repair, maintenance or repair will be charged directly to the Unit Owner receiving the service as a limited charge allocated solely to that Unit Owner and will not be part of the regular monthly assessment, as described in the Responsibility Chart.

The Association will carry insurance on the Common Facilities as required by the Act. The Association will also cover insurance on the Units, provided however the Association will not carry insurance on the following items: (i) personal property; and (ii) fixtures and equipment which were not installed in the Unit as of the date of the sale of the Unit by the Declarant or which were upgrades from the standard models (**"Betterments"**). The cost of the property insurance provided by the Association will be billed back to the Unit Owners either as a part of the Common Expenses or as a separate bill. Owners shall be responsible to provide insurance for personal property and the Betterments. Any Owner who has received approval for and has installed a Water Feature (as that term is defined in the Declaration) shall obtain umbrella liability insurance coverage in an amount not less than $1,000,000.00 per occurrence which coverage shall contain a specific endorsement covering the Water Feature. Each Unit Owner is responsible to obtain insurance for its Unit and all personal property for those items at his or her cost.

The Responsibility Chart lists and describes the services to be provided by the Association for various amenities and components, how the expenses of providing such services will be charged to the Unit Owners, and the responsibilities of the Unit Owners for maintenance, repair and replacement items relating to the Units.

The Common Facilities depicted on the Plans will be constructed by the Declarant. Common Facilities serving individual Units will be constructed in connection with the construction of those Units. The Declarant may, in its discretion, provide additional facilities or amenities not required by the Declaration or the approved plans and designate such facilities as Common Facilities or Controlled Facilities.

The completion of certain Common Facilities will be secured by an agreement with the Township, pursuant to the Pennsylvania Municipalities Planning Code, requiring that financial security be provided by the Declarant to secure the completion of some of the Common Facilities if the Declarant fails to do so. However, the Declarant is not providing any bond, letter of credit or other security directly to the Association or to the Unit Owners. The Declarant has, however, obtained construction financing that the Declarant has determined will be sufficient (together with other funds of the Declarant) to finance the completion of the Common Facilities as well as the Units.

The Common Facilities will be conveyed to the Association at no expense to the Association. The Association will assume the responsibility for maintaining, insuring, repairing and replacing such Common Facilities once they are completed, as provided in the Act. Until a Common Facility has been substantially completed, the Declarant (and not the Association) is responsible for all maintenance and all costs and taxes associated with such Common Facility.

## 7. THE ASSOCIATION

The Community and the Common Elements will be governed and managed by Haverford Reserve, the Carriage Homes Community Association ("**Association**") which will be organized as a Pennsylvania non-profit corporation. The Unit Owners (including the Declarant) will be the

9

only Members of the Association. The Association will be responsible to manage, maintain, repair, replace and insure the Common Facilities and to perform the Association's limited maintenance obligations with respect to the Controlled Facilities. The Association will levy and collect Common Expense Assessments from the Unit Owners to pay the Common Expenses and will levy and collect the Limited Common Expenses Assessments.

The Association will be governed by a Board consisting of three (3) Board members. The Declarant shall have the right to appoint and remove a majority or all of the Board members during the Declarant Control Period, and thereafter a majority or all of the Board members of the Association will be elected by the Unit Owners. Each Unit will have one (1) vote on any matters on which Members of the Association are entitled to vote. Cumulative voting is not permitted (cumulative voting is a process by which members may vote for the election of Board members by multiplying the number of votes they have by the number of Board members to be elected, and then casting the resulting number of votes in favor of any one or more candidates in such proportion as the voting member may determine).

The Board will designate officers who will have the authority to carry out decisions of the board and to manage the ordinary day-to-day operations of the Association.

The Association will be governed by the Declaration as well as its by-laws. A current copy of the By-Laws is attached as **Exhibit "D"**. The By-Laws govern the internal workings and procedures applicable to the Association, the Board and the officers (see the discussion of "By-Laws" below).

The Association is authorized to engage an independent management firm to assist in the management of the Community and the Common Elements. The Declarant intends that the initial manager will be Mid-Atlantic Management Corporation. The manager will be compensated by the Association, and that compensation will be a Common Expense. A draft copy of the Management Agreement is attached hereto as **Exhibit "C"**. The Declarant and the Board reserve the right to choose a different management firm.

IMAN_BB 1293195v7

The Association will have the authority to make rules and regulations governing the use and enjoyment of the Common Elements as well as architectural policies and guidelines with respect to matters subject to approval under the Declaration. No rules and regulations have yet been adopted or proposed, and copies of any proposed or adopted rules and regulations will be provided to prospective Unit purchasers when available.

## 8. FINANCIAL MATTERS; FINANCING

A preliminary proposed first annual budget of the Association is attached as **Exhibit "E"**. The budget was prepared by Mid-Atlantic Management Corporation. The budget includes an estimate of the Common Expenses and Common Expense Assessments to be made by the Association against each Unit for such period of time. The budget includes reserves for future repairs and replacements of certain Common Facilities based on the estimated cost to repair and replace those Common Facilities. The budget is only a projected budget, is based on certain assumptions which are more fully set forth on **Exhibit "E"**, and is subject to change as more Units are completed and as the Association assumes responsibility for maintenance and repair of the Common Elements. The budget figures are, of course, estimates and the Declarant cannot be certain that sufficient funds have been budgeted by the Association to cover all Common Expenses that may be incurred. The figures were obtained, however, with the assistance of professional management consultants. In the event that insufficient funds are budgeted for any given fiscal year, the Board may levy one or more further special assessments to make up the budget deficit.

On the date hereof, the Association has no material assets or liabilities and, therefore, no balance sheet is provided for the Association.

Except for those accounted for in the budget, there are no services, or personal property not owned by the Association, being provided by the Declarant, that will be required to be obtained by the Association for the operation or enjoyment of the Common Elements when the Declarant ceases to furnish such services or property.

At the time of settlement, each purchaser of a Unit from the Declarant or Homeowner shall pay a one-time contribution in the amount of One Thousand Five Hundred Dollars ($1,500.00). This contribution is in addition to the regular Common Expense Assessment applicable to the Unit.

The Declarant does not contemplate that any user fees will be charged for the use of any Common Elements or other facilities in the Community that are provided for the common benefit of the Unit Owners except for the Common Expense Assessments.

## 9. LIENS AND TITLE MATTERS

The Property is subject to mortgages and other security documents in favor of Declarant's lender, Wilmington Trust of Pennsylvania ("**Construction Mortgage**"). Before a Unit is conveyed to a purchaser, that Unit will be released from the Construction Mortgage and before Common Facilities are conveyed to the Association the Declarant will either satisfy the Construction Mortgage or obtain the release of such Common Facilities therefrom.

The Property, the Units, and the Common Facilities are also subject to the easements and other matters of record described in the Declaration and under the Act. The Declarant reserves the right to create additional easements through the Property as necessary for the development of the Community, including easements in favor of utility companies and others furnishing utility, sewer and water service to the Community.

The Property is also subject to a declaration of easements, covenants, and restrictions between the Declarant, Pohlig, and the Township, a copy of which is attached hereto as **Exhibit "F"**. The ECR provides for the maintenance of the Overall Property including the stormwater management facilities, as well as a cost allocation between Declarant, Pohlig, and the Township. Any fees associated with the ECR and maintenance responsibilities of the Association will be included as a Common Expense and will be shown on the Budget.

## 10. JUDGMENTS AND LITIGATION

As of the date hereof, there are no judgments against the Association and there is no pending litigation against or affecting the Community.

## 11. ENVIRONMENTAL MATTERS

There are no materially adverse environmental matters affecting the Property.

## 12. VIOLATIONS

To the best of the Declarant's actual knowledge, there are no outstanding and uncured notices of violations of any governmental requirements affecting the Community or any buildings and improvements thereon.

## 13. PERMITS AND APPROVALS

Declarant either has obtained or will obtain, at its expense, all governmental approvals and permits necessary for the development, use and occupancy of the Community, excluding building and use and occupancy permits for individual Units. Declarant has received final subdivision and land development approval for Phase 1 of the Community from Haverford Township. The Declarant, at its expense, will obtain a building permit and any other related permits for each individual Unit before construction and will obtain a certificate of occupancy for each Unit upon its completion and before conveyance to a Unit purchaser. No other permits are required for the use and enjoyment of the Units.

## 14. RESTRAINTS ON ALIENATION OR LEASING

The Units are not subject to any restrictions on sale or rights of first refusal. The Declaration contains certain restrictions on leasing of Units. No Unit may be leased for any transient or hotel purpose; no Unit may be leased without a written lease and the rights of any Lessee must be subject to the Declaration, By-Laws and Rules and Regulations.

## 15. ROADS; UTILITIES

Roads within the Community will be constructed by the Haverford Hills Associates, L.P., (a partnership consisting of an affiliate of the Declarant and an affiliate of Pohlig) and maintained by the Association as part of the Common Facilities. Parkview Road (the entrance road connecting the Community to Darby Road) has been constructed and will be maintained by the Township and pursuant to the ECR.

Utilities serving the Community will include public water service furnished by Aqua, public sanitary sewer service provided by Haverford Township, electric and natural gas service provided by PECO, telephone service provided by Verizon and, at the option of each Unit Owner, cable television service provided by Comcast Cable. The utility delivery systems serving the Community will be installed either by the Declarant or by the utility provider. Such utility installations will not be maintained by the Association and will be the responsibility of the utility companies, except for laterals and lines connecting individual Units to such services for which the Unit Owners are responsible.

All of the structural components and utility installations will be essentially new when the Declarant sells Units to purchasers. Estimates of replacement costs set forth in the proposed budget are based on the cost of replacing the system or item in question in current dollars, and are limited to those facilities for which the Association will be responsible. Such costs may, however, be subject to inflationary and other increases. The replacement cost figures represent the Declarant's estimate of such costs but are not a guaranty that the actual costs will not be higher.

## 16. WARRANTIES

The Declarant will warrant the Common Facilities against structural defects as required by the Act for two (2) years after the date on which the first Unit is conveyed by the Declarant.

Pursuant to the Act, the Declarant will warrant the Units against structural defects for two (2) years after the date of transfer of the Unit from the Declarant to the purchaser at closing and

14

will warrant the Common Facilities against structural defects for a period of two (2) years after the date the first unit is conveyed.

No warranty is given with respect to normal wear and tear or any items of maintenance with respect to the Units or the Common Elements.

EXCEPT FOR THE EXPRESS WARRANTIES REQUIRED BY THE ACT AND ANY OTHER EXPRESS WARRANTIES INCLUDED IN AN AGREEMENT OF SALE FOR A UNIT, THE DECLARANT IS SELLING THE UNITS AND ANY PERSONAL PROPERTY THEREIN "AS-IS".

### 17. REAL ESTATE

The Declarant has designated certain parts of the Property as **"Convertible Real Estate."** Convertible Real Estate is real property on which the Declarant reserves the right to create Units. Until such time as the Declarant elects to create Units within the Convertible Real Estate, the Declarant is responsible for all costs associated with the ownership and maintenance of the Convertible Real Estate. Once the Declarant creates Units or Common Elements within the Convertible Real Estate, which the Declarant does by amending the Declaration, then those Units become part of the Community. Any Units showing as being proposed for construction within the Convertible Real Estate are not subject to assessments until those units are, in fact, created.

### 18. ESCROW OF DEPOSITS; PAYMENTS FOR EXTRAS

Any deposits made by a purchaser in connection with the purchase of a Unit shall be held by Declarant or an escrow agent approved by Declarant in escrow in compliance with Section 5408 of the Act and will be returned to the purchaser if the purchaser cancels the contract pursuant to Section 5406 (relating to the purchaser's right to cancel within seven (7) days after delivery of the Public Offering Statement). If the Agreement of Sale is canceled or terminated for any other reason, the rights of the parties with respect to the deposit shall be determined by the Agreement of Sale and applicable law.

IMAN_BB 1293195v7

Amounts to be paid by a purchaser for extras, options and upgrades will not be deposited in escrow. Such charges shall be separately set forth in the Agreement of Sale or in a change order that will be made a part of the Agreement of Sale. Deposits or payments for the cost of extras (as determined under the Agreement of Sale) will be payable in advance directly to the Declarant, will not earn interest and may be commingled with Declarant's other funds. Unless settlement under an Agreement of Sale fails to take place as a result of a default by Declarant, such amounts are non-refundable except to the extent provided in the Agreement of Sale between the purchaser and the Declarant.

### 19. INSURANCE FOR COMMON FACILITIES

The Association will obtain casualty insurance with respect to Common Facilities owned by the Association for which such coverage is customarily obtained. The Association will obtain general liability insurance insuring the Association against liability for personal injury (including death) and property damage occurring on or about the Community and attributable to the acts or omissions of the Association or property owned by the Association. Such insurance shall have limits of not less than Two Million Dollars ($2,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate, and shall otherwise comply with the Act.

### 20. UNIT INSURANCE

The Association will obtain casualty insurance for the Units (excluding personal property and Betterments) as set forth in the Declaration and Section 6 hereof. Unit Owners are responsible to obtain casualty insurance to cover personal property and Betterments.

### 21. UNIT RESERVATION FORM

Declarant may, but need not, offer potential purchasers of the Units the opportunity to reserve a particular Unit for a limited time by signing a reservation form in substantially the form attached as **Exhibit "G"** attached hereto. If Declarant sells or conveys the Unit subject to a Unit reservation, Declarant's only liability is to refund the reservation deposit paid by the purchaser. If the purchaser elects not to purchase a Unit, the reservation deposit paid by the purchaser will

be refunded without interest.  This reservation procedure is intended to provide prospective purchasers with the opportunity to review this Public Offering Statement as well as other information pertaining to the Community in order to finalize their decision to purchase a Unit but does not give the potential purchaser any equitable interest in the Unit or bind the prospective purchaser or Declarant.

## 22.  AGREEMENT OF SALE

To purchase a Unit a prospective purchaser must enter into an Agreement of Sale to buy the Unit from Declarant.  The Agreement of Sale is substantially in the form attached as on **Exhibit "H"** hereto.  Declarant reserves the right to make changes to the form of Agreement of Sale from time to time, but the Declarant cannot modify an Agreement of Sale after it is signed by all parties without the consent of all parties.  In summary, the Agreement of Sale:

(1)     Identifies the parties to the Agreement;

(2)     Sets forth the purchase price and payment terms, including the base price, initial options, lot premiums as well as provides for deposits due and the terms under which the deposits will be released, provides that the amount paid for any options or upgrades, regardless of the form of payment may be used by the Seller and will not be returned by the Buyer;

(3)     Sets forth the terms for the mortgage contingency.   The purchaser obtaining a mortgage is a condition precedent to the consummation of the Agreement of Sale;

(4)     Provides that title to the Unit will be good and marketable and insurable by a reputable title company;

(5)     Provides the procedures under which extras will be added, substitutions made and when selections must be made;

(6)     Provides that any changes requested by the Buyer will be made only in accordance with a written amendment to the Agreement of Sale signed by the Buyer and Seller;

17

(7)     Provides for the settlement date and the outside settlement date. The Agreement provides that the settlement date may be extended outside of the outside settlement date in the event of a force majeure. Sets for the settlement costs and apportionments providing that taxes, water charges, sewer rent and community association charges will be apportioned on a pro rata basis as of the date of settlement; provides that the Seller may charge a "late fee" to the Buyer for delays of Settlement caused in whole or in part by the Buyer;

(8)     Provides for possession of the Units, states that there will be three (3) inspections prior to settlement (prior to installation of dry wall, at least seven (7) days to settlement; and on the day of settlement). Provides that at settlement, a punch list specifying work which remains to be completed will be prepared and that the Seller will use commercially reasonable efforts to complete the interior punch list items within sixty (60) days after settlement but that there will be no hold back or escrow or any part of the purchase price at settlement for punch list items or otherwise.

(9)     Sets forth the statutory warranties and manufacturers warranties;

(10)     Acknowledges that the Unit is part of a planned community and that the Buyer has been presented with all the planned community documents and will take title subject to those documents;

(11)     Describes what happens in the event of default by the Seller;

(12)     Sets forth what takes place in the event of default by a Buyer;

(13)     Acknowledges that the premises are being purchased by the Buyer as a result of Buyer's inspection of the present stage of construction of the community and as a result of Buyer's inspection of the plans for the completion of the premises and not by any representation made by the Seller or any salesman.

(14)     Sets forth that the Seller has the right to make any changes to the lot

18

necessary to complete the construction of the Dwelling in accordance with the building plans and provides that the Buyer agrees that Buyer shall not be able to request structural options or changes after the date of the Agreement of Sale or make changes to the Dwelling selection after the form is completed.

(15)    Sets forth that the Agreement will not be recorded.

(16)    Sets forth that time is of the essence in the Agreement;

(17)    Sets forth that damage to the community or the premises by fire or other casualty prior to settlement will not void the Agreement;

(18)    Sets forth that if requested by the Seller, the Buyer will execute and deliver an Affidavit of Completion;

(19)    Sets forth that the Buyer will provide the Seller and the Seller's agents access to the property after settlement for the purpose of completing the punch list items;

(20)    Provides that the lot will be finished, graded and seeded for grass;

(21)    Sets forth the conditions to the Seller's obligations and provides that if the Seller, for any reason, is unable to complete the construction of the Dwelling or to otherwise develop the property in accordance with the terms hereof at the prices for materials or the scale of wages for labor existing on the date of the execution of this Agreement by Seller, Seller shall have the right at any time prior to the completion of the roof, framing of the Dwelling to adjust the purchase price;

(22)     Provides that a condemnation will not void the Agreement and provides that the Declarant will be relieved of its obligation to convey title to the portion of the property condemned;

(23)     Sets forth the notice to the Buyer with respect to the warranty;

(24)     Sets forth normal development of new construction and states that the Seller will not be responsible for nail pops, seam ridges, shrinkage in drywall, lumber, trim, millwork or wood floors, settling of the dwelling, utility trenches, crackling, cracking, falling away, chipping or discoloration of or imperfection in brick or block work, concrete or grout, shrinking or warping of doors to a degree of less than ½", color variations and fixtures, appliances, stained wood, tile, marble, granite, brick or mortar, quantity or quality of growth of trees or dampness or water in basements.  The Agreement also provides that water infiltration may occur in the basement and the cellar walls and Seller shall supply a sump pump;

(25)     Provides that formal tender of the Deed is waived;

(26)     Provides that the Buyer may elect to have the property tested for radon and releases the Seller from any radon liability;

(27)     Provides an integration clause;

(28)     Sets forth that the Seller has the right to deduct from the deposit any unpaid charges for which the Buyer may be liable;

(29)     Sets forth that the Agreement may not be assigned by the Buyer;

(30)     Sets forth the broker's compensation; and

(31)     Sets forth Buyer's occupancy representation.

## 23. MANAGEMENT AGREEMENT AND OTHER CONTRACTS

20

The Declarant presently intends that the Manager will provide management for the Community pursuant to the terms of a formal contract (the **"Management Agreement"**) which has been or will be entered into with the Association upon its creation and the form of which is attached hereto as **Exhibit "D"**.

The Management Agreement will set forth the Manager's management responsibilities for the Community Association and will provide for an initial term of one (1) year, with automatic renewals of one (1) year. However, the Condominium Association shall have the right to terminate the Management Agreement without penalty upon at least ninety (90) days' prior written notice to the Manager within six (6) months after the Board elected by the Owners takes office.

Under the Management Agreement, the Manger will perform a number of the functions under the authority of the Board including the collection of assessments, preparation of an annual budget, maintaining the business and financial records of the Association, overseeing the maintenance of the Common Elements for which the Association is responsible (e.g., maintenance, bush and shrub replacement, etc.), employing, on behalf of the Association, personnel required to perform the maintenance services for which the Association is responsible and to assist in the development and administration of rules and regulations for the Community.

In addition to the Management Agreement, the Declarant contemplates that there will be other contracts into which the Declarant or the Association will enter for certain services to be provided to the Community such as trash removal and landscaping.

Other than the Management Agreement and the other contracts described above, there are no additional contracts currently in effect which will affect the Community. However, the Board shall have the right to enter into such other contracts as may be necessary or desirable for the management, operations and administration of the Community.

In accordance with Section 5305 of the Act, certain contracts which may be entered into after the date hereof and affect the Community may be terminable by the Association at any time

after the Board elected by the Owners pursuant to the Declaration takes office upon at least ninety (90) days' prior notice to the other party.

## 24. DECLARATION

The Declaration is a document that together with the plats and plans of the Community creates the Community and submits the Property to the Act. In summary, the Declaration addresses the following:

(1)    Article I describes the Property.

(2)    Article II sets forth the submission of the Property and all easements, rights and appurtenances belonging thereto.

(3)    Article III sets forth the interpretation of the Declaration and By-Laws and defines terms used therein.

(4)    Article IV discusses applicability of the Declaration to the Property and Unit Owners' transfer of ownership in a Unit.

(5)    Article V describes the Units, Common Facilities and Controlled Facilities and sets forth the maintenance responsibilities of the Association and the Unit Owners.

(6)    Article VI sets forth the Plan depicting the Property.

(7)    Article VII describes Association membership, voting rights and powers and duties of the Association.

(8)    Article VIII describes insurance obligations of the Association and the Owners.

(9)    Article IX sets forth the easements to which the Property is subject.

22

(10)    Article X sets forth the covenant for assessments and any other charges or costs levied by the Association.

(11)    Article XI discusses the various use restrictions and other obligations of Unit Owners.

(12)    Article XII describes the architectural review and approval of improvements within the Property.

(13)    Article XIII discusses compliance and default of Unit Owners with the terms, covenants, conditions and restrictions of the Declaration, By-Laws and any rules and regulations adopted pursuant thereto.

(14)    Article XIV describes the indemnification of officers, members of the Board and committee members and the limited liability thereof.

(15)    Article XV describes the rights of certain mortgagees and states that mortgages are expressly subject to the Declaration.

(16)    Article XVI sets forth general provisions dealing with amendments to the Declaration, execution and recording, duration, enforcement, severability, effective date, governing law, notification and other miscellaneous items.

25. **BY-LAWS**

The By-Laws generally govern the internal workings of the Association.  In summary, the By-Laws provide (in addition to provisions similar to those contained in the Declaration) as follows:

(1)    the procedure for calling meetings of Board and Members of the Association;

         (2)     the procedure for electing the Board, removing Board and filling vacancies on the Board;

         (3)     the titles and general description of duties of the primary officers of the Association, and the method for appointing and removing such officers and filling vacancies in such positions;

         (4)     the procedure for creating committees of the Board to oversee specific functions of the Association, the duties of such committees and the authority thereof;

         (5)     the rights and liabilities of officers and Board of the Association, and the obligation of the Association to indemnify representatives of the Association who are subject to claims, liabilities or suits by reason of having served as officers or Board of the Association, under certain circumstances;

         (6)     the procedure for amending the By-Laws; and

         (7)     the annual budget for the Community is proposed and adopted by the Board, which also determines the amounts of the assessments for Common Expenses. The Board is also authorized to determine and assess any special assessment required for the benefit, maintenance, upkeep and repair of the Community and any elements thereof, including the Controlled Facilities.

## 26. REVIEW OF DOCUMENTS

Each prospective purchaser of a Unit is encouraged to read this Public Offering Statement and each of the Exhibits in its entirety for his or her own protection. Each purchaser may consult legal counsel of his or her choice and obtain legal advice regarding such documents.

## 27. MODIFICATIONS TO PUBLIC OFFERING STATEMENT

The Declarant reserves the right, from time to time, to make changes to this Public Offering Statement and the various Exhibits attached hereto. Any modification to this Public Offering Statement will be given to each person who has entered into an agreement to buy a Unit but who has not yet purchased the Unit. A purchaser receiving a modification to this Public Offering Statement that materially and adversely affects the rights or obligations of the purchaser may have the right to cancel a contract for the purchase of a Unit as provided in the Act.

## 28. NO OTHER REPRESENTATIONS

NO REAL ESTATE BROKER, REAL ESTATE SALESPERSON OR ANY MEMBER OF THE DECLARANT'S CONSTRUCTION OR SALES STAFF IS AUTHORIZED TO MAKE ANY STATEMENTS OR REPRESENTATIONS THAT ARE NOT CONTAINED IN THIS PUBLIC OFFERING STATEMENT.   NO OTHER REPRESENTATION OR STATEMENT MAY BE RELIED ON BY PURCHASERS AND NO SUCH OTHER REPRESENTATION OR STATEMENT IS BINDING ON THE DECLARANT OR BUILDER.

## 29. CONFLICTING PROVISIONS

Any references to or summaries of the provisions of the Declaration, By-Laws or other documents contained in this Public Offering Statement are qualified by reference to the entire documents to which such statements refer. If there is any conflict or inconsistency between the statements made in this Public Offering Statement and the provisions of the applicable document, the applicable document is controlling.

## 30. END OF PUBLIC OFFERING STATEMENT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

# EXHIBIT "A"

## DECLARATION

### (ATTACHED)

## EXHIBIT "B"

## RESPONSIBILITY CHART

**Ownership Key:**

H               Home – owned by one or more Homeowners, a dwelling.  Includes the Lot under and around the Dwelling as shown on the Plan.  A "Unit" under the PA UPCA.

H-CTF =      Controlled Facility – Those components of the Home which receive one or more services from the Association.

CF =          Common Facility – owned by the Association to which all Homeowners are members. A "Common Element" under the Pennsylvania Uniform Planned Community Act.

LCF =         Limited Common Facility – portions of the Common Facilities which are limited in use or access to one or more Homeowners.

P =            Public – components owned by a Public Utility Company.

T =            Township owned

**Assessment Key:**

CE =          Common Expense – fees charged to cover the Association costs which are shared equally by all Homeowners.

LCE =         Limited Common Expense – fees charged for Association costs which are shared equally only by those Homeowners of conveyed homes for services to Controlled Facilities and Limited Common Facilities. Once all homes are conveyed, these Limited Common Expenses will become Common Expenses

LC =   Limited Charge – direct charges to Homeowners for Association costs which are excluded from the budget (and monthly fees), charged only to one or more Homeowners who derive the benefit when the service will be provided.

| COMPONENT | COMMUNITY OWNERSHIP CATEGORY | ASSOCIATIONS RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Roofing Flashing | H-CTF | Repair Replacement | LCE LCE | None |
| Skylights | H | None | | Repair Replacement (1) |
| Gutters Downspouts | H-CFT | Repair Maintenance Replacement | LCE LCE LCE | None |
| Stucco   and   Stone exterior | H-CTF | Repair Eventual replacement | LC LC | None |
| Handiplank  or  similar siding material | H-CTF | Repainting Replacement | LC LC | None |
| Chimney Exteriors | H-CTF | Repair Eventual replacement | LC LC | Full Cleaning |
| Fireplaces, Hearths | H | None | | Repair Replacement |
| Windows Window glass, Sliding glass doors Patio doors | H | None | | Cleaning Repair Replacement (1) |
| Front Entrance Door Patio or Balcony door | H-CFT | Repainting Exterior side | LCE | Repair Replacement (1) |
| Locks, hinges or other hardware  on  windows and doors | H | None | | Repair Replacement |
| Garage Door | H-CTF | Repainting exterior side | LCE | Repair Replacement (1) |

| COMPONENT | OWNERSHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Garage door lock, Hardware, mechanicals | H | None | | Maintenance Repair Replacement |
| Front Porch, entranceway landing, stoop (brick with concrete | H-CTF | Snow clearing Replacement | LCE LC | Clearing Ice Melting |
| Exterior entrance lighting, controlled inside Home | H | None | | Repair Maintenance Electricity Replacement (1) |
| Privacy fencing | H-CTF | Repair Maintenance Replacement Restraining | LC LC LC LC | None |
| Foundation Walls | H | None | | None |
| Basement, internal structural components | H | None | | None |
| Interior components or everything inside "exterior surface side" or having an "interior aspect" | H | None | | Repair Maintenance Replacement |
| Attic space, non-structural components beneath roof sheathing, including insulation | H (access only with Board approval | None | | Cleaning Repair |
| Plumbing and electrical-if services one Home, regardless of location | H | None | | Repair Maintenance Replacement |

| COMPONENT | OWNERSHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| HVAC units (wherever located) | H | None | | Repair Maintenance Operation Replacement |
| Sidewalks to main entry of individual Homes | H-CTF | Snow clearing Repair Replacement | LCE LCE LCE | Cleaning Ice melting |
| Driveways | H-CTF | Snow clearing Repair Sealcoating Replacement | LCE LCE LCE LCE | Clearing Ice melting |
| Sprinkler Irrigation System in the Common | CF | Operation Maintenance Repair Replacement | CE CE CE CE | None |
| Sprinkler Irrigation System near homes | H | Operation Maintenance Repair Replacement | LCE LCE LCE LCE | None |
| Common sidewalk near entrance to the property | CF | Snow clearing Repair Replacement | CE CE CE | None |
| Planted beds directly adjacent to homes | H-CTF | Limited maintenance Mulching | LCE LCE | Watering Planting |
| All other landscape on the property | CF | Maintenance Replacement | CE CE | None |

| COMPONENT | OWNERSHIP CATEGORY | COMMUNITY ASSOCIATION RESPONSIBILITY | CHARGED AS | OWNER RESPONSIBILITY |
|---|---|---|---|---|
| Common Wall Adjacent to the Quadrangle property | CF | Repair Replacement Repainting fencing | CE CE CE | None |
| Independent Garage Buildings (Garage Spaces) located along front of the community | CF(3) | Repair Operation Maintenance Replacement | CE CE CE CE | None |
| Green Lane and Valley Ridge Road as well as the parking spaces locate | CF | Repair Resurfacing Snow clearing (2) | CE CE CE CE | None |
| Entrances into the Haverford Reserve property from Parkview Boulevard | CF | Operation Repair Maintenance Replacement Resurfacing | CE CE CE CE CE | None |
| Curbing along Green Lane and Valley Ridge Road | CF | Repair Replacement | CE CE | None |
| Street Lighting along Green Lane and Valley Ridge Road | CF | Electricity Repair Maintenance Replacement | CE CE CE CE | None |
| Mailboxes | CF | Repair Replacement | CE CE | None |
| Storm Water Basin | CF | Operation Maintenance Replacement | CE CE CE | None |
| Parkview Boulevard Landscape | T(4) | Maintenance Replacement | CE(4) CE(4) | None |

(1) Items to be replaced by Owner which must first be approved by the Association

(2) Snow will be cleared where there are no vehicles are parked in area when contractor is present to do the work.

(3) The four parking spaces inside each garage are Limited Common Elements initially assigned by the Declarant with subsequent assignments made by the Board. Holders of those twelve assignments pay a monthly fee to the Association

(4) Although Parkview Boulevard is owned by Haverford Township, all the landscape material located along both sides and the islands are the permanent maintenance obligation shared by the Haverford Reserve Community Association and the Athertyn Condominium Association. Each Association will pay half of the expense with Athertyn having the duty to manage these services. The Haverford Reserve-related expense is included in its budget so no separate fee will be charged to the Owners.

EXHIBIT "C"

BY-LAWS
OF
HAVERFORD RESERVE, THE CARRIAGE HOMES, COMMUNITY ASSOCIATION
(A PENNSYLVANIA NON-PROFIT CORPORATION)

(ATTACHED)

1

## EXHIBIT "D"

## FORM OF MANAGEMENT AGREEMENT

EXHIBIT "E"

FIRST PROPOSED BUDGET
OF
HAVERFORD RESERVE, THE CARRIAGE HOMES,
COMMUNITY ASSOCIATION

(ATTACHED)

## EXHIBIT "F"

## DECLARATION OF EASEMENTS, COVENANTS AND RESTRICTIONS

## EXHIBIT "G"

## DECLARANT'S RESERVATION/DEPOSIT FORM

### (ATTACHED)

IMAN_BB 1293195v7

## EXHIBIT "H"

## STANDARD FORM OF AGREEMENT OF SALE

### (ATTACHED)

# EXHIBIT "C"



1904 Main Street
Lake Como, NJ 07719
PH (732) 894-9813
information@dcengineeringns.com

July 30, 2018

Haverford Reserve, the Carriage Homes
c/o: Marcus & Hoffman
326 West State Street
Media, PA 19063
*sent via email to rhoffman@marcushoffman.com*

Attn:   Robert J. Hoffman, Esquire

**Re:     Weep Screed Recommendations
dCEI Job No. 2108-99-001CE**

Dear Mr. Hoffman,

Pursuant to the Board's request, dC Engineering Inspections, LLC ('dCEI') reviewed various documents, building code requirements, and industry standards pertaining to the placement of foundation weep screed in portland cement based plaster systems on residential buildings. The intent of the research was to determine the best approach for repairs to the issues noted with weep screed placement at the Haverford Reserve community, located in Haverford, Pennsylvania. Additionally, we searched for documentation to support the Declarants proposed method of weep screed remediation using a stone trench. A summary of our comments is provided below followed by our recommendations.

### Background

During previous inspections, dCEI observed that foundation weep screed is not visible at the base of the stone veneer cladding systems. We have also observed many areas where there is insufficient weep screed clearance at the base of stucco cladding systems. These issues are documented in our Transition Inspection Report, dated October 25, 2017.

Weep screed is a required component in a Portland Cement Based Plaster system to allow drainage of the system. The current cladding system on the buildings is a cavity wall system which requires certain components for a successful system. All exterior claddings of this type pass some rainwater and will allow incidental moisture to pass through it. Moisture will migrate inward or outward depending on temperature and other factors. The cavity wall (or rainscreen) system must control this penetrating water and expel it to the exterior if the home. The weep screed is part of the system that directs the water to the exterior of the building. For this reason, the weep screed is a very important part of the system. Without weep screed, the water can remain trapped in the system causing the stone, building paper, wood building and other components to deteriorate.

The currently installed weep screed is not visible at nearly all stone areas, except at a few newly constructed buildings. We have been informed that the weep screed was installed below grade, and this is why the weep screed is not visible. We have not performed community-wide testing to determine whether this statement is accurate, however, we have no reason to believe it is untrue. We also do not know how deep below grade the weep screed is buried.

It is our understanding that the Declarant has retained Spotlight Home Inspection, LLC to assess the defective weep screed as well as address other noted issues. The intent of this letter is to offer a detailed response to the proposed remediation method specific to the weep screed as offered by Spotlight Home Inspection, LLC.

## Evaluation of Repair Method Proposed by Spotlight Home Inspections, LLC

dCEI reviewed the document titled Weep Screed Placement, which was prepared by William J. Dare of Spotlight Home Inspection, LLC. In this document, Mr. Dare proposes the installation of a perforated pipe surrounded by stone at the below grade weep screed. A detail of the proposed repair method [on OMNIA's title block] was attached to Mr. Dare's letter.

Our opinion regarding the proposed repair method is summarized in the following numbered bullet-points:

1. ***The proposed repair scope does not satisfy the building code requirements for weep screed placement*** – The building code and referenced ASTM standard is very clear on the clearance requirements for weep screed and does not offer any exceptions to the requirements by implementing supplemental drainage systems. The building code excerpt is inset below and specifically states that *'The weep screed shall be placed a minimum of 4 inches above the earth or 2 inches above paved areas'*. The ASTM standard, which is adopted by the code, states that *'The nose of the screed shall be placed not less than 4 in. above raw earth or 2in. above paved surfaces'.*

   **IRC Section R703.6**

   *"A minimum 0.019-inch, corrosion-resistant weep screed or plastic weep screed, with a minimum vertical attachment flange of 3½" inches shall be provided at or below the foundation plate line on exterior stud walls in accordance with ASTM C 926. The weep screed shall be placed a minimum of 4 inches above the earth or 2 inches above paved areas and shall be of a type that will allow trapped water to drain to the exterior of the building. The weather-resistant barrier shall lap the attachment flange. The exterior lath shall cover and terminate on the attachment flange of the weep screed."*

   **ASTM C1063**

   *"Foundation weep screed shall be installed at the bottom of all steel or wood framed exterior walls to receive lath or plaster.  Place the bottom edge of the foundation weep screed not less than 1 in. below the joint formed by the foundation and framing.  The nose of the screed shall be placed not less than 4 in. above raw earth or 2in. above paved surfaces.  [...]"*

2. ***The proposed repair scope may create a new problem*** – The building code requires surface drainage to be conveyed away from the building foundation (see IRC R401.3).  This is typically accomplished by sloping the grade away from the building at a minimum of 6 inches for 10 feet.  Replacing the relatively low permeability soil with a trench filled with drainage stone would prevent surface drainage. Instead, water would accumulate in the stone trench and saturate lower soil layers in the vicinity of the foundation walls which is not desirable. The proposed stone trench will attract surface runoff, and water which is travelling in the soil.



3. *The proposed repair scope will create a long-term maintenance issue* –The proposed stone trench will require regular maintenance to prevent soil and other deposits from obstructing drainage and clogging the system. We are not confident that silt and soil deposits can be successfully restricted from entering the stone and compromising the proposed system.

4. *The proposed repair scope lacks sufficient detail*– As documented in previous reports by dCEI, many portions of weep screed are buried under asphalt driveways.  The proposed repair detail does not indicate how these areas would be addressed.

   Additionally, the proposed repair detail does not indicate where the proposed drain discharges. Is the underdrain intended to discharge to daylight, connect to a new storm system network, or tie into an existing system? If the system is to be tied into the existing storm drains, we are not aware of any asbuilt drawings showing the layout of the existing storm pipe located in the lawn areas.

5. *The proposed repair scope is not a recognized repair method* – Over the years and as part of this project we have reviewed dozens of published documents, codes, standards and articles relating to the installation of MSV, and other portland cement plaster based systems. We have never seen this proposed detail identified as an appropriate installation method for a weep screed. As far as we are aware, the proposed method has never been proven to be successful.

6. *Warranty Issue* – The stone veneer warranty will likely become void, if not installed per their requirements and in agreement with the building code. The manufacturer of the stone should be consulted before performing any work on the stone.

## dCEI's Recommendations

Unless the Declarant [or their expert] can show evidence that the proposed repair method is an acceptable substitute to a properly installed weep screed, dCEI cannot approve this alternate approach. This method has never been tested, and is not listed as an approved installation procedure by any known authority.

In order to bring the MSV system into compliance, we recommend modification of the existing MSV system to meet the clearance requirements of the building code.  We are aware of three (3) ways in which this can be accomplished. These three (3) methods are summarized below:

## Option #1

1. Saw-cut the stone veneer in a straight line approximately 6" above paved surfaces and 8" above soil grade.
2. Carefully remove the cut portions of veneer below the saw-cut, leaving the building paper and drainage mat intact.
3. Install new weep screed with the vertical flange behind the building paper and drainage mat.
4. Install a horizontal band of approved stone or composite material (i.e.: Azek, Boral Trim) to fill in the gap between the nose of the weep screed and the stone cut line. The horizontal band will be installed in front of the drainage mat so as to maintain a continuous drainage plane to the weep screed below.



**Option #2**

1. Remove portions of the stone veneer that are within 2" of paved surfaces and 4" of grade, leaving the building paper and drainage mat intact.
2. Install weep screed with the vertical flange behind the building paper and drainage mat.
3. Install replacement veneer units in areas of missing stone to match.

**Option #3**

1. Remove all stone veneer and reinstall the system to meet the requirements of the building code.

Should further information be provided to support the Declarant's proposed remediation, such as details for the work or documentation supporting the approach, our office can review this information. If you have any questions or require additional information, please do not hesitate to contact this office.

Sincerely,                                        Sincerely,

Daniel Garcia                                    Daniel Reuther
PA PE # PE80185                                  EIT

EXHIBIT "D"



August 30, 2018

Haverford Reserve, the Carriage Homes
c/o: Marcus & Hoffman
326 West State Street
Media, PA 19063
*sent via email to rhoffman@marcushoffman.com*

Attn:    Robert J. Hoffman, Esquire

**Re:    Moisture Probe Testing (Ten (10) Buildings)**
        **dCEI Job No. 2108-99-001CE**

Dear Mr. Hoffman,

Pursuant to the Board's request, dC Engineering Inspections, LLC ('dCEI') has performed moisture probe testing at ten (10) buildings within the Haverford Reserve Carriage Home community. The primary intent of this testing was to obtain information about the moisture content of the wood structure behind the stucco and stone cladding systems. A summary of our findings is provided below followed by our recommendations.

### Background
Haverford Reserve, the Carriage Homes is a planned residential community consisting of fifty (50) two-family dwellings located in the Township of Haverford, Delaware County, Pennsylvania. Multiple concerns with the as-built construction of the building façade systems in the Community have been previously identified. A summary of these concerns is provided in dCEI's Transition Inspection Report, dated October 25, 2017 ('the Transition Report').

### Moisture Probe Testing Information
The moisture probe testing was performed on August 7, 2018 and August 8, 2018. A summary of the weather conditions at the time of testing is provided below:
- August 7, 2018:        80's; Clear
- August 8, 2018:        80's; Clear

According to the NOAA weather station located in Villanova, Pennsylvania, the most recent rainfall event prior to the start of testing occurred on August 5, 2018 and brought approximately 0.16" of rain to the area. Rainfall totaling approximately 0.09" was reported on August 8, 2018. A Record of Climatological Observations with precipitation data for the Villanova weather station is provided in Appendix D.

Moisture measurements of the underlying wood structure were obtained using a pin-type moisture meter manufactured by Delmhorst Instrument Co. (model BD-2100). The calibration of the specific

meter that was used was certified by the manufacturer on August 3, 2018 as indicated in the Letter of Certification provided in Appendix C.

The readings taken using the moisture meter are to be used as a tool in assessing the building for moisture intrusion. In areas where the readings were observed to be normal, the possibility of water intrusion cannot be ruled out. The results of the moisture meter measurements strongly rely on weather conditions prior to the testing. If a rain event was not significant enough, or was wind driven in a certain direction, this will have a substantial impact on the route of water. Additionally, the weather is a significant factor when it comes to the drying of wood that may have been wet from a previous rain event. For these reasons, as well as interior environmental conditions and construction materials, wood that was observed to be dry at the time of our inspection may be experiencing water infiltration but was not showing the symptoms in the form of high moisture content readings.

### Moisture Probe Findings

Moisture readings were measured at a total of fifty-eight (58) locations on ten (10) buildings within the community. The general areas where testing was performed were selected based on certain façade-related construction deficiencies that have been previously identified by dCEI. These areas include:

- At the base of exterior walls where foundation weep screed is either not installed or buried below grade/paving
- Below window sills at horizontal transitions between MSV and stucco
- Below chimney chase 'shoulders'
- Below kickout flashing at roof and wall intersections

These typical building areas are identified in the annotated photos provided in Appendix A.

A table summarizing the moisture probe data is provided in Appendix B. Note that the values listed in the table are without "corrections". Delmhorst specifies meter readings taken on construction grade lumber material can be taken at face value, without "corrections".

Elevated moisture readings occurred at thirty-one (31) of the fifty-eight (58) locations that were tested (53.4%). We define "elevated moisture reading" to mean any moisture reading at or above 16.1%. After reviewing and considering research, testing and analysis by: prominent organizations in the wood industry across North America like the United States Department of Agriculture, Forest Service, Forest Products Laboratory, APA – The Engineered Wood Association, the National Association of Home Builders Research Center, Forintek Canada Corp., and the Canadian Wood Council, and; prominent practitioners in the wood industry, five (5) categories emerged for classifying measurements taken using hand-held resistance meters on untreated wood in completed construction in Pennsylvania. These categories are summarized in the table below alongside of a count of the moisture probe data:



| SUMMARY TABLE | | PROBE COUNT |
|---|---|---|
| 0% - 6.0% | These results are abnormally low and indicate that: the test was performed improperly or the meter malfunctioned resulting in the erroneous reading, or; there is an external force lowering the moisture content of the wood in this location. | 0 |
| 6.1% - 16.0% | These results are consistent with normal wood in Pennsylvania and indicate that either moisture infiltration has not yet occurred, or has not occurred within a relatively significant amount of time. | 27 |
| 16.1% - 19.9% | These results indicate that moisture infiltration is occurring, especially if a source for moisture infiltration has been confirmed. | 9 |
| 20.0% - 30.0% | These results indicate that moisture infiltration is occurring at levels where deterioration will occur if the wood is infected with wood rotting fungi. | 12 |
| 30.1% and above | These results indicate that moisture infiltration is occurring at levels where infection by wood rotting fungi will eventually occur, and deterioration by wood rotting fungi can progress at a rapid rate. | 10 |

## Conclusion and Recommendations

The data collected during our moisture probe testing indicates active water infiltration is occurring at multiple areas of the building envelope. Elevated moisture readings were recorded at multiple areas that were tested, but were found to be most prominent at: (1) the base of walls at entry stoops; (2) the base of walls at entry wall jogs; and (3) the base of walls below bay windows. Construction deficiencies that have been previously identified in these areas include: (1) failure to install weep screed and flashing atop the sill/ledge; (2) discontinuous flashing atop the sill/ledge; (3) missing or obstructed foundation weep screed; and (4) insufficient clearance from intersecting surfaces (i.e. landscaping, pavement, etc.). As detailed in the Transition Report, these deficiencies allow water behind the system and impede the ability of water to drain out. This will cause damage to moisture-sensitive building materials such as wood, fiberglass insulation and gypsum drywall.

dCEI recommends additional investigation work be performed to evaluate portions of the concealed construction at building areas where elevated moisture content was measured. We also recommend additional moisture probe testing at each of the fifty (50) buildings in the community to assist in determining the pervasiveness of water infiltration.



Should you have any questions or require additional information, please do not hesitate to contact this office.

Sincerely,

Sincerely,

Daniel Garcia
PA PE # PE80185

Daniel Reuther
EIT

# Appendix A

Haverford Reserve
Moisture Probe Testing
Appendix A



TYPICAL WALL
AT ENTRY STOOP

TYPICAL ENTRY
WALL JOG

August 30, 2018
Page 3 of 8

Haverford Reserve
Moisture Probe Testing
Appendix A



TYPICAL
WINDOW SILL

TYPICAL MUDSILL
BELOW WINDOW

August 30, 2018
Page 4 of 8



TYPICAL GARAGE
WALL JOG

Haverford Reserve
Moisture Probe Testing
Appendix A

August 30, 2018
Page 5 of 8

Haverford Reserve
Moisture Probe Testing
Appendix A



TYPICAL GARAGE
WINDOW SILL

TYPICAL CHIMNEY SHOULDER



TYPICAL
CHIMNEY BASE

August 30, 2018
Page 8 of 8



TYPICAL DECK LEDGER

Haverford Reserve
Moisture Probe Testing
Appendix A

# Appendix B

Haverford Reserve, The Carriage Homes
Moisture Probe Testing

| DATE | LINE | ADDRESS | ELEVATION | TYPE | LOCATION | DCEI READING 1 | DCEI READING 2 | DCEI READING 3 | NOTE(S) |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 102 GREEN LN | FRONT | MSV | WINDOW SILL | 14.2% | | | |
| | 2 | 102 GREEN LN | FRONT | MSV | MUDSILL BELOW WINDOW | 15.3% | | | 6" TO GRADE |
| | 3 | 102 GREEN LN | FRONT | MSV | ENTRY WALL JOG | 40.0% | | | INSIDE CORNER, 5" ABOVE MUDSILL |
| | 4 | 102 GREEN LN | FRONT | MSV | ENTRY WALL JOG | 40.0% | | | 6" ABOVE 102C |
| | 5 | 101 GREEN LN | GARAGE | MSV | GARAGE WINDOW SILL | 11.2% | | | 10" BELOW WINDOW |
| | 6 | 101 GREEN LN | FRONT | MSV | WALL AT ENTRY STOOP | 7.6% | 8.8% | | 10" FROM PAVER SURFACE |
| | 7 | 102 GREEN LN | REAR | MSV | CHIMNEY SHOULDER | 11.2% | | | |
| | 8 | 105 GREEN LN | GARAGE | MSV | GARAGE WINDOW SILL | 10.4% | 11.1% | | 12" BELOW WINDOW |
| | 9 | 105 GREEN LN | FRONT | MSV | BELOW ENTRY KICKOUT | 28.7% | | | |
| | 10 | 105 GREEN LN | FRONT | MSV | WALL AT ENTRY STOOP | 22.2% | | | |
| | 11 | 105 GREEN LN | FRONT | STUCCO | WALL AT ENTRY STOOP | 40.0% | | | |
| | 12 | 105 GREEN LN | REAR | STUCCO | CHIMNEY BASE | 15.5% | 15.6% | | |
| | 13 | 259 VALLEY RIDGE RD | GARAGE | MSV | GARAGE WALL JOG | 21.3% | 21.2% | | 17 "ABOVE PAVEMENT |
| | 14 | 259 VALLEY RIDGE RD | FRONT | MSV | WALL AT ENTRY STOOP | 17.8% | 17.0% | | 3" ABOVE PAVER SURFACE |
| | 15 | 259 VALLEY RIDGE RD | FRONT | STUCCO | OVER WATER TABLE | 22.4% | 16.1% | | |
| | 16 | 259 VALLEY RIDGE RD | FRONT | MSV | MUDSILL | 18.2% | 18.0% | | BELOW 259C; 12" FROM GRADE |
| | 17 | 257 VALLEY RIDGE RD | FRONT | MSV | ENTRY WALL JOG | 40.0% | | | VERY SOFT |
| | 18 | 257 VALLEY RIDGE RD | FRONT | MSV | ENTRY WALL JOG | 40.0% | | | NEAR 257A; VERY SOFT |

DAY ONE 8/7/2018

Haverford Reserve, The Carriage Homes
Moisture Probe Testing

| DATE | LINE | ADDRESS | ELEVATION | TYPE | LOCATION | DCEI READING 1 | DCEI READING 2 | DCEI READING 3 | NOTE(S) |
|---|---|---|---|---|---|---|---|---|---|
| DAY ONE 8/7/2018 | 19 | 243 VALLEY RIDGE RD | GARAGE | MSV | MUDSILL | 15.7% | 15.2% | | POTENTIALLY TOO LOW |
| | 20 | 243 VALLEY RIDGE RD | GARAGE | MSV | MUDSILL | 14.4% | | | 2" ABOVE 243A |
| | 21 | 243 VALLEY RIDGE RD | FRONT | STUCCO | BELOW BREEZEWAY KICKOUT | 9.3% | 10.2% | | |
| | 22 | 243 VALLEY RIDGE RD | FRONT | MSV | WALL AT ENTRY STOOP | 40.0% | | | |
| | 23 | 243 VALLEY RIDGE RD | FRONT | MSV | WALL AT ENTRY STOOP | 22.3% | 23.1% | | 9FT ABOVE SLAB; ABOVE 243D |
| | 24 | 241 VALLEY RIDGE RD | FRONT | MSV | MUDSILL BAY WINDOW | 30.0% | 27.2% | | |
| | 25 | 260 VALLEY RIDGE RD | FRONT | MSV | BELOW ENTRY KICKOUT | 13.5% | | | |
| | 26 | 260 VALLEY RIDGE RD | FRONT | MSV | WALL AT ENTRY STOOP | 10.1% | | | 2" ABOVE PAVER |
| | 27 | 260 VALLEY RIDGE RD | REAR | STUCCO | CHIMNEY BASE | 17.0% | 10.1% | 12.1% | |
| | 28 | 258 VALLEY RIDGE RD | REAR | STUCCO | CHIMNEY BASE | 12.7% | 10.7% | | |
| | 29 | 258 VALLEY RIDGE RD | FRONT | MSV | WALL AT ENTRY STOOP | 19.2% | 19.1% | | 2" ABOVE PAVER |
| | 30 | 258 VALLEY RIDGE RD | FRONT | MSV | MUDSILL BAY WINDOW | 23.4% | 23.8% | | 4" FROM GRADE |
| | 31 | 258 VALLEY RIDGE RD | FRONT | MSV | BELOW BREEZEWAY KICKOUT | 10.0% | | | |
| DAY TWO 8/8/2018 | 32 | 246 VALLEY RIDGE RD | FRONT | MSV | WALL AT ENTRY STOOP | 40.0% | 40.0% | | |
| | 33 | 246 VALLEY RIDGE RD | FRONT | MSV | BELOW ENTRY KICKOUT | 20.0% | 19.8% | | ABOVE 246A PROBE |
| | 34 | 246 VALLEY RIDGE RD | FRONT | MSV | MUDSILL BAY WINDOW | 23.9% | 25.7% | | 11" TO GRADE, 32" TO SILL |
| | 35 | 246 VALLEY RIDGE RD | REAR | STUCCO | REAR DECK LEDGER | 12.6% | | | |
| | 36 | 248 VALLEY RIDGE RD | REAR | STUCCO | REAR DECK LEDGER | 18.2% | | | |

Haverford Reserve, The Carriage Homes
Moisture Probe Testing

| DATE | LINE | ADDRESS | ELEVATION | TYPE | LOCATION | DCEI READING 1 | DCEI READING 2 | DCEI READING 3 | NOTE(S) |
|------|------|---------|-----------|------|----------|----------------|----------------|----------------|---------|
| | 37 | 202 VALLEY RIDGE RD | FRONT | MSV | MUDSILL | 10.9% | | | GARAGE @ GRADE |
| | 38 | 202 VALLEY RIDGE RD | FRONT | MSV | MUDSILL | 14.0% | | | INSIDE CORNER AT GARAGE |
| | 39 | 204 VALLEY RIDGE RD | FRONT | MSV | ENTRY WALL JOG | 40.0% | | | VERY SOFT |
| | 40 | 204 VALLEY RIDGE RD | REAR | STUCCO | CHIMNEY BASE | 16.3% | | | INSIDE CORNER NEXT TO CHIMNEY; 16" ABOVE WEEP |
| | 41 | 204 VALLEY RIDGE RD | REAR | STUCCO | REAR DECK LEDGER | 15.2% | | | UNDER HARDIE TRANSITION |
| | 42 | 222 VALLEY RIDGE RD | FRONT | STUCCO | BELOW ENTRY KICKOUT | 9.3% | 10.3% | | |
| | 43 | 222 VALLEY RIDGE RD | FRONT | STUCCO | WINDOW SILL | 10.1% | 10.4% | | |
| | 44 | 222 VALLEY RIDGE RD | FRONT | MSV | WALL AT ENTRY STOOP | 19.9% | 17.1% | 19.1% | |
| | 45 | 222 VALLEY RIDGE RD | FRONT | MSV | MUDSILL BAY WINDOW | 24.8% | | | 9" TO GRADE |
| | 46 | 224 VALLEY RIDGE RD | GARAGE | MSV | WINDOW SILL | 15.4% | | | |
| | 47 | 224 VALLEY RIDGE RD | GARAGE | MSV | MUDSILL | 19.2% | | | 6" +/- TO GRADE; INSIDE CORNER |
| | 48 | 126 GREEN LN | FRONT | MSV | MUDSILL | 19.5% | | | |
| | 49 | 126 GREEN LN | FRONT | STUCCO | MUDSILL | 15.1% | | | INSIDE CORNER |
| | 50 | 126 GREEN LN | FRONT | MSV | WALL AT ENTRY STOOP | 33.9% | 32.6% | | |
| | 51 | 124 GREEN LN | FRONT | STUCCO | MUDSILL | 11.6% | | | UNDER KICKOUT AREA |
| | 52 | 124 GREEN LN | FRONT | MSV | MUDSILL | 15.5% | | | |
| | 53 | 131 GREEN LN | FRONT | MSV | WALL AT ENTRY STOOP | 40.0% | | | |
| | 54 | 131 GREEN LN | FRONT | MSV | KICKOUT | 13.8% | | | OVER PROBE 131A |

DAY TWO 8/8/2018

Haverford Reserve, The Carriage Homes
Moisture Probe Testing

| DATE | LINE | ADDRESS | ELEVATION | TYPE | LOCATION | DCEI READING 1 | DCEI READING 2 | DCEI READING 3 | NOTE(S) |
|------|------|---------|-----------|------|----------|----------------|----------------|----------------|---------|
| DAY TWO 8/8/2018 | 55 | 129 GREEN LN | REAR | STUCCO | CHIMNEY BASE | 15.7% | | | |
| | 56 | 129 GREEN LN | REAR | STUCCO | CHIMNEY BASE | 13.8% | | | |
| | 57 | 129 GREEN LN | SIDE | STUCCO | CHIMNEY SHOULDER | 20.0% | 12.8% | 14.3% | |
| | 58 | 129 GREEN LN | FRONT | STUCCO | MUDSILL BAY WINDOW | 23.5% | | | |

# Appendix C



## LETTER OF CERTIFICATION

August 2, 2018

DC Engineering Inspections, LLC
1904 Main Street
Lake Como, NJ 07719

Gentlemen:

Subject: Moisture Meter – Model: BD-2100, Serial No: 59189

This is to certify that the primary calibration - electrical resistance - of the
Delmhorst Moisture Meter referenced above has been tested on equipment
whose accuracy is certified by the following equipment:

> General Radio Bridge, Model No. 1644-A, S/N 2526
> Keithley Multimeter, Model No. 197, S/N 283483

The calibration of these instruments, certified by Industrial Process
Measurement, Inc. with Report No. 69495-01 dated November 13, 2017 and
Report No. 69495-02 dated November 10, 2017, is traceable to the NIST.

Sincerely,

John C. Laurenzi
V.P. Manufacturing

JCL: AA



# CALIBRATION VERIFICATION FOR
# WOOD MOISTURE METERS

**Customer Name:  DC Engineering Inspections, LLC**

**Model #:  BD-2100**

**Serial #:  59189**

**Date:  8/3/18**

| Nominal Settings At Factory | INCOMING | OUTGOING |
|---|---|---|
| 7.0 +/- 0.5 | 7.1 | 7.1 |
| 10.0 +/- 0.5 | 10.0 | 10.0 |
| 15.0 +/- 0.5 | 15.2 | 15.2 |
| 20.0 +/- 0.5 | 20.0 | 20.0 |
| 25.0 +/- 0.5 | 24.9 | 24.9 |
| 30.0 +/- 0.5 | 30.1 | 30.1 |

John C. Laurenzi
VP Manufacturing

Rev. 11/07

# Appendix D

U.S. Department of Commerce
National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service
Current Location: Elev. 390 ft. Lat: 40.0232° N Lon: -75.3709° W
Station: VILLANOVA, PA US USC00369191

**Record of Climatological Observations**

These data are quality controlled and may not be identical to the original observations.
Generated on 08/27/2018

National Centers for Environmental Information
151 Patton Avenue
Asheville, North Carolina 28801

Observation Time Temperature: Unknown Observation Time Precipitation: 0800

| Y e a r | M o n t h | D a y | Temperature (F) 24 Hrs. Ending at Observation Time Max. | Min. | At Obs. | Precipitation Rain, Melted Snow, Etc. (in) | 24 Hour Amounts Ending at Observation Time F l a g | Snow, Ice Pellets, Hail (in) | F l a g | Snow, Ice Pellets, Hail, Ice on Ground (in) | At Obs. Time | Evaporation 24 Hour Wind Movement (mi) | Amount of Evap. (in) | Soil Temperature (F) 4 in. Depth Ground Cover (see *) | Max. | Min. | 8 in. Depth Ground Cover (see *) | Max. | Min. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 08 | 01 | | | | 0.10 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 02 | | | | 0.05 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 03 | | | | 0.00 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 04 | | | | 1.00 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 05 | | | | 0.16 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 06 | | | | 0.00 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 07 | | | | 0.00 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 08 | | | | 0.09 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 09 | | | | | | | | 0.0 | | | | | | | | | |
| 2018 | 08 | 10 | | | | 0.11 | | 0.0 | | 0.0 | | | | | | | | | |
| 2018 | 08 | 11 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 12 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 13 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 14 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 15 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 16 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 17 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 18 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 19 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 20 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 21 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 22 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 23 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 24 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 25 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 26 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 27 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 28 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 29 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 30 | | | | | | | | | | | | | | | | | |
| 2018 | 08 | 31 | | | | | | | | | | | | | | | | | |
| Summary | | | | | | 1.51 | | 0.0 | | | | | | | | | | | |

Empty, or blank, cells indicate that a data observation was not reported.
"Ground Cover: 1=Grass; 2=Fallow; 3=Bare Ground; 4=Brome grass; 5=Sod; 6=Straw mulch; 7=Grass muck; 8=Bare muck; 0=Unknown
"s" This data value failed one of NCDC's quality control tests.
"T" values in the Precipitation or Snow category above indicate a "trace" value was recorded.
"A" values in the Precipitation Flag or the Snow Flag column indicate a multiday total, accumulated since last measurement, is being used.
Data value inconsistency may be present due to rounding calculations during the conversion process from SI metric units to standard imperial units.

# EXHIBIT "E"

10/12/2018

# Haverford Reserve: The Carriage Homes

Invasive Façade Inspection Summary – Day 1 (10/10/2018)





10/12/2018

# Haverford Reserve: The Carriage Homes

## Reference Material: Moisture Content in Wood Structures

| SUMMARY TABLE | |
|---|---|
| 0% - 6.0% | These results are abnormally low and indicate that: the test was performed improperly or the meter malfunctioned resulting in the erroneous reading, or; there is an external force lowering the moisture content of the wood in this location. |
| 6.1% - 16.0% | These results are consistent with normal wood in Pennsylvania and indicate that either moisture infiltration has not yet occurred, or has not occurred within a relatively significant amount of time. |
| 16.1% - 19.9% | These results indicate that moisture infiltration is occurring, especially if a source for moisture infiltration has been confirmed. |
| 20.0% - 30.0% | These results indicate that moisture infiltration is occurring at levels where deterioration will occur if the wood is infected with wood rotting fungi. |
| 30.1% and above | These results indicate that moisture infiltration is occurring at levels where infection by wood rotting fungi will eventually occur, and deterioration by wood rotting fungi can progress at a rapid rate. |

Page 2 of 13





# TC#01 – 102 Green Lane

Leads to Darby Rd

Leads to Marple Rd

Available Home Sites
Quick Delivery
Sales Center & Model

The Carriage Homes at HAVERFORD RESERVE

Page 3 of 13

10/12/2018



TC#01 – 102 Green Lane

10/12/2018



Previous Moisture Probe Reading of 40.0%







10/12/2018

# TC#01 – 102 Green Lane



Entry slab poured in front of wood wall framing

Moisture Probe Reading of 40.0% - Saturated wood and building paper



Weep Screed 4"-6" below grade

Code requires weep screed be at least 4" ABOVE grade.

Wood framing must be preservative-treated when within 8" of grade.

# TC#01 – 102 Green Lane



Deteriorated structural rim board due to moisture; loss of structural integrity

Note: OSB Sheathing removed to reveal that damage extends beyond sheathing and into rim board





Bottom of wood framing



10/12/2018

# TC#01 – 102 Green Lane



Wet and heavily deteriorated OSB wall sheathing

Layer 1
Layer 2
Layer 3
Layer 4
Layer 5
Layer 6
Layer 7

7 Layers of paper at overlap areas creates breathability concerns.

MORE = BETTER

TC#02 – 241 Valley Ridge Road

10/12/2018

Leads to Darby Rd

Leads to Marple Rd

Available Home Sites

Quick Delivery

Sales Center & Model

The Carriage Homes at HAVERFORD RESERVE

Page 8 of 13



10/12/2018

# Text Cut TC#02 – 241 Valley Ridge Road



Previous Moisture Probe Reading of 30.0%





Page 9 of 13



# TC#02 – 241 Valley Ridge Road



Wire mesh and fasteners corroded

Paper does not overlap vertical flange of weep screed

Weep Screed 6'-8" below grade

Code requires weep screed be at least 4" ABOVE grade

10/12/2018

Page 10 of 13





# TC#02 – 241 Valley Ridge Road

Wood Moisture content measured at 20% (i.e.: 'wet')

Wire mesh and fasteners corroded

Note: 3 layers of building paper + drainage mat

Concrete and building paper wet

Weep Screed 6"-8" below grade

10/12/2018

10/12/2018

# TC#02 – 241 Valley Ridge Road

Buried weep screed is preventing moisture from draining at the base of the wall



'WET'

26.3% moisture at bottom of wood framing



'DRY'

12.6% moisture approx. 32" above grade

10/12/2018

# Haverford Reserve: The Carriage Homes

## NEXT STEPS:

- Additional invasive testing of other homes
- Additional moisture probing of other homes
- Document review of construction phasing and/or contractors installing stucco on a building by building basis
- Interior inspections of rim board area at basement where unfinished (we need to verify the feasibility of this)



# EXHIBIT "F"

# Haverford Reserve: The Carriage Homes

## Interim Façade Testing Report

### Based on findings to-date as of December 20, 2018

*provided for settlement purposes only*



*Prepared by:*

dci
ENGINEERING

PRELIMINARY

# INTRODUCTION / OUTLINE

- The interim analysis provided herein is based on 10 days of moisture probe and invasive testing conducted jointly with:

  - Association's Construction Representative - Daniel Ciarcia & Daniel Reuther (dC Engineering Inspections LLC)
  - Legal Counsel for the Association - Adam Marcus & Preston Satchell
  - Legal Counsel for the Declarant - Mark Parisi
  - Declarant's Construction Representative - William Dare (Spotlight Inspections)
  - various sub-contractors supplied by the Declarant for the purposes of performing test cuts and restoration.

- The information is grouped and presented in the following parts:

  - PART I:     Moisture Probe Testing
  - PART II:    Invasive Testing
  - PART III:   Summary
  - PART IV:   Preliminary Recommendations/Next Steps

- *This is a preliminary report. dCEI reserves the right to supplement, amend, and update this report as additional information is gathered through further analysis, inspections, investigation, and/or subsequent repairs. As repairs are completed, it may be determined that additional testing and/or additional repairs will be required.*

# PART I:
## Moisture Probe Testing

# Moisture Probes: Testing Progress



36 Buildings Tested

14 Buildings not Tested

# Moisture Probes: Data Classification



**0% - 6.0%**
These results are abnormally low and indicate that the test was performed improperly or the meter malfunctioned resulting in the erroneous reading, or; there is an external force lowering the moisture content of the wood in this location.

**DATA LABEL KEY**

| Desription |
|---|
| # of locations |
| % of total |

**6.1% - 16.0%**
These results are consistent with normal wood in Pennsylvania and indicate that either moisture infiltration has not yet occurred, or has not occurred within a relatively significant amount of time.

Abnormally Low
3
1%

Normal
189
54%

High
93
27%

Elevated
62
18%

**20.0% - 30.0%**
These results indicate that moisture infiltration is occurring at levels where deterioration will occur if the wood is infected with wood rotting fungi.

**30.1% and above**
These results indicate that moisture infiltration is occurring at levels where infection by wood rotting fungi will eventually occur, and deterioration by wood rotting fungi can progress at a rapid rate.

**16.1% - 19.9%**
These results indicate that moisture infiltration is occurring, especially if a source for moisture infiltration has been confirmed.

5

# Moisture Probes: Elevated Moisture
## General Locations



Mudsill
71

OTHER
9

Deck Ledger
10

Chimney
19

Entry Stoop/Wall
Jog
46

# Moisture Probes: General Locations



"MUDSILL"

**AREA TESTED AT:**
64 UNITS (138 LOCATIONS)

**ELEVATED MOISTURE
DETECTED AT:**
48 UNITS (71 LOCATIONS)

# Moisture Probes: General Locations



"ENTRY STOOP/WALL JOG"

**AREA TESTED AT:**
49 UNITS (55 LOCATIONS)

**ELEVATED MOISTURE DETECTED AT:**
41 UNITS (46 LOCATIONS)

# Moisture Probes: General Locations



"CHIMNEY"

**AREA TESTED AT:**
34 UNITS (54 LOCATIONS)

**ELEVATED MOISTURE DETECTED AT:**
13 UNITS (19 LOCATIONS)

# Moisture Probes: General Locations



"DECK LEDGER"

**AREA TESTED AT:**
14 UNITS (17 LOCATIONS)

**ELEVATED MOISTURE DETECTED AT:**
9 UNITS (10 LOCATIONS)

# PART II:
## Invasive Testing

# Invasive Inspections: Locations



7 Locations Complete

The Carriage Homes at HAVERFORD RESERVE

Invasive Inspections: Location #1





# Invasive Inspections: Location #1



Previous Moisture Probe Reading of 40.0%





# HIGH MOISTURE LEVELS

# Invasive Inspections: Location #1





## NO SYSTEM DRAINAGE

# Invasive Inspections: Location #1



Deteriorated structural rim board due to moisture; loss of structural integrity



Note: OSB Sheathing removed to reveal that damage extends beyond sheathing and into rim board



Bottom of wood framing

# STRUCTURAL WOOD DECAY

16

Invasive Inspections: Location #1



7 Layers of paper at overlap areas creates breathability concerns.

MORE = BETTER

Layer 1
Layer 2
Layer 3
Layer 4
Layer 5
Layer 6
Layer 7

Wet and heavily deteriorated OSB wall sheathing

BREATHABILITY ISSUES

# Invasive Inspections: Location #2





Invasive Inspections: Location #2



Previous Moisture Probe Reading of 30.0%



HIGH MOISTURE LEVELS

# Invasive Inspections: Location #2



Paper does not overlap vertical flange of weep screed

Wire mesh and fasteners corroded

Weep Screed 6"-8" below grade

Code requires weep screed be at least 4" ABOVE grade

## NO SYSTEM DRAINAGE



## Invasive Inspections: Location #2

Wood Moisture content measured at 20% (i.e.: 'wet')

Wire mesh and fasteners corroded

Note: 3 layers of building paper + drainage mat

Concrete and building paper wet

Weep Screed 6''–8'' below grade

## EARLY DETERIORATION

# Invasive Inspections: Location #2

Buried weep screed is preventing moisture from draining at the base of the wall

## NO SYSTEM DRAINAGE



12.6% moisture approx. 32" above grade

'DRY'

26.3% moisture at bottom of wood framing

'WET'

22

# Invasive Inspections: Location #3







Invasive Inspections: Location #3

Wire mesh and fasteners corroded

Casing Bead Installed Above Stone Sill

Drainage Mat Not Continuous Beyond Stone Sill (not installed behind stucco)

Previous Moisture Probe Reading of 22%

NO DRAINAGE

## Invasive Inspections: Location #3



**Behind Stucco**
-Building Paper
-Housewrap

Sheathing Completely Saturated

**Behind Stone**
-Drainage Mat
-Building Paper
-Housewrap

Self-Adhered Flashing Between Sheathing & Foundation

# HIGH MOISTURE LEVELS

# Invasive Inspections: Location #4





# Invasive Inspections: Location #4



Drainage Mat Verified Behind Stucco

Casing Bead Installed Above Stone Sill

No Previous Moisture Readings; Area Selected to Determine if Drainage Mat is Installed Behind Stucco

# Invasive Inspections: Location #5





# Invasive Inspections: Location #5



Corrosion of Mesh & Fasteners

Drainage Mat

Complete Sheathing Deterioration

Housewrap Behind 4 Layers of Paper

Area of Test

NO SYSTEM DRAINAGE

# Invasive Inspections: Location #6





# Invasive Inspections: Location #6



Corrosion of Mesh & Fasteners

Housewrap Does Not Extend To Weep Screed (approx. 6" short)

Weep Screed Approx. 12" Down From Sheathing Edge

Previous Moisture Probe Readings of 30%-40% (questioned by Spotlight)

# HIGH MOISTURE LEVELS

31



Invasive Inspections: Location #6

Behind Stucco
-Building Paper
-Housewrap

'DRY'

NO DRAINAGE

Sheathing Completely Saturated

Building Paper Installed in Front of Casing Bead

Self-Adhered Flashing Between Sheathing & Foundation

Behind Stone
-Drainage Mat
-Housewrap

'WET'

HIGH MOISTURE LEVELS

# Invasive Inspections: Location #7





Invasive Inspections: Location #7

Horizontal Trim Installed Tight to Flashing

Casing Bead Installed in Front of Flashing Dam

Saturated/Deteriorated Sheathing

Previous Moisture Probe Readings of 34%

HIGH MOISTURE LEVELS

Invasive Inspections: Location #7



Building Paper In Front of Vertical Flange of Weep Screed

Vertical Overlap of Paper < 2" (6" min. required by code)

Flashing Installed Over Weep Screed

Building Paper Behind Vertical Flange of Flashing (mislap)

Drainage Mat Not Installed on This Wall

Drainage Mat Does Not Extend To Corner

NO DRAINAGE

# Invasive Inspections: Recap

1. Foundation weep screed installed, but buried below grade and pavement. The current placement of foundation weep screed renders it ineffective. (No Drainage)

2. Elevated moisture verified at 6 of 7 locations; Building and/or structural damage at 5 of 7 locations.

3. Inconsistent construction observed:

   a) Number of Building Paper Layers Vary (Too many layers create breathability concerns)
   b) Drainage Mat Behind Stucco Sporadic (No drainage some areas)

**With certain components,**

As-Built
Construction at
'Location x'



Approved Design Detail(s)
and/or Code Requirements
-or-
Methods Described by the Declarant
and Their Expert
-or-
As-Built Construction at 'Location y'

*The lack of consistency has impacted our ability to draw conclusions about the construction at all homes in the community*

*The above list is meant to provide a simple summary of initial findings from invasive inspections completed to-date as they relate to the exterior façade. This is not a comprehensive list of all observed defects and/or observations made as they relate to the construction.*

36

# PART III:
## Summary

# SUMMARY

Based on our invasive and probe inspection observations (to-date), the following are areas/components of most immediate and serious concern:

1. Entry Stoops

2. Stone Weep Screed

3. Stone/Stucco Transitions

4. Chimneys

5. Deck Ledgers

All five (5) areas were observed to contain high levels of moisture which will have a negative impact on moisture sensitive building materials such as wood framing, sheathing, fasteners, insulation, interior finishes, etc.

38

# SUMMARY

## 1. Entry Stoops:

- The construction at entry stoops is not in accordance with the original design plans, building code, or industry standards.

- The as-built conditions are causing damage to the building and must be repaired at all homes.

- The Declarant has proposed a repair method for the entry stoop, which is discussed on the following pages.







# SUMMARY

## 1. Entry Stoops:

Declarant's Proposed Repair



FRONT PORCH REPAIR DETAIL FOR
GUIDI HOMES | HAVERFORD RESERVE

Repair Detail
Scale: 3"=1'-0"

Existing Detail Condition
Scale: 3"=1'-0"

TYPICAL WALL SECTION
OF DAMAGED AREA



PROPOSED CUT LINE

HOW CAN THE 3½" VERTICAL LEG OF WEEP SCREED BE INSTALLED BEHIND WRB? HOW WILL IT BE FASTENED?

# SUMMARY

## dCEI Questions/Comments/Concerns:

- Concern with the ability to integrate the weep screed with drainage plane without cutting higher than final weep screed elevation.

- Concern with the overall aesthetics.

- Will the repair detail be signed and sealed/stamped by a licensed design professional?

- Will anything be done to the cut edge above the weep screed?

- How will the work be done at foam embellishments?

- What type of cement board will be used?

- How will the system terminate at ends?

- Will the boundaries of the work be consistent at each unit?

- Who will determine if wood replacement or structural repairs are necessary?

- Will there be oversight of the work if this is implemented community-wide?

- Where they exist, will issues with riser height variations be corrected?

## 1. Entry Stoops:
### Declarant's Proposed Repair



FOAM EMBELLISHMENT WILL PROJECT BEYOND PROPOSED AZEK BOARD

# SUMMARY

## 2. Stone Weep Screed:

- The current placement of foundation weep screed is not in accordance with the original design plans, building code, or industry standards. The wall systems cannot drain.

- High moisture and/or damage have been measured/observed at multiple areas along the base of the wall.

- Although moisture readings at some locations along the base of the wall were in the 'normal' range, the weep screed placement is a systemic code defect that must be repaired community-wide.

- The inconsistencies with the building paper and housewrap behind the stone further complicate this issue.

### DESIGN DETAIL



### AS-BUILT CONDITIONS



### Applicable References

#### IRC Section R703.6

*"A minimum 0.019-inch, corrosion-resistant weep screed or plastic weep screed, with a minimum vertical attachment flange of 3½" inches shall be provided at or below the foundation plate line on exterior stud walls in accordance with ASTM C 926. The weep screed shall be placed a minimum of 4 inches above the earth or 2 inches above paved areas and shall be of a type that will allow trapped water to drain to the exterior of the building. The weather-resistant barrier shall lap the attachment flange. The exterior lath shall cover and terminate on the attachment flange of the weep screed."*

#### ASTM C 1063

*"Foundation weep screed shall be installed at the bottom of all steel or wood framed exterior walls to receive lath or plaster. Place the bottom edge of the foundation weep screed not less than 1 in. below the joint formed by the foundation and framing. The nose of the screed shall be placed not less than 4 in. above the earth or 2 in. above paved surfaces. The weather resistive barrier and lath shall entirely cover the vertical flange and terminate at the top edge of the nose or ground flange."*

42

# SUMMARY

## 3. Stone/Stucco Transitions:

- The current construction and flashing at horizontal transitions between stone and stucco (i.e. at stone sill areas) are not in accordance with the original design plans, building code, or industry standards.

- The inconsistencies with the building paper and housewrap behind the stone and stucco further complicate this issue.

- The wall systems do not drain as intended.



### DESCRIPTION OF INSTALLED SYSTEM FROM SPOTLIGHT'S LETTER

This system installed does permit drainage. The water resistive barrier system installed behind the stucco and stone consists of one layer of Fortifiber Weather Smart. The product is a polymeric weather-resistive barrier, utilizing a high-strength nonwoven substrate and a monolithic non-perforated coating of smart polymers, two layers of Fortifiber Super Jumbo-Tex asphalt impregnated kraft paper, 6mm Keen Driwall™ Rainscreen which is a entangled net drainage mat for exterior wall systems. This system exceeds the current building code including the latest codes not yet adopted.

The system is continuous behind the stucco and stone to the weep screed. Any incidental moisture behind the cladding drains uninterrupted to the weep screed for drainage. With this system, the need for through wall flashings at the stucco to water table juncture is eliminated.

NOT ACCURATE

NOT INSTALLED

BASE COAT & FINISH COAT OF
STUCCO OVER GALV. METAL LATH
(2) LAYERS OF UNDERLAYMENT
LAP OVER SCREED
GALV. METAL WEEP SCREED
GALV. METAL  FLASHING
SEALANT UNDER FLASHING
SELF ADHERED SILL FLASHING
LAP UNDERLAYEMENT
GALV. METAL CLIP ANGLE
1 1.2" X2" X ⅛" (18GA)
MORTAR SCRATCH COAT
GALV. METAL LATH
(2) LAYERS UNDERLAYMENT
OVER SHEATHING
APPLIED STONE VENEER

**DESIGN DETAIL**

# SUMMARY

## 3. Stone/Stucco Transitions:

- Inconsistencies with the building paper and housewrap behind the stone and stucco further complicate this issue.



### VARIATION #1

THIS INSTALLATION IS CONSISTANT WITH SPOTLIGHT'S WRITTEN DESCRIPTION

DRAINAGE MAT CONTINUOUS BEYOND STONE SILL (i.e. INSTALLED BEHIND STONE AND STUCCO

### VARIATION #2

BUILDING PAPER LAYER IN FRONT OF CASING BEAD (NOT CONTINUOUS DOWN TO STONE)

HOUSEWRAP CONTINUOUS BEHIND CASING BEAD

DRAINAGE MAT NOT INSTALLED BEHIND STUCCO

### VARIATION #3

HOUSEWRAP AND BUILDING PAPER LAYERS CONTINUOUS BEHIND CASING BEAD

DRAINAGE MAT DOES NOT EXTEND BEYOND STONE SILL (i.e. NOT INSTALLED BEHIND STUCCO)

# SUMMARY

## 4. Chimney Enclosures:

- There are two primary aspects of the stucco cladding systems at chimney enclosures that are of concern.



HIGH MOISTURE REQUIRES FURTHER INVESTIGATION

*Over Chimney Shoulders'*

BURIED WEEP SCREED CODE VIOLATION – NO DRAINAGE

*At Obstructed Weep Screed*

Additional issues with the chimney enclosures are interrelated with deck ledger concerns – these areas are grouped with the 'deck ledger' classification (next page)

# SUMMARY

## 5. Deck Ledgers:

- Deck ledger flashing is not installed at the majority of decks in the community.
  - The apparent deck ledger flashing was inspected at 222 Valley Ridge Road and was found to be improperly installed.

- The installation of deck ledgers in front of the stucco cladding systems without flashing is not in accordance with the building code or industry standards.

- High moisture has been measured at multiple areas below deck ledgers.

- Damage was observed at the area where invasive testing was performed.

### 2006 International Residential Code

**R703.8 Flashing.** Approved corrosion-resistant flashing shall be applied shingle-fashion in such a manner to prevent entry of water into the wall cavity or penetration of water to the building structural framing components. The flashing shall extend to the surface of the exterior wall finish. Approved corrosion-resistant flashings shall be installed at all of the following locations:

1. Exterior window and door openings. Flashing at exterior window and door openings shall extend to the surface of the exterior wall finish or to the water-resistive barrier for subsequent drainage.

2. At the intersection of chimneys or other masonry construction with frame or stucco walls, with projecting lips on both sides under stucco copings.

3. Under and at the ends of masonry, wood or metal copings and sills.

4. Continuously above all projecting wood trim.

5. Where exterior porches, decks or stairs attach to a wall or floor assembly of wood-frame construction.

6. At wall and roof intersections.

7. At built-in gutters.



LEDGER FLASHING APPEARS TO BE INSTALLED HOWEVER.

UPON CLOSER INSPECTION AT THE TOPSIDE OF THE DECK, THIS PIECE OF FLASHING WAS FOUND TO BE INSTALLED ENTIRELY IN FRONT OF THE CLADDING SYSTEM COLLECTS WATER INSTEAD OF DEFLECTING IT TO THE EXTERIOR



NO VISIBLE LEDGER FLASHING

46

# PART IV:
## Preliminary Recommendations/Next Steps

(Based on findings to-date)

# RECOMMENDATIONS/NEXT STEPS

1. Entry Stoops        2. Stone Weep Screed        3. Stone/Stucco Transitions

Considering our observations thus far, when these three (3) issues are jointly considered, a community-wide comprehensive repair will require the following:

1. Full replacement of stone veneer system including and below the stone sill along all walls that are clad with stone; and

2. Removal and replacement of a portion of the stucco cladding system above the stone.

***Doing so will facilitate:***

A. placement of foundation weep screed to meet code and allow drainage;

B. evaluation of concealed components (sheathing, framing, insulation, etc.); repairs as necessary;

C. correction of flashing and drainage plane to bring into compliance with approved design);

D. proper integration of drainage plane from new to old;

E. acceptable aesthetics;

F. complete system warranties;

# RECOMMENDATIONS/NEXT STEPS

## 4. Chimneys

**Visually evaluate all chimneys in community:**

A. The weep screed must be installed above grade to meet code and provide drainage. Areas below grade need to be evaluated and properly protected. Hardscaping will need to be removed.

B. Additional testing/inspections are required to determine the full extent of the issues and damage at chimneys.

- This includes complete removal of stucco cladding from the chimney at 235 Valley Ridge Road as agreed on 10/24/18 by Legal Counsel for the Association, Legal Counsel for the Declarant & Declarant's Construction Representative.

- Selective removal of stucco cladding from chimneys found to be wet (4 additional units minimum);

- Subsequent work as necessary based on findings.

# RECOMMENDATIONS/NEXT STEPS

## 5. Deck Ledgers

**Visually evaluate all decks in community:**

*At areas where ledger flashing is not installed*

- Deck ledger flashing must be installed at all locations where it is missing so as to meet the requirements of the building code.

- Damaged components (sheathing, framing, insulation, etc.) to be replaced as required.

*At areas where ledger flashing appears to be installed*

- Remove trim section from a minimum of 10 decks for evaluation;

- Subsequent work as necessary based on findings. This may require more inspections.

- Deck ledger flashing must be installed at all locations where it is improperly installed to meet the requirements of the building code.

50

# EXHIBIT "G"



1508 Main Street
Lake Como, NJ 07719
Ph: (732) 994-8210
[illegible]

March 28, 2019

Haverford Reserve, the Carriage Homes
c/o: Marcus & Hoffman
326 West State Street
Media, PA 19063
*sent via email to amarcus@marcushoffman.com & psatchell@marcushoffman.com*

Attn:    Adam Marcus, Esq

Re:    **Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2**
       **dCEI Job No. 2108-99-001CE**

Dear Mr. Marcus,

As you are aware, there are multiple construction defects with the installation of stone veneer, stucco, and deck ledgers in the Haverford Reserve Community. These defects have been documented in detail in previous reports by dC Engineering Inspections, LLC ('dCEI'). This letter has been prepared at the request of the Haverford Reserve Board of Directors with the intent of summarizing the anticipated protocols to further investigate and repair the stone, stucco, deck ledgers, and chimneys.

The following documents were reviewed prior to preparation of this report and are referenced within:

- The Transition Inspection Report for the Haverford Reserve Community by dCEI; dated October 25, 2017 (the 'Transition Inspection Report');

- The Preliminary Interim Façade Testing Report Based on findings to-date as of December 20, 2018 by dCEI (the 'Interim Façade Testing Report');

- Letter from Brian Mann of The OMNIA Group, Inc. to Mr. Paul Abdalla & Mr. Steve Bonitatis, Guidi Homes; dated January 30, 2019 (the OMNIA Letter);

- The 'Front Porch Repair Detail for Guidi homes/Haverford Reserve' by The OMNIA Group, Inc.; dated November 6, 2018 ('Architects Drawing').

- Preliminary Interim Façade Testing Report prepared by dC Engineering Inspections, LLC, dated December 20, 2019 ('Interim Façade Testing Report').

The Preliminary Interim Façade Testing Report identifies the results of moisture testing performed jointly by dCEI and the Declarant's construction expert at thirty six (36) of the fifty (50) buildings within the community. Elevated moisture was detected in the wood sheathing at forty six percent (46%) of the tested locations. The elevated moisture readings indicate that there is active water intrusion behind cladding system and that the exterior walls are not providing the building with a weather –resistant building envelope as required by the applicable building code (IRC R703.1). The system has not been constructed in a manner that prevents the accumulation of water within the wall assembly. In order to address the moisture intrusion issues, all sources of water intrusion must be identified, damaged building components require replacement, and the system must be modified to provide a means of draining water that enters the system.

Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 257 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 2 of 16

# Stone Veneer Foundation Weep Screed and Entry Stoops

In the Interim Façade Testing Report, dCEI recommends full replacement of the stone veneer system from the stone sill down to below the mudsill. This includes removal of the stone sill itself as well as removal and replacement of a portion of the stucco cladding system installed directly above the stone sill. These recommendations address multiple construction issues with the exterior plaster systems, such as a) buried foundation weep screed (as required per the design plans) and b) missing through-wall flashing at the stone veneer and stucco transition (as required per the design plans).

In the OMNIA Letter, Mr. Mann recommends that the stone veneer is removed from the bottom of the wall to install weep screed. OMNIA provided the following detail for this work:




Existing Condition                                 Repair Detail

The Declarant has proposed a foundation weep screed retrofit as described by OMNIA at a 'prototype' building. Our understanding is that the purpose of this 'prototype' is to obtain information about the feasibility of implementing repairs community-wide. The prototype will also allow the owners to evaluate aesthetics of the repaired condition. After consulting with the Board, dCEI suggests that this work is performed at 222-224 Valley Ridge Road beginning on April 8, 2019, if and only if the conditions of this letter are met.

At this time, dCEI has concerns with achieving an acceptable performance of the cladding system without full removal of, at a minimum, all of the stone veneer (below the stone sills). These concerns include, but are not limited to:

1. The feasibility of removing portions of the stone veneer without damaging the underlying drainage layers;



Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 258 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 3 of 16

2. The feasibility of properly integrating new flashing components with the existing drainage layers;

3. The feasibility of identifying and replacing all moisture-damaged wall sheathing and framing components;

4. The possibility of other construction issues that may be contributing to water infiltration but are not visible within the boundaries of work;

5. The feasibility of providing an aesthetically acceptable repair condition;

6. The flat surface and lack of slope at the stone sill does not shed water away from the building; and

7. The continuity of the drainage plane at the sill stone and the lack of through wall flashing at this transition.

Our primary concern pertains to the existing construction at the transition from stucco to stone (item 7 above). The approved design plans for construction of the homes include a specific detail for the transition from stucco to stone. This detail requires weep screed and sill flashing between the stone veneer and stucco cladding systems so as to offer a means for moisture within the stucco cladding system to escape before it travels down behind the stone. This detail is not incorporated in the existing construction nor will it be installed with the Declarant's proposed repair scope. The Declarant and their construction representative have suggested that the use of continuous drainage mat negates the need for this flashing and drainage detail at the stone veneer and stucco.

The flashing detail outlined on the design plans will offer benefits to the cladding system that currently do not exist, and that were intended per the design plans. The installation of flashing and drainage provisions between the stucco and stone veneer according to the original design plans would:

a) separate the stucco and stone veneer systems (allowing for easier replacement and repair in the future);

b) provide an additional drainage relief for moisture behind the stucco cladding material; and

c) provide an installation that is in accordance with the original design detail, recognized standards, and manufacturer requirements.

The figure directly below shows a published detail by the manufacturer of the drainage mat installed at Haverford (Keene Building Products). The second figure is another detail from the Masonry Veneer Manufacturer's Association (MVMA). MVMA is a well-recognized industry standard for installation of stone veneer. Both details indicate installation of the through wall flashing at the transition between different cladding materials. These details are identical in concept to the design plans and neither of them indicate that installation of a drainage mat eliminates the need for this detail.









Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 260 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 5 of 16

At our meeting on January 18, 2019, Steve Bonitatis (the Declarants representative) indicated that the drainage mat is continuous at all homes except two (2) buildings (107-108 Green Lane and 257-259 Valley Ridge Road). As previously noted, the Declarant and their construction representative (Spotlight) have suggested that the use of continuous drainage mat negates the need for this flashing and drainage detail at the stone veneer and stucco. The Declarant's design professional must provide a signed and sealed detail indicating the acceptance of the omitted flashing systems. This detail must be provided prior to the start of the 'prototype' work.

Our inspection observations indicate the discontinuous drainage mat is more widespread than disclosed. During our invasive testing at several locations in the community, we found an area of discontinuous drainage mat at 116 Green Lane, 259 Valley Ridge Road, 107 Green Lane.

It is imperative that the continuity of the drainage mat on the wall [in this case, the transition from stucco to stone] is verified at all homes in the community before considering the acceptable deletion of the through-wall flashing system. The continuity of the drainage mat behind the system is necessary in order to determine the full extent of required repairs. A continuous drainage mat is crucial to the Declarant's recommended approach.

We offer the following comments to the proposed repairs to the cladding system at the 'prototype' building:

| Protocol – 'Prototype' Work at 222-224 Valley Ridge Road | |
|---|---|
| **GENERAL:** | • Prior to construction, a pre-inspection of the home should be performed with the homeowner and Declarant or Declarant's representative. Additionally, photos must be taken of the home, including landscaping in the areas of work by the Declarant or Declarants representative. |
| | • Landscaping that is significantly damaged as a result of the work will need to be repaired/replaced to the satisfaction of the Board of Directors once the work is complete. |
| | • All necessary permits must be obtained by the contractor; |
| | • If there is any type of disagreement regarding the scope of repair, the Declarant's construction representative, the Declarant's contractor, and dCEI will attempt to reach a mutually agreed upon resolution. In the event that such a resolution cannot be reached, dCEI will direct the repair. |
| | • All work shall be warranted by Declarant and Contractor consistent with the warranty provisions under the Uniform Planned Communities Act, from the date of completion of the work. |
| | • General liability insurance certificate with coverage not less than $2,000,000 per occurrence shall be provided prior to commencement of |



any work naming the Association and the Individual Unit Owner where the work is being completed as additional insured's under said policy.

| | |
|---|---|
| **ENTRY STOOPS:** | ▪ The repair at entry stoops will be in accordance with the following description prepared by Spotlight Home Inspection: |

Repair at the stoop, see architects drawing. Hardie backer board will be installed in place of OSB where the stoop sits against the wall. Fluid applied membrane will be painted on the backer board fully covering it. Trowel grade fluid applied will be applied from the backer board onto the concrete foundation where they intersect. Peal and stick membrane will be applied over the backer board and under the door's sill pan flashing. An PVC wood analog riser will be installed which extends from below the sill plate to at least 2" above the finial paver elevation. A drip cap and weep screed will be installed on top of the riser. This will integrate behind the original water resistive barrier (WRB) and be tapped directly to the substrate. Any damaged WRB must be repaired with fluid applied membrane. The veneer stone will be installed with new wire as needed. A PVC block will be installed below the Canamould accents.

Additionally:

- ▪ New stone units and mortar will be an acceptable match to existing materials as determined by dCEI;
- ▪ Final repair product to be similar in appearance to work previously implemented at 130 Valley Ridge Road;
- ▪ Step and landing dimensions will be re-constructed to meet applicable code requirements;
- ▪ Damaged underlying materials will be evaluated and replaced in kind;
- ▪ Additional work as required based on field conditions observed by dCEI to identify and address the source(s) of moisture.

| | |
|---|---|
| **FOUNDATION WEEP SCREED *(walls with stone veneer and fiber cement siding)*:** | ▪ The stone sills will be removed and reinstalled along all the entire length of all walls where there is a transition between stone veneer and fiber cement siding. The stone sills must be reinstalled with a minimum 2% slope away from the building. |
| | ▪ Foundation weep screed will be installed at the foundation line along all walls with stone veneer. The work will be performed as summarized in 'Stone Wall Repair Detail' by OMNIA, with the following clarifications & changes: |

  o Damaged sheathing and framing will be replaced in kind;

  o Insulation at damaged sheathing will be replaced in kind;

  o Weep screed to be corrosion resistant with a minimum vertical attachment flange of 3½". Weep screed to be similar in color to the stone. WRB to overlap entire weep screed flange;

  o Stone veneer will be re-installed over the exposed portion of the foundation wall.

    ▪ MVMA requires a minimum of 2 in. clearance from grade and ½" clearance from paved surfaces.



Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 262 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 7 of 16

o  New stone units and mortar will be an acceptable match to existing materials as determined by dCEI.

o  The mudsill to foundation transition will be installed in accordance with the MVMA detail provided below with the color of the flashing transition to match stone:



**FOUNDATION WEEP SCREED** (*walls with stone veneer and stucco*):

■  The stone sills will be removed along all the entire length of all walls where there is a transition between stone veneer and stucco. The underlying conditions will be evaluated to determine if the drainage mat is continuous and free draining at the horizontal transition between stucco and stone:

One of the following repair methods will be implemented depending on whether or not the drainage mat is found to be continuous and free draining:

**Condition #1 – Continuous Drainage Mat**
*If the drainage mat is found to be continuous and free draining:*

■  Foundation weep screed will be installed at the foundation line along all walls with stone veneer. The work will be performed as summarized in 'Stone Wall Repair Detail' by OMNIA, with the following clarifications & changes:

   o  Damaged sheathing and framing will be replaced in kind;

   o  Insulation at damaged sheathing will be replaced in kind;

   o  Weep screed to be corrosion resistant with a minimum vertical attachment flange of 3½". Weep screed to be similar in color to the stone. WRB to overlap entire weep screed flange;



Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 263 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 8 of 16

    o  Stone veneer will be re-installed over the exposed portion of the foundation wall.

          ■  MVMA requires a minimum of 2 in. clearance from grade and ½" clearance from paved surfaces.

    o  New stone units and mortar will be an acceptable match to existing materials as determined by dCEI.

    o  Stone sills will be reinstalled with a minimum 2% slope to drain water away from the building.

    o  The mudsill to foundation transition will be installed in accordance with the MVMA detail provided below with the color of the flashing transition to match stone:



## Condition #2 – Discontinuous Drainage Mat

*If the drainage mat is found to be discontinuous or obstructed, the stone veneer shall be removed up to and including the stone sill.*

    ■  An 8"-12" strip of stucco will be removed above the stone sill to allow the incorporation of the MVMA transition detail below:

dC



- Damaged sheathing and framing will be replaced in kind.
- Insulation at damaged sheathing will be replaced in kind
- The stone veneer will be installed in accordance with MVMA recommendations.
- The stucco will be reinstalled in accordance with ASTM C 1063 and ASTM C 926 (current editions).
  - o   Stucco must be restored so as to be an acceptable match to the existing finish without resulting in a maintenance burden.
- Ledge flashing and sill stone will contain a minimum 2% slope to drain water away from the building.
- Weep screed to be corrosion resistant with a minimum vertical attachment flange of 3½". Weep screed to be similar in color to the stone. WRB to overlap entire weep screed flange.
- New stone units and mortar will be an acceptable match to existing materials as determined by dCEI.
- MSV will be reinstalled over the exposed portion of the foundation wall
  - o   MVMA requires a minimum of 2 in. clearance from grade and ½" clearance from paved surfaces.
- The mudsill to foundation transition will be installed in accordance with the MVMA below with the color of the flashing transition to match stone:



Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 265 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 10 of 16



The information obtained from the 'prototype' repairs will assist in developing a more detailed and comprehensive protocol for work to be performed on a community-wide basis. Upon completion of the prototypes, remedial repair plans should be prepared by a licensed professional. Upon request, dCEI can prepare these remedial design plans.

The proposed remedial plans will include critical information such as:

1. Written descriptive scope of work;
2. General notes for construction;
3. List of applicable codes and standards for the repairs;
4. Site map identifying units where repairs are required;
5. Typical floor plan(s) and building elevations identifying repair areas;
6. Specific notes about structural repairs and identification of same;
7. Specific notes about site restoration, interior restoration, access during construction, etc;
8. Details regarding the following:
    a. Entry stoop - door sill and jamb integration;
    b. Drainage plane (WRB);
    c. Drainage plane (WRB) overlap requirement (new to old);
    d. Drainage mat type and location;
    e. Flashing at sill plate transition to foundation;
    f. Stone on foundation wall (below sill plate);
    g. Penetration details (dryer hoods, cables, electrical boxes, etc).



Case 2:22-cv-03805-TJS Document 21-12 Filed 11/21/22 Page 266 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 11 of 16

# Stucco Foundation Weep Screed

In the Interim Façade Testing Report, dCEI recommends the installation of weep screed at areas where it is missing. The chimneys located at the rear of many homes do not contain visible weep screed. The protocol below outlines the anticipated work required to repair this condition:

## Protocol – Stucco Foundation Weep Screed Retrofit

- All necessary permits will be obtained by the contractor;

- All work shall be warranted by Declarant and Contractor consistent with the warranty provisions under the Uniform Planned Communities Act, from the date of completion of the work.

- General liability insurance certificate with coverage not less than $2,000,000 per occurrence shall be provided prior to commencement of any work naming the Association and the Individual Unit Owner where the work is being completed as additional insured's under said policy.

- Where applicable, remove existing hardscaping (i.e.: pavers) that is located directly in front of the stucco;

- Saw-cut stucco such that approximately 12" can be removed above surface of the exterior finish;

- If damaged building materials are encountered, additional stucco will need to be removed to identify the source, address the source, and repair all damaged building materials.

- Replace damaged sheathing and framing in kind;

- Replace insulation at sheathing replacement, in kind;

- Where applicable, replace existing sheathing with cement board in areas that will be located below paver stairs and landings;

- Where applicable, apply waterproofing membrane over cement board sheathing and extend a minimum of 4" onto the supporting foundation;

- Install foundation weep screed such that the nose is located a minimum of 4" above exterior surface; weep screed to be installed over drip cap for PVC board;

- Install 8" wide strip of self-adhered flashing (butyl) over the mounting flange of the weep screed;

- Integrate existing WRB with foundation weep screed system; materials to be installed in a shingle-like fashion;

- Reinstall stucco in accordance with ASTM C 1063 and ASTM C 926 (current editions).

  o Stucco must be restored so as to be an acceptable match to the existing finish without resulting in a maintenance burden.



Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 267 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 12 of 16

- Additional work as required based on field conditions observed by dCEI to identify and address the source(s) of moisture.

- If there is any type of disagreement regarding the scope of repair, the Declarant's construction representative, the Declarant's contractor, and dCEI will attempt to reach a mutually agreed upon resolution. In the event that such a resolution cannot be reached, dCEI will direct the repair.

The information obtained from the 'prototype' repairs will assist in developing a more detailed and comprehensive protocol for work to be performed on a community-wide basis. Upon completion of the prototypes, remedial repair plans should be prepared by a licensed professional. Upon request, dCEI can prepare these remedial design plans.

## Deck Ledger Flashing

The portion of the OMNIA Letter pertaining to deck ledger flashing is unclear. OMNIA states that the 2006 IRC does not *'specifically reference the attachment of a ledger board to the house structure or flashing in that area'*, but then goes on to discuss Section R703.8(5) of the same code that requires *'flashing at decks'*. OMNIA contends that the introduction of a cut in the stucco/WRB assembly for the installation of deck ledger flashing increases the risk of water penetration to the wood frame. According to OMNIA, the current installation allows for a continuous moisture barrier.

dCEI does not agree with the positon that deck ledger flashing is not required at the rear elevated wood decks [as suggested by OMNIA]. Section R703.8 of IBC 2006 requires corrosion resistant flashing to extend to the surface of the exterior wall finish where decks attach to the wall. Since the ledger board *is* the location where the deck is attached to the wall, it is our position that ledger flashing is required.

Our inspection did not reveal the presence of properly installed and visible deck ledger flashing. During our meeting January 18, 2019, Steve Bonitatis (the Declarants representative) indicated that all decks were installed after the cladding systems and therefore deck ledger flashing does not exist at any homes within the community.

It is our understanding that the Declarant will obtain a supplemental letter from OMNIA that clearly states the deck installation in the community is in compliance with the building code applicable at the time of construction. This letter must be written such that it can serve as acceptable support to homeowners needing to provide documentation indicating acceptable construction. Once this letter is obtained, moisture probe testing will be performed at each of the sixty four (64) decks in the community. The moisture probe testing will be performed in accordance with the protocol described below. If high levels of moisture are detected during the testing, further investigation and remediation will be performed.

If the Declarant's architect does not prepare a letter, it is our opinion that deck ledger flashing must be installed.



Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 268 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 13 of 16

## Protocol - Moisture Probe Testing at Deck Ledgers

- Moisture probe measurements will be taken in the sheathing at approximately 2" below the ledger board.

- Moisture readings will be taken with Delmhorst moisture meters. All moisture readings as well as soft wood conditions will be documented.

- Testing will start and end four inches (4") beyond the outer deck edges.

- Moisture readings will be spaced no further than thirty inches (30") apart.

- Testing will also occur below the corners of the doors and at inside and outside wall corners.

- If the ledger board is attached to a chimney at least one test location will occur on each elevation of the chimney.

- If the wall below the ledger board is concrete or testing in the stucco indicates 16.0% or greater (using the dCEI meter or Spotlight meter), testing will occur through the ledger board.

    o   The moisture threshold of 16.0% has been determined after reviewing and considering research, testing, and analysis by: prominent organizations in the wood industry across North America like the United States Department of Agriculture, Forest Service, Forest Products Laboratory, APA – The Engineered Wood Association, the National Association of Home Builders Research Center, Forintek Canada Corp., and the Canadian Wood Council, and prominent practitioners in the wood industry.

- If the ledger board is accessible (i.e. no soffit material) testing through the ledger board will occur below the corners of the doors regardless of the testing outcome below.

- All holes will be sealed with Dow Corning 790 caulk or equivalent.

- Additional testing will be performed as needed to further confirm conditions.

# Chimneys

In the Interim Façade Testing Report, dCEI recommends additional testing and inspection of the chimneys to determine the full extent of the issues and damage. At this time, the extent of issues at stucco clad chimneys is unknown. Every home in the community has at least one stucco clad chimney.

### 212 Valley Ridge Road Chimneys

On March 1, 2019, invasive inspections were performed at areas along the chimney located on the side elevation of 212 Valley Ridge Road. A portion of the stucco cladding system was removed from the chimney wall adjacent to one of the chimney 'shoulders'. The exposed wall sheathing was found to be wet. Subsequent moisture readings taken along the chimney wall also indicated high levels of moisture, extending up to roof level.



Case 2:22-cv-03805-TJS  Document 21-12  Filed 11/21/22  Page 269 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 14 of 16

Further investigation and repair from moisture intrusion requires removal of large portions of the stucco cladding system around the chimney, which requires access via scaffolding.

Initially, the Declarant's inspection representative (Spotlight/Bill Dare) indicated that they would coordinate and schedule the work with the Declarant's contractor. We have not received a response from Spotlight on scheduling of this work. As such, dCEI requested a proposal from KPI2 Contractors to assist with this work and will be forwarding same once received.

The protocol below outlines the anticipated additional invasive inspection work and subsequent repairs at the chimney located at 212 Valley Ridge Road.

---

### Protocol – 212 Valley Ridge Road Chimney

- The contractor will provide temporary protection for the landscaping in the area of work;

- The contractor will erect scaffolding around the chimney up to the roof eave;

- The stone chimney shoulder will be removed from the right side of the chimney;

- The stucco will be removed from the front, right, and rear walls of the chimney, beginning approximately 3 ft. above the roof eave and continuing down at least 1 ft. below the 'shoulder';

- The existing flashing and WRB conditions will be documented by dCEI prior to them being removed by the contractor;

- Additional materials will be removed as necessary;

- Areas of damaged sheathing, and framing will be replaced in kind;

- Insulation at replaced sheathing will be replaced in kind;

- The contractor will restore the cladding systems in accordance with all applicable codes and standards.

- Additional work as required based on field conditions observed by dCEI to identify and address the source(s) of moisture.

- If there is any type of disagreement regarding the scope of repair, the Declarant's construction representative, the Declarant's contractor, and dCEI will attempt to reach a mutually agreed upon resolution. In the event that such a resolution cannot be reached, dCEI will direct the repair.

---

230 Valley Ridge Road Chimney
On October 24, 2018 moisture probe testing was performed at areas along the chimney located on the side elevation of 230 Valley Ridge Road. This testing indicated areas of high moisture. After completion of this testing, legal counsel for the Association, legal counsel for the Declarant, the



Case 2:22-cv-03805-TJS  Document 21-12  Filed 11/21/22  Page 270 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve –Façade Investigation, Testing, and Repair Protocols – revision 2
March 28, 2019
Page 15 of 16

Declarant's construction representative, and dCEI agreed that the stucco must be removed from around the chimney perimeter to further evaluate and repair the chimney.

The Declarant's counsel indicated that the Declarant would provide a contractor and coordinate this work. We have not received a response from Spotlight or counsel on the scheduling of this work. As such, dCEI has requested a proposal from KPI2 Contractors to assist with this work and will be forwarding same once received.

The protocol below outlines the anticipated additional invasive inspection work and subsequent repairs required at the chimney of 230 Valley Ridge Road.

## Protocol – 230 Valley Ridge Road Chimney

- The contractor will provide temporary protection for the landscaping in the area of work;
- The contractor will erect scaffolding around the chimney up to at least 3 ft. above the roof eave;
- The stucco will be removed from the entire chimney perimeter, beginning approximately 3 ft. above the roof eave and continuing down to the foundation;
- The existing flashing and WRB conditions will be documented by dCEI prior to them being removed by the contractor;
- Areas of damaged sheathing, and framing will be replaced in kind;
- Insulation at replaced sheathing will be replaced, in kind;
- The contractor will restore the cladding systems in accordance with all applicable codes and standards.
- Additional work as required based on field conditions observed by dCEI to identify and address the source(s) of moisture.
- If there is any type of disagreement regarding the scope of repair, the Declarant's construction representative, the Declarant's contractor, and dCEI will attempt to reach a mutually agreed upon resolution. In the event that such a resolution cannot be reached, dCEI will direct the repair.

Other Chimneys Throughout the Community

The information obtained during investigation of the chimneys at 212 and 230 Valley Ridge Road can be used to develop a protocol for evaluation and repairs at remaining chimneys within the community. At a minimum, dCEI recommends moisture probe testing at all chimneys in the community. Additional testing protocols can be developed after the investigation work at 212 and 230 Valley Ridge Road have been completed.



This is a preliminary report. dCEI reserves the right to supplement, amend, and update this report as additional information is gathered through further analysis, inspections, investigation, and/or subsequent repairs. As repairs are completed, it may be determined that additional testing and/or additional repairs will be required.

Should you have any questions or require additional information, please do not hesitate to contact our office.

Sincerely,                                   Sincerely,

Daniel Ciarcia                               Daniel Reuther
PA PE # PE80185                              EIT

# EXHIBIT "H"



1004 Main Street
Lake Como, NJ 07719
PH (732) 894-9510
info@buildinspectus.com

April 16, 2019

Haverford Reserve, the Carriage Homes
c/o: Marcus & Hoffman
326 West State Street
Media, PA 19063
*sent via email to amarcus@marcushoffman.com & psatchell@marcushoffman.com*

Attn:   Adam Marcus, Esq

**Re:   Haverford Reserve – Window Sill Flashing
dCEI Job No. 2108-99-001CE**

Dear Mr. Marcus,

Pursuant to your request, dC Engineering Inspections, LLC ('dCEI') has reviewed the Andersen® 400 series window installation instructions provided by the Declarant's legal counsel [Appendix A]. It is our understanding that these documents were provided in response to dCEI identifying the installation of self-adhered flashing over the bottom flanges of windows as a construction defect. This issue was initially raised in dCEI's April 11, 2019 letter, which states: *"Self-adhered flashing was found to be installed over the lower window flange, which is not an acceptable method of installation for drainage-type wall systems such as those installed in the Haverford Reserve community."*

Andersen® 400 series windows can be installed with either barrier-type or drainage-type water management systems. Brief descriptions of each of these water management systems are provided below:

> **Barrier Systems:** Barrier-type systems rely entirely on the outermost exterior wall surfaces being water-tight at all times. With so many potential entry points for water intrusion on the exterior shell of a building, this is an unrealistic expectation for most wood-framed buildings. For this reason, barrier systems are not common in new residential construction in this geographical area.

> **Drainage Systems**: Unlike barrier-wall systems, drainage wall systems are based on the premise that some water will infiltrate through the siding material. Drainage systems are designed to effectively manage this water (i.e. collect any water that infiltrates and divert it out of the wall before it causes leaks). Drainage-wall systems are used in the majority of new residential construction, including the Haverford Reserve community.

The installation instructions for Andersen® casement windows provided by the Declarant's legal counsel are specific to the barrier-type water management method and are therefore not applicable to the construction at the Haverford Reserve community. The Anderson® window installation instructions for drainage-type water management systems (i.e. the applicable installation instructions) do not show self-adhered flashing installed over the lower window flange. This is true for both the

current version of installation instructions [Appendix B] as well as the version published around the time of construction [Appendix C].

As indicated in our April 11, 2019 letter, the installation of self-adhered flashing over the lower window flange prevents water from properly draining from the wall system. The existing sill flashing conditions observed at 222 and 224 Valley Ridge Road are not in accordance with any of the following:

- The current (2008) window manufacturer's published installation instructions for drainage-type water management systems [Appendix B];

- The window manufacturer's published installation instructions from 2008 [Appendix C];

- The flashing manufacturer's published installation instructions [Appendix D];

- The drainage mat manufacturer's published installation details [Appendix E]; or

- The details from Sheet DT-4 of the approved design plans for the building [Appendix F].

This as-built installation defect involving the installation of self-adhered flashing over the bottom window flange was confirmed at each of the four (4) window assemblies that have been exposed at 222 and 224 Valley Ridge Road to-date. We have no reason to believe that the window flashing conditions at the remaining windows located directly above the stone ledge will be any different. As such, the stone veneer must be removed entirely from below all of the windows to evaluate and correct the conditions.

We also recommend that the flashing conditions of windows located elsewhere around the building are evaluated (i.e. windows that are not located directly above the stone ledge).

Should you have any questions or require additional information, please do not hesitate to contact our office.

Sincerely,

Daniel Reuther

\Dropbox (Team dCEI)\dCEI Projects\2108 Haverford Reserve\99-001ce  Haverford\Correspondence Out\20190416-Haverford-windowflashing.docx



# APPENDIX
# A

# Installation Instructions for:



**Project Type -**
  New Construction
**Coastal Installation -**
  No
**Product Series -**
  400 Series
**Product Type -**
  Casement Window
**Shape -**
  Rectangle
**Wall Type -**
  Wood or Steel Stud
**Weather Resistant Barrier (House Wrap) -**
  Applied Before Window/Door Installation
**Water Management Method -**
  Barrier Method
**Sill Flashing Method -**
  Single Piece (Continuous Pan or Continuous Formable
  Flashing)
**Anchoring Method -**
  Vinyl Installation Flange (only)
**Drip Cap Pre-applied -**
  No

Parts Included:

- Window
- Important Product and Safety Information
- Resource Directory
- Warranty

Read these instructions and the product safety
information before starting procedure.

## Typical Tools Needed

Safety Glasses

Drill/Driver

Hammer

Level

J-Roller

Caulking Gun

Putty Knife

Tape Measure

Utility Knife

Staple Gun

Protective Gloves

## General Supplies Needed

Foam Backer Rod

Low Expanding Foam

Formable Self-Adhering Flashing

Sealant

Shims (Waterproof)

Fasteners

Straight Self-Adhering Flashing

House Wrap Tape

Water Resistive Barrier/House Wrap

Drip Cap

"Andersen" and all other marks where denoted are trademarks of Andersen Corporation. Copyright 2018 Andersen Corporation. All rights reserved.

11/03/2018

## FASTENER CHART

### INSTALLATION FLANGE ANCHORING REQUIREMENTS (select one)

| Fastener | Substrate | Minimum Head | Minimum Shank | Minimum Embedment to Structural Framing | Steel Type/Coating | Spacing |
|---|---|---|---|---|---|---|
| Roofing Nail | Wood | 5/16" | 11 ga | 1-1/2" | Galvanized, Zinc Chromate, *Stainless Steel, *Ceramic Coated | Every Hole |
| Wood Screw | Wood | 5/16" | #6 | | | |
| Self-Tapping Metal Screw | Metal | 5/16" | #8 | 3 Full Threads | | |

### †INSTALLATION GUSSET PLATE ANCHORING REQUIREMENTS (select one)

| Fastener | Substrate | Minimum Head | Minimum Shank | Minimum Embedment to Structural Framing | Steel Type/Coating | Spacing |
|---|---|---|---|---|---|---|
| Wood Screw | Wood | 5/16" | #10 | 1-1/2" | Galvanized, Zinc Chromate, *Stainless Steel, *Ceramic Coated | Every Hole or as shown in Step |
| Self-Tapping Metal Screw | Metal | 5/16" | #12 | 3 Full Threads | | |

Use the correct fastener driver based on the selected fastener's head type.

Size pilot and clearance holes based on the selected fastener's shank diameter as needed.

*Use 300 series stainless steel or ceramic coated fasteners when fastening to treated lumber.

†Gusset plate is concealed behind installation flange on joined windows.

# Important Safety and Product Information

**Andersen** WINDOWS·DOORS

## for Andersen® Windows and Doors

 This is the Safety Alert Symbol used to alert you to potential injury hazards. Obey all safety messages that follow this symbol to avoid possible injury or death.

**Read this Important Safety and Product Information completely before starting.**

### Signal Word and Consequence

| | | | |
|---|---|---|---|
| **COULD** Result in: | ⚠ **WARNING** Major Injury/Death | **COULD** Result in: | ⚠ **CAUTION** Minor Injury |
| **COULD** Result in: | **NOTICE** Product or Property Damage | | **IMPORTANT** Procedure and Product Information |

### Safety and Product Information Index

- Tools
- Handling
- Installation
- Sealing
- Fastening
- Finishing
- Glass
- Protective Film
- Cleaning
- Use/Operation
- Joining
- Product Information

- Leave this installation instruction with the home/building owner
- For additional support or help please go to: help.andersenwindows.com
- To configure installation instructions go to: andersenwindows.com/installation

## Tools

⚠ **WARNING**

- Follow manufacturers' instructions for hand and power tools. Always wear safety glasses. Failure to do so could result in injury, product or property damage.

## Handling

⚠ **WARNING**

- Windows and doors can be heavy. Use safe lifting techniques and a reasonable number of people with enough strength to lift, carry, and install window and door products. Heavier windows and doors will require mechanical assistance. Failure to do so could result in injury, product or property damage.

- **DO NOT** lift or carry window or door by the exterior trim or extension jambs. Doing so could result in injury, product or property damage.

- Windows, doors, and installation components can have sharp edges. Wear protective equipment when handling. Failure to do so could result in injury.

## Installation

⚠ **WARNING**

- Use caution when working at elevated heights and around window and door openings. Follow the manufacturers' instructions for ladders and scaffolding. Failure to do so could result in injury or death.

- Support window or door in opening at all times until fully fastened. Failure to do so could result in window or door falling out causing injury, property or product damage.

- Windows and doors have small parts (e.g. hole plugs, operator spline caps, fasteners, etc.). Small parts if swallowed could pose a choking hazard to young children. Dispose of unused, loose, or easily removed small parts. Failure to do so could result in injury.

# Installation (Continued)

## NOTICE

• Andersen head flashing and installation flanges **DO NOT** take the place of window and door flashing tape or liquid flashing. Window or door must be properly flashed and sealed with a material compatible sealant for protection against water and air infiltration. Failure to do so could result in product or property damage.

• **DO NOT** set window or door directly on installation flange. Doing so could affect product performance, and could result in product or property damage.

• **DO NOT** set window directly on sill plate. Elevate window with shims under the side jambs. Failure to do so could affect operation and product performance, and could result in product damage.

• Window or door must be properly shimmed. Failure to do so could affect operation and product performance, and could result in product damage.

• A continuous full perimeter interior seal between window or door frame and opening is required. Failure to do so will affect product performance, and could result in product or property damage.

• Protect window and door sills during installation and throughout construction. Failure to do so could result in product damage.

• **DO NOT** remove window or door packaging material until instructed to do so. Doing so could result in product damage.

# Sealing

## ⚠ CAUTION

• Follow instructions of foam, sealant, and flashing manufacturers regarding safety, material application, compatibility, and periodic maintenance for continued weather resistance of their products. Failure to do so could result in injury, product or property damage.

## NOTICE

• Clean and prepare surfaces receiving sealant following sealant manufacturer's instructions. Failure to do so could result in water infiltration causing product or property damage.

# Fastening

## ⚠ WARNING

• Metal fasteners and components could corrode when exposed to preservative-treated or fire-retardant treated lumber. Use approved fasteners and components to fasten window or door. Failure to do so could cause a failure resulting in injury, product or property damage.

• Fastener must attach to a structural framing member with a 1-1/2" minimum fastener embedment. Failure to do so could result in injury, product or property damage.

• **DO NOT** remove screws that attach installation clips or gusset plates to window or door frames. Doing so could result in injury, product or property damage.

## NOTICE

• Use masonry screws when fastening directly into masonry or through a buck into masonry. Failure to do so could affect product performance, and could result in product or property damage.

• **DO NOT** over drive screws or nails. Doing so could result in product damage.

• Fasteners must be attached to a structural framing member. Failure to do so will reduce the structural performance to less than published values and could affect product performance, and could result in product or property damage.

# Finishing

## NOTICE

• **DO NOT** stain or paint weatherstrip, vinyl, glass, or hardware. Doing so could result in product damage.

• Read and follow finish manufacturer's instructions and safety information. Failure to do so could result in product damage.

• **DO NOT** over load brush with stain or paint when finishing. Doing so could allow finish to wick between glass stop or grille, and glass.

# Finishing (Continued)

## NOTICE

• Finish unassembled unfinished gliding patio doors and MultiGlide™ patio doors prior to installation. Some surfaces are not accessible after installation. For all other products not mentioned above, finish all wood surfaces immediately after installation. Unfinished wood will deteriorate, discolor, and could bow or split.

Some surfaces are hidden from view.

# Glass

## ⚠ WARNING

• Unless specifically ordered, Andersen windows are not equipped with safety glass, and if broken, could fragment causing injury. Many laws and building codes require safety glass in locations adjacent to or near doors. Andersen windows are available with safety glass that could reduce the likelihood of injury when broken. Information on safety glass is available from your local Andersen dealer.

• Tempered or laminated safety glass is not standard for windows and must be special ordered. Check local building codes for required locations. Failure to do so could result in injury, product or property damage.

## NOTICE

• DO NOT apply any type of film to insulating glass. Doing so could cause thermal stress conditions and result in glass damage. Shading devices (e.g. insulated coverings, shutters, etc.) could also cause thermal stress and condensation causing deterioration of windows or doors.

• DO NOT use sealants on exterior or interior glass surface.

# Protective Film

## ⚠ WARNING

• DO NOT place suction grips over film seam. Suction grips will not hold if placed over film seam to lift or move window or door. Window or door will fall and could result in injury, product or property damage.



• DO NOT remove protective film near flammable materials. Static charge created when removing film can ignite flammable materials or cause a shock. Doing so could result in injury, product or property damage. See warning label on glass.



• Dispose of protective film immediately after removing. Failure to do so could pose a suffocation hazard to children.

## NOTICE

• DO NOT remove protective film until after construction is completed. Doing so could allow glass to be damaged.

# Cleaning

## NOTICE

• Acid solutions used for cleaning masonry or concrete will damage glass, fasteners, hardware, and metal flashing. Protect window or door and follow cleaning product manufacturer's instructions. If acid contacts window or door, wash all surfaces immediately with clean water.

• DO NOT use metal razor blades to clean glass surface. Glass damage could result.

• DO NOT use or apply solvents, abrasives, harsh chemicals or cleaners to glass, sash, panels, frame, or window or door components. Doing so will result in product damage. For a list of recommended cleaners go to: andersenwindows.com

# Use/Operation

## ⚠ WARNING

• **DO NOT** stand in front of or near windows or doors during a storm. Doing so could result in injury. Accessories such as grilles, art glass, and insect screens could dislodge and become airborne if window or door is impacted by wind-borne debris from severe storms or hurricane strength winds. In the event of a storm, remove all accessories from windows or doors and move to a safe location.

• **DO NOT** install air conditioner in window. Doing so could result in injury, product or property damage.

• Wind load brackets must be flipped out when not tilting or cleaning. If wind load brackets are not flipped out, window could blow in resulting in potential injury and/or product damage.



Flipped Out          Flipped In

## ⚠ CAUTION

• **DO NOT** attach objects or accessories to window or door except Andersen® products specifically designed for the window or door. Doing so could result in injury, product or property damage.

# Joining

## ⚠ WARNING

• **DO NOT** join any window or door, horizontally or vertically, to any window or door not designed for joining. Doing so could result in injury, product or property damage.

• Joined windows or doors must be individually supported in the opening. Failure to do so could affect operation and product performance, and could result in product or property damage.

# Product and General Information

## IMPORTANT

• Buildings constructed prior to 1978 could contain lead paint which could be disturbed during window or door replacement. For more information on proper management of lead paint, go to: www.epa.gov/lead

• Instructions may not be right for all installations due to building design, construction materials, or methods used and/or building or site conditions. Consult a contractor or architect for recommendations.

• Installation flanges may need to be removed for some installations. (e.g. masonry, replacement), or where exterior finish is already applied (e.g. siding, brick veneer, stucco).

• Installation flange on the window or door alone will not properly flash and seal the window or door.

• **DO NOT** remove band, plastic ties, or packing clips from window or door until instructed.

• **DO NOT** remove performance (NFRC) label until after final inspection. Doing so could delay final inspection and sign-off by the code official.

• Check with your local building code official to identify and confirm compliance with local building code requirements.

• Contact local authorities or waste management company for proper recycling and disposal instructions for removed window or door.

• Clean glass using liquid glass cleaner.

• Clean exterior frame, sash, panels, and insect screens using mild detergent and water with a soft cloth or brush.

• For hard to clean areas, use a nonabrasive cleaner.

• Extension jambs can be factory applied on some windows or field applied prior to installation. **DO NOT** apply extension jambs prior to window or door installation that will be fastened with installation clips. Doing so could prevent access to installation clips for fastening.

• For extension jamb application refer to instructions included with part(s) or go to: andersenwindows.com

• Protective film is not present on all windows or doors.

• Remove protective film by peeling from seam or corner. Use a plastic scraper to start if needed.

• Remove protective film within six (6) months of installation and when temperature is above 32° F.

• Protective Film is not a substitute for masking.

**1**



Check that the opening is sized correctly. Allow additional space for flashing thickness, installation clips, joining components, and their fasteners.

**2**



Check that the opening is square. The diagonal measurements should be within 1/8".

**3**



Check that the opening is plumb and level.

**4**



Apply the house wrap according to the manufacturer's instructions and cut opening as shown.

**5**




Fold in the house wrap and staple it to the interior of the opening. For steel stud walls, tape house wrap as shown.

**6**



Cut off the excess house wrap.

**7**



Tape the house wrap at the bottom of the opening as shown.

**8**



Cut the house wrap to create a top flap as shown.

**9**



Fold the house wrap flap up and temporarily tape it in place.

**10**



### NOTICE

Make sure there are no wrinkles or voids in flashing during application and overlapping. Failure to do so could result in product or property damage.

Apply flashing at the bottom of the opening as shown. Smooth using a J-roller.

**11**



### IMPORTANT

Single piece flashing is shown from this point forward, this does not affect the installation process.

Tape the flashing corners as shown.

**12**



Remove all shipping materials and packaging from window. Verify that sash is closed and locked.

**13**



If gusset plates are present, drill installation clearance holes through the gusset and installation flange using gusset plate holes as a template.

**14**



Place window on a clean work surface. Clean the installation flange on both sides using soap and water, or a non-abrasive solvent free cleaner.

This area intentionally left blank. Continue to next page.

**15**




Prepare shims to allow for a 3/8" space for interior sealing as shown.

**16**



Place shims on the bottom of the opening under the side jamb locations inset 1/4" from each side.

**17**



Apply a 1/4" sealant bead to the full perimeter of the opening, no more than 1/2" from the edge as shown.

**18**









Center the window in the opening, setting the window on the shims. Make sure shims are positioned under the side jambs and integral or joined combination locations as shown.

**NOTICE**

Place shims directly under side jambs. At gusset plate locations, place shims to not interfere with gusset plate screws. Failure to do so could result in product damage and could result in poor operation.

**19**



OR

Temporarily fasten with a single fastener at top as shown.

**20**



For joined units only, verify that all flange overlaps are sealed and top side flanges are lapped over bottom side flanges to the exterior.

**21**



Shim at the sides of the window using precut shims.

**22**



Check that the frame is square. Adjust shims as needed until diagonal measurements are within 1/8".

**23**



### NOTICE

**Correct any frame bow during installation. Failure to do so could result in product or property damage and could result in poor operation and product performance.**

Check that the frame is not bowed. Adjust shims as needed until measurements are within 1/8".

**24**



Check that the frame is plumb and level. Adjust shims as needed.

**25**







Fasten through the installation flange, installation clips, and gusset plates. See fastener chart for spacing and approved fasteners.

**26**





If flangeless gusset plates are present, drill installation clearance holes and fasten through the frame and gusset at 2" and 4" from midpoint of gusset as shown.

**27**



### NOTICE

Make sure there are no wrinkles or voids in flashing during application and overlapping. Failure to do so could result in product or property damage.

Apply flashing at the bottom edge, overlapping the installation flange as shown. Smooth using a J-roller.

**28**







Apply flashing at the sides of the window, overlapping sill flashing as shown. Smooth using a J-roller.

### NOTICE

Make sure there are no wrinkles or voids in flashing during application and overlapping. Failure to do so could result in product or property damage.

**29**





Apply a 1/4" sealant bead to the top and down 1" on both sides where installation flange meets frame. Quickly go to next step.

**30**



Place the drip cap (full width) in sealant as shown.

This area intentionally left blank. Continue to next page.

**31**



> **NOTICE**
>
> Make sure there are no wrinkles or voids in flashing during application and overlapping. Failure to do so could result in product or property damage.
>
> Side flashing cannot extend above top flashing. Doing so could result in product or property damage.



Apply flashing over the drip cap leg, overlapping the side flashing as shown. Smooth using a J-roller.

**32**



Unfold the house wrap top flap and tape the seams using house wrap tape as shown.

This area intentionally left blank. Continue to next page.

**33**

Low Expanding Foam Option

**NOTICE**

DO NOT overfill with low expanding foam or overpack with backer rod between the frame and opening or between joined windows or doors. Doing so will bow window or door jambs and could result in poor operation and product performance.

OR

Backer Rod and Sealant Option



Apply sealant continuously to full perimeter of opening, filling interior 1/3 of cavity as shown using low expanding foam or backer rod and sealant.

# Exterior Finishing Instructions
## for All Windows and Doors


Andersen. WINDOWS·DOORS

Read these instructions before starting procedure. For additional information visit www.andersenwindows.com. For questions call 1-888-888-7020.

**Tools and Supplies Needed**







| Safety Glasses | Foam Backer Rod | Putty Knife | Caulking Gun | Sealant |

### ⚠ WARNING

· Follow manufacturers' instructions for hand and power tools. Always wear safety glasses. Failure to do so could result in injury, product or property damage.

· Use caution when working at elevated heights and around window and door openings. Follow the manufacturers' instructions for ladders and scaffolding. Failure to do so could result in injury or death.

### ⚠ CAUTION

Follow instructions of foam, sealant, and flashing manufacturers regarding safety, material application, compatibility, and periodic maintenance for continued weather resistance of their products. Failure to do so could result in injury, product or property damage.

### NOTICE

Clean and prepare surfaces receiving sealant following sealant manufacturer's instructions. Failure to do so could result in water infiltration causing product or property damage.

## 1





1/4"

**IMPORTANT**

Leave 1/4" gap between exterior wall cladding / siding and window or door frame, as shown. For brick, leave 1/2" gap at sill.

1/4"
(1/2" for Brick)

## 2



Insert backer rod between frame and exterior wall cladding / siding as shown.

## 3



Apply sealant full perimeter between frame and exterior wall cladding / siding as shown.

Installation is complete.

# APPENDIX
# B

# Installation Instructions for:



**Project Type -**
  New Construction
**Coastal Installation -**
  No
**Product Series -**
  400 Series
**Product Type -**
  Casement Window
**Shape -**
  Rectangle
**Wall Type -**
  Wood or Steel Stud
**Weather Resistant Barrier (House Wrap) -**
  Applied Before Window/Door Installation
**Water Management Method -**
  Drainage Method
**Sill Flashing Method -**
  Single Piece (Continuous Pan or Continuous Formable Flashing)
**Anchoring Method -**
  Vinyl Installation Flange (only)
**Drip Cap Pre-applied -**
  No



Read these instructions and the product safety information before starting procedure.

Parts Included:

- Window
- Important Product and Safety Information
- Resource Directory
- Warranty

## Typical Tools Needed



Safety Glasses
Drill/Driver
Hammer
Level
J-Roller
Caulking Gun
Putty Knife
Tape Measure
Protective Gloves
Utility Knife
Staple Gun

## General Supplies Needed



Foam Backer Rod
Low Expanding Foam
Formable Self-Adhering Flashing
Sealant
Shims (Waterproof)
Fasteners
Straight Self-Adhering Flashing
House Wrap Tape
Water Resistive Barrier/House Wrap
Drip Cap

"Andersen" and all other marks where denoted are trademarks of Andersen Corporation. Copyright 2018 Andersen Corporation. All rights reserved.

## FASTENER CHART

### INSTALLATION FLANGE ANCHORING REQUIREMENTS (select one)

| Fastener | Substrate | Minimum Head | Minimum Shank | Minimum Embedment to Structural Framing | Steel Type/Coating | Spacing |
|---|---|---|---|---|---|---|
| Roofing Nail | Wood | 5/16" | 11 ga | 1-1/2" | Galvanized, Zinc Chromate, *Stainless Steel, *Ceramic Coated | Every Hole |
| Wood Screw | Wood | 5/16" | #6 | | | |
| Self-Tapping Metal Screw | Metal | 5/16" | #8 | 3 Full Threads | | |

### †INSTALLATION GUSSET PLATE ANCHORING REQUIREMENTS (select one)

| Fastener | Substrate | Minimum Head | Minimum Shank | Minimum Embedment to Structural Framing | Steel Type/Coating | Spacing |
|---|---|---|---|---|---|---|
| Wood Screw | Wood | 5/16" | #10 | 1-1/2" | Galvanized, Zinc Chromate, *Stainless Steel, *Ceramic Coated | Every Hole or as shown in Step |
| Self-Tapping Metal Screw | Metal | 5/16" | #12 | 3 Full Threads | | |

Use the correct fastener driver based on the selected fastener's head type.
Size pilot and clearance holes based on the selected fastener's shank diameter as needed.
*Use 300 series stainless steel or ceramic coated fasteners when fastening to treated lumber.
†Gusset plate is concealed behind installation flange on joined windows.

# Important Safety and Product Information

## for Andersen® Windows and Doors

**Andersen.** WINDOWS·DOORS AW

 This is the Safety Alert Symbol used to alert you to potential injury hazards. Obey all safety messages that follow this symbol to avoid possible injury or death.

**Read this Important Safety and Product Information completely before starting.**

### Signal Word and Consequence

**COULD** Result in: ⚠ **WARNING** Major Injury/Death

**COULD** Result in: ⚠ **CAUTION** Minor Injury

**COULD** Result in: **NOTICE** Product or Property Damage

**IMPORTANT** Procedure and Product Information

### Safety and Product Information Index

| | |
|---|---|
| ▋ Tools | ▋ Glass |
| ▋ Handling | ▋ Protective Film |
| ▋ Installation | ▋ Cleaning |
| ▋ Sealing | ▋ Use/Operation |
| ▋ Fastening | ▋ Joining |
| ▋ Finishing | ▋ Product Information |

- Leave this installation instruction with the home/building owner
- For additional support or help please go to: help.andersenwindows.com
- To configure installation instructions go to: andersenwindows.com/installation

## Tools

⚠ **WARNING**

- Follow manufacturers' instructions for hand and power tools. Always wear safety glasses. Failure to do so could result in injury, product or property damage.

## Handling

⚠ **WARNING**

- Windows and doors can be heavy. Use safe lifting techniques and a reasonable number of people with enough strength to lift, carry, and install window and door products. Heavier windows and doors will require mechanical assistance. Failure to do so could result in injury, product or property damage.

- **DO NOT** lift or carry window or door by the exterior trim or extension jambs. Doing so could result in injury, product or property damage.

- Windows, doors, and installation components can have sharp edges. Wear protective equipment when handling. Failure to do so could result in injury.

## Installation

⚠ **WARNING**

- Use caution when working at elevated heights and around window and door openings. Follow the manufacturers' instructions for ladders and scaffolding. Failure to do so could result in injury or death.

- Support window or door in opening at all times until fully fastened. Failure to do so could result in window or door falling out causing injury, property or product damage.

- Windows and doors have small parts (e.g. hole plugs, operator spline caps, fasteners, etc.). Small parts if swallowed could pose a choking hazard to young children. Dispose of unused, loose, or easily removed small parts. Failure to do so could result in injury.

## Installation (Continued)

### NOTICE

• Andersen head flashing and installation flanges **DO NOT** take the place of window and door flashing tape or liquid flashing. Window or door must be properly flashed and sealed with a material compatible sealant for protection against water and air infiltration. Failure to do so could result in product or property damage.

• **DO NOT** set window or door directly on installation flange. Doing so could affect product performance, and could result in product or property damage.

• **DO NOT** set window directly on sill plate. Elevate window with shims under the side jambs. Failure to do so could affect operation and product performance, and could result in product damage.

• Window or door must be properly shimmed. Failure to do so could affect operation and product performance, and could result in product damage.

• A continuous full perimeter interior seal between window or door frame and opening is required. Failure to do so will affect product performance, and could result in product or property damage.

• Protect window and door sills during installation and throughout construction. Failure to do so could result in product damage.

• **DO NOT** remove window or door packaging material until instructed to do so. Doing so could result in product damage.

## Fastening

### ⚠ WARNING

• Metal fasteners and components could corrode when exposed to preservative-treated or fire-retardant treated lumber. Use approved fasteners and components to fasten window or door. Failure to do so could cause a failure resulting in injury, product or property damage.

• Fastener must attach to a structural framing member with a 1-1/2" minimum fastener embedment. Failure to do so could result in injury, product or property damage.

• **DO NOT** remove screws that attach installation clips or gusset plates to window or door frames. Doing so could result in injury, product or property damage.

### NOTICE

• Use masonry screws when fastening directly into masonry or through a buck into masonry. Failure to do so could affect product performance, and could result in product or property damage.

• **DO NOT** over drive screws or nails. Doing so could result in product damage.

• Fasteners must be attached to a structural framing member. Failure to do so will reduce the structural performance to less than published values and could affect product performance, and could result in product or property damage.

## Sealing

### ⚠ CAUTION

• Follow instructions of foam, sealant, and flashing manufacturers regarding safety, material application, compatibility, and periodic maintenance for continued weather resistance of their products. Failure to do so could result in injury, product or property damage.

### NOTICE

• Clean and prepare surfaces receiving sealant following sealant manufacturer's instructions. Failure to do so could result in water infiltration causing product or property damage.

## Finishing

### NOTICE

• **DO NOT** stain or paint weatherstrip, vinyl, glass, or hardware. Doing so could result in product damage.

• Read and follow finish manufacturer's instructions and safety information. Failure to do so could result in product damage.

• **DO NOT** over load brush with stain or paint when finishing. Doing so could allow finish to wick between glass stop or grille, and glass.

# Finishing (Continued)

### NOTICE

• Finish unassembled unfinished gliding patio doors and MultiGlide™ patio doors prior to installation. Some surfaces are not accessible after installation. For all other products not mentioned above, finish all wood surfaces immediately after installation. Unfinished wood will deteriorate, discolor, and could bow or split.

Some surfaces are hidden from view.

# Glass

### ⚠ WARNING

• Unless specifically ordered, Andersen windows are not equipped with safety glass, and if broken, could fragment causing injury. Many laws and building codes require safety glass in locations adjacent to or near doors. Andersen windows are available with safety glass that could reduce the likelihood of injury when broken. Information on safety glass is available from your local Andersen dealer.

• Tempered or laminated safety glass is not standard for windows and must be special ordered. Check local building codes for required locations. Failure to do so could result in injury, product or property damage.

### NOTICE

• **DO NOT** apply any type of film to insulating glass. Doing so could cause thermal stress conditions and result in glass damage. Shading devices (e.g. insulated coverings, shutters, etc.) could also cause thermal stress and condensation causing deterioration of windows or doors.

• **DO NOT** use sealants on exterior or interior glass surface.

# Protective Film

### ⚠ WARNING

• **DO NOT** place suction grips over film seam. Suction grips will not hold if placed over film seam to lift or move window or door. Window or door will fall and could result in injury, product or property damage. 

• **DO NOT** remove protective film near flammable materials. Static charge created when removing film can ignite flammable materials or cause a shock. Doing so could result in injury, product or property damage.  **See warning label on glass.** 

• Dispose of protective film immediately after removing. Failure to do so could pose a suffocation hazard to children.

### NOTICE

• **DO NOT** remove protective film until after construction is completed. Doing so could allow glass to be damaged.

# Cleaning

### NOTICE

• Acid solutions used for cleaning masonry or concrete will damage glass, fasteners, hardware, and metal flashing. Protect window or door and follow cleaning product manufacturer's instructions. If acid contacts window or door, wash all surfaces immediately with clean water.

• **DO NOT** use metal razor blades to clean glass surface. Glass damage could result.

• **DO NOT** use or apply solvents, abrasives, harsh chemicals or cleaners to glass, sash, panels, frame, or window or door components. Doing so will result in product damage. For a list of recommended cleaners go to: andersenwindows.com

# Use/Operation

## ⚠ WARNING

• **DO NOT** stand in front of or near windows or doors during a storm. Doing so could result in injury. Accessories such as grilles, art glass, and insect screens could dislodge and become airborne if window or door is impacted by wind-borne debris from severe storms or hurricane strength winds. In the event of a storm, remove all accessories from windows or doors and move to a safe location.

• **DO NOT** install air conditioner in window. Doing so could result in injury, product or property damage.

• Wind load brackets must be flipped out when not tilting or cleaning. If wind load brackets are not flipped out, window could blow in resulting in potential injury and/or product damage.



Flipped Out          Flipped In

## ⚠ CAUTION

• **DO NOT** attach objects or accessories to window or door except Andersen® products specifically designed for the window or door. Doing so could result in injury, product or property damage.

# Joining

## ⚠ WARNING

• **DO NOT** join any window or door, horizontally or vertically, to any window or door not designed for joining. Doing so could result in injury, product or property damage.

• Joined windows or doors must be individually supported in the opening. Failure to do so could affect operation and product performance, and could result in product or property damage.

# Product and General Information

## IMPORTANT

• Buildings constructed prior to 1978 could contain lead paint which could be disturbed during window or door replacement. For more information on proper management of lead paint, go to: www.epa.gov/lead

• Instructions may not be right for all installations due to building design, construction materials, or methods used and/or building or site conditions. Consult a contractor or architect for recommendations.

• Installation flanges may need to be removed for some installations. (e.g. masonry, replacement), or where exterior finish is already applied (e.g. siding, brick veneer, stucco).

• Installation flange on the window or door alone will not properly flash and seal the window or door.

• **DO NOT** remove band, plastic ties, or packing clips from window or door until instructed.

• **DO NOT** remove performance (NFRC) label until after final inspection. Doing so could delay final inspection and sign-off by the code official.

• Check with your local building code official to identify and confirm compliance with local building code requirements.

• Contact local authorities or waste management company for proper recycling and disposal instructions for removed window or door.

• Clean glass using liquid glass cleaner.

• Clean exterior frame, sash, panels, and insect screens using mild detergent and water with a soft cloth or brush.

• For hard to clean areas, use a nonabrasive cleaner.

• Extension jambs can be factory applied on some windows or field applied prior to installation. **DO NOT** apply extension jambs prior to window or door installation that will be fastened with installation clips. Doing so could prevent access to installation clips for fastening.

• For extension jamb application refer to instructions included with part(s) or go to: andersenwindows.com

• Protective film is not present on all windows or doors.

• Remove protective film by peeling from seam or corner. Use a plastic scraper to start if needed.

• Remove protective film within six (6) months of installation and when temperature is above 32° F.

• Protective Film is not a substitute for masking.



**1**

Remove all shipping materials and packaging from window. Verify that sash is closed and locked.

**2**



If gusset plates are present, drill installation clearance holes through the gusset and installation flange using gusset plate holes as a template.

**3**



Place window on a clean work surface. Clean the installation flange on both sides using soap and water, or a non-abrasive solvent free cleaner.

This area intentionally left blank. Continue to next page.

**4**



Prepare shims to allow for a 3/8" space for interior sealing as shown.

**5**



Place shims on the bottom of the opening under the side jamb locations inset 1/4" from each side.

**6**



Apply a 1/4" sealant bead at the top and the sides of the opening, no more than 1/2" from the edge as shown.

**7**









Center the window in the opening, setting the window on the shims. Make sure shims are positioned under the side jambs and integral or joined combination locations as shown.

**NOTICE**

Place shims directly under side jambs. At gusset plate locations, place shims to not interfere with gusset plate screws. Failure to do so could result in product damage and could result in poor operation.

**8**



OR

Temporarily fasten with a single fastener at top as shown.

**9**



For joined units only, verify that all flange overlaps are sealed and top side flanges are lapped over bottom side flanges to the exterior.

**10**



Shim at the sides of the window using precut shims.

**11**



Check that the frame is square. Adjust shims as needed until diagonal measurements are within 1/8".

**12**



### NOTICE

**Correct any frame bow during installation. Failure to do so could result in product or property damage and could result in poor operation and product performance.**

Check that the frame is not bowed. Adjust shims as needed until measurements are within 1/8".

**13**



Check that the frame is plumb and level. Adjust shims as needed.

**14**







Fasten through the installation flange, installation clips, and gusset plates. See fastener chart for spacing and approved fasteners.

**15**





If flangeless gusset plates are present, drill installation clearance holes and fasten through the frame and gusset at 2" and 4" from midpoint of gusset as shown.

**16**







Apply flashing at the sides of the window, overlapping sill flashing as shown. Smooth using a J-roller.

**NOTICE**

Make sure there are no wrinkles or voids in flashing during application and overlapping. Failure to do so could result in product or property damage.

**17**







Apply a 1/4" sealant bead to the top and down 1" on both sides where installation flange meets frame. Quickly go to next step.

**18**



Place the drip cap (full width) in sealant as shown.

**19**



### NOTICE

Make sure there are no wrinkles or voids in flashing during application and overlapping. Failure to do so could result in product or property damage.

Side flashing cannot extend above top flashing. Doing so could result in product or property damage.



Apply flashing over the drip cap leg, overlapping the side flashing as shown. Smooth using a J-roller.

**20**



Unfold the house wrap top flap and tape the seams using house wrap tape as shown.

This area intentionally left blank. Continue to next page.

**21**

**Low Expanding Foam Option**

**NOTICE**

DO NOT overfill with low expanding foam or overpack with backer rod between the frame and opening or between joined windows or doors. Doing so will bow window or door jambs and could result in poor operation and product performance.

OR

**Backer Rod and Sealant Option**



Apply sealant continuously to full perimeter of opening, filling interior 1/3 of cavity as shown using low expanding foam or backer rod and sealant.

# Exterior Finishing Instructions
## for All Windows and Doors



Read these instructions before starting procedure. For additional information visit www.andersenwindows.com. For questions call 1-888-888-7020.

**Tools and Supplies Needed**











| Safety Glasses | Foam Backer Rod | Putty Knife | Caulking Gun | Sealant |

### ⚠ WARNING
· Follow manufacturers' instructions for hand and power tools. Always wear safety glasses. Failure to do so could result in injury, product or property damage.

· Use caution when working at elevated heights and around window and door openings. Follow the manufacturers' instructions for ladders and scaffolding. Failure to do so could result in injury or death.

### ⚠ CAUTION
Follow instructions of foam, sealant, and flashing manufacturers regarding safety, material application, compatibility, and periodic maintenance for continued weather resistance of their products. Failure to do so could result in injury, product or property damage.

### NOTICE
Clean and prepare surfaces receiving sealant following sealant manufacturer's instructions. Failure to do so could result in water infiltration causing product or property damage.



**1**

#### IMPORTANT
Leave 1/4" gap between exterior wall cladding /siding and window or door frame, as shown. For brick, leave 1/2" gap at sill.

1/4"

1/4"
(1/2" for Brick)



**2**

Insert backer rod between frame and exterior wall cladding /siding as shown.



**3**

Apply sealant full perimeter between frame and exterior wall cladding /siding as shown.

Installation is complete.

# APPENDIX
# C

Read guide from beginning to end before starting installation. Read and follow all warnings and cautions during unit installation.
Lea completamente la guía antes de comenzar la instalación. Lea y respete todas las advertencias y precauciones durante la instalación de la unidad.

# Installation Guide/Guía de instalación Andersen WINDOWS·DOORS

for Andersen® 200/400 Series Casement, Awning
Picture and Transom Windows

Para ventanas de la serie 200/400 Batientes, de Proyección, Estacionarias, y Antepecho

**Thank you for choosing Andersen. / Gracias por elegir Andersen.**

Instructions are for typical, new wood-framed wall construction with weather protection in place.

Instructions may not be right for all installations due to building design, construction materials or methods used and/or building or site conditions. Consult a contractor or architect for recommendations.

Flanges on the unit alone will not properly flash and seal the window. Follow these instructions carefully.

For questions call 1-888-888-7020 Monday - Friday, 7 a.m. to 7 p.m. and Saturday, 8 a.m. to 4 p.m. central time.

For more information and/or guides visit andersenwindows.com.

**Please leave this guide with building owner.**

Las instrucciones son para construcción nueva en paredes con marco de madera que cuentan con protección contra la intemperie.

Es posible que las instrucciones no sean las adecuadas para todas las instalaciones debido al diseño del edificio, los materiales de construcción o los métodos utilizados, y/o las condiciones de la obra o el edificio. Consulte a un constructor o arquitecto para obtener recomendaciones.

Las bridas en la unidad no proporcionarán por sí mismas un flashing ni sellarán la ventana de manera adecuada. Siga las siguientes instrucciones cuidadosamente.

Si tiene alguna pregunta llame al 1-888-888-7020 de lunes a viernes, de 7 a.m. a 7 p.m., hora del centro, y los sábados de 8 a.m. a 4 p.m., hora del centro.

Para obtener más información y/o guías, visite andersenwindows.com.

**Deje esta guía con el dueño de la construcción.**

"Andersen" and all other trademarks where denoted are marks of Andersen Corporation. ©2007-2008 Andersen Corporation. All rights reserved.
"Andersen" y las demás marcas comerciales que aparezcan son marcas de Andersen Corporation. ©2007-2008 Andersen Corporation. Reservados todos los derechos.

0005094 BC   Revised 07/17/08

## Parts Included / Partes incluidas

- Window / Ventana
- Installation guide / Guía de instalación
- Warranty card / Tarjeta de garantía

## Tools Needed / Herramientas necesarias

- Safety glasses / Gafas de protección
- Tape measure / Cinta métrica
- Level / Nivel
- Putty knife / Espátula
- Utility knife / Cuchilla de uso general
- Hammer / Martillo
- Staple gun / Pistola engrapadora
- Screw gun / Taladro para instalar tornillos
- Caulk gun / Pistola para calafatear

## Supplies Needed / Suministros necesarios

(A) Formable self-adhering sill flashing* / Flashing para riel auto-adherente moldeable*

(B) Flashing* / Flashing*

  * Or other flashing method/material recommended by a contractor or architect. Unit flanges do not take the place of flashing.
  * O bien otro método/material de flashing recomendado por el contratista o arquitecto. Las bridas de la unidad no reemplazan el flashing.

(C) Drip cap (full width) / Tapa de goteo (ancho total)

(D) House wrap tape / Cinta para sellar "House wrap"

- Foam backer rod / Varilla sellador de espuma
- Sealant / Sellador
- Low expanding foam (optional) / Espuma de baja expansión (opcional)
- Shims (waterproof) / Cuñas (impermeables)
- Extension jambs/stool (optional) / Jambas de extensión/peana (opcional)
- Fasteners (see approved fastener chart) / Sujetadores (consulte la tabla de sujetadores aprobados)



or*
o bien*

2

# Unit Identification / Identificación De La Unidad



Casement
Ventanas Batientes

Single
Sencilla

Double
Doble

Triple
Triple

Awning Picture
Ventana De
Proyección
Estacionaria

Picture
Ventana
Estacionaria

Awning or Transom
Ventana de Proyección y/o Antepecho

Single
Sencilla

Double
Doble

Triple
Triple

Awning
Ventana de Proyección

Double
Doble

Triple
Triple

▶ *Combination units must be individually supported to the rough opening.*

▶ *Las unidades de combinación deben tener soporte individualmente al tamaño del buque.*

---

**⚠ WARNING / ADVERTENCIA**

**Do not carry or lift unit by extension jambs. Doing so may result in injury, product or property damage.**

No levante ó cargue la unidad cogiéndola de las jambas, esto puede ocasionar daño al producto y dañar su área de trabajo.

---

**⚠ WARNING / ADVERTENCIA**

**Use caution when working at elevated heights and around unit openings. Follow manufacturers' instructions for ladders and/ or scaffolding. Failure to do so may result in injury or death.**

Sea cauteloso al trabajar en lugares elevados y cerca de las aberturas de la unidades. Siga las instrucciones del fabricante para el uso de escaleras y/o andamios. Si no lo hiciera, podrían producirse lesiones o la muerte.

**⚠ WARNING / ADVERTENCIA**

**Follow manufacturers' instructions for hand or power tools. Always wear safety glasses. Failure to do so may result in injury and/or product damage.**

Siga las instrucciones del fabricante para el uso de herramientas eléctricas o manuales. Utilice siempre gafas de seguridad. Si no lo hiciera, podrían producirse lesiones y/o daños al producto.

**CAUTION / PRECAUCIÓN**

**Follow instructions of foam, sealant and flashing manufacturer regarding material application and compatibility with this product.**

Siga las instrucciones del fabricante correspondientes al flashing y al sellador de espuma, con respecto a la aplicación y su compatibilidad con este producto.

# Glass / Vidrio

▶ *Tempered or laminated safety glass is not standard and must be special ordered. Check local building codes.*

▶ **Leave protective film in place until after construction is finished. Leave (NFRC) performance label in place until final inspection.**

▶ *Protective film and exterior coating are not present on all units.*

▶ *Los vidrios de seguridad templados o laminados no son estándar y se requiere un pedido especial. Consulte los códigos de construcción locales.*

▶ **Deje la película protectora en su lugar hasta que finalice la construcción. Conserve la etiqueta de rendimiento (NFRC) en su lugar hasta que se realice la inspección final.**

▶ *La película protectora y el revestimiento exterior no se encuentran en todas las unidades.*



**⚠ WARNING / ADVERTENCIA**

Suction grips will not hold if placed over seam of film to lift or move unit. Unit will fall causing damage or injury.

Las ventosas no funcionarán si se colocan sobre la costura de la película al levantar o mover la unidad. La unidad se caerá y provocará daños y lesiones.

**CAUTION / PRECAUCIÓN**



Sealants will damage exterior coating on glass.

Los selladores dañarán el revestimiento exterior del vidrio.

# Fasteners / Sujetadores

**⚠ WARNING / ADVERTENCIA**

Metal fasteners and components may corrode when exposed to preservative treated and/or fire-retardant treated lumber. Use approved fasteners and components to fasten unit. Failure to do so may cause a failure resulting in injury, property or product damage.

Los componentes y los sujetadores de metal pueden corroerse cuando quedan expuestos a madera tratada con retardador de fuego y/o con preservante. Utilice los componentes y sujetadores apropiados para ajustar la unidad. Si esto no se respeta, se pueden producir lesiones o daños al producto o a la propiedad.

**APPROVED FASTENER CHART (select one)**

| Fastener | Min Shank | Min Head | Min Length | Type of Steel | Spacing |
|----------|-----------|----------|------------|---------------|---------|
| Roofing Nail | 11 ga. | 5/16" | 1-3/4" | galvanized, zinc plated, ceramic coated, stainless | 6-8" or every hole |
| Deck Screw | #6 | 5/16" | 1-5/8" | | |

▶ *For installations that require jamb clips, see these guides:*

Installation Guide for Andersen 200/400 Series Casement, Awning, Transom, and Picture Windows with Stormwatch® Protection

Six Inch Jamb Clip Application for Stormwatch® Windows with Pre-applied Extension Jambs

▶ *Find guide on our website at* www.andersenwindows.com

**TABLA DE SUJETADORES APROBADOS (seleccione uno)**

| Sujetador | Espiga mín. | Cabecera mín. | Longitud mín. | Tipo de acero | Espacio |
|-----------|-------------|---------------|---------------|---------------|---------|
| Clavos para techado | 11 ga. | 5/16" | 1-3/4" | galvanizado, cincado, revestido con cerámica, inoxidable | 6-8" o bien en cada orificio |
| Tornillo para pórtico | #6 | 5/16" | 1-5/8" | | |

▶ *Para las instalaciones que requieren sujetadores de jambas, consulte las siguientes guías:*

Guía de Instalación para ventanas de las series 200/400 Batientes, de Proyección, Estacionarias, y Antepecho.

Aplicación de sujetadores de jambas de seis pulgadas para ventanas Stormwatch® con jambas de extensión preaplicadas

▶ *Encuentre una guía en nuestro sitio Web en* www.andersenwindows.com

# Finishing / Acabado

**CAUTION / PRECAUCIÓN**

Finish wood surfaces immediately after installation. Unfinished wood will deteriorate, discolor, and/or may bow and split.

Do not stain or paint weatherstrip, vinyl, glass or hardware. Product damage may occur.

*Aplique el acabado a las superficies de madera inmediatamente después de la instalación. Dejar la madera sin darle el acabado deteriorará, decolorará y/o puede pandearse o partirse.*

*No manche ni pinte los burletes, el vinilo, el vidrio y los herrajes. El producto se puede dañar.*

▶ *Apply interior casing and/or stool to complete installation.*

▶ *Film is not a substitute for masking.*



▶ **Read and follow finishing product instructions and warnings on finish material.**

▶ *Aplique molduras interiores y/o peanas para completar la instalación.*

▶ *La película no es un sustituto del enmascarado.*

▶ *Lea y siga las instrucciones para el producto terminado y las advertencias sobre el acabado en el material*



**Hidden Surface**
Superficie oculta

▶ *Finish all hidden wood surfaces.*

▶ *Aplique el acabado en las superficies de madera ocultas.*

# Film Removal / Extracción de la película protectora

▶ *Remove protective film from seam or corner using plastic scraper if needed.*

▶ *Remove protective film within nine months of installation and when temperature is above 32 degrees F.*

▶ *Retire la película protectora de la costura o la esquina con un raspador de plástico, de ser necesario.*

▶ *Retire la película protectora dentro de los nueve meses posteriores a la instalación y cuando la temperatura esté arriba de los 32 grados F.*

**⚠ WARNING / ADVERTENCIA**

Dispose of film immediately after removing. Film may pose suffocation hazard to children.

Deseche la película inmediatamente después de retirarla ya que ésta puede ocasionar peligra de asfixia para los niños.



**⚠ WARNING / ADVERTENCIA**

Static created when removing film can ignite flammable materials or cause a shock.

**See warning label on glass.**

Al separar la película protectora, podría producirse una carga estática que podría causar un choque o chispa.

**Consulte las etiquetas de advertencia sobre el vidrio.**

# Cleaning / Limpieza

▶ **Clean glass using liquid glass cleaner.**

▶ Clean exterior frame, sash, and insect screens using mild detergent and water with a soft cloth or brush.

▶ For hard to clean areas use a nonabrasive cleaner, alcohol-and-water or ammonia-and-water.

▶ **Limpie el vidrio con un limpiador líquido para vidrios.**

▶ Limpie el marco exterior, las hojas y los mosquiteros con detergente suave y agua usando un paño o cepillo suave.

▶ Para las áreas difíciles de limpiar, use un limpiador no abrasivo, alcohol y agua o amoníaco y agua.

**CAUTION / PRECAUCIÓN**

Abrasive cleaners will damage glass surface.

Los limpiadores abrasivos dañan la superficie del vidrio.

**CAUTION / PRECAUCIÓN**



Metal razor blades can damage glass surface and exterior coating.

Las hojas de filo metálico pueden dañar la superficie del vidrio y el revestimiento exterior.

**CAUTION / PRECAUCIÓN**

Acid solutions used for cleaning masonry or concrete will damage glass, fasteners, hardware, and metal flashing.

Protect unit and follow cleaning product instructions carefully. If acid contacts unit, wash all surfaces with water immediately.

Las soluciones ácidas que se utilizan para limpiar la mampostería o el concreto dañan el vidrio, los sujetadores, los herrajes y el flashing de metal.

Proteja la unidad y siga las instrucciones de limpieza del producto con detenimiento. Si el ácido entra en contacto con la unidad, lave inmediatamente todas las superficies con agua.

# Maintenance / Mantenimiento

▶ Do not apply any type of film to insulating glass. Thermal stress and glass damage can result. Shading devices (insulated coverings, shutters, etc.) may also cause thermal stress and condensation damage.

▶ For more information, contact your local Andersen dealer or www.andersenwindows.com

▶ No aplique ningún tipo de película a los vidrios aislantes. Se puede producir falla térmica y otros daños en los vidrios. Las cortinas aislantes, shutters, etc. pueden provocar falla térmica y daños por condensación.

▶ Para obtener más información, comuníquese con su distribuidor de Andersen local o visite www.andersenwindows.com

**⚠ WARNING / ADVERTENCIA**



Do not install air conditioner in window. Injury and/or product or property damage may occur.

El aire acondicionado colocado en la ventana puede provocar lesiones y/o daños al producto o la propiedad.



Check opening size. Allow for flashing thickness.
Verifique el tamaño de la abertura. Tenga en cuenta el espesor del flashing.



Check plumb, level, square. Diagonals must be within 1/8".
Verifique la plomada, el nivel y la escuadra. Las diagonales deben estar entre 1/8".



Cut house wrap.
Recorte el house wrap.



Fold in and staple.
Doble y engrape.



Cut and create top flap from house wrap.
Corte y cree una pestaña superior con cinta para envolver.



Fold flap up and tape.
Doble la pestaña hacia arriba y coloque cinta.



Apply flashing at sill.
Aplique el flashing en el riel.



Staple, nail or tape corners.
Engrape, clave o encinte las esquinas.

7



Set and level shims at all side
jamb locations.
Posicione y nivele las cuñas en
todos los lados de las jambas.



Apply sealant at **sides and top only**.
Aplique sellador **únicamente en los lados
y la parte superior**.

**⚠ WARNING / ADVERTENCIA**

Windows and doors can be heavy.
Use safe lifting techniques and a
reasonable number of people with
enough strength to lift, carry and install
window and door products to avoid
injury and/or product damage.

Las puertas y las ventanas pueden ser
pesadas. Utilice técnicas seguras de
levantamiento de peso y un número
razonable de personas con suficiente
fuerza para levantar, cargar e instalar los
productos de puertas y ventanas, a fin
de evitar lesiones y/o daños al producto.



Center window in opening on shims.
Centre la ventana en las aberturas sobre las cuñas.



Temporarily fasten top corner.
Sujete la esquina superior temporalmente.



Seal **All** flange overlaps. Lap top side flanges over
bottom side flanges to the exterior.
Selle **Todos** las sobreposiciones de reborde.
Superponga las bridas laterales superiores sobre las
bridas laterales inferiores hacia el exterior.

8



**14**
**Interior**

Shim Sides
Laterales de la cuña

Shim Middle
Centro de la cuña

(exterior views)
(vistas exteriores)

Shim sides. **Do not shim at top.**
Coloque cuñas en los laterales.
**No coloque cuñas en la parte superior.**

Check plumb, level, square. Adjust shims as needed until measurements are within 1/8".
Verifique la plomada, el nivel y la cuadratura. Ajuste las cuñas según sea necesario hasta que las medidas estén dentro de 1/8".



**15**
**Exterior**

or
o bien

6-8"

Fastener (see chart)
Sujetador (consulte la tabla)

Joined Units Only / Sólo unidades unidas

Steel End Bracket

(interior views)
(vistas interiores)

Aluminum End Plate

Fasten on all sides.
Sujete todos los lados.

Fasten through brackets or plates also.
Sujete también a través de las placas de refuerzo.



**16**
**Exterior**

2"

Overlap
Solapamiento

Flashing
Flashing

Apply flashing at sides, overlapping sill flashing.
Aplique flashing en los laterales, sobreponiéndolo sobre el flashing para riel.



**17**
**Exterior**

Flange
Brida

1/4" Bead Sealant
Sellador para listones de 1/4"

Apply sealant at top only. Quickly go to next step.
Selle **únicamente los lados y la parte superior**.
Pase rápidamente al siguiente paso.

9



Place drip cap in sealant, centering over unit(s).
Coloque la tapa de goteo en sellador,
centrandola sobre la(s) unidad(es)



Apply flashing over drip cap leg, overlapping side
flashing.
Aplique el flashing sobre la pata de la tapa de goteo,
sobreponiéndolo sobre el flashing de la peana.



Fold house wrap down and tape.
Doble el house wrap hacia abajo y coloque
cinta.



Cut shims flush.
Recorte las cuñas emparejando.



Seal all sides. **Do not completely fill void at sill to allow
for drainage.**
Selle todos los lados. **No rellene totalmente el espacio
en el riel para permitir el drenaje.**

**or/
o bien**

Insert backer rod. Apply sealant on all sides.
Introduzca la varilla de respaldo. Aplique sellador en todos los lados.

10



Leave gap between exterior trim/siding/stucco/brick and window for sealing.
Deje un espacio entre el contramarco/el revestimiento/el estuco/el ladrillo exterior y la
ventana para el sellado.



Insert backer rod on four sides.
Introduzca la varilla de respaldo
en los cuatro lados.



Apply sealant to all sides.
Aplique sellador en todos los lados.

▶ *Window installation is complete.*

▶ *For extension jamb application
see instruction guide packaged
with jambs or go to*
andersenwindows.com.

▶ *La instalación de la ventana
está completa.*

▶ *Para obtener información sobre la
aplicación de jambas de extensión,
consulte la guía de instrucciones
incluida en el paquete de las jambas
o visite* andersenwindows.com.

# APPENDIX
# D

# WINDOW FLASHING
## A GUIDE TO INSTALLATION
## METHOD "A"
### SELF ADHESIVE FLASHING

The "Method A" installation guide is designed for integral flanged window applications, where the window is installed before the weather resistive barrier is applied. Compliance with the building code and proper installation are critical in reducing potential water leakage points.

Under adverse weather conditions, the installer may consider using "Method B" with mechanically attached flashing. Consideration should be given to preparing the substrate for best adhesion. For some substrates, a primer may be required.

The following **Fortifiber Building Systems Group®** flexible window flashing products are acceptable for this method:

- **Moistop E-Z Seal® Self Adhesive Flashing**
  6, 9 and 12 inch x 75' rolls
- **FortiFlash® Waterproof Flashing**
  4, 6, 9, 12, 18 and 36 inch x 75' rolls
- **FortiFlash® Commercial Waterproof Flashing**
  6, 9, 12 and 18 inch x 75' rolls
- **FortiFlash® Butyl Waterproof Flashing**
  4, 6, 9 and 12 inch x 75' rolls
- **Moistop® Sealant** (Exceeds AAMA Standards)

THIS INSTALLATION GUIDE REFERENCES THE *AMERICAN ARCHITECTURAL MANUFACTURERS ASSOCIATION* PUBLICATION 2400-02.



We suggest you review Forti-Facts Technical sheet available at **www.fortifiber.com**.
Or for further assistance, please call our technical hotline at **(800) 773-4777**.

## 1 SILL FLASHING



After cleaning surface press firmly into place with adhesive edge flush with top of rough opening.

Sill flashing length is RO width + (2x flashing width).

**a** Staple... When flashing sill with FortiFlash or FortiFlash Butyl ... Or partially pull release paper

Cut the sill flashing the width of the rough opening + 2x the width of the flashing. Wipe the exterior sheathing or wall with a clean rag to ensure proper adhesion. Remove the release paper and press the sill flashing in place so that the top edge of the flashing's adhesive is level with the top edge of the rough opening. Once pressed in place, use a "J" roller (or wallpaper seaming tool) to seal the flashing to the sheathing. **Note:** when using **Forti-Flash** or **FortiFlash Butyl**, partially remove the release paper or staple to allow for integration with weather-resistive barrier **(1a)**. Once the weather barrier has been tucked under the sill flashing, remove the remaining release paper and press firmly in place.

## 2 INSTALL WINDOW



Apply continuous ⅜ inch bead of sealant on window flange

Before installing the window, apply a continuous ³/₈" bead of **Moistop Sealant** to the backside (interior) of the mounting flange. Install the window according to the window manufacturer's instructions.

CONTINUED...

**CONTINUED FROM FRONT ...**



## 3 JAMB FLASHING

### SILL JUNCTION

### HEAD JUNCTION

Jamb flashing length is RO height + (2x flashing width, minus 1").

Align the flashing flush against the window frame with the adhesive strip covering the entire window flange.

**a** Place adhesive edge of flashing against window and fully cover window flange.

Start jamb flashing even with bottom of sill flashing.

**b** Using the jamb flashing formula RO height + (2x flashing width, minus 1") will bring the jamb flashing within 1" of the top of the head flashing.

See Step 4 for details on installing the head flashing.

Prior to installing the jamb flashing, wipe the window jamb flange and exterior walls with a clean rag to ensure proper adhesion. Cut the jamb flashing to the height of the rough opening + 2x the width of the flashing, **minus 1" (see 3a and 3b)**. Remove the release paper and place the jamb flashing against the window flange and firmly press into place in a single direction to prevent voids. Once pressed in place, use a "J" roller (or wallpaper tool) to seal the flashing to the window flange. Repeat this procedure for the other side of the window.

## 4 HEAD FLASHING



Head flashing length is RO width + (2x flashing width, plus 2").

Align the flashing flush against the window frame with the adhesive strip covering the entire window flange.

Start head flashing 1" beyond jamb flashing.

Wipe the head flange, jamb flashing and sheathing with a clean rag. Cut the head flashing to twice the width of the rough opening + 2x the width of the flashing **plus 2"**. Install the head flashing by pressing firmly in place in one direction to prevent voids.

### Call 1-800-773-4777 for Technical Assistance
### www.fortifiber.com

**Limitations:** For optimum adhesion, **Moistop E-Z Seal, FortiFlash and FortiFlash Commercial** flashings should be applied at temperatures between 40° F (4.4° C) and 120° F (48.9° C); **FortiFlash Butyl** may be applied at temperatures between 25° F (3.9° C) and 125° F (51.7° C). Be cautious about using FortiFlash where it can be exposed to temperatures above its Service Temperature such as hot climates or behind fiber cement and metal sidings that absorb a significant amount of heat. FortiFlash, FortiFlash Commercial and FortiFlash Butyl are the only Fortifiber flashing products that can be installed horizontally or at a slope of less than 60°. Where installed horizontally or with a slope of less than 60° do not use fasteners. Product should be covered as soon as possible. Inspect product to insure it is free of any protrusions or damage which may compromise its moisture-resistive properties. FortiFlash is not compatible with EPDM or flexible (plasticized) Polyvinyl Chloride (PVC) based products. FortiFlash and Moistop E-Z Seal are not compatible with some sealants. Consult with sealant manufacturer for compatibility information. Direct exposure of sealant to the adhesive side of FortiFlash or Moistop E-Z Seal can be detrimental if the amount of sealant exceeds what is specified above. Please follow these recommendations regarding location and amount of sealant to be used. Fortifiber strongly recommends against the practice of using a "knockdown bead of sealant," or "buttering the flange" with sealant, because this amount of sealant is excessive and unnecessary.

## OVERVIEW



To properly integrate sill and jamb flashing tuck the weather resistive barrier underneath.

Fortifiber recommends the use of a well integrated weather-resistive barrier with all of its flashing systems.

This recommendation refers to the most common types of windows used (surface mounted). For other types of frames, special attention should be paid to the window manufacturer's instructions.



**Fortifiber Building Systems Group®**

*Protecting Your World from the Elements®*

NATIONAL SALES OFFICE - Fernley, NV

(10/6/15)

# APPENDIX
# E



FLANGED WINDOW UNIT

SELF-ADHERING FLASHING

WINDOW FLANGE

BACKER ROD & SEALANT

WATER RESISTANT BARRIER
TAPE

CASING BEAD ( OPTIONAL )

INTERIOR WALLBOARD

VAPOR BARRIER
( IF REQUIRED )

INSULATION

EXTERIOR SHEATHING

WATER RESISTANT
BARRIER

**DRIWALL™ RAINSCREEN**

CODE COMPLIANT LATH

THIN STONE

| SKETCH NO: | TSV-11 | SKETCH: | | | |
|---|---|---|---|---|---|
| DATE: | 1/1/11 | THIN STONE VENEER FLANGED WINDOW SILL | | **Keene Building Products** P.O. Box 241353 Cleveland, OH 44124 P ( 877 ) 514-5336 F ( 440) 605-1120 www.keenebuilding.com | |

# APPENDIX F



# EXHIBIT "I"

# Haverford Reserve: The Carriage Homes

## 212 Valley Ridge Road Chimney Stucco Evaluation Report

Report Date: 6/17/2019



The Carriage Homes at HAVERFORD RESERVE

Prepared by:

dg ENGINEERING

# 212 Valley Ridge Road Chimney

## PART I:
## History/Background

# 212 Valley Ridge Road Chimney

## History/Background



Initial Moisture Probe Testing:

- Conducted on November 20, 2018 jointly with:
  - Association's Construction Representative - Daniel Ciarcia & Daniel Reuther (dC Engineering Inspections LLC)
  - Declarant's Construction Representative - William Dare (Spotlight Inspections)

- Elevated moisture (25.3%) of wood-based sheathing observed at chimney 'shoulder'

# 212 Valley Ridge Road Chimney

## History/Background



Invasive Testing:

- Conducted on March 1,2019 jointly with:
  - Association's Construction Representative - Daniel Ciarcia & Daniel Reuther (dC Engineering Inspections LLC)
  - Declarant's Construction Representative - William Dare (Spotlight Inspections)
  - Declarant's Contractor – John Shields (Stucco Code, Inc.)
- Portions of the stucco were removed directly above chimney 'shoulder'
  - Wood-based sheathing observed to be saturated
- Additional moisture testing performed higher up on the chimney wall
  - Elevated moisture readings observed up to and beyond roof eave
- Further investigation and repair required access via scaffolding

# 212 Valley Ridge Road Chimney

## PART II:
## Evaluation/Remediation

# 212 Valley Ridge Road Chimney

Evaluation/Remediation

- Work began on April 9, 2019 by the Association's contractor (KPI2)

- Initially, stucco removal was limited to a portion of the chimney enclosure wall above the roof
  - The underlying construction was found to be completely saturated, which initiated additional stucco removal

- The stucco system was removed from the entire chimney enclosure

- High moisture readings were observed at almost all areas of the wood-based wall sheathing around the chimney enclosure

- Significant sheathing deterioration was observed

- A culmination of multiple as-built construction deficiencies allowed water to infiltrate behind the stucco-clad exterior wall systems and damage wood-based framing components:

  1. Improperly Constructed and Installed Chimney Chase Cap
  2. Improperly Executed Architectural Feature
  3. Improperly Installed Weather-Resistive Barrier ('WRB')
  4. Improper Underlayment Installed at Chimney Shoulder

- The thermal building envelope was found to be discontinuous at the chimney enclosure

# 212 Valley Ridge Road Chimney

Evaluation/Remediation

**Improperly Constructed and Installed Chimney Chase Cap**



Painted sheetmetal
chimney enclosure cap

# 212 Valley Ridge Road Chimney

## Evaluation/Remediation

### Improperly Constructed and Installed Chimney Chase Cap



ISSUE: Top surface of enclosure cap not sloped to shed water

NOTE: This alone is not a direct violation of code, but the lack of slope allows water to pond on the surface of the cap. This ponding water will accelerate corrosion

ISSUE: Projecting flanges/drip edges not provided on pan skirt . This does not meet industry standard requirements for installation of the sheet metal as outlined in the manual prepared by SMACNA.

SMACNA requires that:

*"The sheet metal extends vertically down the wall finish a minimum of 2 in. and terminating in a hem with a kick"*

ISSUE: Fasteners and seams not properly sealed

# 212 Valley Ridge Road Chimney

Evaluation/Remediation

**Improperly Constructed and Installed Chimney Chase Cap**

<u>ISSUE:</u> Pan skirt does not adequately overlap stucco. Does not meet IRC (Building Code) or SMACNA (Industry Standard) requirements

IRC/2006 – R703.1
*"Exterior walls shall provide the building with a weather-resistant exterior wall envelope."*

SMACNA
*"The sheet metal <u>extends vertically down the wall finish a minimum of 2 in.</u> and terminating in a hem with a kick"*



GAP

DOES NOT EXTEND DOWN THE WALL FINISH
Grade D paper visible between enclosure cap and stucco

# 212 Valley Ridge Road Chimney

Evaluation/Remediation

**Improper Execution of Architectural Feature**



Architectural shadow board feature

**NOTE:** *PHOTO NOT OF 212 VRR CHIMNEY; FOR DIAGRAMMATIC PURPOSES ONLY*

# 212 Valley Ridge Road Chimney

## Evaluation/Remediation

### Improper Execution of Architectural Feature



ISSUE: Drainage mat terminates at underside of architectural feature. No air space provided to allow drainage

ISSUE: Drainage opening not provided between horizontal and vertical plaster surfaces.
Does not meet requirements of ASTM C929 (required by the building code/IRC)

**ASTM C929-06**

*"Where vertical and horizontal exterior plaster surfaces meet, both surfaces shall be terminated with casing beads with the vertical surface extending at least 1/4 in. (6 mm) below the intersecting horizontal plastered surface, thus providing a drip edge. The casing bead for the horizontal surface shall be terminated not less than 1/4 in. from the back of the vertical surface to provide drainage."*

# 212 Valley Ridge Road Chimney

Evaluation/Remediation

## Improperly Installed Weather-Resistive Barrier



ISSUE: Excessive number of penetrations through WRB layers create leaks

Does not reflect good installation practices

# 212 Valley Ridge Road Chimney

Evaluation/Remediation

## Improperly Installed Weather-Resistive Barrier

NORTHWEST CORNER

ISSUE: Insufficient overlap & discontinuous WRB



Water infiltrates behind WRB and remains trapped

Does not meet building code requirements





IRC/2006 – R703.2

"One layer of No. 15 asphalt felt, free from holes and breaks, complying with ASTM D 226 for Type 1felt or other approved water-resistive barrier shall be applied over studs or sheathing of all exterior walls. Such felt or material shall be applied horizontally, with the upper layer lapped over the lower layer not less than 2 inches (51 mm). Where joints occur, felt shall be lapped not less than 6 inches (152 mm)."



13

# 212 Valley Ridge Road Chimney

Evaluation/Remediation

## Improperly Installed Weather-Resistive Barrier

SOUTHEAST CORNER

ISSUE: Insufficient overlap/discontinuous WRB





Water infiltrates behind WRB and remains trapped

IRC/2006 – R703.2

"One layer of No. 15 asphalt felt, free from holes and breaks, complying with ASTM D 226 for Type 1felt or other approved water-resistive barrier shall be applied over studs or sheathing of all exterior walls. Such felt or material shall be applied horizontally, with the upper layer lapped over the lower layer not less than 2 inches (51 mm). Where joints occur, felt shall be lapped not less than 6 inches (152 mm)."

# 212 Valley Ridge Road Chimney

## Evaluation/Remediation

**Improper Underlayment at Chimney 'Shoulder'**





ISSUE: Improper material type for waterproofing a horizontal surface. Insufficient overlap/discontinuous WRB

Per manufacturer (Fortifiber):

*"This product is not recommended for horizontal, roofing or below grade applications."*

# 212 Valley Ridge Road Chimney

Evaluation/Remediation

## Improper Underlayment at Chimney 'Shoulder'

**Per Industry Standard:**

**ASTM**

*"In no case shall a paper-based material be used as a waterproof membrane on surfaces or roofs having a slope of less than 60° from the horizontal. (See Fig. 2.) (**Warning**— The use of a paper-based material in an application where water can pool or collect on its surface may result in the degradation of this material and the penetration of water through the building weather resistant barrier.)"*

Paper based products are approved for "walls" within 30° of vertical.

Paper based products are NOT allowed on "roofs" having a slope of less than 60° from horizontal.





# 212 Valley Ridge Road Chimney

Evaluation/Remediation

Moisture Damage and Wet Sheathing as a Result of the Defective Construction





# 212 Valley Ridge Road Chimney

Evaluation/Remediation

**Discontinuous Thermal Envelope Leads to Heating and Cooling Inefficiencies in the Home and is a Building Code Defect.**



ISSUE: Thermal insulation not installed at ceiling in chase

# PART III:
## Recommendations/Next Steps

# Recommendations

Each of the 100 homes in the community has at least 1 chimney and many have 2

- Additional inspections and testing are required to determine if conditions similar to those observed at 212 Valley Ridge Road exist at other homes.

  - Each chimney enclosure must be evaluated to determine if similar conditions exist

- At this time we recommend the following testing phases/protocols:

  - LARGE SCALE EVALUATION & REPAIR AT 222 VALLEY RIDGE ROAD REAR CHIMNEY:

    - As documented in dCEI's report dated April 15, 2019, results of moisture probe testing previously performed at the rear chimney of 222 Valley Ridge Road indicate active moisture infiltration.
    - The complete removal of the stucco system from around the chimney is required for a proper evaluation and comprehensive repair.
      - It is anticipated that this will require the removal of portions of the rear exterior deck

  - COMMUNITY-WIDE CHIMNEY TESTING (anticipated 2 phases if investigation):

| PHASE I | PHASE II |
|---|---|
| • Perform ground-level visual inspections of all chimneys<br>• Perform aerial inspections of all chimneys using UAV (i.e.: drone)<br>   • Document chase cover slope and visible areas of ponding water<br>   • Document chase cover drip edge conditions<br>   • Document installation and overlap of cladding systems<br>   • Document other notable existing conditions | • Perform moisture probe testing and test cuts at representative sample of chimneys (at this time it is anticipated at 20 homes but this may be revised after our initial phase one inspections)<br>   • Testing will be concentrated in the following areas (again, this may be revised after our initial phase one inspections) :<br>     • Below architectural feature at top of chimney enclosures.  Note that this will require assistance from a contractor and access with either an aerial lift or scaffolding.<br>     • Above and below chimney shoulder(s) |

- Community-wide repair/remediation procedures to be determined based on outcome of testing

EXHIBIT "J"



1904 Main Street
Lake Como, NJ 07719
Ph (762) 894-9510
engineering@engineering.com

December 2, 2019

Haverford Reserve, the Carriage Homes
c/o: Marcus & Hoffman
326 West State Street
Media, PA 19063
*sent via email to amarcus@marcushoffman.com*

Attn:    Adam Marcus, Esquire

**Re:    Moisture Probe Testing (Twenty (20) Chimney Enclosures) - revised
          dCEI Job No. 2108-99-001CE**

Dear Mr. Marcus,

Pursuant to the Board's request, moisture probe testing has been performed at twenty (20) exterior chimney enclosures in the Haverford Reserve Carriage Home community. This testing was performed by the Declarant's construction inspector, Spotlight Home Inspections on October 31, 2019, November 1, 2019, November 19, 2019 and November 20, 2019. dC Engineering Inspections ('dCEI') was on-site to observe the testing and verify moisture readings as necessary.

The primary intent of the moisture testing was to obtain information about the moisture content of the wood structure behind the stucco cladding systems at exterior chimney enclosure walls. The testing was performed in general accordance with the proposed protocol issued on 8/6/2019 (Appendix A). However, it should be noted that certain variations were required because of access limitations.

A summary of our findings is provided below followed by our recommendations.

### Background

Haverford Reserve, the Carriage Homes is a planned residential community consisting of fifty (50) two-family dwellings located in the Township of Haverford, Delaware County, Pennsylvania. Multiple concerns with the as-built construction of the building façade systems in the Community have been previously identified. A summary of these concerns is provided in dCEI's Transition Inspection Report, dated October 25, 2017 ('the Transition Report').

Extensive evaluations were previously performed to investigate water infiltration at the chimney enclosures of 212 Valley Ridge Road and 222 Valley Ridge Road. These inspections revealed a number of as-built construction deficiencies involving the chimney enclosures. These construction deficiencies include:

1. the top surfaces of the chase pans are not sloped to shed water;
2. projecting flanges are not provided at the chase pan skirts;
3. the chase pan seams and fasteners are improperly sealed;
4. there is insufficient overlap between chase pan skirt and the stucco systems;

5. drainage mat is not provided behind the architectural trim feature at the top of the chimney enclosures;
6. drainage openings are not provided between the horizontal and vertical stucco surfaces;
7. there are excessive penetrations through the weather-resistive barrier;
8. there are areas of discontinuity of the weather-resistive barrier;
9. improper underlayment installed at chimney shoulder; and
10. the thermal envelope is discontinuous at the chimney enclosure.

Additionally, all of the chimney enclosures in the community were visually evaluated from imagery obtained using an unmanned aerial vehicle. To the extent possible, these evaluations confirmed that many of the construction deficiencies listed above also exist at other chimney enclosures in the community.

The moisture probe testing discussed in this report was performed to help determine if, and to what extent, water infiltration was occurring at other chimney enclosures within the community. A sampling of twenty (20) chimney enclosures was selected based on previous inspection data, dates of construction, installing stucco contractor, building elevation, and availability.

### General Testing Information

Spotlight Home Inspections drilled through the stucco and took moisture measurements of the underlying wood structure at each testing location. dCEI verified the moisture measurements as necessary. All moisture content measurements were obtained using pin-type moisture meters manufactured by Delmhorst Instrument Co. (model BD-2100).

The readings taken using the moisture meter are to be used as a tool in assessing the building for moisture intrusion. In areas where the readings were observed to be normal, the possibility of water intrusion cannot be ruled out. The results of the moisture meter measurements strongly rely on weather conditions prior to the testing. If a rain event was not significant enough, or was wind driven in a certain direction, this will have a substantial impact on the route of water. Additionally, the weather is a significant factor when it comes to the drying of wood that may have been wet from a previous rain event. For these reasons, as well as interior environmental conditions and construction materials, wood that was observed to be dry at the time of our inspection may be experiencing water infiltration but was not showing the symptoms in the form of high moisture content readings.



Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 357 of 395

Haverford Reserve, the Carriage Homes
Moisture Probe Testing (Twenty (20) Chimney Enclosures)
December 2, 2019
Page 3 of 5

## Data & Analysis

The moisture probe data collected during the testing is provided on the annotated photographs in Appendix B, which were prepared by Spotlight Home Inspections.

**Elevated moisture and/or 'soft' sheathing was observed at nineteen (19) of the twenty (20) chimney enclosures that were tested.** We define "elevated moisture reading" to mean any moisture reading at or above 16.1%. After reviewing and considering research, testing and analysis by: prominent organizations in the wood industry across North America like the United States Department of Agriculture, Forest Service, Forest Products Laboratory, APA – The Engineered Wood Association, the National Association of Home Builders Research Center, Forintek Canada Corp., and the Canadian Wood Council, and; prominent practitioners in the wood industry, five (5) categories emerged for classifying measurements taken using hand-held resistance meters on untreated wood in completed construction in Pennsylvania. These categories are summarized in the table below:

| SUMMARY TABLE | |
|---|---|
| 0% - 6.0% | These results are abnormally low and indicate that: the test was performed improperly or the meter malfunctioned resulting in the erroneous reading, or; there is an external force lowering the moisture content of the wood in this location. |
| 6.1% - 16.0% | These results are consistent with normal wood in Pennsylvania and indicate that either moisture infiltration has not yet occurred, or has not occurred within a relatively significant amount of time. |
| 16.1% - 19.9% | These results indicate that moisture infiltration is occurring, especially if a source for moisture infiltration has been confirmed. |
| 20.0% - 30.0% | These results indicate that moisture infiltration is occurring at levels where deterioration will occur if the wood is infected with wood rotting fungi. |
| 30.1% and above | These results indicate that moisture infiltration is occurring at levels where infection by wood rotting fungi will eventually occur, and deterioration by wood rotting fungi can progress at a rapid rate. |



## Analysis by 'Level'

In general, moisture data was collected at three (3) 'levels' of each tested chimney enclosure. These levels are depicted in the in the figure below. The maximum moisture content measured at each 'level' are summarized in the table to the right of the figure.



| Address | Top | Shoulder | Bottom | Year Built* |
|---|---|---|---|---|
| 101 Green Lane | 24% | 13% | **38%** | 2012 |
| 102 Green Lane | **32%** | 29% | **39%** | 2012 |
| 109 Green Lane | 18% | **37%** | **40%** | 2012 |
| 110 Green Lane | **31%** | **28%** | **40%** | 2013 |
| 119 Green Lane | 13% | **35%** | 25% | 2014 |
| 122 Green Lane | 23% | 10% | 12% | 2016 |
| 124 Green Lane | 23% | **38%** | 14% | 2014 |
| 126 Green Lane | 13% | **10%** | 12% | 2013 |
| 202 Valley Ridge Road | **40%** | 10% | **11%** | 2014 |
| 208 Valley Ridge Road | 12% | 12% | **40%** | 2013 |
| 213 Valley Ridge Road | **16%** | **39%** | **40%** | 2012 |
| 218 Valley Ridge Road | 26% | 12% | 13% | 2010 |
| 219 Valley Ridge Road | **22%** | **37%** | **15%** | 2013 |
| 224 Valley Ridge Road | 21% | 13% | 14% | 2010 |
| 231 Valley Ridge Road | 13% | 8% | 12% | 2011 |
| 239 Valley Ridge Road | 16% | **40%** | 29% | 2012 |
| 240 Valley Ridge Road | **18%** | 12% | 15% | 2010 |
| 245 Valley Ridge Road | **18%** | **21%** | **11%** | 2010 |
| 249 Valley Ridge Road | 13% | **28%** | 18% | 2010 |
| 256 Valley Ridge Road | 17% | **15%** | **40%** | 2012 |

*year build as listed by Delaware County property records

**readings that are <u>**underlined and bold**</u> indicate the substrate was found to be soft at that level

**Elevated moisture and/or 'soft' sheathing were observed at the top level of fifteen (15) of the twenty (20) chimney enclosures that were tested [i.e. 75% of the tested chimney enclosures].**

**Elevated moisture and/or 'soft' sheathing were observed at the shoulder level of ten (10) of the twenty (20) chimney enclosures that were tested [i.e. 50% of the tested chimney enclosures].**

**Elevated moisture and/or 'soft' sheathing were observed at the bottom level of ten (10) of the twenty (20) chimney enclosures that were tested [i.e. 50% of the tested chimney enclosures].**



Conclusion and Recommendations

The data collected during our moisture probe testing indicates active water infiltration is occurring at nineteen (19) of the twenty (20) tested chimney enclosures. Based on our inspection observations and the moisture testing data, it is likely that similar construction deficiencies previously observed at 212 Valley Ridge Road and 222 Valley Ridge Road exist at most, if not all, chimney enclosures in the community.

Additional testing and investigation are required to evaluate all of the chimney enclosures within the community. However, based on the available data and the frequency and non-localized nature of the elevated moisture readings obtained during this phase of testing, it is likely that a comprehensive and community-wide repair approach will be necessary. We anticipate this to include the following work at each location:

- Removal and replacement of the existing chase pan;
- Removal and replacement of the entire stucco system and related flashings around the chimney enclosure;
- Removal and replacement of building materials damaged by water infiltration;

Upon request, dCEI can provide detailed plans, specifications, and construction details for these repairs.

Should you have any questions or require additional information, please do not hesitate to contact this office.

Sincerely,                                        Sincerely,

Daniel Ciarcia                                   Daniel Reuther
PA PE # PE80185



# EXHIBIT "K"



ENGINEERING

04  Main
Lise Romo NJ05713
(754) 884-6410

September 10, 2019

Haverford Reserve, the Carriage Homes
c/o: Marcus & Hoffman
326 West State Street
Media, PA 19063
*sent via email to amarcus@marcushoffman.com*

Attn:   Adam Marcus, Esq

**Re:    Haverford Reserve – Deck Ledger Observations at 222 Valley Ridge Road - revised
        dCEI Job No. 2108-99-001CE**

Dear Mr. Marcus,

Pursuant to your request, an inspector from dC Engineering Inspections, LLC ('dCEI') has been
observing the stucco repair/replacement work at the rear chimney enclosure of 222 Valley Ridge Road
in the Haverford Reserve community.  This work is being performed by the Declarant's contractor
with the primary intent of investigating the source of water infiltrations behind the stucco system and
making the necessary repairs.

During our inspections of the ongoing work at 222 Valley Ridge Road, we observed certain conditions
that warrant further action.   Upon full completion of the repair work, dCEI can provide a
comprehensive outline of our observations.  However, at this time there is an issue regarding the fiber
cement siding and the deck ledger board that requires immediate attention:

1- **Deck Ledger Board Installed in Front of Fiber Cement Siding** –The chimney enclosure
   repair work required an area of deck boards be removed, which exposed previously concealed
   portions of the deck ledger installation.  Based on our inspection observations, the entire board-
   and-batten fiber cement siding system extends behind the deck ledger, resulting in the
   following conditions:

   *Improper Ledger Fastening* - The vertical battens installed behind the ledger board create
   a gap/air space between the back side of the ledger board and the exterior face of the
   wall.  No blocking is provided in the air space behind the ledger flashing.  These
   conditions do not allow the intended clamping action to occur between the ledger
   board and the structure.

   Design values for wood connections are based on the assumption that the faces of the
   structural members are brought into contact when fasteners are installed[1].  The as-built
   deck ledger configuration does not bring these faces in contact, resulting in concerns
   with the structural adequacy of the as-built deck ledger connection.

---
[1] National Design Specifications for Wood Construction; 2015 Edition by the American Wood Council

Case 2:22-cv-03805-TJS   Document 21-12   Filed 11/21/22   Page 362 of 395

Haverford Reserve, the Carriage Homes
Haverford Reserve – Deck Ledger Observations at 222 Valley Ridge Road · revised
September 10, 2019
Page 2 of 4

*Lack of Façade Drainage* – In addition to dCEI's concerns regarding the lack of deck ledger flashing which have been documented in detail in previous reports, the installation of the deck ledger board in front of the fiber cement siding system results in an additional area where moisture will become trapped.

The existing construction contains a plastic 'z-bend' flashing component over the deck ledger. The upper vertical flange of this flashing is not properly integrated with the drainage plane of the wall. Instead, it is installed in front of the vertical battens of the siding system allowing water get behind it. Due to the lack of drainage provisions, this water can become trapped between the back side of the deck ledger and the face of the siding system. A graphical representation of this is provided below for clarification:





Fiber cement siding products are not permitted for structural use and will deteriorate when they remain in contact with standing water. This deterioration can have structural implications with the fiber cement siding being part of the structural connection for the deck ledger.



Moisture probe testing of the wood-based exterior sheathing was performed in multiple locations below the deck ledger. The figure below shows the approximate locations of moisture probe measurements. The moisture levels at the outside building corner below the deck ledger were as high as 34%, indicating moisture infiltration is active and occurring at levels where infection by wood rotting fungi will eventually occur and deterioration by wood rotting fungi can progress at a rapid rate. Moisture levels beyond the outside wall corner were within normal range (i.e. between 6.1% and 16.0%).





Based on the above information, dCEI recommends the conditions at the deck ledger flashing be modified to comply with the installation detail published by the fiber cement siding manufacture (JamesHardie®) as shown below:



Implementing this detail will require the following work:

1. Temporary shoring of the existing deck structure;

2. Removal of additional deck boards;

3. Removal of the existing deck ledger board;

4. Removal the fiber cement siding system 2" above finished deck surface;

5. Installation of code-compliant deck ledger flashing integrated with exterior wall drainage plane;

6. Installation of new deck ledger board (thickness as required to align with joist ends).

Should you have any questions or require additional information, please do not hesitate to contact our office.

Sincerely,

Daniel Reuther



EXHIBIT "L"



904 Main Street
Lake Como, NJ 07719
Ph (732) 894-0610
[company website / email]

September 28, 2020

Haverford Reserve, the Carriage Homes
c/o: Marcus & Hoffman
326 West State Street
Media, PA 19063
*sent via email to amarcus@marcushoffman.com*

Attn:   Adam Marcus, Esq

**Re:   Haverford Reserve – Façade Testing
dCEI Job No. 2108-99-001CE**

Dear Mr. Marcus,

Pursuant to your request, an inspector from dC Engineering Inspections, LLC ('dCEI') has performed moisture probe and invasive façade testing at various locations in the Haverford Reserve community. These inspections were performed with assistance from Apex Contractors, LLC in February and March of 2020. The primary intent of the moisture testing was to obtain information about the moisture content of the wood structure behind the cladding systems at various exterior wall locations. The invasive inspections were performed to evaluate the as-built construction conditions at locations where elevated moisture of the wood substrate was detected during moisture probe testing. A summary of our findings is provided herein.

## Background

Haverford Reserve, the Carriage Homes is a planned residential community consisting of fifty (50) two-family dwellings located in the Township of Haverford, Delaware County, Pennsylvania. Multiple concerns with the as-built construction of the building façade systems in the Community have been previously identified and documented in previous reports by dCEI. These reports include:

1. *Transition Inspection Report*, dated October 25, 2017 ('the Transition Report');
2. *Weep Screed Recommendations*, dated July 30, 2018;
3. *Moisture Probe Testing (Ten Buildings)*, dated August 30, 2018;
4. *Interim Façade Testing Report*, dated December 20, 2018;
5. *Façade Investigation, Testing, and Repair Protocols*, dated March 28, 2019;
6. *'Prototype' Work at 222, 224 Valley Ridge Road*, dated April 11, 2019;
7. *222 Valley Ridge Road Chimney Enclosure*, dated April 15, 2019;
8. *Window Sill Flashing*, dated April 16, 2019;
9. *Façade Prototype Observations*, dated May 29, 2019;
10. *212 Valley Ridge Road Chimney Stucco Evaluation Report*, dated June 17, 2019;
11. *Deck Ledger Observations at 222 Valley Ridge Road*, dated September 10, 2019;
12. *Moisture Probe Testing (Twenty Chimney Enclosures)*, dated December 2, 2019; and
13. *Moisture Probe Testing (Windows at Twenty Homes)*, dated December 4, 2019.

Overview of Façade System Design Concept

The stucco and stone veneer cladding systems installed on the exterior walls of the homes in the Haverford Reserve community are drainage wall systems.   Drainage wall systems are based on the premise that some water will infiltrate through the siding material. Drainage systems are designed to effectively manage this water (i.e. collect any water that infiltrates and divert it out of the wall before it causes leaks).

# Moisture Probe Testing

A sampling of eighteen (18) homes was selected based on previous inspection data, dates of construction, installing stucco contractor, building elevation, and availability.  All moisture content measurements were obtained using pin-type moisture meters manufactured by Delmhorst Instrument Co. (model BD-2100).

A total of one hundred eighty-five (185) locations were tested across the eighteen (18) home sample. This phase of moisture probe testing was primarily concentrated at the 'typical' building areas listed below. Observations and data from previous inspection and testing work warranted further evaluation of these areas.

- At and around roof/wall interfaces (80 locations).
- At and around front entry door recesses (96 locations).

**Elevated moisture was detected at one (1) or more of tested locations on six (6) of the eighteen (18) tested homes [33% of tested homes].**

**Elevated moisture was detected at and around roof/wall interfaces at six (6) of the eighteen (18) tested homes [33% of tested homes].  Ten (10) of the eighty (80) locations at and around roof/wall interfaces were found to have elevated moisture levels [12.5% of tested roof/wall locations].**

**All of the ninety six (96) moisture readings at and around front entry door recesses were within normal range at the time of our testing.**

A map of the community showing the homes where this phase of moisture probe testing is provided below.





We define "elevated moisture reading" to mean any moisture reading at or above 16.1%. After reviewing and considering research, testing and analysis by: prominent organizations in the wood industry across North America like the United States Department of Agriculture, Forest Service, Forest Products Laboratory, APA – The Engineered Wood Association, the National Association of Home Builders Research Center, Forintek Canada Corp., and the Canadian Wood Council, and; prominent practitioners in the wood industry, five (5) categories emerged for classifying measurements taken using hand-held resistance meters on untreated wood in completed construction in Pennsylvania. These categories are summarized in the table below:

| SUMMARY TABLE | |
|---|---|
| 0% - 6.0% | These results are abnormally low and indicate that: the test was performed improperly or the meter malfunctioned resulting in the erroneous reading, or; there is an external force lowering the moisture content of the wood in this location. |
| 6.1% - 16.0% | These results are consistent with normal wood in Pennsylvania and indicate that either moisture infiltration has not yet occurred, or has not occurred within a relatively significant amount of time. |



| 16.1% - 19.9% | These results indicate that moisture infiltration is occurring, especially if a source for moisture infiltration has been confirmed. |
|---|---|
| 20.0% - 30.0% | These results indicate that moisture infiltration is occurring at levels where deterioration will occur if the wood is infected with wood rotting fungi. |
| 30.1% and above | These results indicate that moisture infiltration is occurring at levels where infection by wood rotting fungi will eventually occur, and deterioration by wood rotting fungi can progress at a rapid rate. |

The readings taken using the moisture meter are to be used as a tool in assessing the building for moisture intrusion. In areas where the readings were observed to be normal, the possibility of water intrusion cannot be ruled out. The results of the moisture meter measurements strongly rely on weather conditions prior to the testing. If a rain event was not significant enough, or was wind driven in a certain direction, this will have a substantial impact on the route of water. Additionally, the weather is a significant factor when it comes to the drying of wood that may have been wet from a previous rain event. For these reasons, as well as interior environmental conditions and construction materials, wood that was observed to be dry at the time of our inspection may be experiencing water infiltration but was not showing the symptoms in the form of high moisture content readings.

A summary table of the moisture probe testing data is provided in Appendix A.



## Invasive Inspections – Stone and Stucco Test Cuts

Invasive inspections involving the removal of stucco and/or stone veneer were performed at ten (10) of the eleven (11) locations where elevated moisture of the wood substrate was detected during this phase of moisture probe testing. The eleventh (11th) invasive inspection location was performed at 256 Valley Ridge Road, where previous moisture probe testing indicated elevated moisture (see dCEI report dated 12/4/2019). In total, invasive inspections were performed at seven (7) homes during this phase of testing.

A map of the community showing the homes at which invasive inspections were performed is provided below.



The locations of this phase of invasive inspections are listed below along with a bulleted summary of observed conditions. Additional details regarding the cited installation issues are provided in the 'Construction Deficiencies' section of this report. Note that all directional descriptors are from the exterior perspective facing the applicable elevation of the home.

1. *212 Valley Ridge Road* – front elevation along the right side of the window below the barrel roof dormer.

   - Discontinuous sealant at Canamold window head
   - Soffit receiver buried in stucco



- Self-adhered flashing turned out at underside of soffit receiver
- Discontinuous WRB at side of window
- Porkchop capping flange turns onto self-adhered flashing (incorrect lap)

As a result of the defects moisture damage was observed at the exterior sheathing below soffit receiver.

2. *218 Valley Ridge Road* – front elevation above and below the roof intersection on the right side of the entry tower element.

   KICKOUT AREA:

   - Discontinuous sealant behind gutter
   - Gutter tight to stone veneer
   - Soffit receiver buried in stone veneer
   - WRB not continuous behind soffit receiver
   - Fascia capping flange turns onto exterior wall sheathing behind WRB (incorrect lap)

As a result of the defects moisture damage was observed at exterior wall sheathing around kickout flashing.

   CRICKET AREA:

   - Metal cricket terminates behind stone veneer casing bead
   - Various open joints in aluminum capping
   - WRB does not wrap outside wall corner
   - Self-adhered flashing turned out behind cricket
   - Self-adhered flashing installed over roof step flashing (incorrect lap)

As a result of the defects moisture damage was observed at exterior wall sheathing above step flashing.

3. *218 Valley Ridge Road* – rear elevation above and below the roof intersection at the family room.

   KICKOUT AREA:

   - Damaged kickout flashing
   - Gutter tight to stucco
   - Soffit receiver buried in stucco
   - Aluminum fascia capping does not return onto the exterior wall
   - WRB not continuous behind soffit receiver

   CRICKET AREA:

   - Crack observed in metal roof cricket
   - WRB layers open at outside wall corner
   - Self-adhered flashing installed over roof step flashing (incorrect lap)



As a result of the defects moisture was observed at exterior wall sheathing.


4. *218 Valley Ridge Road* – rear elevation along right side of cantilever balcony.
   - PVC trim attached directly to outrigger beam with no flashing or water barrier
   - Roof drip edge installed over ledger; not integrated with WRB
   - No proper flashing provided

As a result of the defects moisture staining was observed at the outrigger beam and the soffit nailers are rotted.


5. *223 Valley Ridge Road* – side elevation along the right side of the window below the barrel roof dormer.
   - Discontinuous sealant at Canamold window head
   - Soffit receiver buried in stucco
   - WRB not continuous behind soffit receiver
   - Porchchop capping flange turns onto self-adhered flashing (incorrect lap)
   - WRB turned out at barge trim

As a result of the defects moisture was observed at exterior wall sheathing below the soffit receiver.


6. *223 Valley Ridge Road* – rear elevation above and below the roof intersection at the unit separation wall.
   - Gutter tight to stucco
   - Discontinuous sealant behind gutter
   - Fascia capping flange turns onto exterior wall sheathing (incorrect lap)
   - WRB discontinuous at roof/wall intersection
   - Drip edge not installed at adjacent roof
   - Fascia capping does not extend under drip edge (exposed wood)

As a result of the defects moisture was observed at exterior wall sheathing around kickout flashing


7. *234 Valley Ridge Road* – side elevation along the right side of the window below the barrel roof dormer.
   - Gap at barge trim
   - Discontinuous sealant at Canamold window head
   - Soffit receiver buried in stucco
   - WRB not continuous behind soffit receiver
   - Porchchop capping flange turns onto exterior wall sheathing (incorrect lap)



- Self-adhered flashing installed over porkchop wall return (incorrect lap)

As a result of the defects moisture was observed at exterior wall sheathing below the soffit receiver.

8. *234 Valley Ridge Road* – rear elevation above and below the roof intersection at the family room.
   KICKOUT AREA:
   - Damaged kickout flashing
   - Soffit receiver buried behind stucco
   - WRB not continuous behind soffit receiver
   - Fascia capping flange turns onto exterior wall sheathing behind WRB (incorrect lap)
   - Note: Gutter does not appear to be original

   CRICKET AREA
   - Chipped stucco at outside wall corner
   - Staple holes observed in metal cricket
   - Ice and water shield behind step flashing poorly adhered

As a result of the defects moisture damage observed at exterior wall sheathing around kickout flashing and moisture staining at underside of roof sheathing

9. *102 Green Lane* - front elevation above and below the roof intersection on the right side of the entry tower element.
   - Damaged kickout flashing
   - WRB not continuous behind soffit receiver
   - Twelve (12) layers of housewrap and paper exist (excessive)

10. *238 Valley Ridge Road* – side elevation along the right side of the window below the barrel roof dormer.
    - Crack in stucco originating at corner of frieze board
    - Chipped stucco at outside wall corner
    - Discontinuous sealant at Canamold window head
    - Soffit receiver buried in stucco
    - Porkchop capping flange turns onto WRB of exterior wall (incorrect lap)

As a result of the defects moisture damage observed at exterior sheathing below soffit receiver

11. *256 Valley Ridge Road* – side elevation along the right side of the window below the barrel roof dormer.
    - Excessive sealant between soffit and receiver



- Discontinuous sealant at Canamold window head
- Discontinuous sealant at window
- Soffit receiver buried in stucco
- Porkchop capping flange turns onto self-adhered flashing (incorrect lap)
- WRB not continuous behind soffit receiver

## Invasive Inspections – Composite Trim and Vinyl Soffit

In addition to the invasive inspection locations listed above at stone and stucco areas, portions of composite trim boards and/or vinyl soffit were removed from various areas of the buildings. These locations are listed below along with a bulleted summary of the observed conditions. Additional details regarding the cited installation issues are provided in the 'Construction Deficiencies' section of this report. Note that all directional descriptors are from the exterior perspective facing the applicable elevation of the home.

1. *102 Green Lane* – section of trim removed from the right side of the chimney enclosure on the rear elevation and from left side of the adjacent window.
   - The trim board was observed to be separating from the wall at multiple locations.
   - The trim board is improperly fastened with wire nails (2 rows) at approximately 16"-24" on-center.
   - The flashing atop the trim at the base of the siding is not properly integrated with the WRB.
   - The WRB is not continuous to the top of the wall.
   - The window drip cap is not properly integrated with the WRB.

2. *106 Green Lane* – section of trim and soffit removed at deck ledger.
   - No deck ledger flashing is installed.

3. *108 Green Lane* – section of trim removed from the left side of the frieze board on the rear elevation.
   - The WRB is not continuous atop to horizontal trim band (areas of exposed sheathing behind trim).

4. *110 Green Lane* – section of trim removed from the inside wall corner along the right side of the family room.
   - The trim board was observed to be separating from the wall at multiple locations.
   - The trim board is improperly fastened with 1/16" diameter wire nails (2 rows) at approximately 16" on-center.



- The flashing atop the trim at the base of the siding is not properly integrated with the WRB.

5. *110 Green Lane* – section of trim removed at deck ledger.
   - A flashing bend is installed atop the ledger but is improperly located entirely in front of the fiber cement siding system.

6. *112 Green Lane* – section of trim removed from the inside wall corner at garage wall jog.
   - The trim board is improperly fastened with 1/16" diameter wire nails (2 rows) at approximately 22"-45" on-center.
   - The flashing atop the trim at the base of the siding is not properly integrated with the WRB.

7. *112 Green Lane* – section of trim removed from the right side of the chimney enclosure on the rear elevation.
   - Moisture staining was observed on the Hardie Board behind the trim around the chimney shoulder.

8. *112 Green Lane* – section of trim removed at deck ledger.
   - No deck ledger flashing is installed.
   - Fiber cement battens are continuous behind ledger board.

9. *124 Green Lane* – section of trim removed from the outside corner of garage wall.
   - The trim board is improperly fastened with 1/16" diameter wire nails.

10. *124 Green Lane* – section of trim and soffit removed at deck ledger.
    - Fiber cement battens are not continuous behind ledger board.
    - The flashing behind the trim is not properly integrated with the WRB.

11. *249 Valley Ridge Road* - section of trim removed from the outside corner of garage wall.
    - The trim board is improperly fastened with 1/16" diameter wire nails.
    - The flashing is discontinuous at the outside corner bend.

12. *249 Valley Ridge Road* - section of trim removed from the inside wall corner along the right side of the family room.
    - The trim board is improperly fastened with 1/16" diameter wire nails (2 rows) at approximately 12"-20" on-center.
    - The flashing atop the perpendicular trim is not properly integrated with the WRB.



13. *249 Valley Ridge Road* – section of trim removed at deck ledger.

    • A flashing bend is installed atop the ledger but is improperly located entirely in front of the fiber cement siding system.

14. *243 Valley Ridge Road* - section of trim removed from the outside corner of garage wall.

    • Backer rod was observed to be hanging out of the gap between the trim and the ledge flashing.

    • Sealant is installed between the trim and the ledge flashing, obstructing drainage.

15. *243 Valley Ridge Road* - section of trim removed from the right side of the chimney enclosure on the rear elevation.

    • The trim board was observed to be separating from the wall at multiple locations.

    • The trim board is improperly fastened with wire nails (2 rows) at approximately 12"-24" on-center.

    • Excessive sealant behind trim at inside wall corner and deck.

16. *250 Valley Ridge Road* – section of trim removed at deck ledger.

    • A flashing bend is installed atop the ledger but is improperly located entirely in front of the fiber cement siding system.

17. *234 Valley Ridge Road* - section of trim removed from the inside wall corner along the right side of the family room.

    • The trim board was observed to be separating from the wall at multiple locations.

    • The trim board is improperly fastened with wire nails (2 rows) at approximately 21" on-center.

    • The flashing atop the trim at the base of the siding is not properly integrated with the WRB.

18. *221 Valley Ridge Road* - section of composite trim removed from base of fiber cement siding at rear elevation.

    • The flashing atop the trim at the base of the siding is installed over the WRB and a weep screed.



## Construction Deficiencies

Multiple construction deficiencies that are contributing to water infiltration and failure of the trim pieces were observed and documented during our testing and inspections. The narrative sections below are intended to provide a detailed description of the most significant and/or pervasive issues that were observed.

### 1- Improper Construction at Eaves:

The approved design plans for the buildings include sections and details pertaining to the construction at and around roof eaves. As shown in Figure 1, the design details specify a composite frieze board installed over 1x wood blocking. The details depict the composite frieze board in front of and overlapping the exterior face of the stucco.

The as-built frieze board construction was found to be significantly different from the approved design at all of the inspected locations. The installed freeze board consists of aluminum-wrapped wood fastened directly to the exterior wall sheathing instead of the specified composite frieze board spaced away from the sheathing. This deviation from the approved design results in the stucco system terminating under and below the frieze board, instead of behind it as intended. The as-built construction also results in the frieze board and portions of the soffit channel being effectively buried in the stucco as shown in Figure 2. The original design provides a greater level of protection than the asbuilt conditions because it allows proper shedding of water over successive layers of materials.





*Figure 1 – Eave detail from approved design plans*

*Figure 2 – As-built frieze board construction*

### 2- Discontinuous stucco at dormer barge trim

The approved design plans for the buildings include sections and details pertaining to the construction at and around roof dormers. As shown in Figure 3, the design details specify a composite barge trim installed over 1x wood blocking at the top of dormer walls. The details depict the composite barge trim in front of and overlapping the exterior face of the stucco.



This is not accomplished with the as-built construction. Instead, the stucco terminates at or below the composite trim. At many areas, the WRB is visibly turned out about the top edge of the stucco providing an entry point for water. The edge of the wood behind the barge trim is also visible in many areas. A representative photo of these conditions is provided in Figure 4.



*Figure 3 – Dormer detail from approved design plans*



*Figure 4 – Stucco terminates at underside of trim; WRB turned out*

### 3- Discontinuous sealant:

The sealant joints along the interfaces of dissimilar materials were found to be either discontinuous or non-existent at intersections between dissimilar materials. The lack or discontinuous nature of sealant joints allows excess water to infiltrate into the wall system. This was particularly evident at many locations behind roof gutter terminations and areas where Canamold window heads intersect with roof returns. Representative photos of these areas are provided in the figures below.



*Figure 5 – gutter termination*          *Figure 6 – discontinuous sealant behind gutter termination*





*Figure 7 – Canamould window head at roof return*  *Figure 8 – discontinuous sealant at roof return*

Although the intent of drainage wall systems is to effectively manage some water that circumvents the cladding, the lack of continuous sealant joints, as seen, will allow the system to become overwhelmed resulting in failures and water intrusion.

## 4- Discontinuous drainage plane:

The drainage plane of the wall system is comprised of a weather-resistive barrier (WRB) together with various flashing components. The drainage plane of the walls in the Haverford Reserve community is defined by the WeatherSmart® housewrap layer (WRB) that is installed over the exterior wall sheathing.

The drainage plane was found to be discontinuous at <u>all</u> eleven (11) locations where our invasive inspections were performed. For the purpose of this report, 'discontinuous drainage plane' includes: (1) areas where upper layers of WRB do not overlap lower layers of WRB; and (2) areas where there is insufficient overlap between consecutive WRB layers and/or WRB and flashing layers.

The most prominent area where discontinuous drainage plane was observed during our invasive testing was at roof and wall intersections. There are three (3) general configurations where these intersections occur:

- (A) where the intersecting wall is perpendicular to the eave edge of the roof;
- (B) where the intersecting wall is parallel to the eave edge of the roof; and
- (C) between portions of exterior walls above the main roof level and adjacent roof crickets.

Representative photos of each of these configurations is provided below for clarification along with an analysis of the observed conditions.



## *Configuration (A): wall perpendicular to the eave edge of the roof*

Six (6) of our invasive inspections involved perpendicular intersections between a roof and exterior wall. At these locations, a kickout flashing is installed to divert water away from the wall. The underside of the roof overhang is covered with vinyl soffit. The aluminum capping of the fascia board is bent out to form a flange that turns onto the intersecting wall[1]. At some locations, this flange is installed directly to the exterior wall sheathing. At other locations, a strip of self-adhered flashing membrane is installed between the flange and the sheathing. The WRB is then installed in front of the return flange of the aluminum capping. This lapping order is incorrect and does not shed water. Any water traveling down the return flange is directed behind the WRB onto the wood-based exterior wall sheathing. The aluminum flange must be integrated with the



*Figure 9- Configuration 1: wall perpendicular to eave edge of roof*

WRB in a shingle fashion provide a continuous drainage plane that sheds water to the exterior of the building. This improper overlap is exacerbated by the lack of continuous WRB around the vinyl soffit, as discussed in the following paragraph.

The WRB does not continue behind the receiver of the vinyl soffit at any of the inspected locations. The components of the drainage plane either terminate under or are notched around the vinyl soffit. This as-built installation method results in discontinuity of the drainage plane with no overlap or insignificant overlap between consecutive layers of drainage plane components.

The as-built conditions are construction defects and a building code violation. The as-built conditions do not comply with **Section R703.2 of IRC/2006**, which requires WRB to be continuous to the top of walls and terminated at penetrations and building appendages in a manner to provide the building a weather-resistant exterior wall envelope.

---

[1] NOTED EXCEPTION: the capping does not turn out at 218 Valley Ridge Road (test location #3)



### *Configuration (B): wall parallel to the eave edge of the roof*

At locations where the intersecting wall is parallel to the eave edge of the roof, aluminum capping is installed where the roof returns into the wall. The underside of the roof overhand is covered with vinyl soffit. An aluminum-capped frieze board is installed below the soffit and terminates a few inches short of the roof return.

Similar to Configuration 'A' above, the aluminum capping of the roof return and frieze board is bent out to form a flange that turns onto the intersecting wall. At some locations, this flange is installed directly to the exterior wall sheathing. At other locations, a strip of self-adhered flashing membrane is installed between the flange and the sheathing[2]. The WRB is installed in front of the return flange of the aluminum capping. This lapping order is incorrect and does not shed water. Any water traveling down the return



*Figure 10 - Configuration 2: wall parallel to eave edge of roof*

flange is directed behind the WRB onto the wood-based exterior wall sheathing. The aluminum flange must be integrated with the WRB in a shingle fashion to provide a continuous drainage plane that sheds water to the exterior of the building. Again, the improper overlap issue is exacerbated by the lack of continuous WRB around the vinyl soffit, as discussed in the following paragraph.

Although the exact conditions vary by tested location, the drainage plane of the wall is discontinuous at all inspected locations where the wall intersects the roof return and/or frieze board. The components of the drainage plane either terminate under or are notched around the vinyl soffit. This as-built installation method results in discontinuity of the drainage plane with no overlap or an inadequate overlap between consecutive layers of drainage plane components. The WRB must extend beyond the soffit so as to provide the minimum required overlap between consecutive layers of the drainage plane.

Together, the two items noted above allow moisture to be funneled behind the drainage plane of the wall system as shown in the graphic below.

---

[2] NOTED EXCEPTION: at 234 Valley Ridge Road, a strip of self-adhered flashing is installed over the return flange of the aluminum capping.





The as-built conditions are construction defects and a building code violation. The as-built conditions do not comply with **Section R703.2 of IRC/2006**, which requires WRB to be continuous to the top of walls and terminated at penetrations and building appendages in a manner to provide the building a weather-resistant exterior wall envelope.

### *Configuration (C): walls above the main roof level and adjacent roof crickets*

Our invasive inspections at locations #2, #3, and #8 began with investigating the as-built construction conditions at kickout locations (i.e. Configuration A). At these locations, the moisture patterns observed around kickout flashings suggest additional source(s) of water infiltration exist at or above the roof line. Additional stone and stucco were removed along portions of exterior walls located above the roof line to investigate these moisture sources.

Our invasive inspections were limited to exterior wall façade systems and did not include removal of the roof covering. However, our inspection observations suggest that certain aspects of the roof system (both design and construction) are contributing to water infiltration observed at the exterior walls. This is especially true of the Pembrey model roof areas discussed in the sections below.

Pembrey 'Tower' Element

At 218 Valley Ridge Road (location #2), a portion of the stone veneer was removed from the 'tower' element that is typical of the Pembrey home models.



It should be noted that a number of issues pertaining to the 'tower' element of the Pembrey home models have been previously identified by Linn Architects. In general, the roof configuration of the Pembrey units causes drainage from a relatively large and steeply sloped roof area (see highlighted regions in Figure 11) to be funneled against the side wall of the tower element. This and other roof-related issues are documented in the June 2017 report by Linn Architects.



*Figure 11 – Aerial image of Pemby model roof; shaded areas represent portions of roof area that drain onto or along the side wall of the tower element.*

There is a metal cricket that is installed between the roof and the tower structure. The three (3) figures below show a closeup view of this building area. As shown in Figure 12 , the cricket funnels water onto the back edge of the stone veneer. The WRB was found to terminate short of the wall corner (see Figure 13), instead of wrapping the corner as required. Although the vertical portion of the metal valley does turn onto the front tower wall, it does not sufficiently integrate with the WRB. As observed in the photo, the metal valley directs water behind both the stone veneer and the drainage plane of the wall (see Figure 14).





*Figure 12 – cricket terminated into stone veneer casing*

*Figure 13 – WRB does not wrap corner*

*Figure 14 – Water infiltration*



The roof configurations at Pembrey model homes subject the walls of the entry tower to large quantities of water during storm events. The improper flashing methods observed at the outside wall corner of (discussed above) represent at least one (1) area where this water is able to breach the drainage plane of the wall at 218 Valley Ridge Road. Based on the considerable moisture observed on the exterior wall sheathing at and around the kickout flashing (see figure to the right), additional areas of infiltration likely exist along the roof/wall interface.



*Figure 15 – moisture on exterior wall sheathing around kickout*

Rear Family Room

At 218 Valley Ridge Road (location #3) and 234 Valley Ridge Road (location #8), a portion of the stucco was removed from the wall at the roof cricket over the family room. The figure to the right shows a closeup view of this building area. At both locations, the metal cricket was observed to be damaged. A small crack was observed in the cricket at location #3. Staple holes and an unsealed nail head were observed through the cricket at location #8.

The roof cricket over the family room at Pembrey model homes is another location where drainage from large roof areas is funneled towards exterior walls. Based on the moisture staining observed on the underside of the roof sheathing at location



*Figure 16 – Roof cricket over family room*

#8, as well as the exterior wall sheathing at and around the kickout flashing at locations #3 and #8, water is infiltrating at points along the roof/wall interface. The areas of damage to the metal crickets (discussed above) represent at least (1) area where water infiltration may be occurring.

5- **Omission/improper flashing at cantilever balcony:**

Vinyl soffit, fascia board, and portions of the stucco system were removed from around the cantilever balcony on the rear elevation of 218 Valley Ridge Road. We are not aware of any other unit in the community that has this style of balcony.

The original architectural design plans do not include any information or details for the construction of cantilever balconies. Based on our inspection observations, the balcony framing consists of glulam outrigger beams that penetrate through the exterior wall and are



presumably secured to the floor framing members. The balcony joists are installed parallel to the outrigger beams and do not penetrate through the exterior wall. On one end, the joists are hung from a ledger board that runs along the exterior wall between the outrigger beams. The other ends of the joists are hung from a beam secured to the outriggers' ends with framing angles.

A structural assessment of the cantilever balcony is beyond the scope of our evaluation and would require additional invasive inspections and/or an accurate set of as-built drawings. The framing layout observed is not consistent with 'typical' cantilever balcony framing. As such, we recommend obtaining information from the Declarant's Architect on the design and as-built conditions of the balcony framing so it can be analyzed.

The major issue noted during our inspection at the cantilever balcony is the lack of flashing at the beam pockets and ledger board. The only attempt at flashing at the balcony consists of a strip of roof edge metal installed along the top of the ledger board. The edge metal is installed in front of the WRB, thereby rendering it useless. The flashing conditions (or lack thereof) at the cantilever balcony do not comply with **Section R703.8 of IRC/2006**, which requires corrosion-resistant flashings applied shingle-fashion in such a manner to prevent entry of water to structural framing components. The code specifically lists *"where exterior porches, decks or stairs attach to a wall or floor assembly of wood-frame construction"* as a location requiring flashing. This as not accomplished or similar…

Additionally, the PVC fascia board is secured directly to the exposed side of the outrigger beam. With a portion of the fascia board removed, it is apparent that the fascia board is holding moisture against the beam causing deterioration and decolorization.



*Figure 17 – Edge metal at top of ledger installed in front of WRB; no other flashing provided at wall penetration*



*Figure 18 – discoloration of outrigger beam*

## 6- Improperly Fastened Exterior Trim Boards

PVC exterior trim boards were removed from a number of locations during our inspections. It is our understanding that the PVC trim boards that are installed are manufactured by Azek.

The as-built fastening methods of the Azek trim do not meet the necessary installation requirements as outlined by Azek. The trim boards were found to be fastened with 16 gauge pneumatically installed wire nails (see Figure 19), sporadically spaced. The use of wire nails to fasten the PVC trim is not permitted by the manufacturer. The Azek® Trimboards Installation Guidelines state, *"Staples, small brads, and wire nails must not be used".*

At many locations, the nails used to secure the trim boards extend beyond the attachment side by only one inch (1"). ICC ESR-1074 requires Azek® fasteners to be approved box nails or wood screws long enough to penetrate solid wood substrate a minimum of 1½". The nails are too short to penetrate this minimum required distance.

The failure to properly fasten the Azek trim boards has allowed them to separate and pull away from the wall at multiple locations. A representative photo of this condition is provided in Figure 20.



*Figure 19 – 16 gauge nails used to secure trim boards*



*Figure 20 – separation of trim boards from exterior wall*

## 7- Improper Flashing at Fiber Cement Siding

The removal of trim boards allowed for inspection of flashing components of the fiber cement siding system at many locations. The horizontal flashing installed at the base of the Hardie panels was found to be installed in front of the WRB, as shown in Figure 21. This method of installation is not correct as it does not direct water out of the wall system.

The siding manufacturer requires the WRB to overlap the flashing and a minimum of one-quarter inch (¼") clearance between the lower edge of the siding panels and horizontal flashing to allow drainage from the siding system and to prevent exposure to standing/ponding water (see Figure 22). The as-built installation does not meet either of these requirements. The as-built condition allows the base of the fiber cement siding system to remain in contact with



standing water.  This is not permitted by the manufacturer and will reduce the service life of the siding material.



*Figure 21 – flashing not properly integrated with WRB*



*Figure 22 – Hardie Board installation detail*



## Conclusions

The moisture probe testing and invasive inspections have revealed a number of façade-related construction deficiencies in addition to those that have been identified previously in our reports. Many of these additional issues involve discontinuity of the wall drainage plane at and around roof intersections. These discontinuous areas of paper are primary sources of water intrusion into the cladding systems that, in conjunction with the lack of weeps screed and proper flashing details has caused and will continue to cause damage to the building structure.

Our inspection observations suggest that certain aspects of the roof system (both design and construction) are contributing to water infiltration observed at certain locations, particularly at the tower and family room areas on the Pembrey model homes. These roof areas were identified as concerns in the report prepared by Linn Architects. We recommend invasive inspections at these areas on a sampling of five (5) units in the community. Upon request, dCEI can provide a proposal for this investigation work. The work will need to be performed by a qualified contractor under our observation and direction.

Should you have any questions or require additional information, please do not hesitate to contact our office.

Sincerely,                                             Sincerely,

Daniel Ciarcia                                       Daniel Reuther

\Dropbox\[Team dCEI]\dCEI Projects\2108 Haverford Reserve\99-001ce  Haverford\Correspondence Out\20200430-FacadeInspections.docx



Haverford Reserve, The Carriage Homes
Appendix A - Moisture Probe Testing

| Date | Address | Street | Elevation | Material | Location1 | Location2 | dCEI 1 | dCEI 2 | dCEI 3 | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/17/2020 | 106 | Green Lane | Front | Canamold | Entry Surround - soffit | Left | 10.8% | 11.1% | | |
| 2/17/2020 | 106 | Green Lane | Front | Canamold | Entry Surround - soffit | Center | 10.2% | 10.9% | 10.6% | |
| 2/17/2020 | 106 | Green Lane | Front | Canamold | Entry Surround - soffit | Right | 11.1% | 11.5% | | |
| 2/17/2020 | 106 | Green Lane | Front | MSV | Entry Surround - over | Left | 9.7% | 9.8% | | |
| 2/17/2020 | 106 | Green Lane | Front | MSV | Entry Surround - over | Center | 9.1% | 9.3% | | |
| 2/17/2020 | 106 | Green Lane | Front | MSV | Entry Surround - over | Right | 13.6% | 13.1% | | |
| 2/17/2020 | 106 | Green Lane | Front | MSV | kickout | Entry Tower - left side | 9.7% | 9.8% | | |
| 2/17/2020 | 106 | Green Lane | Front | MSV | kickout | Entry Tower - right side | 9.3% | 9.8% | | |
| 2/17/2020 | 106 | Green Lane | Front | STUCCO | kickout | Bay Window - right side | 9.3% | 9.0% | | |
| 2/17/2020 | 106 | Green Lane | Left | STUCCO | Barrel Dormer | Left | 10.5% | 9.8% | | |
| 2/17/2020 | 106 | Green Lane | REAR | STUCCO | kickout | Great Room | 7.1% | 9.4% | | |
| 2/17/2020 | 102 | Green Lane | Front | Canamold | Entry Surround - soffit | Left | 14% | 14% | | |
| 2/17/2020 | 102 | Green Lane | Front | Canamold | Entry Surround - soffit | Center | 13% | 13% | | |
| 2/17/2020 | 102 | Green Lane | Front | Canamold | Entry Surround - soffit | Right | 13% | 14% | | |
| 2/17/2020 | 102 | Green Lane | Front | MSV | Entry Surround - over | Left | 11% | 10% | | |
| 2/17/2020 | 102 | Green Lane | Front | MSV | Entry Surround - over | Center | 9% | 8% | | |
| 2/17/2020 | 102 | Green Lane | Front | MSV | Entry Surround - over | Right | 9% | 8% | | |
| 2/17/2020 | 102 | Green Lane | Front | MSV | kickout | Entry Tower - left side | 9.2% | 8.9% | | |
| 2/17/2020 | 102 | Green Lane | Front | MSV | kickout | Entry Tower - right side | 18.1% | 19.2% | 20.3% | core |
| 2/17/2020 | 102 | Green Lane | rear | Hardie | window | | 10.0% | | | |
| 2/17/2020 | 108 | Green Lane | Front | Canamold | Entry Surround - soffit | Left | 9% | 8% | | |
| 2/17/2020 | 108 | Green Lane | Front | Canamold | Entry Surround - soffit | Center | 11% | 12% | | |
| 2/17/2020 | 108 | Green Lane | Front | Canamold | Entry Surround - soffit | Right | 9% | 8% | | |
| 2/17/2020 | 108 | Green Lane | Front | MSV | Entry Surround - over | Left | 10% | 9% | | |
| 2/17/2020 | 108 | Green Lane | Front | MSV | Entry Surround - over | Center | 9% | | | |
| 2/17/2020 | 108 | Green Lane | Front | MSV | Entry Surround - over | Right | 8% | 8% | | |
| 2/17/2020 | 108 | Green Lane | Front | MSV | kickout | Entry Tower - left side | 9.3% | 9.9% | | |
| 2/17/2020 | 108 | Green Lane | Front | MSV | kickout | Entry Tower - right side | 12.9% | 12.4% | | |
| 2/17/2020 | 108 | Green Lane | front | STUCCO | dormer | left | 10.1% | 9.7% | 14.1% | |
| 2/17/2020 | 108 | Green Lane | Left | STUCCO | | | 11% | 11% | | core |
| 2/19/2020 | 110 | Green Lane | Front | Canamold | Entry Surround - soffit | Left | 10% | 10% | | |
| 2/19/2020 | 110 | Green Lane | Front | Canamold | Entry Surround - soffit | Center | 10% | 10% | | |
| 2/19/2020 | 110 | Green Lane | Front | Canamold | Entry Surround - soffit | Right | 9% | 9% | | |
| 2/19/2020 | 110 | Green Lane | Front | MSV | Entry Surround - over | Left | 9% | 9% | | |
| 2/19/2020 | 110 | Green Lane | Front | MSV | Entry Surround - over | Center | 9% | 10% | | |
| 2/19/2020 | 110 | Green Lane | Front | MSV | Entry Surround - over | Right | 9% | 8% | | |
| 2/19/2020 | 110 | Green Lane | Front | MSV | kickout | Entry Tower - left side | 14.4% | 14.3% | | |
| 2/19/2020 | 110 | Green Lane | Front | MSV | kickout | Entry Tower - right side | 8.6% | 8.6% | | |
| 2/19/2020 | 110 | Green Lane | Front | MSV | kickout | Entry Tower - right side | 8.6% | 9.1% | | |
| 2/19/2020 | 110 | Green Lane | Left | STUCCO | Barrel Dormer | Right | 14.7% | 14.3% | | |
| 2/19/2020 | 110 | Green Lane | Left | STUCCO | Barrel Dormer | Right | 13.7% | 14.2% | | |
| 2/19/2020 | 110 | Green Lane | REAR | STUCCO | kickout | Great Room | 10.8% | 10.9% | | |
| 2/19/2020 | 112 | Green Lane | Front | Canamold | Entry Surround - soffit | Left | 8% | 8% | | |
| 2/19/2020 | 112 | Green Lane | Front | Canamold | Entry Surround - soffit | Right | 9% | 8% | | |

Haverford Reserve, The Carriage Homes
Appendix A - Moisture Probe Testing

April 30, 2020
Page 2 of 5

| Date | Address | Street | Elevation | Material | Location1 | Location2 | dCEI 1 | dCEI 2 | dCEI 3 | Remarks |
|------|---------|--------|-----------|----------|-----------|-----------|--------|--------|--------|---------|
| 2/19/2020 | | 112 Green Lane | Front | MSV | Entry Surround - over | Left | 11% | 12% | | |
| 2/19/2020 | | 112 Green Lane | Front | MSV | Entry Surround - over | Center | 11% | 11% | | |
| 2/19/2020 | | 112 Green Lane | Front | MSV | Entry Surround - over | Right | 12% | 12% | | |
| 2/19/2020 | | 112 Green Lane | Front | MSV | kickout | Entry Tower - left side | 10.0% | 9.2% | | |
| 2/19/2020 | | 112 Green Lane | REAR | Hardie | Over Deck Ledger | inside corner | 9% | 9% | | at core |
| 2/19/2020 | | 124 Green Lane | Front | Canamold | Entry Surround - soffit | Left | 10% | 11% | | |
| 2/19/2020 | | 124 Green Lane | Front | Canamold | Entry Surround - soffit | Right | 8% | 8% | | |
| 2/19/2020 | | 124 Green Lane | Front | MSV | Entry Surround - over | Left | 10% | 10% | | |
| 2/19/2020 | | 124 Green Lane | Front | MSV | Entry Surround - over | Center | 12% | 12% | | |
| 2/19/2020 | | 124 Green Lane | Front | MSV | Entry Surround - over | Right | 8% | 7% | | |
| 2/19/2020 | | 124 Green Lane | Front | MSV | kickout | Entry Tower - left side | 7.2% | 6.8% | | |
| 2/19/2020 | | 124 Green Lane | Front | MSV | kickout | Entry Tower - right side | 8.1% | 9.0% | | |
| 2/19/2020 | | 124 Green Lane | REAR | STUCCO | Below Deck Ledger | Unit Sep Wall | 7.7% | 8.1% | | |
| 2/19/2020 | | 124 Green Lane | REAR | STUCCO | kickout | end joist | 7% | 8% | | |
| 2/20/2020 | | 238 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 8% | 8% | | |
| 2/20/2020 | | 238 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 8% | 9% | | |
| 2/20/2020 | | 238 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 10% | 9% | | |
| 2/20/2020 | | 238 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 10% | 10% | | |
| 2/20/2020 | | 238 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 9% | 10% | | |
| 2/20/2020 | | 238 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 8.2% | 8.6% | | |
| 2/20/2020 | | 238 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 10.0% | 9.0% | | |
| 2/20/2020 | | 238 Valley Ridge Road | right | STUCCO | Barrel Dormer | right | 15.7% | 15.0% | 17.5% | ***meter |
| 2/20/2020 | | 238 Valley Ridge Road | REAR | STUCCO | kickout | Great Room | 7.3% | 6.0% | | |
| 2/20/2020 | | 249 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 8% | 9% | | |
| 2/20/2020 | | 249 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 9% | 8% | | |
| 2/20/2020 | | 249 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 9% | 8% | | |
| 2/20/2020 | | 249 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 8% | 9% | | |
| 2/20/2020 | | 249 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 9% | 9% | | |
| 2/20/2020 | | 249 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 8.8% | 9.2% | | |
| 2/20/2020 | | 249 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 9.5% | 8.1% | | |
| 2/20/2020 | | 249 Valley Ridge Road | left | STUCCO | Barrel Dormer | Right | 14.3% | 14.0% | 12.3% | |
| 2/20/2020 | | 249 Valley Ridge Road | rear | STUCCO | kickout | Great Room | 7.5% | 7.1% | | |
| 2/20/2020 | | 243 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 10% | 10% | | |
| 2/20/2020 | | 243 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 11% | 11% | | |
| 2/20/2020 | | 243 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 7% | 7% | | |
| 2/20/2020 | | 243 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 12% | 12% | | |
| 2/20/2020 | | 243 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 11% | 11% | | |
| 2/20/2020 | | 243 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 9.1% | 9.1% | | |
| 2/20/2020 | | 243 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 7.1% | 8.1% | | |
| 2/20/2020 | | 243 Valley Ridge Road | rear | STUCCO | kickout | Great Room | 8.7% | 8.5% | | |
| 2/20/2020 | | 250 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 10% | 10% | | |
| 2/20/2020 | | 250 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 10% | 9% | | |
| 2/20/2020 | | 250 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 14% | 15% | | |
| 2/20/2020 | | 250 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 13% | 13% | | |
| 2/20/2020 | | 250 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 9% | 9% | | |

| Date | Address | Street | Elevation | Material | Location1 | Location2 | dCEI 1 | dCEI 2 | dCEI 3 | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/20/2020 | | 250 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 6.8% | 6.7% | 7.2% | |
| 2/20/2020 | | 250 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 8.6% | 8.8% | | |
| 2/20/2020 | | 250 Valley Ridge Road | Front | STUCCO | GARAGE WALL JOG | BELOW ROOF | 11.9% | 11.1% | | |
| 2/20/2020 | | 250 Valley Ridge Road | rear | STUCCO | kickout | Great Room | 7.0% | | | |
| 2/20/2020 | | 250 Valley Ridge Road | rear | STUCCO | Bay Window (2nd level) | Right horizontal/vertical | 9% | 9% | | |
| 2/20/2020 | | 250 Valley Ridge Road | rear | STUCCO | kickout | below roof (sep wall) | 9.6% | 9.7% | | no kickout flashing installed |
| 2/20/2020 | | 244 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 9% | 9% | | |
| 2/20/2020 | | 244 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 11% | 11% | | |
| 2/20/2020 | | 244 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 9% | 9% | | |
| 2/20/2020 | | 244 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 13% | 13% | | |
| 2/20/2020 | | 244 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 9% | 10% | | |
| 2/20/2020 | | 244 Valley Ridge Road | Front | MSV | Entry Stoop | | 38% | 40% | | |
| 2/20/2020 | | 244 Valley Ridge Road | Left | STUCCO | kickout | | 11.5% | 11.4% | | |
| 2/21/2020 | | 223 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 9% | 8% | | |
| 2/21/2020 | | 223 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 7% | 9% | | |
| 2/21/2020 | | 223 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 8% | 7% | | |
| 2/21/2020 | | 223 Valley Ridge Road | Front | MSV | kickout | Entry Wall - right side | 7.9% | 10.4% | | |
| 2/21/2020 | | 223 Valley Ridge Road | right | STUCCO | Barrel Dormer | Right | 18.1% | 17.5% | | |
| 2/21/2020 | | 223 Valley Ridge Road | right | STUCCO | Barrel Dormer | Right | 18.6% | 19.2% | | at core |
| 2/21/2020 | | 223 Valley Ridge Road | right | STUCCO | dormer | left | 11.8% | 12.2% | | |
| 2/21/2020 | | 223 Valley Ridge Road | right | STUCCO | kickout | below roof | 7.9% | 8.6% | | |
| 2/21/2020 | | 223 Valley Ridge Road | right | STUCCO | chimney | | 12% | 10% | | |
| 2/21/2020 | | 223 Valley Ridge Road | rear | Hardie | Stoop | left | 11% | 11% | | |
| 2/21/2020 | | 223 Valley Ridge Road | rear | kickout | sep wall | below | 31.5% | 30.7% | 27.1% | |
| 2/21/2020 | | 223 Valley Ridge Road | rear | kickout | sep wall | Above | 10.2% | 9.4% | | |
| 2/21/2020 | | 221 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 10% | 8% | | |
| 2/21/2020 | | 221 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Center | 8% | 9% | | |
| 2/21/2020 | | 221 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 8% | 8% | | |
| 2/21/2020 | | 221 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 7% | 7% | | |
| 2/21/2020 | | 221 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 15% | 15% | | |
| 2/21/2020 | | 221 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 6% | 6% | | |
| 2/21/2020 | | 221 Valley Ridge Road | rear | Hardie | mudsill | left wall jog | 7% | 7% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 12% | 11% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 13% | 13% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 8% | 8% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 9% | 9% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 12% | 13% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 9.7% | 8.2% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 9.3% | 9.9% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 8.0% | 8.7% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | STUCCO | Garage sep wall | Below roof | 11.4% | 11.5% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Front | STUCCO | Garage sep wall | Below Roof | 9.0% | 9.1% | | |
| 2/21/2020 | | 217 Valley Ridge Road | Left | STUCCO | Barrel Dormer | right | 8.1% | 8.6% | | |
| 2/21/2020 | | 217 Valley Ridge Road | REAR | STUCCO | kickout | below roof (sep wall) | 15.7% | 15.2% | | |
| 2/21/2020 | | 234 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 9% | 8% | | |

Haverford Reserve, The Carriage Homes
Appendix A - Moisture Probe Testing

| Date | Address | Street | Elevation | Material | Location1 | Location2 | dCEI 1 | dCEI 2 | dCEI 3 | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/21/2020 | | 234 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 8% | 8% | | |
| 2/21/2020 | | 234 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 9% | 10% | | |
| 2/21/2020 | | 234 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 8% | 8% | | |
| 2/21/2020 | | 234 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 8% | 7% | | |
| 2/21/2020 | | 234 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 7.7% | 7.0% | | |
| 2/21/2020 | | 234 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 8.7% | 7.2% | | |
| 2/21/2020 | | 234 Valley Ridge Road | right | STUCCO | Barrel Dormer | left | 9.1% | 9.1% | | |
| 2/21/2020 | | 234 Valley Ridge Road | right | STUCCO | Barrel Dormer | right | 14.4% | 14.8% | | |
| 2/21/2020 | | 234 Valley Ridge Road | right | STUCCO | Barrel Dormer | right | 23.1% | 23.0% | | |
| 2/21/2020 | | 234 Valley Ridge Road | rear | STUCCO | kickout | Great Room | 23.7% | 29.7% | 27.7% | |
| 2/24/2020 | | 213 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 8% | 8% | | |
| 2/24/2020 | | 213 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 7% | 7% | | |
| 2/24/2020 | | 213 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 8% | 8% | | |
| 2/24/2020 | | 213 Valley Ridge Road | Front | MSV | kickout | Entry Wall - left side | 9.0% | 9.6% | | |
| 2/24/2020 | | 213 Valley Ridge Road | Front | STUCCO | Garage sep wall | Below Roof | 8.1% | 7.4% | | |
| 2/24/2020 | | 213 Valley Ridge Road | Left | STUCCO | Barrel Dormer | right | 9.0% | 8.6% | 12.6% | |
| 2/24/2020 | | 213 Valley Ridge Road | REAR | STUCCO | kickout | Great Room | 8.4% | 8.5% | | |
| 2/24/2020 | | 206 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 11% | 11% | | |
| 2/24/2020 | | 206 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 9% | 9% | | |
| 2/24/2020 | | 206 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 9% | 9% | | |
| 2/24/2020 | | 206 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 10% | 9% | | |
| 2/24/2020 | | 206 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 7% | 8% | | |
| 2/24/2020 | | 206 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 8.5% | 8.1% | 7.9% | |
| 2/24/2020 | | 206 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 8.3% | 7.9% | | |
| 2/24/2020 | | 206 Valley Ridge Road | front | STUCCO | Barrel Dormer | left | 9.4% | 9.4% | | |
| 2/24/2020 | | 206 Valley Ridge Road | Front | STUCCO | dormer | right | 8.1% | 9.0% | | |
| 2/24/2020 | | 206 Valley Ridge Road | right | STUCCO | Barrel Dormer | right | 9.2% | 9.3% | | |
| 2/24/2020 | | 206 Valley Ridge Road | REAR | STUCCO | kickout | Great Room | 8.4% | 7.4% | | |
| 2/24/2020 | | 218 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 10% | 10% | | |
| 2/24/2020 | | 218 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 8% | 8% | | |
| 2/24/2020 | | 218 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 9% | 10% | | |
| 2/24/2020 | | 218 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 10% | 10% | | |
| 2/24/2020 | | 218 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 9% | 9% | | |
| 2/24/2020 | | 218 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 10.0% | 10.1% | | |
| 2/24/2020 | | 218 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 34.1% | 40.0% | | |
| 2/24/2020 | | 218 Valley Ridge Road | Front | STUCCO | dormer | right | 12.8% | 12.9% | | |
| 2/24/2020 | | 218 Valley Ridge Road | right | STUCCO | Barrel Dormer | right | 9.2% | 9.5% | | |
| 2/24/2020 | | 218 Valley Ridge Road | REAR | STUCCO | kickout | Great Room | 20.7% | 23.3% | 26.9% | |
| 2/24/2020 | | 218 Valley Ridge Road | REAR | STUCCO | Cantilever Balcony | right | 25% | 27% | 35% | |
| 2/24/2020 | | 218 Valley Ridge Road | REAR | STUCCO | Cantilever Balcony | left | 23% | 24% | | |
| 2/24/2020 | | 212 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Left | 11% | 12% | | |
| 2/24/2020 | | 212 Valley Ridge Road | Front | Canamold | Entry Surround - soffit | Right | 13% | 14% | | |
| 2/24/2020 | | 212 Valley Ridge Road | Front | MSV | Entry Surround - over | Left | 12% | 12% | | |
| 2/24/2020 | | 212 Valley Ridge Road | Front | MSV | Entry Surround - over | Center | 10% | 10% | | |
| 2/24/2020 | | 212 Valley Ridge Road | Front | MSV | Entry Surround - over | Right | 13% | 12% | | |

Haverford Reserve, The Carriage Homes
Appendix A - Moisture Probe Testing

April 30, 2020
Page 5 of 5

| Date | Address | Street | Elevation | Material | Location1 | Location2 | dCEI 1 | dCEI 2 | dCEI 3 | Remarks |
|------|---------|--------|-----------|----------|-----------|-----------|--------|--------|--------|---------|
| 2/24/2020 | | 212 Valley Ridge Road | Front | MSV | kickout | Entry Tower - left side | 8.7% | 9.2% | | |
| 2/24/2020 | | 212 Valley Ridge Road | Front | MSV | kickout | Entry Tower - right side | 8.2% | 8.3% | | |
| 2/24/2020 | | 212 Valley Ridge Road | Front | STUCCO | Barrel Dormer | right | 40.0% | 40.0% | | |
| 2/24/2020 | | 212 Valley Ridge Road | Front | STUCCO | Barrel Dormer | right | 24.4% | 25.2% | 35.8% | below previous |
| 2/24/2020 | | 212 Valley Ridge Road | Front | STUCCO | dormer | left | 9.6% | 9.3% | | |
| 2/24/2020 | | 212 Valley Ridge Road | rear | STUCCO | kickout | Great Room | 8.4% | 8.6% | | |
| 2/24/2020 | | 212 Valley Ridge Road | rear | Hardie | Below Deck Ledger | | 9% | 9% | | |
| 2/24/2020 | | 212 Valley Ridge Road | rear | STUCCO | kickout | Unit Sep Wall | 10.7% | 10.4% | | |

**MARCUS & HOFFMAN, P.C.**
**BY: ROBERT J. HOFFMAN, ESQUIRE**
Attorney Identification No. 68743
**BY: JAMES P. McEVILLY, III, ESQUIRE**
Attorney Identification No. 74072
326 West State Street
Media, PA  19063
(610) 565-4660
Attorneys for Plaintiff

---

### IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PA
### CIVIL ACTION - LAW

---

| | | |
|---|---|---|
| HAVERFORD RESERVE COMMUNITY ASSOCIATION | : | |
| Plaintiff | : | No.  CV-2016-011177 |
| v. | : | |
| | : | |
| HAVERFORD RESERVE, LP | : | JURY TRIAL DEMANDED |
| HAVERFORD RESERVE GP, LLC | : | |
| THE GOLDENBERG GROUP, INC. | : | |
| GUIDI HOMES AT HAVERFORD RESERVE, LLC | : | |
| GUIDI HOMES, INC. | : | |
| Defendants | : | |

---

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a true and correct copy of the Second Amended Complaint on

the date indicated below upon the following by First Class Mail, postage prepaid and/or email:

| | |
|---|---|
| Mark Parisi, Esquire<br>White and Williams, LLP<br>One Liberty Place<br>1650 Market Street, Suite 1800<br>Philadelphia, PA 19103-7395<br>(Attorney for Defendants, Guidi Homes at Haverford Reserve, LLC<br>and Guidi Homes, Inc.) | Marc B. Kaplin, Esquire<br>Daniel R. Utain, Esquire<br>Kaplin Stewart Meloff Reiter & Stein, P.C.<br>910 Harvest Drive<br>P.O. Box 3037<br>Blue Bell, PA  19422<br>(Attorney for Defendants, Haverford Reserve, LP, Haverford Reserve GP, LLC,<br>The Goldenberg Group, Inc.) |

Andrew J. Reilly, Esquire
Swartz Campbell, LLC
115 North Jackson Street
Media, PA  19063
(Co-Counsel for Defendants, Haverford
Reserve, LP, Haverford Reserve GP, LLC,
The Goldenberg Group, Inc.)

Michael L. Detweiler, Esquire
620 Freedom Business Center
Suite 300
King of Prussia, PA 19406
(Attorney for Defendants, Guidi Homes at
Haverford Reserve, LLC
and Guidi Homes, Inc.)

Jay D. Branderbit, Esquire
Kent & McBride, P.C.
1617 JFK Boulevard, Suite 1140
Philadelphia, PA 19103
(Attorney for Defendant, Haverford Reserve,
LP)

Carmelo T. Torraca, Esquire
Cooper Levenson, P.A.
1125 Atlantic Avenue- 3rd Floor
Atlantic City, NJ 08401
(Attorney for Defendant, Dreifuss Prebilt Inc.)

Dated: <u>April 12, 2021</u>

ROBERT J. HOFFMAN, ESQUIRE
JAMES P. McEVILLY, III ESQUIRE
*Attorneys for Plaintiff*

2